UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DYNAMIC MACHINE WORKS, INC.<br><br>Plaintiff,<br><br>vs.<br><br>MACHINE & ELECTRICAL<br>CONSULTANTS, INC.,<br><br>Defendant. | Civil Action No. 04-10525-WGY |

**DEFENDANT'S STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1**

Defendant Machine & Electrical Consultants, Inc. ("MECI"), pursuant to Local Rule 56.1, hereby submits this statement of material facts as to which there are genuine issues of fact in opposition to plaintiff's motion for summary judgment, and as to which there is no genuine issue of fact, in support of MECI's cross-motion for summary judgment.[1]

1.   MECI is a Biddeford, Maine distributor of heavy machinery and turning equipment, including precision lathes like the Johnford Lathe. (Affidavit of Norman Crepeau ("Crepeau Aff."), ¶ 2).

2.   Dynamic, located in Billerica, Massachusetts, is a manufacturer of "flowform" equipment, meaning "tubular component, hollow components" such as cylinders. (Deposition of Venanzioro Fonte ("Fonte Dep.") at 6-7.)

---

[1]   Dynamic did not file a separate statement of facts pursuant to Local Rule 56.1, but did set forth numbered statements of fact in its Memorandum in Support of Motion for Summary Judgment. Based on the facts set forth herein, all of which are supported by citations to evidence in the record, MECI specifically disputes each of the numbered paragraphs contained on pages 1 through 4 of Plaintiff's Memorandum In Support of Motion for Summary Judgment.

3.    On or about January 13, 2003, Dynamic agreed to purchase the Johnford Lathe from MECI. (Crepeau Aff. ¶ 3).

4.    The Johnford Lathe was manufactured in Taiwan by Roundtop Machinery Industries, Co., Ltd., doing business as Johnford ("Johnford").  Johnford, based in Taiwan, sells its machine lathes in the United States through Absolute Machine Tools, Inc., located in Lorain, Ohio ("Absolute").  (Crepeau Aff. ¶ ¶ 4, 5; Affidavit of Hayden Wellman  ("Wellman Aff.")  ¶ 2)

5.    The Johnford Lathe was designed to machine lathe tubular cylinders, such as missile capsules, up to 23 feet in length.  (Crepeau Aff. ¶ 6; Fonte Dep. 27-29).  The machine uses angled "guideways" for the lathing of the metal, and thus is described as a "slant bed," in contrast to a "flat bed," where the guideways are not angled.  (Crepeau Aff. ¶ 7; Fonte Dep. 64-65).

6.    Dynamic knew that "there is a convention out in the industry . . . that the slant bed cannot do very accurate work for a long time . . ." before purchasing the Johnford Lathe from MECI. (Fonte Dep. at 66-67).  Dynamic's other machines, including one that Dynamic purchased after purportedly rejecting the Johnford Lathe, also are slant beds.  (*Id*. at 70).

7.    Dynamic and MECI agreed to machine specifications described in a proposal dated January 3, 2003.  (Crepeau Aff. ¶ 8, Ex. B; Fonte Dep. at 44-45, Ex. 3). These specifications were "99 percent" prepared by Johnford's U.S. representative, Absolute.  (Deposition of Norman Crepeau ("Crepeau Dep." at 12).

8.     In addition to the January 3, 2003 proposal, the terms of Dynamic's purchase of the Johnford Lathe are set forth in a Purchase Order from Dynamic dated

January 13, 2003; a letter from MECI dated June 26, 2003; a letter from Dynamic dated July 8, 2003 (the "July Letter Agreement"); and a letter from Dynamic dated December 9, 2003 (the "December Letter Agreement.")  (Crepeau Aff. ¶ 8, Ex. C, D, E, F).

9. Pursuant to the terms of Dynamic's January 13, 2003 Purchase Order, Dynamic agreed to pay $355,000 for the Johnford Lathe, with a down payment of $29,500, a second payment of $148,000 upon delivery and a final third payment of $177,500 after acceptance.  There is no dispute that Dynamic has not paid the second and third payment.  (Crepeau Aff. ¶ 9).

