## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DYNAMIC MACHINE WORKS, INC.

        Plaintiff,

vs.

MACHINE & ELECTRICAL
CONSULTANTS, INC.,

        Defendant.

Civil Action No. 04-10525-WGY

### DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.      INTRODUCTION

This action concerns the purchase by Plaintiff Dynamic Machine Works, Inc. ("Dynamic") from Defendant Machine & Electrical Consultants, Inc. ("MECI") of a machine lathe, a Johnford HT-275G Heavy Duty Turning Center (the "Johnford Lathe" or the "machine"). Dynamic seeks to avoid paying for the Johnford Lathe, and to revoke acceptance and recover damages, maintaining that MECI did not meet what Dynamic characterizes as "the Commissioning Deadline." (*See* Complaint, ¶¶ 3- 13). In its counterclaim, MECI claims that Dynamic is obligated to pay for the Johnford Lathe because Dynamic wrongfully rejected the machine before the Commissioning Deadline and prevented MECI from completing the commissioning process. (*See* Answer, ¶ 21; Counterclaim, ¶¶ 1-10).

Dynamic asserts that as of December 11, 2003 the Johnford Lathe did not meet the specifications agreed to by the parties, and that Dynamic rejected the machine under

the Uniform Commercial Code ("U.C.C."), §2-601, or revoked its acceptance of the

Johnford Lathe under § 2-608 of the U.C.C. (Plaintiff's Memorandum in Support of

Motion for Summary Judgment ("Pl. Mem.") at 5-6). Dynamic also demands summary

judgment under Mass. Gen. Laws ch. 93A because it claims MECI "willfully evaded its

known contractual obligations…" (Pl. Mem. at 8).

Dynamic's motion should be denied because MECI complied with the parties'

agreement, and Dynamic improperly rejected the Johnford Lathe: (1) Dynamic's alleged

rejection or revocation of acceptance on December 11, 2003 violated its own undisputed

commitment to MECI that the Commissioning Deadline was extended to "the close of

business day, Friday, December 19, 2003;" (2) MECI would have commissioned the

Johnford Lathe by December 19 but was prevented from doing so by Dynamic; (3)

Dynamic's inadmissible assertion of opinion about the Johnford Lathe's ability to hold

positional accuracy cannot support summary judgment, and in any case is disputed with

admissible evidence to the contrary; and (4) issues of fact concerning Dynamic's own

responsibility for the machine's failure to be commissioned preclude summary judgment.

As to Dynamic's claim under Chapter 93A, Dynamic does not even allege an

unfair, deceptive or bad faith act by MECI, and certainly offers no evidence of such an

act. MECI, therefore, moves for partial summary judgment dismissing Dynamic's claim

under chapter 93A. MECI also moves for partial summary judgment ruling that Dynamic

is not entitled to recover punitive damages or penalties on its breach of contract claim as

a matter of law, and, in particular, that Dynamic is not entitled to refuse to pay for the

Johnford Lathe, and at the same time recover the $500 per day penalty that the parties

agreed to only in the event of delayed commissioning of the machine.

In support of its cross-motion for partial summary judgment, and in opposition to Dynamic's motion for summary judgment, MECI submits affidavits of the Treasurer of MECI, Norman Crepeau; the Vice President of Absolute Machine Tools, Inc., Hayden Wellman; a service technician with MECI, Thomas Giovannani; and the deposition testimony of Mr. Crepeau, Venanzioro Fonte, and Kevin McGinley.

## II.    STATEMENT OF FACTS

MECI is a Biddeford, Maine distributor of heavy machinery and turning equipment, including precision lathes like the Johnford Lathe.  (Affidavit of Norman Crepeau ("Crepeau Aff."), ¶ 2).  Dynamic, located in Billerica, Massachusetts, is a manufacturer of "flowform" equipment, meaning "tubular component, hollow components" such as cylinders.   (Deposition of Venanzioro Fonte ("Fonte Dep.") at 6-7.)

On or about January 13, 2003, Dynamic agreed to purchase the Johnford Lathe from MECI. (Crepeau Aff. ¶ 3).  The Johnford Lathe was manufactured in Taiwan by Roundtop Machinery Industries, Co., Ltd., doing business as Johnford ("Johnford").  Johnford, based in Taiwan, sells its machine lathes in the United States through Absolute Machine Tools, Inc., located in Lorain, Ohio ("Absolute").  (Crepeau Aff. ¶ ¶ 4, 5; (Affidavit of  Hayden Wellman  ("Wellman Aff.")  ¶ 2)