10. Following confirmation of Dynamic's purchase order and receipt of the $29,500 down payment, MECI ordered the Johnford Lathe through Absolute, which in turn placed the order with Johnford in Taiwan.  (Crepeau Aff. ¶ 10).  The production of the Johnford Lathe was expected to take at least 20 weeks, and until delivery MECI provided Dynamic with a rental of a machine lathe.  (Crepeau Aff. ¶ 11; Crepeau Dep. at 22-23).

11. Dynamic and MECI originally agreed to a Commissioning Deadline of May 15, 2003.  (Crepeau Dep. at 23.)  Production of the machine in Taiwan, however, was delayed for reasons-- including the SARS epidemic-- that were beyond the control of MECI.  (Crepeau Aff. ¶ 12).  Accordingly, Dynamic first agreed to extend the original Commissioning Deadline to September 19, 2003, and then agreed to a final Commissioning Deadline of December 19, 2003.  (Crepeau Aff. ¶¶ 13, 27; Crepeau Dep. at 34-35).

12. In June 2003, Johnford informed Absolute and MECI that "the SARS epidemic in Taiwan has caused many unexpected problems for our company.  There has

3

[*sic*] been many restrictions on work and travel and it has been difficult dealing with our subcontractors and getting this done on time. Now that the SARS is just about over, things are finally returning to normal schedule and we expect to have this machine finished and shipped out be middle of Aug[ust]." (Crepeau Dep. at 31-32; Crepeau Aff. ¶ 12, Ex. G).

13. In letters dated June 26 and July 8, 2003 MECI and Dynamic confirmed agreements to continue with the purchase and sale of the Johnford Lathe, despite the unavoidable delays, and agreed to extend the Commissioning Deadline to September 19, 2003. (Crepeau Aff. ¶ 13). The July Letter Agreement also provided as follows:

- The Johnford Lathe would be shipped from Taiwan no later than August 15, 2003.

- Before shipping, Dynamic would receive a factory-performed accuracy test report, including "actual measurements for axis accuracy in positioning and repeatability as well as applicable standards in spindle error limitations."

- The Johnford Lathe was to be capable of meeting certain tasks, including CNC system displays, a 5" diameter boring bar reaching a minimum -.1875" position in the X axis, and conveyor system for removal of chips.

- If the Commissioning Deadline were not met, "MECI will agree to pay Dynamic a fine of $500.00 per day to be deducted from the balance owed to MECI for the cost of the machine."

- Dynamic's second payment (40% of purchase price) of $148,000 would be due upon commissioning, with the balance 30 days from commissioning.

(Crepeau Aff. ¶¶ 13, 15, Ex. E)

14. The parties did not intend that the $500.00 per day incentive charge for delayed commissioning would be liquidated damages if the Johnford Lathe was not commissioned; rather the payment was intended only to be deducted from Dynamic's

4

payments for the Johnford Lathe once commissioning was complete. (Crepeau Aff. ¶ 15).

15.    Commissioning of the Lathe would be complete once it was installed and MECI completed the initial set up. (Crepeau Aff. ¶ 14).

16.    Following agreement on this revised schedule, MECI provided Dynamic with the factory-performed accuracy report on July 29, 2003. (Crepeau Aff. ¶ 16).

17.    Dynamic accepted this report, and on August 15, 2003 Johnford shipped the machine by sea from Taiwan to New York. (Crepeau Aff. ¶¶ 16, 17). MECI delivered the Johnford Lathe by truck from New York to Dynamic on October 9, 2003. (Crepeau Aff. ¶ 18; Crepeau Dep. at 36; Fonte Dep. at 94).

18.    Mr. Crepeau and MECI service technicians were present when the Johnford Lathe was delivered to Dynamic. (Crepeau Dep. at 37). Dynamic then "lagged," or bolted, the machine to its floor, and connected it to air and electrical supply lines. (Deposition of Kevin McGinley ("McGinley Dep.") at 26-7).

19.    Dynamic completed the necessary preliminary work in mid to late October. MECI service technicians working with Dynamic employees then began commissioning the machine. (Crepeau Aff. ¶¶ 19-20).

20.    During the commissioning, MECI hired Oxford Engineering Company, Inc. ("Oxford") to conduct laser testing to determine the horizontal and vertical alignment of the ways over which the cutting tool travels. Jack Grosberg, the President of Oxford, performed the testing during the month of November. (Crepeau Aff. ¶¶ 20, 22).