The Johnford Lathe was designed to machine lathe tubular cylinders, such as missile capsules, up to 23 feet in length.  (Crepeau Aff. ¶ 6; Fonte Dep. 27-29).  The machine uses angled "guideways" for the lathing of the metal, and thus is described as a "slant bed," in contrast to a "flat bed," where the guideways are not angled.  (Crepeau Aff. ¶ 7; Fonte Dep. 64-65).  A photograph of the Johnford Lathe is attached to the Crepeau Affidavit as Exhibit A.  Dynamic contends that "there is a convention out in the

industry . . . that the slant bed cannot do very accurate work for a long time . . .," but admits that it knew this <u>before</u> purchasing the Johnford Lathe from MECI. (Fonte Dep. at 66-67). Dynamic's other machines, including one that Dynamic purchased after purportedly rejecting the Johnford Lathe, also are slant beds. (*Id*. at 70).

Dynamic and MECI agreed to machine specifications described in a proposal dated January 3, 2003. (Crepeau Aff. ¶ 8, Ex. B; Fonte Dep. at 44-45, Ex. 3). These specifications were "99 percent" prepared by Johnford's U.S. representative, Absolute. (Deposition of Norman Crepeau ("Crepeau Dep." at 12). In addition to the January 3, 2003 proposal, the terms of Dynamic's purchase of the Johnford Lathe are set forth in a Purchase Order from Dynamic dated January 13, 2003; a letter from MECI dated June 26, 2003; a letter from Dynamic dated July 8, 2003 (the "July Letter Agreement"); and a letter from Dynamic dated December 9, 2003 (the "December Letter Agreement.") (Crepeau Aff. ¶ 8, Ex. C, D, E, F). Pursuant to the terms of Dynamic's January 13, 2003 Purchase Order, Dynamic agreed to pay $355,000 for the Johnford Lathe, with a down payment of $29,500, a second payment of $148,000 upon delivery and a final third payment of $177,500 after acceptance. There is no dispute that Dynamic has not paid the second and third payment. (Crepeau Aff. ¶ 9).

Following confirmation of Dynamic's purchase order and receipt of the $29,500 down payment, MECI ordered the Johnford Lathe through Absolute, which in turn placed the order with Johnford in Taiwan. (Crepeau Aff. ¶ 10). The production of the Johnford Lathe was expected to take at least 20 weeks, and until delivery MECI provided Dynamic with a rental of a machine lathe. (Crepeau Aff. ¶ 11; Crepeau Dep. at 22-23).

Dynamic and MECI originally agreed to a Commissioning Deadline of May 15, 2003.  (Crepeau Dep. at 23.)  Production of the machine in Taiwan, however, was delayed for reasons-- including the SARS epidemic-- that were beyond the control of MECI.  (Crepeau Aff. ¶ 12).  Accordingly, Dynamic first agreed to extend the original Commissioning Deadline to September 19, 2003, and then agreed to a final Commissioning Deadline of December 19, 2003.  (Crepeau Aff. ¶¶ 13, 27; Crepeau Dep. at 34-35).

Through the production process, MECI informed Dynamic of developments in Taiwan and provided copies of Johnford's communications concerning the delays to Dynamic.  In June 2003, Johnford informed Absolute and MECI that "the SARS epidemic in Taiwan has caused many unexpected problems for our company.  There has [*sic*] been many restrictions on work and travel and it has been difficult dealing with our subcontractors and getting this done on time.  Now that the SARS is just about over, things are finally returning to normal schedule and we expect to have this machine finished and shipped out be middle of Aug[ust]."  (Crepeau Dep. at 31-32; Crepeau Aff. ¶ 12, Ex. G).

In letters dated June 26 and July 8, 2003 MECI and Dynamic confirmed agreements to continue with the purchase and sale of the Johnford Lathe, despite the unavoidable delays, and agreed to extend the Commissioning Deadline to September 19, 2003.  (Crepeau Aff. ¶ 13).  The July Letter Agreement also provided as follows:

- The Johnford Lathe would be shipped from Taiwan no later than August 15, 2003.

- Before shipping, Dynamic would receive a factory-performed accuracy test report, including "actual measurements for axis accuracy in positioning and repeatability as well as applicable standards in spindle error limitations."

- The Johnford Lathe was to be capable of meeting certain tasks, including CNC system displays, a 5" diameter boring bar reaching a minimum -.1875" position in the X axis, and conveyor system for removal of chips.

- If the Commissioning Deadline were not met, "MECI will agree to pay Dynamic a fine of $500.00 per day to be deducted from the balance owed to MECI for the cost of the machine."

- Dynamic's second payment (40% of purchase price) of $148,000 would be due upon commissioning, with the balance 30 days from commissioning.