21. Mr. Grosberg stopped testing and left Dynamic on November 26, 2003. Neither Mr. Grosberg nor anyone else from Oxford performed any work or inspections on the Johnford Lathe since that date. (Crepeau Aff. ¶ 24; Fonte Dep. at 20-21.)

22. After November 26, 2003, MECI service technicians and Dynamic employees continued to make adjustments to the Johnford Lathe to continue to improve its performance and ensure that it would operate within specifications. (Crepeau Aff. ¶ 25; Affidavit of Thomas Giovannani ("Giovannani Aff.") ¶ 6).

23. On December 9, 2003 Dynamic agreed to a revised Commissioning Deadline of December 19, 2003.

24. Ven Fonte, Dynamic's president, confirmed this agreement in writing:

> **As I stated to you early this morning on the telephone, we will grant you one last and final deadline for this machine to be fully and unconditionally commissioned by the close of business day, Friday December 19, 2003.**

(Crepeau Aff. ¶ 27, Ex. F) (emphasis added).

25. MECI correctly believed that the Johnford Lathe would be fully commissioned and would meet all specifications by December 19. (Crepeau Aff. ¶ 28; Giovannani Aff. ¶¶ 8, 9).

26. With no explanation, on December 11 Dynamic informed MECI that it "hereby rejects or revokes any acceptance of the above-referenced lathe." (Crepeau Aff. ¶ 29).

27. In response, Mr. Crepeau immediately contacted Mr. Fonte, and told him "don't do anything. Let me talk to Absolute," so that MECI would be able to complete commissioning by the December 19 deadline. (Fonte Dep. at 129: Crepeau Aff. ¶30).

6

28. Dynamic ignored this instruction. When Mr. Crepeau and personnel from Absolute arrived to continue commissioning the Johnford Lathe on December 15, Dynamic already had dismantled and moved the machine. (Crepeau Aff. ¶ 31; Fonte Dep. at 129-30).

29. As of December 11, 2003, the Johnford Lathe was capable of being aligned and commissioned by December 19. (Crepeau Aff. ¶ 28; Giovannani Aff. ¶ 9; Wellman Aff. ¶¶ 5,6).

30. The machine was not commissioned because Dynamic unreasonably refused to comply with the December 19 deadline, and did not allow MECI the previously agreed upon time period to finish commissioning. (Crepeau Dep. at 42-3; 68-9; 75-76; Crepeau Aff. ¶ 32; Giovannani Aff. ¶¶ 8, 9; Wellman Aff. ¶ 6).

31. Dynamic had originally purchased the Johnford Lathe "because on the horizon there was the possibility of getting [a contract for] the Tomahawk missile launch capsule." (Fonte Dep. at 28.)

32. In order to manufacture the missile capsules, Dynamic required a machine, such as the Johnford Lathe, that was capable of handling a 21-foot cylinder. (*Id.* at 32).

33. Dynamic never entered into a contract to produce the Tomahawk missile capsule and is "doing quite well without it." Dynamic "kind of pulled back with that" because "the price of aluminum has gone up some seven or eight hundred dollars and Raytheon would like us to absorb some of that and we said no." (*Id*. at 29, 32, 39).

34. Since purportedly rejecting the Johnford Lathe, Dynamic has acquired two new lathes, but neither is capable of meeting requirements for the Tomahawk missile capsule contract because they are only 120-inch machines. (*Id*. at 32, 35-40).

35. Dynamic is no longer pursuing the Tomahawk missile capsule contract.

(*Id*. at 32, 35-40).

                        Respectfully submitted,

                        MACHINE & ELECTRICAL
                        CONSULTANTS, INC.

                        by its attorneys,

                        /s/ Jeffrey D. Clements

                        _____
                        Jeffrey D. Clements, BBO #632544
                        Clements & Clements, LLP
                        50 Federal Street
                        Boston, MA 02110
                        (617) 451-1802

COUNSEL:

Keith R. Jacques
Smith Elliot Smith & Garmey, P.A.
199 Main Street
P.O. Box 1179
Saco, ME 04072

DATED: October 12, 2004.

**CERTIFICATE OF SERVICE**

I, Jeffrey D. Clements, hereby certify that a copy of the foregoing document was served by electronic filing to counsel of record for the plaintiff on October 12, 2004.

                        /s/ Jeffrey D. Clements

                        _____