(Crepeau Aff. ¶¶ 13, 15, Ex. E)

The parties did not intend that the $500.00 per day penalty for delayed commissioning would be liquidated damages if the Johnford Lathe was not commissioned. Instead, the payment was intended only to be deducted from Dynamic's payments for the Johnford Lathe once commissioning was complete. (Crepeau Aff. ¶ 15). Commissioning of the Lathe would be complete once it was installed and MECI completed the initial set up. (Crepeau Aff. ¶ 14).

Following agreement on this revised schedule, MECI provided Dynamic with the factory-performed accuracy report on July 29, 2003. (Crepeau Aff. ¶ 16). Dynamic accepted this report, and on August 15, 2003 Johnford shipped the machine by sea from Taiwan to New York. (Crepeau Aff. ¶¶ 16, 17). MECI delivered the Johnford Lathe by truck from New York to Dynamic on October 9, 2003. (Crepeau Aff. ¶ 18; Crepeau Dep. at 36; Fonte Dep. at 94). Mr. Crepeau and MECI service technicians were present when the Johnford Lathe was delivered to Dynamic. (Crepeau Dep. at 37). Dynamic then "lagged," or bolted, the machine to its floor, and connected it to air and electrical supply lines. (Deposition of Kevin McGinley ("McGinley Dep.") at 26-7).

6

Dynamic completed the necessary preliminary work in mid to late October.
MECI service technicians working with Dynamic employees then began commissioning
the machine. During the commissioning, MECI hired Oxford Engineering Company, Inc.
("Oxford") to conduct laser testing to determine the horizontal and vertical alignment of
the ways over which the cutting tool travels.  Jack Grosberg, the President of Oxford,
performed the testing during the month of November.  (Crepeau Aff. ¶¶ 20, 22).   Mr.
Grosberg stopped testing and left Dynamic on November 26, 2003.   Neither Mr.
Grosberg nor anyone else from Oxford  performed any work or inspections on the
Johnford Lathe since that date.  (Crepeau Aff. ¶ 24; Fonte Dep. at 20-21.)

After November 26, 2003, MECI service technicians and Dynamic employees
continued to make adjustments to the Johnford lathe to continue to improve its
performance and ensure that it would operate within specifications.   (Crepeau Aff. ¶ 25;
Affidavit of Thomas Giovannani ("Giovannani Aff.") ¶ 6).  On December 9, 2003
Dynamic agreed to a revised Commissioning Deadline of December 19, 2003.  Ven
Fonte, Dynamic's president, confirmed this agreement in writing:

> **As I stated to you early this morning on the telephone, we will grant you one
> last and final deadline for this machine to be fully and unconditionally
> commissioned by the close of business day, Friday December 19, 2003.**

(Crepeau Aff. ¶ 27, Ex. F) (emphasis added).

Accordingly, MECI continued to make minor adjustments to the machine and
agreed to perform a test cut on the machine.  MECI correctly believed that the Johnford
Lathe would be fully commissioned and would meet all specifications by December 19.
(Crepeau Aff. ¶ 28; Giovannani Aff. ¶¶ 8, 9).  With no explanation, however, on
December 11 Dynamic informed MECI that it "hereby rejects or revokes any acceptance

of the above-referenced lathe." (Crepeau Aff. ¶ 29).   In response, Mr. Crepeau

immediately contacted Mr. Fonte, and told him "don't do anything.  Let me talk to

Absolute," so that MECI would be able to complete commissioning by the December 19

deadline.  (Fonte Dep. at 129: Crepeau Aff. ¶30).  Dynamic ignored this instruction.

When Mr. Crepeau and personnel from Absolute arrived to continue commissioning the

Johnford Lathe on December 15, Dynamic already had dismantled and moved the

machine.  (Crepeau Aff. ¶ 31;  Fonte Dep. at 129-30).

  As of December 11, 2003, the Johnford Lathe was capable of being aligned and

commissioned by December 19**.**  (Crepeau Aff. ¶ 28; Giovannani Aff. ¶ 9; Wellman  Aff.

¶¶ 5,6).   The machine was not commissioned because Dynamic unreasonably refused to

comply with the December 19 deadline, and did not allow MECI the previously agreed

upon time period to finish commissioning.  (Crepeau Dep. at 42-3; 68-9; 75-76; Crepeau

Aff. ¶ 32; Giovannani Aff. ¶¶ 8, 9; Wellman Aff. ¶ 6).

  Dynamic's precipitous "rejection" appears to have been based on its change of

heart about its own business objectives.  Dynamic had originally purchased the Johnford

Lathe "because on the horizon there was the possibility of getting [a contract for] the

Tomahawk missile launch capsule."  (Fonte Dep. at 28.)  In order to manufacture the

missile capsules, Dynamic required a machine, such as the Johnford Lathe, that was

capable of handling a 21-foot cylinder.  (*Id.* at 32).  Dynamic, however, never actually

entered into a contract to produce the Tomahawk missile capsule, and "kind of pulled

back with that" because "the price of aluminum has gone up some seven or eight hundred

dollars and Raytheon would like us to absorb some of that and we said no." (*Id.* at 29,

32).[1]  Since purportedly rejecting the Johnford Lathe, Dynamic has acquired two new lathes, but neither is capable of meeting requirements for the Tomahawk missile capsule contract because they are only 120-inch machines.  (*Id*. at 32, 35-40).  Dynamic is no longer pursuing the Tomahawk missile capsule contract.  (*Id*. at 32, 35-40).

### III.    ARGUMENT

**A.    Material Issues of Fact About the Compliance of the Johnford Lathe With Specifications Preclude Summary Judgment.**

**1.  Dynamic Wrongfully Rejected the Johnford Lathe Before the Commissioning Deadline Had Expired.**

Dynamic's argument that it properly rejected the Johnford Lathe on December 11, 2003, two days after agreeing to extend the Commissioning Deadline to December 19, fails for at least two independent reasons.  First, a buyer cannot repudiate a contract before the time for the seller's performance has run.  Second, a seller is entitled to a reasonable opportunity to cure defective goods. Dynamic's premature refusal to pay for the machine or permit further commissioning improperly denied that opportunity, and constitutes an improper rejection under the U.C.C. [2]

---

[1]      While Mr. Fonte also maintains that "we kind of lost momentum when the machine no longer became available to do what we wanted to do," he admits that he is not interested in pursuing the Tomahawk contract:  Dynamic is working "24 hours a day for six days since August to this March . . . So Tomahawk, yeah, it's very interesting and so on but we are doing quite well without it."  (*Id*. at 39.)

[2]      For purposes of addressing Dynamic's motion for summary judgment, MECI accepts Dynamic's assumption that the U.C.C. governs the issues raised in the motion, but reserves its right to contest that assumption at trial, as the agreements between the parties, particularly the July and December Letter Agreements concerning commissioning, may constitute agreements for services to repair the machine rather than for goods.  *See* Mass. Gen. Laws ch. 106, §2-102 (U.C.C. applies to sales of goods only); *New England Power Co. v. Riley Stoker Corp.*, 20 Mass.App.Ct. 25, 34-35, 477 N.E.2d 1054, 1060-61, *rev. denied*, 395 Mass. 1103, 481 N.E.2d 197 (1985) (agreement settling dispute over defective boilers already delivered is an agreement for services, not for the sale of goods); *ITT Corporation v. LTX Corporation*, 926 F.2d 1258, 1267 (1st Cir. 1991) ("We think it likely that a Massachusetts court would apply *Riley Stoker* to hold" that a letter agreement concerning disputed delivery of cable assemblies "was not a contract for the sale of goods.")

A buyer may reject goods that "fail in any respect to conform to the contract." Mass. Gen. Laws ch. 106, § 2-601.  This right of rejection may only be exercised in the manner prescribed by the U.C.C., and is construed in light of other provisions that limit the right of rejection.  *See* §§ 2-508 (right to cure defects); 2-606 (failure to make effective rejection constitutes acceptance); 2-608 (notice of revocation of acceptance must be timely); 2-602 (rejection must be timely); 2-609 (adequate assurance of performance); 2-610 (anticipatory repudiation).  A buyer may not properly reject goods by unilaterally deeming the goods to be defective, while refusing to accept a reasonable offer to cure any alleged defect.  *See Mass. Gen. Laws* ch. 106, § 2-508.  *Cf. Midwest Precision Services, Inc. v. PTM Industries, Inc.,* 887 F.2d 1128 (1st Cir. 1989) (district court concluded that buyer wrongfully rejected machine after complaining to seller that it was damaged, and rejecting all seller's proposals to cure any damage).

Here, Dynamic's purported rejection contravened both its agreement with MECI and MECI's rights under the U.C.C.  Dynamic agreed in writing to a December 19 Commissioning Deadline;  MECI would have completed commissioning by that date had it been allowed to continue its work; Dynamic improperly terminated the process on December 11, over one week before the Commissioning Deadline; and when MECI and Absolute arrived on December 15 to continue the commissioning process, they found that Dynamic had disconnected, disabled, and moved the Johnford Lathe, preventing MECI from completing its performance of the contract.   (Crepeau Aff. ¶ 32; Giovannani Aff. ¶¶ 8, 9; Wellman Aff. ¶¶ 5, 6; Crepeau Dep. at 42-3; 68-9; 75-76; Fonte Dep. at 129-30).

The December Letter Agreement modified the Commissioning Deadline under the contract between Dynamic and MECI.  *See* Mass. Gen. Laws ch. 106, §2-209(1) ("An

agreement modifying a contract within this Article needs no consideration to be binding.")  Dynamic's purported rejection before the December 19 Commissioning Deadline, therefore, constituted a repudiation of the agreement before MECI's performance was due.  Moreover, even if Dynamic's confirmation of the December 19 deadline is considered a mere recognition of MECI's "last chance" for curing defects, rather than as a contractual extension of the Commissioning Deadline, MECI was entitled to use that last chance to commission the Johnford Lathe.  *See* Mass. Gen. Laws ch. 106, § 2-508.[3]  Whether MECI's time for performance had not yet run by December 11 because the parties had modified the contract to extend the Commissioning Deadline, or whether MECI was in the process of curing alleged defects in the machine on that date, Dynamic's purported rejection was improper.

Dynamic's motion takes two dubious approaches to avoid this result.  Neither supports summary judgment in this case.  First, Dynamic simply omits any reference whatsoever to the December Letter Agreement.  (*See* Fonte Aff. and Pl. Mem.)  Dynamic's case would be stronger if the December Letter Agreement extending the Commissioning Deadline to December 19 simply did not exist, but ignoring that agreement does not make it go away.

Second, Dynamic offers a 1½-page affidavit of Jack Grosberg, suggesting without foundation that MECI could not have commissioned the Johnford Lathe at any time.

---

[3]    Mass. Gen. Laws ch. 106, §2-508 provides:

(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

After the briefest of preliminaries, Mr. Grosberg simply declares "in my opinion, the Johnford Lathe was not capable of, nor could it be made to hold positional accuracy of +/- .0005" over the entire stroke of the machine."  (*See* Affidavit of Jack Grosberg ("Grosberg Aff."), ¶ 8).  The Grosberg Affidavit is not admissible evidence that could possibly support, let alone require as undisputed fact, the conclusion that it asserts. Moreover, that affidavit is contradicted by substantial evidence that the Johnford Lathe would have been commissioned had MECI had the opportunity to complete the project.

Mr. Grosberg's opinion testimony lacks foundation, is not admissible, and cannot support summary judgment for Dynamic.  *See* Fed. R. Civ. P. 56(e) (affidavits must "on personal knowledge . . . set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.") Mr. Grosberg's opinion is not admissible expert testimony under Federal Rule of Evidence 702 because Dynamic has failed to satisfy the procedural and substantive foundations for consideration of such expert testimony.  Dynamic has not designated Mr. Grosberg, or anyone else, as an expert, nor has Dynamic made any expert disclosure as required by Fed. R. Civ. P. 26(a)(2) and this Court's Scheduling Order.  Further, Dynamic has failed to demonstrate in Mr. Grosberg's affidavit or elsewhere that his opinion about the Johnford Lathe "rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993).

Mr. Grosberg's eight-paragraph affidavit provides virtually no explanation of the basis for his opinion, nor any description of when he observed the Johnford Lathe. The affidavit does not begin to show that Mr. Grosberg has the expertise to support his opinion about the Johnford Lathe.  For example, the totality of information offered about

Mr. Grosberg's education, experience, or other sources of expertise is as follows: "I have been engaged in various manufacturing engineering capacities for approximately forty (40) years. My primary experience for the past twenty-three (23) years has been the precision optical and laser calibration of linear displacement of machinery." Whatever "various manufacturing engineering capacities," or "precision optical and laser calibration of linear displacement of machinery," means (and Mr. Grosberg does not say), the affidavit says nothing about how Mr. Grosberg is capable of opining about the Johnford Lathe, beyond his involvement in measurements of "positional accuracy."

Nor does Mr. Grosberg's affidavit contain any foundation for drawing inferences about the condition of the Johnford Lathe on December 9 (when Dynamic agreed to extend the Commissioning Deadline) or December 11 (when Dynamic attempted to reject the machine). Mr. Grosberg had no involvement in commissioning efforts after November 26, 2003, almost two weeks before Dynamic agreed to the December 19 Commissioning Deadline, a two-week period in which work on the machine continued. (Crepeau Aff. ¶ 24; Giovannani Aff. ¶ 5). Dynamic has failed to show Mr. Grosberg's affidavit is admissible expert testimony.[4]

Nor is Mr. Grosberg's affidavit admissible opinion evidence under Federal Rule of Evidence 701. Instead, the affidavit contains exactly the kind of conclusory opinion that is regularly excluded from consideration at the summary judgment stage and at trial. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 346-7 (1st Cir.

---

[4] To the extent that Mr. Grosberg is proffered as an expert, notwithstanding Dynamic's failure to comply with its discovery and expert disclosure obligations, MECI is entitled to question Mr. Grosberg about his opinion, and to counter-designate its own expert. MECI's deadline for counter-designations of experts is December 4, 2004. Dynamic's motion for summary judgment should be denied under Fed. R. Civ. P. 56(f), in addition to all of the reasons stated herein

1995) ("conclusory lay opinions" about defendant's alleged racial animus "were properly excluded" from consideration at summary judgment stage because "the depositions disclosed no evidentiary foundation for an inference of *racial* animus.") (emphasis in original), *citing Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624 (1st Cir. 1988) (lay opinion testimony, which does little more than tell the jury what result to reach, should not be admitted). *See also Bandera v. City of Quincy*, 344 F.3d 47, 53 (1st Cir. 2003) ("wholly inappropriate opinion testimony" should have been excluded as witness "was not qualified as an expert on anything and her assessments were not the limited kind of opinion testimony deemed helpful to a jury" under Rule 701).

Even if Mr. Grosberg's opinion about the machine was entitled to consideration, that opinion is contradicted by admissible evidence proffered by MECI, and is not a basis for summary judgment.   Mr. Grosberg did not determine positional accuracy and other specifications agreed upon by the parties.   Rather, his testing was limited to determining the horizontal and vertical alignment of the ways over which the cutting tool traveled. (Crepeau Aff. ¶¶ 22, 23).   Additionally, MECI continued the commissioning process after November 26, when Mr. Grosberg departed, and would have completed that process by December 19.  (Crepeau Dep. at 42-3; 68-9; 75-76; Crepeau Aff. ¶ 32; Giovannani Aff. ¶¶ 8, 9; Wellman Aff. ¶ 6)

Accordingly, Dynamic is not entitled to summary judgment because it did not properly reject the Johnford Lathe.  Dynamic's repudiation of the contract on December 11 was in breach of the agreed Commissioning Deadline of December 19, and entitled

MECI to suspend its own performance and resort to any remedy for breach of the agreement under the U.C.C. § 2-610.[5]

### 2. Dynamic Was Not Entitled To Revoke Its Acceptance of the Johnford Lathe Before the Commissioning Date of December 19, 2003.

"Under the UCC, a buyer is deemed to have accepted goods when, after a reasonable opportunity to inspect them, he signifies to the seller that he will retain them in spite of their non-conformity, or fails to reject them; or when he performs any act inconsistent with the seller's ownership of the goods." *Novacore Technologies, Inc. v. GST Communications Corporation, 20 F. Supp. 2d 169, 183* (D.Mass. 1998). Even where a seller may be liable for breach of warranty, a buyer who uses the good, fails to reject it, or acts in a manner inconsistent with the seller's ownership accepts the good and is liable for the contract price. *See Southworth Machinery Co., Inc. v. F/V Corey Pride*, 994 F.2d 37, 40-1 (1st Cir. 1993) (where seller of boat engine breached warranty where defect caused fire, buyer remains liable for contract price where it used the engine).

Here, Dynamic received the factory-test report as required by the July Letter Agreement, and the Johnford Lathe was shipped on or before August 15, 2003. Dynamic accepted delivery of the machine, connected it to electrical and air supplies, and bolted it to Dynamic's floor. Commissioning then proceeded until December 11, when Dynamic refused to allow MECI to continue the process, unilaterally removed the Johnford Lathe

---

[5] Mass. Gen. Laws ch. 106, § 2-610 provides:
When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
(a) for a commercially reasonable time await performance by the repudiating party; or
(b) resort to any remedy for breach (section 2-703 or section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (section 2-704).

from its power source, and dismantled the machine's settings and alignments a week before the December 19 deadline.

By doing so, Dynamic disregarded MECI's instruction "not to do anything" until Mr. Crepeau and Mr. Wellman from Absolute were able to inspect and continue commissioning the machine on December 15.  (Crepeau Aff. ¶¶ 30, 31).  Dynamic accepted the Johnford Lathe under § 2-606 of the U.C.C. on December 11, if not sooner, when it ignored MECI's instructions and acted in a manner inconsistent with MECI's ownership of the machine.  *See Industria de Calcados Martini Ltda. v. Maxwell Shoe Co., Inc.,* 36 Mass.App.Ct. 268, 273, 630 N.E.2d 299, 302 (1994) (buyer accepted defective shoes where it "acted on its own in sending the shoes for refinishing and then selling them and retaining the proceeds for its own benefit."), *distinguishing Delano Growers' Coop. Winery v. Supreme Wine Co.,* 393 Mass. 666, 678-681, 473 N.E.2d 1066 (1985) (no acceptance where buyer made valid rejection of defective wine, and reprocessed it at the express instruction of seller).

Dynamic argues that even if it accepted the Johnford Lathe, it revoked that acceptance.  *See* Mass. Gen. Laws ch. 106, § 2-608; *Novacore Technologies*, 20 F. Supp. 2d at 184 (buyer has burden of proving effective revocation).   Dynamic's argument is only possible-- and even then not meritorious-- if one accepts Dynamic's premise that the December 19 deadline agreed to in writing by Dynamic does not exist.  This premise, however, cannot be accepted because it is contrary to the facts and evidence.

**B.    Dynamic is Not Entitled, as a Matter of Law, to Both Reject the Johnford Lathe, and Seek A Penalty of $500 per day.**

In the July Letter Agreement, Dynamic and MECI agreed to a Commissioning Deadline of September 19, 2003, and to a penalty that would apply only if Dynamic

accepted and paid for the Johnford Lathe after that date. [6]   This provision does not permit

recovery of a penalty if Dynamic does not accept and pay for the Johnford Lathe:

> Beginning with September 20, 2003 and continuing for every calendar day
> thereafter **until complete commissioning of the machine is achieved**, MECI will
> agree to pay Dynamic a fine of $500.00 per day **to be deducted from the
> balance owed to M&E for the cost of the machine**.

(Crepeau Aff. Ex. E, at 2.) (emphasis added).

Dynamic's effort to transform this language into a punitive damages provision

contradicts fundamental principles of contract construction.  *See Midwest Precision*

*Services, Inc. v. PTM Industries, Inc.,* 887 F.2d 1128 (1st Cir. 1989) ("First, contracts,

where possible, are to be construed to reach a sensible result.  Second, in a case of doubt,

a contract provision is to be construed against the party that drew it . . .") (citations and

internal quotations omitted).  The July Letter Agreement cannot reasonably be construed

to mean that MECI agreed to pay a daily penalty even where Dynamic rejected the

Johnford Lathe and repudiated its own obligation to pay MECI.

First, the language of the July Letter Agreement, drafted by Dynamic, states that

the daily penalty was to be deducted from Dynamic's future payments to MECI.

(Crepeau Aff. Ex. E).  Construing this language to mean what the parties did not intend--

that Dynamic was entitled both to reject the Johnford Lathe <u>and</u> to collect $500.00 per

day for each day beyond the Commissioning Deadline-- would not be "a sensible result"

because it would be contrary to public policy.  *See Space Master Intern., Inc. v. City of*

*Worcester*, 940 F.2d 16, 17 (1st Cir. 1991) ("Liquidated damages must compensate for

loss rather than punish for breach. . ." (citations and internal quotations omitted);

---

[6]    Dynamic agreed to extend the September 19, 2003 Commissioning Deadline to December 19, 2003 in the December Letter Agreement.  (Crepeau Aff. ¶ 27).

*Ellenwood v. Exxon Shipping*, 980 F.2d 1270, 1283 (1st Cir. 1993) (punitive damages not recoverable in contract action), *citing Restatement (Second) of Contracts*, §355 (1981).

MECI respectfully requests that summary judgment be entered against Dynamic, holding that it is not entitled as a matter of law both to reject the Johnford Lathe and to collect a $500 per day penalty. In any event, Dynamic's motion for summary judgment should be denied because MECI will demonstrate at trial that the penalty clause does not apply if the Johnford Lathe was not commissioned, and is otherwise unenforceable as a penalty. *See Honey Dew Associates v. M & K Food Corp.*, 241 F.3d 23, 28 (1st Cir. 2001) ("validity of a liquidated damages clause is usually a fact-specific exercise").

### C.    MECI is Entitled to Summary Judgment on Dynamic's Chapter 93A Claim Because Dynamic Does Not Allege or Cite Any Evidence of Any Coercive, Unfair or Deceptive Act of MECI.

Dynamic asserts that MECI "willfully evaded its known contractual obligations to Dynamic," and, therefore, violated Mass. Gen. Laws ch. 93A, §§ 2 and 11. *See* Pl. Mem. at 8. As the record shows, this assertion is nonsense. Even if it were true, that allegation is insufficient to support a claim under Chapter 93A as a matter of law. Accordingly, MECI requests that summary judgment enter against Dynamic on that claim.

In order to prevail on its claim under Chapter 93A, Dynamic must prove that MECI engaged in an "an unfair or deceptive act. . . ." A breach of contract, without more, does not amount to an unfair or deceptive act. *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 226 (1992) (in the absence of "an extortionate quality that gives it the rancid flavor of unfairness" even a deliberate failure to perform contractual obligations "does not present an occasion for invocation of ch. 93A remedies.")[7] Chapter 93A only

---

[7]    While the Supreme Judicial Court cautions against substituting phrases such as "rancid flavor" or "level of rascality" for thorough analysis, it continues to reinforce the requirement that a Chapter 93A claim

applies in the context of contractual non-performance when a breach of contract is coupled with intentional misrepresentations or extortionate activity. *See Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 475, 583 N.E.2d 806 (1991) ("knowing use of a pretext to coerce"); *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 51 (1st Cir.1998) (repeated and intentional misrepresentations).

Here, Dynamic does not even allege a coercive, unfair or deceptive act, let alone provide any evidence of one. Dynamic's Complaint merely describes terms of agreement between the parties, and the alleged failure by MECI to commission the Johnford Lathe. *See* Complaint ¶¶ 3-13. The only allegation concerning MECI's conduct states: "To date, MECI has not returned Dynamic's down payment, has not paid the $500.00 day penalty, and has not provided instructions or indemnity all as requested." *Id.* ¶ 16. Count IV of Dynamic's Complaint, containing the chapter 93A claim, merely recites statutory elements of the cause of action. *Id.* ¶¶ 35-41. Nowhere does Dynamic allege any wrongful, unfair, or bad faith act by MECI.

Dynamic's motion adds nothing to these inadequate allegations, and confirms that Chapter 93A has no place in this contractual dispute. Neither the Fonte Affidavit nor the Grosberg Affidavit contain any suggestion that MECI ever made a false or deceptive statement, attempted to gain any leverage or in any way acted unfairly. The <u>only</u>

---

must have more than the breach, whether intentional or not, of a contract. *See Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 42, 648 N.E.2d 435 (1995) ("We view as uninstructive phrases such as "level of rascality' and "rancid flavor of unfairness" in deciding questions of unfairness under G.L. c. 93A," and instead "focus on the nature of challenged conduct and on the purpose and effect of that conduct. . . .") (citations omitted). *See also Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass.App.Ct. 416, 418, 671 N.E.2d 963, 965 (1996) ("Mere resistance to a just claim is not the stuff of c. 93A."); *Quaker State Oil Ref. Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989) (merely withholding funds and countersuing does not give rise to liability under chapter 93A); *Boston Pilots v. Motor Vessel Midnight Gambler*, 357 F.3d 129 (1st Cir. 2004) (refusal to pay, without more, is not a violation of Chapter 93A).

evidence cited by Dynamic to support its Chapter 93A claim is Mr. Crepeau's belief that he did not believe MECI breached its obligations.  (Pl. Mem. at 9.) ("When asked why MECI had not returned Dynamic's downpayment, its princip[al] Norm Crepeau['s], only response was, "I don't know."  Its justification for not accepting return of the equipment is "I don't want the machine back" and "I want him to buy it.").[8]  At worst, Dynamic maintains that MECI is in breach of the agreement between the parties.  Accordingly, summary judgment should enter against Dynamic on Count IV of its Complaint.

### IV.    CONCLUSION

For the reasons stated herein, MECI respectfully requests that Dynamic's motion for summary judgment be denied, and that summary judgment enter against Dynamic on Count IV of its Complaint, and to the extent it seeks both to recover a penalty and to avoid paying for the Johnford Lathe.

Respectfully submitted,

MACHINE & ELECTRICAL
ONSULTANTS, INC.

by its attorneys,

/s/ Jeffrey D. Clements_____

Jeffrey D. Clements, BBO #632544
Clements & Clements LLP
50 Federal Street
Boston, MA 02110
(617)  451-1802

---

[8]    Dynamic omits Mr. Crepeau's full response, which makes clear  his good faith belief that Dynamic breached its obligation to MECI:

Q.    Do you believe that that machine is commissionable?
A.    Yes.
Q.    Within all of the technical specifications of the January technical specifications?
A.    Yes.

Crepeau Dep. at 68.  *See also Id*. at 69, 76 ("I was not allowed to finish [commissioning].")

COUNSEL:

Keith R. Jacques
Smith Elliot Smith & Garmey, P.A.
199 Main Street
P.O. Box 1179
Saco, ME  04072


DATED:  October 12, 2004.

### CERTIFICATE OF SERVICE

I, Jeffrey D. Clements, hereby certify that a copy of the foregoing document was served by electronic filing to counsel of record for the plaintiff on October 12, 2004.

/s/ Jeffrey D. Clements

_____