Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 04-10525-WGY


DYNAMIC MACHINE WORKS, INC.,      )
          Plaintiff,              )
                                  )
     VS.                          )
                                  )
MACHINE & ELECTRICAL              )
CONSULTANTS, INC.,                )
          Defendant.              )



DEPOSITION OF VENANZIORO FONTE,

a witness called on behalf of the Defendant,

taken pursuant to the provisions of the Federal

Rules of Civil Procedure, before Susan L.

Prokopik, Registered Merit Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the offices of Dynamic Machine

Works, Inc., 12 Suburban Park Drive, Billerica,

Massachusetts, on Monday, September 20, 2004,

commencing at 10:18 a.m.


MAGGIOLI REPORTING SERVICES, INC.  (781) 356-2636

Page 2

1    APPEARANCES:

2

3

4       LAW OFFICES OF JACK BRYAN LITTLE, P.C.

5              (By Jack Bryan Little, Esq.)

6              401 Andover Street

7              North Andover, Massachusetts   01845

8              for the Plaintiff.

9

10

11      SMITH ELLIOTT SMITH & GARMEY, P.A.

12             (By Keith R. Jacques, Esq.)

13             199 Main Street

14             P.O. Box 1179

15             Saco, Maine   04072

16             for the Defendant.

17

18   ALSO PRESENT:

19

20             Norman Crepeau

21

22

23

24

VENANZIORO FONTE                                              September 20, 2004

Page 3

1                        I N D E X

2    Witness          Direct   Cross   Redirect   Recross

3    VENANZIORO FONTE

4    (By Mr. Jacques)   4

5

6                     E X H I B I T S

7    Exhibit No.                          Page

8

     1      Defendant's Notice to Take Oral
9           Deposition of Ven Fonte        11

10   2      12/23/02 document              40

11   3      1/3/03 document                44

12   4      Purchase order #13436          46

13   5      1/13/03 letter                 54

14   6      Invoice #7844                  57

15   7      2/27/03 E-mail                 59

16   8      Memo                           71

17   9      Memo                           71

18   10     6/26/03 letter                 74

19   11     7/8/03 letter                  95

20   12     Accuracy Inspection report     81

21   13     12/9/03 letter                 96

22   14     12/11/03 letter               106

23   15     Document                      115

24   16     Affidavit of Venanzioro Fonte 123

Page 4

```
1                    P R O C E E D I N G S

2

3                    VENANZIORO FONTE

4         having been satisfactorily identified and duly

5         sworn by the Notary Public, was examined and

6         testified as follows:

7

8         DIRECT EXAMINATION BY MR. JACQUES:

9    Q.   Mr. Fonte, could you please state your full name

10        for the record?

11   A.   First name is Venanzioro.  That's V as in Victor

12        E N A N Z I O R O.  Last name is Fonte.

13        F O N T E.                              `

14   Q.   Mr. Fonte, what is your home address?

15   A.   19 Buckmaster, B U C K M A S T E R, Drive,

16        Sudbury, S U D B U R Y, Massachusetts, 01776.

17   Q.   How long have you lived at that address?

18   A.   Since 1982.

19   Q.   And you're currently associated with the

20        plaintiff in this case, Dynamic Machine Works,

21        Inc.?

22   A.   That is correct.

23   Q.   And this deposition is taking place in the

24        business' conference room; is that correct?
```

VENANZIORO FONTE                                                September 20, 2004

Page 5

1  A.  That is correct.

2  Q.  Could you for the record, what is the address of

3      Dynamic Machine Works?

4  A.  12 Suburban, S U B U R B A N, Park Drive,

5      Billerica, 01821.  Massachusetts.

6  Q.  How long has Dynamic Machine Works, Inc., the

7      corporation, been in existence?

8  A.  Since June, 1973.

9  Q.  Prior to June of 1973, was Dynamic Machine Works

10     operating as a noncorporation?

11 A.  Did not exist.

12 Q.  Okay.  Have you been associated with Dynamic

13     Machine Works since June of 1973?

14 A.  Yes.

15 Q.  You're one of the founding fathers so to speak?

16 A.  That is correct.

17 Q.  Okay.  What is your position at Dynamic Machine

18     Works?

19 A.  I am the president.

20 Q.  Have you been president since June, 1973?

21 A.  Correct.

22 Q.  Who are the other officers of the corporation?

23 A.  My son Matthew.

24 Q.  What is his position?

VENANZIORO FONTE                                                   September 20, 2004

Page 6

1    A.   Clerk.  And possibly treasurer.

2    Q.   Anybody else?

3    A.   No.

4    Q.   Does Matthew, other than serving as clerk or

5         treasurer, does he work for the company?

6    A.   That is correct.

7    Q.   What is his role in the company?

8    A.   He's a manager of market development.  Business

9         development or markets development.

10   Q.   Was Matthew involved in this particular

11        transaction?  You understand when I say "this

12        particular transaction" I'm talking about the

13        purchase of the Johnford lathe from Machine &

14        Electrical?

15   A.   He was not.

16   Q.   Are you the sole shareholder of the company?

17   A.   That is correct.

18   Q.   So you're 100 percent shareholder?

19   A.   Yes.

20   Q.   Could you describe the nature of Dynamic Machine

21        Works' business?

22   A.   The company was born as a precision machine shop.

23        And since 1980s, late '80s, we became a

24        flowforming company.  Flowforming, F L O W

VENANZIORO FONTE                                                September 20, 2004

Page 7

```
 1        F O R M I N G, which is a metal working process
 2        for the production of tubular component, hollow
 3        components.  Mostly for the missile industry
 4        initially but we have spread into other areas.
 5        Wherever the cylinders are required.
 6   Q.   How many employees does Dynamic Machine Works
 7        currently have?
 8   A.   Don't know exact but somewhere between 40 and 45.
 9   Q.   Do all of those employees work out of this
10        location or --
11   A.   That is correct.
12   Q.   Have you worked continuously for the corporation
13        since June of 1973?
14   A.   Yes.
15   Q.   Have you been involved in any other businesses
16        since June of 1973?
17   A.   I used to have a smaller company that took care
18        of investments, which is now defunct.  The name
19        of the company was World Dynamics Corporation.
20   Q.   Were you the sole shareholder of that corporation
21        also?
22   A.   That is correct.
23   Q.   And when did World Dynamics go out of business?
24   A.   I think last year.  Closed it.  It had been
```

VENANZIORO FONTE                                                    September 20, 2004

Page 8

1          inoperative for a number of years or so.

2     Q.   Can you briefly describe for me your educational

3          background from going forward from high school to

4          present, to the present?

5     A.   I have an Associate's degree in mechanical

6          technology.

7     Q.   When did you receive that degree?

8     A.   Wentworth Institute in Boston.

9     Q.   What year?

10    A.   '69.

11    Q.   Between 1969 and 1973, what did you do for work?

12    A.   I worked as a junior engineer in a company called

13         Thermoelectron in Woburn, Mass.

14    Q.   What were your responsibilities with that

15         company?

16    A.   I designed and supervised a group of four or five

17         craftsmen that built draw benches for the pulling

18         of tubes.  The purchasing of tubes and also

19         furnaces for the heating of metal.

20    Q.   Did you work at that company throughout the

21         period of 1969 to 1973?

22    A.   Yes.

23    Q.   Okay.  Why did you leave that company?

24    A.   To start Dynamic.

VENANZIORO FONTE                                                September 20, 2004

Page 9

```
 1   Q.   Mr. Fonte, have you ever had your deposition

 2        taken before?

 3   A.   Yes.

 4   Q.   On how many occasions have you had your

 5        deposition taken in the past?

 6   A.   Once.

 7   Q.   Can you describe for me briefly the circumstances

 8        arising for the necessity of you having your

 9        deposition taken?

10   A.   It was a legal deposition on some arguments with

11        my father-in-law.

12   Q.   When was that deposition?

13   A.   1993, '94.  Those years.

14   Q.   Did the arguments involve business arguments

15        related to your business as opposed to personal?

16   A.   Correct.

17   Q.   They were business arguments?

18   A.   The two overlapped.  There was some arguments

19        about agreements where I had before, which we saw

20        it differently.

21   Q.   Other than the litigation back in the early 1990s

22        involving your father-in-law, has Dynamic Machine

23        Works been involved in any other lawsuits?

24   A.   No, sir.  And it was not involved -- Dynamic was
```

```
 1       not involved at the time.

 2   Q.  It was a claim against you personally?

 3   A.  Right.

 4   Q.  So since 1973, Dynamic has never been involved in

 5       any litigation?

 6   A.  No, sir.  Never.

 7   Q.  I'm going to -- since 1973 is a long time ago --

 8       just go over a couple of ground rules for today's

 9       deposition.

10   A.  Sure.

11   Q.  During the course of the deposition, I may ask

12       you questions that you don't understand.  And if

13       you don't understand my question, please ask me

14       to rephrase it and I'll clarify it so we can be

15       on the same wavelength.  Okay?  If I ask you any

16       questions during the course of the deposition

17       that require a yes or no answer, you need to

18       answer yes or no verbally as opposed to nodding

19       your head or shaking your head.  Okay?

20   A.  Correct.  I understand.

21   Q.  And during the course of the deposition, I will

22       try not to interrupt you while you're answering.

23       And if you could let me finish my question before

24       you start answering, that will make the court
```

1       reporter's job a lot easier.  Okay?

2  A.   Okay.

3  Q.   If you need to take a break at any point during

4       the deposition, just ask me and I'll accommodate

5       you.  And the only thing I may ask is that you

6       finish answering the question on the table or the

7       line of questioning before we break.  Okay?

8  A.   Okay.

9  Q.   And if during the course of the deposition I

10      remind you of any of these things, I'm not

11      chastising you.  I'm just trying to make the

12      process go as smoothly as possible.

13 A.   I understand.

14 Q.   Mr. Fonte --

15            MR. JACQUES:  Could I have this marked,

16      please?

17            (Defendant's Notice to Take Oral

18      Deposition of Ven Fonte marked Exhibit No. 1.)

19 Q.   Mr. Fonte, I'm handing you a document that we've

20      marked as Exhibit 1 and I'll represent to you

21      that that's the notice to take your deposition in

22      this case.  Have you had an opportunity to see

23      that before just now?

24 A.   Yes.

Page 12

```
 1    Q.   And that deposition notice in addition to

 2         requiring you to be here today to testify also

 3         asked that you produce at the deposition a series

 4         of documents numbered one through four.  Is that

 5         correct?

 6    A.   Correct.

 7    Q.   My understanding from discussions with you and

 8         your counsel prior to the deposition is that any

 9         documents responsive to that request previously

10         had been provided in connection with the initial

11         disclosure and the one document that was produced

12         at Mr. Crepeau's deposition.  Is that correct?

13              MR. LITTLE:  That is my belief.  If

14         there are other documents that come to my

15         attention, I will provide them to you.

16    Q.   But as we sit here today, you're not aware of any

17         documents that haven't been provided to your

18         attorney --

19    A.   No.

20    Q.   -- that would be responsive to these requests?

21    A.   That is correct.

22    Q.   Could you identify for me the individuals within

23         your company who have knowledge of this

24         particular transaction, who for the time being I
```

Page 13

1      just need their names?

2   A.   Kevin McGinley.  M G -- excuse me.  M C -- excuse

3        me.  M C G I N L E Y.  John Heymans.

4        H E Y M A N S.  And Nicholas -- that's N I C H O

5        L A S.  Fonte, F O N T E.

6   Q.   Who is Ed Vannah?

7   A.   He is now the shop supervisor.

8   Q.   Did Mr. Vannah have any involvement in this

9        transaction?

10  A.   Difficult.  I think you should be more specific

11       with that question.  Involvement, he was a shop

12       supervisor so at one point when the machine has

13       come in, he has seen the machine.  He has seen

14       what's going on and so on.  The purchase order,

15       the contract level, no, he did not.

16  Q.   What about any concerns that Dynamic had

17       regarding the operation of the machine?  Would he

18       be involved in that process?

19  A.   He was from a point where discussions were

20       probably were kept around the shop between

21       engineering and manufacturing.  It was the

22       responsibility of engineering to bless the

23       machine.  Whether the machine could perform what

24       it was purchased for or not.

Page 14

1    Q.   Would Mr. Vannah have any knowledge regarding

2         either the purchase or the commissioning or the

3         operation or any alleged defects in this machine

4         that any of the other individuals you identified

5         would not have?

6    A.   I don't think so.

7    Q.   Okay.  With respect to Mr. McGinley, how long has

8         he been associated with your company?

9    A.   Let's see.  The better part of ten, 12 years.  He

10        was here.  He ran the shop for a number of years.

11        Then left.  Actually worked for Norman for a

12        period of time and then he came back here three,

13        four, five years ago.  I don't remember.

14   Q.   What is Mr. McGinley's current position in the

15        company?

16   A.   He acts in a variety of functions but

17        predominantly he is the person responsible for

18        program management.  When programs become

19        complex, more than a normal purchase order, he

20        will take care of that.  And he's also the

21        procurement person for the company.

22   Q.   Okay.  And what was his involvement in this

23        particular transaction?

24   A.   He pretty much participated in the discussions

```
 1        with me and Norman.  I think when John and Nick

 2        may have also participated but we certain --

 3        Kevin was the guy that wrote the purchase order

 4        to Machine & Electrical.  If there was any

 5        questions that had come up, he was -- he acted as

 6        a program manager.  Basically he made sure that

 7        the purchase orders say the right thing.  He

 8        said, Sure, the machine came in what it was

 9        supposed to come in.

10             If it didn't, he would be the first to

11        come and tell me.  Look, Norman called.  The

12        machine is not coming in.

13             So there was a point of contact

14        managing the program basically.

15   Q.   Would Mr. McGinley have been involved in the

16        discussions surrounding the commissioning and

17        performance of the machine?

18   A.   Yes.  Of course.

19   Q.   Nick Fonte is your son?

20   A.   Correct.

21   Q.   How long has Nick been involved in the business?

22   A.   Full-time, I'm afraid to say but it's got to be

23        six, seven years since he graduated.  He's 30 so

24        he graduated -- at least seven years.
```

1    Q.   What was Nick's involvement in this transaction?

2    A.   He's the person that -- at that time he was a

3         programmer.  He ran the shop.  So he had a direct

4         involvement with the knowledge that the

5         machine -- whether the machine could do what we

6         needed to do and the type of work that we have

7         around here.

8    Q.   And --

9    A.   From the technical point of view.

10   Q.   Are Nick and Matthew your only sons?

11   A.   Correct.

12   Q.   And John Heymans, as I understand, is an engineer

13        with the company?

14   A.   Correct.  He is engineering manager.

15   Q.   Okay.  And how long has he been involved in the

16        company?

17   A.   Oh, longer than Nick so I don't know.  Eight,

18        nine years.

19   Q.   And what was his involvement in this particular

20        transaction?

21   A.   Analyzing what we got for reports from the

22        commissioning of the machine, drawing, where is

23        the machine going to go, how it's going to fit

24        into the shop and so on.  Each one of us had some

VENANZIORO FONTE                                                September 20, 2004

```
 1        participation in it in a variety of fashions.

 2   Q.   Did all four of you -- when I say "all four," I'm

 3        referring to yourself, Kevin, Nick and John.  Did

 4        all four of you have direct contact with Norman

 5        Crepeau at Machine & Electrical Consultants?

 6   A.   On this transaction or generally speaking?

 7   Q.   Correct.  On this transaction.

 8   A.   I think so.  All of us participated somewhere

 9        along the line.  I probably discussed the

10        purchase order, the specs with Kevin, with

11        Norman.  Then I kind of stand back and they start

12        to take over.  They start to look at things and

13        details as things arise.  But sooner or later

14        because of the lathes and what needed to be done

15        and the commissioning, everyone is participating.

16   Q.   Okay.  And would Mr. Vannah have had any contact

17        with Norm Crepeau, if you know?

18   A.   I don't know.

19   Q.   Now, there is a motion for summary judgment

20        that's been filed in this case and there's an

21        affidavit that's been signed by an individual by

22        the name of Jack Grosberg.  You're aware of that?

23   A.   Yes.

24   Q.   Who are the individuals that had contact with Mr.
```

 1      Grosberg during the time period that he was here

 2      performing work on the machine?

 3   A.  I think in a direct contact with him was probably

 4      Nick and John.  More so than anyone else.  I had

 5      contact with Jack.  I went out and checked on a

 6      daily basis how things were progressing.  So we

 7      all -- and I'm sure Kevin probably did also.  I'm

 8      not sure about it but chances are he spoke to him

 9      to find out what's going on.

10   Q.  Has Mr. Grosberg ever performed work on behalf of

11      Dynamic Machine Works other than the work he

12      performed on the lathe which is the subject of

13      this transaction?

14              MR. LITTLE:  I would like to clarify

15      that Mr. Grosberg was not working for Dynamic at

16      all.  He was employed by your client.

17              MR. JACQUES:  Bad question.  Let me

18      rephrase the question.

19   Q.  Has Mr. Grosberg ever performed work at Dynamic

20      Machine Works other than the work which he

21      performed on this lathe?

22   A.  Before or after?

23   Q.  On any occasion.

24   A.  At any time.  Okay.  He was here about ten days

Page 19

```
 1        ago to -- under contract by a different company

 2        to come and check things out.

 3   Q.   What company was he working for on that occasion?

 4   A.   Phoenix Machinery.  I don't know.  Phoenix

 5        something.  Machine Tool.  You probably know a

 6        little bit better.  More correctly.  It's a

 7        company that rebuilt our flowforming machine.  It

 8        had to be leveled.  We had ground, reground the

 9        ways.  These are guideways on the machine.  Part

10        of the machine.  And he had to come in and level

11        everything.  And we asked that he'll be the

12        person to come in.

13   Q.   So Phoenix would have hired Mr. Grosberg to do

14        the work but you had asked that Mr. Grosberg be

15        the individual that came in to do this work?

16   A.   Because we trusted him.  I think he's quite

17        capable.

18   Q.   Is that the only other occasion that Mr. Grosberg

19        has been --

20   A.   Yes.  I don't think we had ever met the man

21        before or after that.

22   Q.   How long was he here the most recent visit?

23   A.   A day.  Maybe a day and a half.  John and Nick

24        can probably answer that more accurately so --
```

VENANZIORO FONTE                                         September 20, 2004

Page 20

```
 1        I'm just assuming that.  That could be totally

 2        wrong but I don't think it was more than a day or

 3        two.

 4   Q.   When he was here most recently working on the

 5        other machine -- the free flowing machine I

 6        believe you said?

 7   A.   Flowforming machine.

 8   Q.   Flowforming machine, did he inspect or do any

 9        work on the lathe which is the subject of this

10        lawsuit?

11   A.   Did Jack?

12   Q.   Right.

13   A.   No.

14   Q.   Okay.  And the lathe that's the subject of this

15        lawsuit is still located within your facility; is

16        that correct?

17   A.   That is correct.

18   Q.   At any time other than the time period that Mr.

19        Grosberg was performing work on the lathe back in

20        I believe it was November of last year, has he

21        performed any work or inspections on the subject

22        lathe?

23   A.   No.  The lathe has been moved from where it was.

24        There is nothing to inspect.  It's -- it's not on
```

VENANZIORO FONTE                                                    September 20, 2004

Page 21

1    the pavement where it should be.  It's just been

2    parked somewhere.

3  Q.  How long have you known Norm Crepeau?

4  A.  Twenty years?  I don't know.  A long time.

5  Q.  Okay.  During the time period that you have known

6    Mr. Crepeau, has it been in connection with his

7    involvement with Machine & Electrical

8    Consultants?

9  A.  Correct.

10 Q.  Did you know Mr. Crepeau before his association

11   with Machine & Electrical Consultants?

12 A.  I think so.  During TekRep.  It was a company

13   that Norman used to work for way back. `

14   T E K R E P.

15 Q.  Do you know his business associate, Fabien

16   Crepeau?

17 A.  Yes.

18 Q.  Fabien Dube.  I'm sorry.

19 A.  Yes.

20 Q.  How long have you known Mr. Dube?

21 A.  I only met him once.  Three years ago.  I think

22   when we were doing the flowforming machine.  We

23   went out to lunch once.

24 Q.  Did you have any conversations or correspondence

Page 22

1      with Fabien Dube involving the subject lathe?

2   A.  Not that I can recall.

3   Q.  Were all your dealings in connection with the

4       lathe with Norman, with Norman Crepeau?

5   A.  As far as I can recall.

6   Q.  Do you recall having conversations with anyone at

7       MECI other than Mr. Crepeau with respect to the

8       lathe?

9   A.  I couldn't tell you.

10  Q.  As you sit here, you don't have any recollection

11      of speaking to anyone other than Norman Crepeau?

12  A.  In speaking about the problems, it was most

13      likely Norm.  Okay?

14  Q.  Okay.

15  A.  If I spoke to someone trying to get to Norm, it

16      might have been Fabien.  I said, Fabien, things

17      aren't going well here with the lathe.

18          I may have made comments.  That's why I

19      can't tell you yes or no on the situation very

20      clearly.  It all depends exactly what you're

21      referring to.

22  Q.  Okay.  As you sit here today, do you have any

23      recollection of having conversations with Fabien

24      Dube regarding any delays in the lathe being

Page 23

1      delivered to Dynamic?

2  A.  No, I do not.

3  Q.  Do you have any recollection of having any

4      discussions with Fabien Dube regarding any

5      concerns that you might have regarding the

6      operation of the lathe?

7  A.  No, I do not.

8  Q.  And broadening that a bit, as you sit here, do

9      you have any recollection of having any

10     discussions with anyone at MECI regarding any

11     delays in the delivery of the lathe?

12 A.  No.

13 Q.  And do you have any recollection of having any

14     conversations with anyone at MECI regarding any

15     difficulty that you were having with the

16     operation of the machine?

17 A.  Well, with Norman.

18 Q.  Other than Mr. Crepeau.

19 A.  No.

20 Q.  How many transactions has Dynamic had with

21     Machine & Electrical Consultants other than the

22     Johnford lathe?

23 A.  I'm sure there's been an innumerable amount where

24     they provided service for our machines.  Small

Page 24

```
 1        purchase order and they worked for the hour.  I
 2        have no idea whether that's 20 or 100 or 200 but
 3        for a number of years we have worked together.
 4    Q.  Both in the sales and service area?
 5    A.  Correct.  We -- I don't remember on the sale.  We
 6        have refurbished two machines with Machine &
 7        Electrical.  CNC lathe.  That's L A T H E.  And
 8        one flowforming machine.
 9    Q.  Throughout this time period, your primary contact
10        at MECI has been Mr. Crepeau?
11    A.  Yes.  I probably wasn't all involved all the
12        time.  There were other people.  He probably
13        dealt with John or Nick or -- I was out of it.
14        This is probably the most involved I ever been in
15        any transaction.
16    Q.  Okay.  Have you ever had any problems or concerns
17        with MECI in the past prior to the issues arising
18        from this lathe?
19    A.  There was some issues with CNC lathe that I
20        didn't particularly agree with the way they done
21        work but generally speaking it was a good
22        relationship.
23    Q.  At any time did you find them to be dishonest
24        with you in the business?
```

VENANZIORO FONTE                                              September 20, 2004

Page 25

1   A.   No.

2   Q.   Did you find them to be unreceptive to your needs

3        or concerns?

4   A.   No.

5   Q.   Did you find them to be competent and qualified

6        in providing the services that they were

7        providing?

8   A.   Yes.

9            MR. LITTLE:  May I clarify that those

10       last three questions were prior to this

11       transaction?

12           MR. JACQUES:  Yes.

13  Q.   Do you have knowledge regarding MECI's `reputation

14       in the industry?

15  A.   No, I do not.

16  Q.   I would like to shift and start focusing on the

17       Johnford lathe.  And just so to make matters

18       simpler, rather than refer to it by the HT275G,

19       if you can just agree with me that when we're

20       talking about the Johnford lathe, we're talking

21       about the lathe that Dynamic purchased and that's

22       in its facility now.

23  A.   That is correct.  Fine.

24  Q.   If we move away from that and we talk about some

Page 26

```
 1      other Johnford lathe, then we will need to

 2      clarify that because otherwise we'll assume that

 3      we're talking about the lathe that Dynamic

 4      purchased and that's located in your facility.

 5              MR. LITTLE:  Not to quibble but the

 6      word "purchase" is one of the issues before the

 7      court right now.  Our position is the machine was

 8      rejected so to the extent you're using the term

 9      "purchase," if you're referring to the subject of

10      a purchase order, I'll stop quibbling.

11              MR. JACQUES:  That's fair enough.  It

12      wasn't a trick question.  I wasn't trying to back

13      you in.  Okay.  We're going home now.  `We won.  I

14      want to make sure we're talking about the same

15      machine when we talk about things.

16  Q.  When did Dynamic decide to enter into a purchase

17      order for the Johnford lathe?

18  A.  We need to define that there -- the purchase

19      order that purchased so we are clear on that.

20      Okay.  The first lathe was a G lathe.  275G

21      model, which was much bigger lathe.  And then

22      came the H lathe, which is presently what's here

23      today.

24  Q.  Okay.
```

Page 27

1    A.    So you need to clarify which lathe you're talking

2          about.

3    Q.    Let's --

4    A.    First one happened December.  The second one

5          happened in January.

6    Q.    Okay.  Let me step back a little bit.  At some

7          point in December, 2002, Dynamic began speaking

8          with Machine & Electrical Consultants regarding

9          purchasing a Johnford lathe, correct?

10   A.    As I understand you -- I assume you furnished the

11         thing -- you're amassing everything into one.

12   Q.    Correct.  For the time being.

13   A.    Then that probably begun -- the first `

14         conversation might have begun in November or

15         beginning of December, 2002.

16   Q.    Okay.  And why did Dynamic decide to purchase a

17         Johnford lathe?

18   A.    We needed another large lathe.  We had one large

19         Mazak, M A Z A K, lathe, and we needed a second

20         machine.  So we were looking to purchase a second

21         large and long machine for the type of work that

22         we do.

23   Q.    Were you looking to purchase a machine that was

24         virtually identical to the Mazak lathe you

VENANZIORO FONTE                                    September 20, 2004

Page 28

```
 1       already had for one that had larger capabilities

 2       than the existing lathe?

 3   A.  We were looking to satisfy the needs that we had

 4       at the time, which was -- would have been a lathe

 5       such as the Mazak.  The original thought, so you

 6       are clear in all of this, was to go to 160-inch

 7       lathe, which is slightly longer than what we have

 8       now.  What we had was 120.

 9              And when we started to deal with 160

10       inches in length, we thought that maybe we could

11       encompass all of our needs into one lathe because

12       on the horizon there was the possibility of

13       getting the Tomahawk missile launch capsule.

14       That's T O M A W --

15              MR. LITTLE:  Tomahawk.

16       T O M A H A W K.

17   A.  Right.  Correct.

18              And so we started to look at the

19       potential to make this thing that's 21-feet long,

20       to actually get into 21-feet long lathe, which

21       would have satisfied for 98 percent of what we

22       were to do with this thing.  And if this contract

23       came along, we would have the lathe.

24   Q.  So the existing business that Dynamic had would
```

Page 29

```
 1       have been served by a 100 -- the 120-inch Mazak

 2       lathe you had or a duplicate of that lathe?

 3   A.  160 inches would have been what we were looking

 4       for.

 5   Q.  Okay.  And going to a lathe that was 20-feet plus

 6       was to accommodate the Tomahawk missile launch

 7       capsule potential contract?

 8   A.  Plus we have always here a need for long pipe.

 9       We make 19-, 20-feet long pipes.  Sometimes we

10       have to face one end or turn some section with a

11       rollers and the forming haven't done the right

12       thing and it's always a problem.

13   Q.  With respect to the Tomahawk missile potential

14       contract, does your company have that contract

15       now?

16   A.  No.

17   Q.  Is it still a possibility that that contract will

18       be given to your company sometime in the future?

19   A.  Very much so but we have kind of pulled back with

20       that.  There is a number of issues.  One, we

21       don't have the machine and, two, the price of the

22       aluminum has gone up some seven or eight hundred

23       dollars and Raytheon would like us to absorb some

24       of that and we say no.
```

Page 30

```
 1                    If we had the machine, we would say yes

 2        but right now, not in the mood to deal with

 3        Raytheon.

 4    Q.  If we could focus on that contract a little bit.

 5        In December, 2002, I take it that you had

 6        submitted a bid for that contract; is that

 7        correct?

 8    A.  We have been submitting bids for that contract

 9        since 1996.

10    Q.  Okay.  And Raytheon currently has that contract;

11        is that correct?

12    A.  Raytheon is the major contractor.

13    Q.  Okay.  And --

14    A.  We would have done a portion, which is a launch

15        capsule for the missile.

16    Q.  Okay.

17    A.  Raytheon, it's an ongoing thing.  There is an

18        incumbent in California that does those parts

19        right now.

20    Q.  At some point you indicated that you pulled back

21        from that contract.  When did you make the

22        decision to pull back from that contract?

23    A.  This happened this year.  There's still

24        conversation going on every month around this
```

VENANZIORO FONTE                                        September 20, 2004

Page 31

```
 1       contract.  I'm just not moving.  I'm not doing
 2       anything, trying to get a contract right now.
 3       Let me put it this way.
 4   Q.  Okay.  And you mentioned that one of the reasons
 5       you pulled back from that contract is you don't
 6       have a machine with that capability, correct?
 7   A.  Correct.
 8   Q.  Is the largest machine that you have on your
 9       floor now the 120-inch --
10   A.  Correct.
11   Q.  -- Mazak?
12   A.  Correct.
13   Q.  Are you looking to purchase a machine that has a
14       larger capability than the 120-inch Mazak?
15   A.  I might if the need comes up.
16   Q.  But currently, your customer demands are
17       satisfied by the Mazak machine at 120 inches; is
18       that correct?
19   A.  We would like longer machine but it's not a
20       prerequisite.  We can work around it by putting
21       things through the spindle of Mazak and holding
22       both sides and doing things.  We get away with
23       that.  Okay?  But it would be desire to have a
24       longer machine.
```

Page 32

1   Q.   Could you get away with the Mazak if you had the

2          Tomahawk missile launch capsule?

3   A.   No.

4   Q.   That would require you to have a longer lathe?

5   A.   Correct.

6   Q.   Could you get away with a 160-inch machine with a

7          Tomahawk missile launch capsule?

8   A.   No.

9   Q.   It would require a lathe that had capabilities up

10         to 21 feet?

11   A.   Correct.

12   Q.   In other words, you can't use two and bond it

13        together for the missile launch capsule?

14   A.   Correct.

15   Q.   The second reason that you gave for pulling back

16        is that the price of aluminum has increased.

17   A.   Price of aluminum has gone up about $800 on this

18        particular part.  It's a large casting.

19        C A S T I N G.

20   Q.   It's increased by $800?

21   A.   Per unit, correct.  Raytheon has been putting

22        pressure that feels that we should absorb some of

23        it.  Given the complexity of the part, the fact

24        we don't have a machine to do it, although we

VENANZIORO FONTE                                                    September 20, 2004

Page 33

 1       have gone to see two machines in Ohio on two

 2       different trips that are 30-foot long.  Flat bed

 3       lathes.  Nothing like this.  If it comes to that,

 4       that's what we will purchase.

 5   Q.  The two Ohio machines, you say they're 30-feet

 6       long machines?

 7   A.  Yeah.  Long -- even longer than these machines.

 8       Thirty, 36.  I don't remember.

 9   Q.  Okay.  What type of machines are those machines?

10   A.  I don't remember the names.

11   Q.  Do you know if someone within your company

12       remembers the names, would know the names?

13   A.  I'm sure we have files.  John probably.` Nick.  I

14       don't know.

15   Q.  And I take it going back to the increased price

16       of aluminum, the $800 per unit, I take it what

17       we've got is you are committed to a set price and

18       now there's the increase in aluminum and the

19       question becomes do you pay that or does somebody

20       else pay it?

21   A.  No, no.  We hold our proposals for 90 days so

22       anything after that gets renegotiated again.

23       That's not an issue.  The issue is one not having

24       the machine in here.  The place is getting very

Page 34

```
 1      busy.  We have bought two large machines since
 2      last year so room to move these Tomahawk will
 3      cause different issues.  So I have to give a
 4      strong consideration to get a Tomahawk.  We kind
 5      of lost momentum when the machine no longer
 6      became available to do what we wanted to do.
 7              It has kind of cooled us off a little
 8      bit so that right now, if Raytheon calls and
 9      Matthew comes and see me, rather than normally
10      what I would give him a straight answer, now I
11      say, Let me think about it.  After I think about
12      it, I say, Well, let it go.
13              That's the feeling with the Tomahawk.
14  Q.  You identified -- you mentioned that you
15      purchased two new machines since you had those
16      discussions with Machine & Electrical with
17      respect to the Johnford lathe.  Have those new
18      machines been purchased to replace the Johnford
19      lathe?
20  A.  The first one was.
21  Q.  Okay.  What kind of machine was that?
22  A.  Mazak.
23  Q.  That's a different machine than the Mazak we have
24      been talking about?
```

 1   A.   No.  Same identical machine.

 2   Q.   Duplicate?

 3   A.   Second machine.

 4   Q.   Okay.  120 inch?

 5   A.   Correct.  Length.  That came within three days

 6        when we rejected.  Literally.  Four or five days.

 7   Q.   The second machine that you purchased, does it

 8        serve any of the same functions that the Johnford

 9        lathe would serve?

10   A.   Yes.

11   Q.   What kind of machine is that?

12   A.   Oh, you're talking the one, the third machine?

13   Q.   Correct.  The third one.

14   A.   That's a Daewoo machine.  D --

15             MR. LITTLE:  Daewoo.

16   A.   D A W O O.

17             MR. CREPEAU:  D A E W O O.  Daewoo.

18   A.   Okay.

19   Q.   What is the function of that machine?

20   A.   It's a turning.  CNC lathe.  That's a type.

21        That's a metal working process.  Metal turning.

22        T U R N I N G.

23   Q.   When was the Daewoo purchased?

24   A.   Last month.  And it just came in last week.

VENANZIORO FONTE                                                        September 20, 2004

Page 36

1  Q.  Okay.  And what is the capability, the length

2      capability of that machine?

3  A.  120 inches with milling capabilities.

4  Q.  Is the milling --

5  A.  That's turning and milling at the same time.

6      It's a much more complex machine than the other

7      two.

8  Q.  Did the Johnford lathe have milling capabilities?

9  A.  No.

10 Q.  So is the Daewoo in your mind, is it a

11     replacement for the Johnford lathe?

12 A.  No.

13 Q.  Other than the lack of a machine and the

14     increased price of aluminum and you indicated

15     you're busy, your business is busy right now, are

16     there any other reasons why you're not pursuing

17     the Tomahawk missile launch capsule contract?

18 A.  Not really.

19 Q.  At any time has anybody from 2002 to the present

20     told you that you wouldn't get that contract if

21     you pursued it?

22 A.  I don't understand the question.

23 Q.  Well, you say you submit proposals that are good

24     for 90 days.

Page 37

1  A.  Right.

2  Q.  I'm assuming what happens is you submit a

3      proposal and either --

4  A.  Six months go by before -- so it's just a

5      standard 90-days term that we have -- the

6      validity of our proposal.  Raytheon will take

7      four months to address an issue and then they

8      come back.  At that point you have the

9      prerogative to bail out to say, No.  I need

10     another $100 or whatever.

11 Q.  I guess my question is, since 2002, has Raytheon

12     come back and rejected your proposals or have

13     they simply not been acted upon?           `

14 A.  There has been an issue with the incumbent.

15     Raytheon has been putting pressure on them to

16     come down with a price to meet ours, which is

17     much more attractive to Raytheon.  And the

18     incumbent has not -- Raytheon is afraid that if

19     they pull the Tomahawk at this point they might

20     go out of business.  So Raytheon is looking for

21     us to help them justify to knock off to absorb

22     some of those $800 and I'm saying no.

23          And they basically are saying, We'll

24     give you the contract if you just knock off maybe

1        300 out of the 800.  I say, No.

2                  Mind you, this is $10,000 part so $300

3        is nothing.  Just my heart isn't there right now.

4    Q.  And even if your heart was there and you said,

5        Yes, I'll absorb a portion of the price, there's

6        no guarantee that you would get the contract,

7        correct?

8    A.  No.  There would be.  Well, there's no guarantees

9        in life on anything, right?  Certainly not in the

10       business world.  But I will have a 98 percent

11       confidence level because it has been going on for

12       several, several years.

13   Q.  But you don't know whether the incumbent would

14       actually decide to go forward with the project?

15   A.  We drifting into area that it's a very complex

16       issue.  The incumbent was a larger shop than we

17       are.  Larger company than we are but we're a job

18       shop.  They were bought out by Rockwell.  So

19       Rockwell jack their price up.  Making for them

20       very difficult to remain in business.

21                  That is one concern of Raytheon so

22       Raytheon has been knocking on the door

23       periodically and we're like -- Raytheon Summa.

24       S U M M A.  That's another company that does this

VENANZIORO FONTE                                    September 20, 2004

Page 39

```
 1      stuff for Raytheon.  The launch systems for

 2      Raytheon is Summa.  So that in a nutshell, Keith,

 3      the -- if I wanted the contract, the contract is

 4      ours.  Literally.  I lost the momentum of this

 5      thing.  There is just so much going on at the

 6      shop right now.

 7              Last year we worked 24 hours a day for

 8      six days since August to this March.  Okay?

 9      Without really a break.  So Tomahawk, yeah, it's

10      very interesting and so on but we doing quite

11      well without it.

12  Q.  Okay.  Without the Tomahawk contract, does your

13      business have any need for a machine with the

14      length capabilities of the Johnford lathe?

15  A.  Sure.

16  Q.  But not -- from what I understand, you've looked

17      at machines but to date you haven't felt the need

18      to actually purchase a machine to meet those

19      needs?

20  A.  Because we came so close with the Tomahawk that I

21      had to get ready.  We had some commitment and

22      some responsibility to what we put down on the

23      proposal and I felt if Raytheon was going to push

24      it -- this is before the increase -- we will have
```

Page 40

1      to take it, even though I was trying to dodge it.

2  Q.  Okay.  But where things currently stand, I take

3      it you're not planning on going forward and

4      buying these machines that you looked at in Ohio

5      because you pulled back from the Tomahawk?

6  A.  That is correct.

7  Q.  So without the Tomahawk contract, the machines

8      that you have with 120-inch capabilities are

9      sufficient for your needs?

10 A.  For now.

11          MR. JACQUES:  If you can mark that as

12      2, please.

13          (12/23/02 document marked Exhibit No.

14      2.)

15 Q.  Mr. Fonte, I'm handing you a document that we

16     marked as Exhibit 2, which is a document that's

17     dated December 23, 2002 on Machine & Electrical

18     Consultants' letterhead involving the Johnford

19     HT275G heavy-duty turning center.  Do you

20     recognize that document?

21 A.  Yes.

22 Q.  And is that a document that you would have seen

23     and reviewed back in December, 2002?

24 A.  That is correct.

Page 41

1    Q.   On the top right-hand of the page is a document

2         -- some printing that says "Original."  And do

3         you know whose handwriting that is?

4    A.   That's mine.

5    Q.   And then looking to page two of that document,

6         there's some handwritten corrections or

7         modifications to that page.  Do you know whose

8         handwriting those changes are?

9    A.   The one on the right is mine.  The one on the

10        left could be Kevin or Nick.  I think it's Kevin.

11   Q.   Okay.  And just so the record is clear, when you

12        talk about "the right," the handwritten changes

13        on the right-hand column is yours and on the

14        left-hand column you believe that might be one of

15        your employees?

16   A.   That is correct.

17   Q.   And this particular subject, the Johnford HT275G

18        heavy-duty turning center, is that the machine

19        that ultimately was delivered to your business by

20        Johnford?

21   A.   No.

22   Q.   What machine ultimately was delivered?

23   A.   An H machine.

24   Q.   So it would be an HT275H?

VENANZIORO FONTE                                                September 20, 2004

Page 42

```
 1  A.  Correct.  I believe so.

 2              No.  I don't know.  I thought it was.

 3              MR. CREPEAU:  That's the machine.

 4  A.  So it's a G.  That's fine.

 5  Q.  Can you describe for me the written modifications

 6      that you made on the right side of page two?  Can

 7      you explain to me what you were looking for with

 8      those modifications?

 9  A.  This was to the best I can recollect just before

10      Christmas.  Norman wanted to book the machine

11      before and he and I had some conversations from

12      my home because we shut down between Christmas

13      and New Year.  This probably came about then.  At

14      that point in reviewing the specifications of the

15      machine, I have made some corrections here.

16              It looks like the OD tool shank size

17      was stated as 1.25 so one and a quarter to one

18      and a half.  We needed 02 inches.  This is

19      probably boilerplate that they use in providing

20      proposal.  And I corrected that.  At one inch.

21      The next thing, ID tool shank size.  That's an

22      internal diameter.  Call for a four-inch split

23      type.  And I put down five inches because of some

24      discussions that we had that we needed five inch
```

VENANZIORO FONTE                                                    September 20, 2004

Page 43

1        for this machine.  Okay?

2               I corrected it because there had been

3        some discussions during the month of December

4        with Norman Crepeau about the five-inch diameter

5        for this tool rather than what has been stated

6        here has been four inches.  So I questioned that.

7        And further down under the page here towards the

8        bottom of page two, looks like the tool

9        statements on this specifications were probably

10       reversed.  So I made some arrow markings to

11       correct that.

12              These were almost like notes to myself

13       at the time probably.  Once I reviewed `this.

14   Q.  Okay.  Is it fair for me to assume that since you

15       made changes to some of the specifications and

16       not the others that the remaining specifications

17       were satisfactory to you?

18   A.  Probably, you know, things like this, I don't --

19       there are certain specifications I don't really

20       understand so it's not my job to review that.  I

21       just kind of look at a summary of things.

22   Q.  Okay.  And when you talked about the

23       specifications that you would have just reviewed,

24       you were referring to the list on page four; is

VENANZIORO FONTE                                                    September 20, 2004

1       that correct?

2    A.  Right.

3    Q.  Okay.  And on page five, the next page of that

4        document, there's a circle around the pricing and

5        then some additional handwriting.  The 295 plus

6        60 equals 355.  Do you know whose handwriting

7        that was?

8    A.  I believe the circle and the question mark is

9        probably mine.  The handwritten 295 for 60 equal

10       355, that could be Kevin.  McGinley, that is.

11               MR. JACQUES:  Mark that as 3, please.

12               (1/3/03 document marked Exhibit No. 3.)

13   Q.  Mr. Fonte, I'm going to hand you a document that

14       we marked as Exhibit 3.  That document is dated

15       January 3, 2003.  Have you seen that document

16       before today?

17   A.  Probably.

18   Q.  Okay.  And in reviewing the document -- and you

19       certainly can take the time to do that if you

20       would like -- it appears to me that the

21       handwritten changes that you made to the -- what

22       was marked as Exhibit 2 were incorporated into

23       the January 3, 2003 machine specifications.

24               Is that your understanding?

VENANZIORO FONTE                                                    September 20, 2004

Page 45

 1   A.   Looks that way.

 2              MR. LITTLE:  You're referring to page

 3        two.

 4              MR. JACQUES:  Right.

 5   Q.   Referring to page two, for example, your

 6        employee's changes were made under the

 7        parenthetical under "turret"?  And then your

 8        changes on the right-hand side were incorporated

 9        also?

10   A.   Correct.

11   Q.   And then if we move on to page five, the purchase

12        price was also changed to 355, correct?

13   A.   Correct.                                       `

14   Q.   Is it --

15              MR. LITTLE:  355 meaning 355,000?

16              MR. JACQUES:  Correct.  355 would have

17        been a bargain.

18   Q.   $355,000, is that what you understood to be the

19        purchase price for the Johnford lathe?

20   A.   Yes.

21   Q.   With respect to Exhibit 3, is Exhibit 3 the

22        specifications that were agreed upon between you

23        and Machine & Electrical Consultants involving

24        the Johnford H2 lathe at the time of your

Page 46

```
 1      entering into a purchase order?

 2  A.  Yes.  But this was followed by something else, I

 3      believe.

 4  Q.  And we'll get to that.

 5  A.  Yes.  That is correct.  At this point, this was

 6      what we agreed on.

 7  Q.  Okay.

 8              (Purchase order #13436 marked Exhibit

 9      No. 4.)

10  Q.  Mr. Fonte, I'm handing you a document that's

11      marked as Exhibit 4.  And if you can identify

12      that document for me.

13              (Off the record.)              `

14  A.  I believe this document came after but I might be

15      wrong.  This document came after Exhibit 3.  Just

16      confirming a bunch of things once we got down to

17      the nitty-gritty of selecting more equipment for

18      this lathe because these are just general type of

19      specifications, meaning what is stated on Exhibit

20      3.

21              This basically provides for accessories

22      to the lathe such as chocks and steady rests and

23      things of that nature.

24  Q.  Okay.  Let me just step back.  With respect to
```

Page 47

```
 1        Exhibit 4, this is the purchase order that
 2        Dynamic provided to Machine & Electrical
 3        Consultants for the Johnford lathe and some
 4        additional equipment, correct?
 5   A.   I believe so.
 6   Q.   What I would like to do is spend a little time
 7        going over the purchase order with you.  That's
 8        not signed by you but it's signed by Kevin
 9        McGinley, correct?
10   A.   Correct.
11   Q.   I'm assuming you authorized Mr. McGinley to sign
12        that purchase order?
13   A.   He's authorized.  Not this specific one but he's
14        authorized to sign purchase orders.
15   Q.   Okay.  The first -- I'm going to go by line
16        number.
17   A.   Yeah.
18   Q.   The first line number involves some chucks for a
19        unit price of $71,000.  Do you see that?
20   A.   Yes.
21   Q.   Did Dynamic receive those chucks?
22   A.   I believe so.
23   Q.   Okay.  And the description is that one of the
24        chucks was to be installed on the Mazak and then
```

VENANZIORO FONTE                                            September 20, 2004

1      one on the Johnford lathe; is that correct?

2   A.  Correct.

3   Q.  Do you know whether one of the chucks ever was

4       installed on the Mazak?

5   A.  I believe so.  I don't get involved with details

6       like that.

7   Q.  Okay.  There's also a -- you indicated that you

8       -- let me step back.  The two chucks that you

9       were purchasing, were those identical chucks?

10  A.  I can't tell you that.

11  Q.  Do you know if the second chuck, the one that was

12      installed in the original Mazak, has been

13      installed on any other machines on your floor?

14  A.  I can't answer that.

15  Q.  Who could?

16  A.  John and Nick for sure.

17  Q.  Do you know whether there's any reason why the

18      second chuck could not be installed, for example,

19      on the second Mazak that you purchased shortly --

20      a while ago?

21  A.  We probably did.  I don't know.

22  Q.  You don't know.  Okay.  The second line item, the

23      Johnford lathe, that line item represents the

24      down payment for that lathe, correct?

VENANZIORO FONTE                                                    September 20, 2004

Page 49

1   A.   Yes.

2   Q.   And that was paid, correct?

3   A.   I think so.

4   Q.   The third line item is for the Johnford lathe and

5        that was the first payment, correct?

6   A.   The second payment.

7   Q.   The second payment.

8   A.   Correct.

9   Q.   The first payment that theoretically was due

10       after delivery of the machine as opposed to the

11       down payment?

12  A.   Correct.

13  Q.   And the fourth line item is for the -- what's

14       designated on this purchase order as the final

15       payment for the lathe, correct?

16  A.   Yes.

17  Q.   With respect to line items three and four, those

18       payments have not been made to Machine &

19       Electrical, correct?

20  A.   That is correct.

21  Q.   The fifth line item is for an autoblock steady --

22       a steady rest?

23  A.   Correct.

24  Q.   Do you know if the steady rest was ever delivered

Page 50

```
 1       to Dynamic?

 2   A.  It was on the machine, I think.  We got installed

 3       on the machine and then taken down or something.

 4   Q.  It was on the Johnford lathe?

 5   A.  Yes.

 6   Q.  Okay.  Who made the decision to purchase a steady

 7       rest in connection with the Johnford lathe?

 8   A.  Probably John, Nick.

 9   Q.  What is the purpose of the steady rest?

10   A.  To support long parts.  All our machines are set

11       up with steady rests because of the nature of

12       parts we do such as long tubes.  They need -- you

13       chuck them one end and you support it here while

14       you machine the end.

15   Q.  Okay.  Some of these questions may appear

16       somewhat ignorant.  I apologize for that and I'm

17       not in the business.  Are steady rests

18       interchangeable among machines or are they

19       machine specific?

20   A.  They're interchangeable as long as they fit the

21       machine.  If you -- this one here does not fit

22       the other machine so we had to buy other steady

23       rests.

24   Q.  Do you know whether this steady rest fits any of
```

VENANZIORO FONTE                                        September 20, 2004

Page 51

1       the machines that are currently on your floor?

2   A.  It does not.  Doors cannot close.

3   Q.  And is that because of the size of the steady

4       rest?

5   A.  That is correct.

6   Q.  Have you removed the steady rest from the

7       Johnford lathe?  Not you person --

8   A.  I believe so.

9   Q.  I understand that question wasn't you personally.

10  A.  I understand.

11  Q.  Your business.  Do you know where the steady rest

12      is located now?

13  A.  Probably right next to the machine.  If you

14      wanted to see just the machine, we can get in

15      from the side and look at the machines.  Do what

16      you want to do.  That's okay.  Just don't want

17      people running around.

18  Q.  When the steady rest was removed from the

19      machine, was that to determine whether it could

20      be used on some of your other machines?

21  A.  Probably but I can't -- wrong man to speak about

22      those things.

23  Q.  Would John be the proper man to speak to about

24      that?

Page 52

1   A.   John and Nick.

2   Q.   The transformer and the $2,000 for the

3        transformer, I take it that was part of the

4        $355,000 purchase price for the Johnford lathe?

5   A.   Repeat the question.

6   Q.   The $2,000 price that's associated with the

7        Johnford lathe for the transformer, was that part

8        of the $355,000 purchase price for the lathe or

9        is that over and above the $355,000, if you know?

10  A.   I don't know but it doesn't appear to be if there

11       is a separate charge for $2,000 here.

12  Q.   Is the transformer interchangeable among

13       machines, if you know?

14  A.   Probably.  The other machines don't need it.  If

15       that's what you want to know.

16  Q.   Okay.

17  A.   It's incorporated into that.

18  Q.   Why is the transformer for the Johnford lathe not

19       incorporated into the machines while they are for

20       the other machines, if you know?

21  A.   Should ask the manufacturer.

22  Q.   You don't know?

23  A.   No.

24  Q.   What sort of steady rest does Dynamic Machine

VENANZIORO FONTE                                                September 20, 2004

Page 53

```
 1      Works -- what sort of steady rest did Dynamic

 2      Machine Works purchase for the Mazak and more

 3      recently for the Daewoo, if you know?

 4   A. Again, John and Nick can tell you that but it's

 5      probably SMW.  If we specked it out for this

 6      machine, we probably used it in the other

 7      machines also.

 8   Q. With respect to the steady rest?

 9   A. Correct.

10   Q. So it's the same -- SMW refers to the parts

11      manufacturer?

12   A. Correct.

13   Q. So it's the same type of steady rest.  `It's the

14      size that's an issue with respect to your other

15      machines?

16   A. I believe so.  I know that we have bought steady

17      rests of late for the other two machines so

18      obviously they could not fit this steady rest in

19      there.  I think there was an issue with the doors

20      closing on both machines.

21   Q. With respect to the various line items, other

22      than the $29,500 down payment for the Johnford

23      lathe, were any of the other unit prices paid to

24      MECI, if you know?
```

VENANZIORO FONTE                                          September 20, 2004

Page 54

1   A.   I believe we paid for the chucks.  It says chucks

2        to be paid net 30 from installation of Mazak so I

3        would imagine we paid for those.  We paid the

4        29,5.  The autoblock I'm sure has been paid

5        because I remember some of the conversation with

6        Norman about this equipment.  It was outside the

7        lathes.  The accessories that we paid net 30.

8        And I cannot answer about the transformer so if

9        the transformer came and it was part of the deal

10       with the lathe, that's probably unpaid.

11            MR. JACQUES:  Go ahead and mark this as

12       the next exhibit, please.

13            (1/13/03 letter marked Exhibit No. 5.)

14  Q.   Let me hand you the marked Exhibit 5, which is a

15       letter from Dynamic to Machine & Electrical

16       Consultants dated January 13, 2003.  Have you

17       seen that letter prior to today?

18  A.   I believe so.

19  Q.   Okay.  What was the purpose of that letter as

20       opposed to the purchase order that previously had

21       been provided to Machine & Electrical

22       Consultants, if you know?

23  A.   I think this was kind of a recap of what had

24       happened.  We made some changes.  There had been

1      conversations and so on.  This kind of recap in a

2      nutshell to summarize and give a synopsis of the

3      situation.

4   Q.  The --

5   A.  It confirms it there.  The purchase order number.

6      13436.  "Dear Norm."  On the first line there

7      basically.

8   Q.  So it references the purchase order that

9      previously had been submitted to Machine &

10     Electrical?

11  A.  Right.  Correct.

12  Q.  And it confirms that the total machine cost was

13     355,000?

14  A.  Correct.

15  Q.  And then it also confirms under 1A that the down

16     payment of 29,5 previously had been paid on

17     December 17, 2002, which was the date of the

18     purchase order, correct?

19  A.  Correct.

20  Q.  Okay.  It references that the second payment was

21     going to be in the amount of 148,000.  Do you see

22     that?

23  A.  Yes.

24  Q.  The second payment under the purchase order was

VENANZIORO FONTE                                        September 20, 2004

Page 56

```
 1      for 118,000.  Do you know what the $30,000

 2      difference is comprised of?

 3  A.  No.

 4  Q.  And then it talks about the final payment being

 5      the amount of $177,500 as opposed to $147,500.

 6      Do you know what caused that discrepancy?

 7  A.  No.

 8              MR. LITTLE:  Again, objection to the

 9      term "discrepancy."

10  Q.  The term "discrepancy" didn't confuse you, did

11      it?

12  A.  It didn't scare me either.

13  Q.  It wasn't meant to do either.

14  A.  You guys -- you lawyers are funny people.

15  Q.  You understand the reason I was asking is just

16      whether you knew why on the purchase order it's

17      147,5 and --

18  A.  Yes.

19  Q.  And the letter it's --

20  A.  I don't know.  When was the chucks supposed to be

21      paid?  I don't know.

22              MR. LITTLE:  It was net 30.

23  A.  That's all right.  I don't think anyone ever

24      picked that up.  That's strange.  All three of
```

VENANZIORO FONTE                                                    September 20, 2004

Page 57

1        them.  Comes to 355.  Don't have a calculator.

2   Q.   Can we take a break just for a second?

3   A.   Sure.

4                (Recess.)

5                (Invoice #7844 marked Exhibit No. 6.)

6   Q.   Mr. Fonte, we're returning after a short break

7        and I assume you understand that you are under

8        oath, continue to remain under oath?

9   A.   Yes, I do.

10  Q.   Okay.  Before we took the break, we were talking

11       about the differences between the purchase order

12       numbers and the numbers contained on the January

13       13, 2003 letter, which is marked as Exhibit 5.

14       There's no --

15                MR. LITTLE:  Exhibits 4 and 5?

16                MR. JACQUES:  Correct.  Exhibit 4 being

17       the purchase order, Exhibit 5 being the January

18       13, 2003 letter.

19  Q.   There's no dispute that the purchase price for

20       the Johnson lathe was $355,000, correct?

21  A.   To my understanding, yes.

22  Q.   Let me hand you what's been marked as Exhibit 6.

23                MR. LITTLE:  Thank you.

24                MR. JACQUES:  Sure.

1   Q.   And I'll represent to you those are two invoices

2        numbered 7844 and 7845.  Have you seen those

3        invoices prior to today?

4   A.   No.

5   Q.   The invoices are for or indicate that they are

6        for the second payment on the Johnford in the

7        amount of 148,000 and the final payment on the

8        Johnford in the amount of $177,500.  You don't

9        dispute that those two payments have not been

10       made by your company to Machine & Electrical or

11       anyone else on its behalf, correct?

12  A.   I don't think so.  You are correct.  They have

13       not been.

14  Q.   I understand as part of this transaction one of

15       the things that Dynamic did was lease a Johnford

16       lathe while waiting for this machine to come in,

17       correct?

18  A.   Correct.

19  Q.   Can you describe for me the type of Johnford

20       lathe that was leased by your company?

21  A.   CNC lathe.  Standard machine.  Standard CNC.

22       That's C as in Charlie, N as in Nancy, C as in

23       Charlie again.  Lathe.  That's L A T H E.

24       Machine.

VENANZIORO FONTE                                          September 20, 2004

Page 59

1  Q.  What were the length capabilities of that

2      machine?

3  A.  It was a very small machine.  It was a medium

4      size CNC lathe I should say.

5  Q.  Bigger or smaller than the existing Mazak you had

6      on the floor?

7  A.  Smaller.  We had a need at the time to drill and

8      that's all we did with that literally.  Just

9      drill.  Using it like a drilling machine.

10 Q.  To bore out the center of --

11 A.  To drill first with the drill bit and then go in

12     there and phase off.

13          MR. JACQUES:  Mark this as 7, please.

14          (2/27/03 E-mail marked Exhibit No. 7.)

15 Q.  Let me hand you a document which is marked as

16     Exhibit 7, which is a copy of an E-mail from

17     Nicholas Fonte to Norman Crepeau with a cc to

18     you.  Have you seen that before today?

19 A.  Yes, I have.

20 Q.  Okay.  The E-mail purports to address some

21     concerns that you have based upon the rental

22     machine; is that correct?

23 A.  Correct.

24 Q.  And it talks about three different items.  The

VENANZIORO FONTE                                    September 20, 2004

Page 60

```
 1        first item being that the screen needs to show

 2        the actual feed rate.  It goes on to say the

 3        rental lathe does not show either.  Do you

 4        understand what was being addressed there as far

 5        as what needed to be incorporated into the new

 6        machine?

 7   A.   Correct.  Yes, I do.

 8   Q.   With respect to that screen, did you understand

 9        that when it was communicated to Mr. Crepeau in

10        February of 2003 to be an additional

11        specification that was not part of the original

12        machine specifications?

13   A.   I need to understand your question.  You're

14        talking about machine specification.  We're

15        referring to the 275 machine, not this one.

16   Q.   Correct.  Correct.

17   A.   So you are clear, what all of this means, a lathe

18        is an analogy.  It's like a car.  If you purchase

19        a car from a dealer, you expect when you go and

20        get the car, the car will have wheels to carry

21        forward.  Okay?  This is the same situation.  A

22        lathe that doesn't tell you how fast you're

23        going, it just -- it's such an anomaly.  I never

24        heard it in 35 years a lathe wouldn't show what
```

VENANZIORO FONTE                                         September 20, 2004

Page 61

```
 1      you're doing.  Okay?

 2              So that needed to be correct.  This was

 3      some points that Nick addressed to Norm.  The

 4      first point was we need to know this stuff.  All

 5      right?  So now, we had had an earlier situation

 6      on one of the rebuilts that Norman had done but

 7      still today at Dynamic is handicapped by this

 8      thing.

 9  Q.  Is it a rebuild of a Johnford?

10  A.  No.  It was a Graziano, G R A Z I A N O, lathe.

11      And this machine does not show the thing.  The

12      inch per -- I think it shows the feed rate in

13      inches per minute when it should show inches per

14      revolution.

15  Q.  I guess my question is, with respect to item

16      number one, did you understand that item to be a

17      modification to the machine that you were

18      purchasing from MECI?

19  A.  No.  What it's saying is this machine doesn't do

20      it.  The machine that we have bought better do

21      it.  That's what it's saying.

22  Q.  Was it your understanding at that time that the

23      machine that you were buying was supposed to do

24      that?
```

Page 62

1   A.   Of course.

2   Q.   Okay.  The second item talks about the rental

3        lathe cannot bring a two-inch bar to center and

4        it indicated that the new machine must bring a

5        five-inch bar to center.

6   A.   Correct.

7   Q.   Was it your understanding that the specifications

8        which you had been provided with respect to this

9        machine provided that the machine would bring a

10       five-inch bar to center?  You can go back and

11       look --

12  A.   Do I understand that to be the case?

13  Q.   Right.

14  A.   That is correct.

15  Q.   Okay.  And in taking a look or if you could look

16       at Exhibit 3 and show me on that exhibit where it

17       identifies bringing a bar five inch to center.

18  A.   We had an agreement with Norm that the machine

19       would do five inches.  This is referring to the

20       tool holder, not the capability of the machine

21       doing the five inch to center.  This is a tool

22       holder.  The ones they provide for the Johnford

23       has a bore with set screws on the top, which we

24       didn't think was adequate so we wanted to split

VENANZIORO FONTE                                          September 20, 2004

Page 63

```
 1        type.  Meaning it's cut on the top and it's got

 2        side screws that will lock the boring bar to make

 3        it vibration free.  That's what that is.

 4   Q.   Okay.

 5   A.   It's a tool holder and not the capability of that

 6        machine going to center.  Okay?  That's covered

 7        on the next one.

 8   Q.   Okay.  So the requirement that the new machine

 9        bring a five-inch bar to center was not something

10        that was referenced in the specifications that

11        were provided to you on January 3, 2003?

12   A.   Without going through the document but it was an

13        understanding that had been covered a number of

14        times with Norman in here and it was never any

15        question to the point that we needed a five-inch

16        bar given the fact also as you can see that we

17        procured special tool holder for it.

18              So if you buy yourself a tool holder,

19        you obviously have to use a five-inch bar.  There

20        was never any question, okay, that that's what we

21        need.

22   Q.   With respect to item number three, the chip

23        conveyor, would that require a modification to

24        the specifications that were provided to you in
```

VENANZIORO FONTE                                                September 20, 2004

Page 64

1        January, 2003?

2   A.   It does not really address the specification, I

3        think.  Again, it's another analogy with the

4        tires.  Okay?  The chip conveyor should be

5        adequate for the size of machine.  A large

6        machine will cut a lot of metal and as such the

7        chip conveyor must be able to move the metal.

8   Q.   Let me ask you.  I notice taking a look at the

9        specifications that the particular machine that

10       you were -- the Johnford lathe in this case was a

11       slant bed machine and you indicated early in your

12       deposition that you had looked at two Ohio

13       machines that were flat bed machines?  `

14  A.   This is after this.

15  Q.   I understand that.  I guess my question is, what

16       is the difference between a slant bed and a flat

17       bed machine, other than the obvious?

18  A.   The flat bed looks very much like this table to

19       you.  The ways are parallel to the floor.  The

20       guideways that hold -- the guideways that provide

21       the accuracy of the machine are parallel to the

22       floor.  It makes it for a much easier way to

23       search for accuracy on the machine itself by

24       jacking the screws underneath that.

VENANZIORO FONTE                                    September 20, 2004

1          On the slant bed, in the turret which

2     is the carrying tool, turret, the station that

3     holds the carrying tool moves on a carriage along

4     this way parallel to the bed.  At any given time,

5     if you have an issue with the accuracy of this

6     machine, you can go and tweak the leveling of the

7     machine to bring the machine into compliance to

8     what you need.

9          And that's usually done if the machine

10    is worn, as guideways are worn, rather than

11    regrind it.  You can actually go there and they

12    do wear because a lot of the work is done in a

13    short amount close to the spindle.  You can

14    actually play and bring it back into compliance.

15    Maybe messing up something else on the machine

16    somewhere else but you can work with that.

17         So slant bed has ways of 45 degrees or

18    60 degrees, depending upon the machine, and by

19    its own nature, geometrically it's very difficult

20    to get that accuracy at this angle in relation to

21    this when the part is standing horizontally and

22    parallel to the ground.  To the floor.  You have

23    a slant bed.  This has almost no relation to this

24    part except this adjustment needs to be tweaked

1        in every way.

2                And on top of that, you have one more

3        axis which carries the turret, which is this axis

4        as you have seen in that drawing.  This axis

5        carries the A axis which we referred, which is

6        the spindle to tailstock and then -- you have the

7        word tailstock.  T A I L S T O C K.

8                So as a result of the geometry of the

9        lathe, there is a convention out in the industry

10       that people are convinced that -- and rightly so.

11       I'm sure I'm not the smartest fellow in this

12       world.  That the slant bed cannot do very

13       accurate work for long time to the point that a

14       lot of manufacturers of slant bed machine make a

15       maximum 160 inches and they feel that you cannot

16       go any over than that, otherwise they gonna run

17       into problems.

18  Q.   Is that something you were aware of before you

19       entered into the purchase order with Machine &

20       Electrical Consultants?

21  A.   Correct.

22  Q.   You were aware that the convention in the

23       industry was that a slant bed couldn't maintain

24       certain tolerances once you got beyond, say, 120

Page 67

```
 1          --

 2   A.    160.  Some Mazak only produce 160 because they

 3         feel that they cannot control that.  Anything

 4         over that, they go to a flat bed.

 5   Q.    Okay.  And explain to me why if you knew that the

 6         convention in the industry was that anything over

 7         160 inches required you to go to a flat bed that

 8         you entered into this purchase order to purchase

 9         a slant bed that was going to have a length of 21

10         feet.

11   A.    Because Norman promised that they could do it.

12         With a classical case of believing the devil, I

13         guess.

14   Q.    Other than a Johnford machine, are you aware of

15         any other manufacturers that manufacture slant

16         bed lathes exceeding 160 inches?

17   A.    I can't think of one but I'm sure there are

18         plenty.

19   Q.    Okay.  When you were --

20   A.    Excuse me.  Did you say that produce slant bed

21         over 160?

22   Q.    Correct.

23   A.    I can't tell you that.  I can't.  I don't know

24         the answer to that.  I was thinking -- I thought
```

VENANZIORO FONTE                                                September 20, 2004

Page 68

1          you had asked that produced lathes of 21 feet.

2    Q.    Are you aware of any manufacturers that produce

3          slant bed lathes exceeding 160 inches?

4    A.    I don't know of any.

5    Q.    Okay.  Did you and Mr. Crepeau have any

6          discussions prior to your providing a purchase

7          order to Machine & Electrical Consultants

8          regarding the slant bed versus flat bed lathe for

9          the application that you were looking for in this

10         instance?

11   A.    The discussions for this lathe, surrounding this

12         particular acquisition of this lathe, geared with

13         Norman, between Norman and I, with Kevin and

14         everyone else, around the Tomahawk.  There was

15         the concern why we bought a long lathe.

16         Otherwise, we could have gotten away with

17         something smaller.  In the eventuality this

18         contract came, we would be ready with this lathe.

19              The concern was the accuracy of the

20         lathe on a slant bed.  Norman said they could

21         hold it.  I said, Show it to me.  They said, We

22         sold one in Chile.

23              I don't remember what you told me.  Six

24         meters, which is about 18, 19 feet.

1        So shouldn't be any problem.  And I

2    believed him.  I had that kind of rapport.  I

3    didn't think he was dishonest.  I believed what

4    Norman say.  Okay?  And so that's based on that,

5    we believed Machine & Electric and we gave them a

6    purchase order.  That's how the whole thing, you

7    know, came about.

8  Q.  What is the advantage of a slant bed as opposed

9    to a flat bed lathe?

10 A.  It's probably chip removal.  That's metal chips.

11    Removal.  It's most likely chips removal.  I

12    don't know.  Maybe Norman can probably help me.

13    But that's --

14 Q.  That's from your --

15 A.  To me, that is probably most important thing.

16    Personally, I think a flat bed, it's a better

17    lathe but that's my opinion.

18 Q.  And is that some element of Monday morning

19    quarterbacking?  I mean, now that --

20 A.  No.  They're all slant back.

21        MR. LITTLE:  Wait until he finishes.

22 Q.  In other words, you had what you feel is an

23    unsatisfactory experience with the slant bed

24    lathe in this particular case.  So when you say

VENANZIORO FONTE                                          September 20, 2004

Page 70

1          in your estimation the flat bed is better, is

2          that an opinion you had prior to your purchase of

3          this Johnford lathe?

4     A.   You can do more accurate work so it's out of 30

5          years of cutting metal chips, working with the

6          tool lathes and we are turning shop when it comes

7          to metal chips, meaning rather than milling,

8          we're a turning shop.  It's that much of a --

9          they're much better machine for accuracy, a flat

10         bed, that is.  But with that said, we probably

11         have two flat beds and 20 slant beds so --

12    Q.   The two Mazaks you have with 120 inches of bed,

13         are those flat or slant?

14    A.   Slant.

15    Q.   The Daewoo that you purchased last month, is that

16         a flat bed or a slant bed?

17    A.   Slant bed.

18    Q.   Taking a look at Exhibit 7 for the moment, do you

19         know if you ever received a written response from

20         Mr. Crepeau regarding the three items identified

21         on that E-mail?

22    A.   I don't think there was a response but some other

23         piece of paper kind of refers to these -- to

24         Norm.  Again, some subsequent correspondence.  I

VENANZIORO FONTE                                                September 20, 2004

Page 71

```
 1        don't know whether we received a response or not.

 2   Q.   Okay.  Again, taking a look at Exhibit 7, with

 3        respect to your concerns regarding the screen,

 4        were those concerns taken care of in the Johnford

 5        lathe that was delivered to you?

 6   A.   I can't answer that.

 7   Q.   With respect to the concerns you had with respect

 8        to the chip conveyor, do you know if those were

 9        addressed in the Johnford lathe that was

10        delivered?

11   A.   I don't know but that's not -- could not be

12        proven since the machine never really operated.

13        That would be the only way to test it. `

14                MR. JACQUES:  8, please.

15   A.   But I don't think it was if I remember right.

16                (Memo marked Exhibit No. 8.)

17                (Memo marked Exhibit No. 9.)

18   Q.   Mr. Fonte, let me hand you a document that's been

19        marked as Exhibit 8 and ask you if you recognize

20        that document.

21   A.   Yes, I do.

22   Q.   Okay.  And that document indicates that it would

23        have been faxed to you on June 23, 2003; is that

24        correct?
```

Page 72

1  A.  Yes.

2  Q.  There are some handwritten notes on the bottom of

3      the fax with the -- very bottom initials of KM.

4      Do you know if that's Kevin McGinley's

5      handwriting?

6  A.  Correct.  That is.

7  Q.  That document indicates that you and Kevin called

8      Mr. Crepeau and that you mentioned that you were

9      considering cancelling the machine because of the

10     delay in the delivery date.

11 A.  Yes.

12 Q.  Is that the first time that you indicated to Mr.

13     Crepeau that you were considering cancelling the

14     machine because of the delay in delivery?

15 A.  No.  It happened before.  Actually, this is a

16     result of some previous conversations from the

17     factory.

18 Q.  Do you --

19 A.  I told him basically if we didn't shape up and

20     get this machine in here fast I was going to

21     cancel, to get his act together, to talk to the

22     factory and get some serious things because we

23     will move on from there depending upon what they

24     say.  So this is the end result of those earlier

VENANZIORO FONTE                                                    September 20, 2004

Page 73

1      conversations.

2  Q.  Okay.  Do you recall when you first started

3      discussing with Mr. Crepeau your concerns

4      regarding the delay in delivery of the machine?

5  A.  The time?

6  Q.  Yes.

7  A.  It could have been in April.

8  Q.  I'm handing you a document that's marked as

9      Exhibit 9.

10                MR. LITTLE:  May I?

11  Q.  Have you seen that document before today?

12  A.  Yes.  I have seen this.

13  Q.  Okay.  And that appears to be a follow-up to the

14      document that's marked as Exhibit 8.  In other

15      words, it was sent within a day of each other,

16      correct?

17  A.  I can't see when it's marked here.  I can only

18      see a telefax date on the top left-hand corner of

19      Exhibit 8.  So I'm not disagreeing with you.  I

20      just can't tell you yes, that is the case what

21      you stated.  I can barely make out that this

22      Exhibit 9 says June 24th but as far as the

23      relationship date-wise to that, I cannot say

24      that.

Page 74

 1   Q.   Is it fair for me to understand that both Exhibit

 2        8 and Exhibit 9 were received by you within a

 3        couple of days of each other?

 4   A.   I can't say that.

 5                  (6/26/03 letter marked Exhibit No.

 6        10.)

 7   Q.   Let me hand you a document that's been marked as

 8        Exhibit 10, which is a letter dated June 26 from

 9        Machine & Electrical to you from Norman Crepeau.

10        Have you seen that letter before today?

11   A.   Yes.

12   Q.   And the letter is dated June 26th.  Would you

13        have received it shortly after June 26th, if you

14        recall?

15   A.   Yes.  I imagine this probably came out through

16        the E-mail or --

17   Q.   That letter establishes what I understand to be

18        new dates with regard to shipping and

19        commissioning of the machine, correct?

20   A.   Yes.

21   Q.   And my understanding is that ultimately you

22        decided not to cancel the order based upon your

23        satisfaction with these new shipment dates and

24        commissioning dates; is that correct?

Page 75

```
 1              MR. LITTLE:  Objection.  You're
 2       characterizing the testimony by the nature of
 3       your question.
 4   A.  That determination of the cancel came after we
 5       signed the next document that you're going to
 6       show, which is the letter of agreement.  It's an
 7       agreement that we had after this document.  At
 8       this point, the decision not to cancel had not
 9       been made.
10              MR. JACQUES:  Okay.  Go ahead and mark
11       that as 11.
12              (7/8/03 letter marked Exhibit No. 11.)
13   Q.  Let me hand you a document that's marked as
14       Exhibit 11.  Just a second ago you were referring
15       to the decision not to cancel was based upon an
16       agreement that we reached after what's been
17       marked as Exhibit 10.  Is this the agreement that
18       you were referring to?
19   A.  That is correct.
20   Q.  And this is a letter, based on your letterhead,
21       to Norman Crepeau dated July 8, 2003, correct?
22   A.  Correct.
23   Q.  And that also -- it references phone
24       conversations on July 27 and July -- on June 27
```

VENANZIORO FONTE                                      September 20, 2004

Page 76

1      and July 1.  Do you see that?

2   A.  No.

3   Q.  Under the reference section.

4   A.  Okay.  Yeah.

5   Q.  The E-mail of June 26, 2003 would have been

6       Exhibit 10, correct?

7   A.  Yes.  Could have been.

8   Q.  Okay.  Do you recall receiving an E-mail on June

9       26 other than what's been marked as Exhibit 10?

10  A.  I don't recall.

11  Q.  The phone conversations on June 27 and July 1,

12      2003, do you have handwritten notes reflecting

13      the conversations that you had on those two

14      dates?

15  A.  No.

16  Q.  Would those have been phone conversations with

17      Mr. Crepeau?

18  A.  Tough to tell right now.

19  Q.  I take it you don't have any independent

20      recollection of those phone conversations as you

21      sit here today?

22  A.  I cannot recollect but it doesn't mean that they

23      don't exist because I jot everything down so it

24      might be just little something somewhere.

Page 77

1    Q.   Do you have a phone log or something of that sort

2         that you maintain regarding telephone

3         conversations that you have?

4    A.   No, no.

5    Q.   Okay.  With respect to any notes that you have

6         regarding phone conversations with Mr. Crepeau,

7         would that be contained in a file involving this

8         transaction?

9    A.   I cannot recall.  I put it down, phone

10        conversation.  There must have been a reason.

11        Certainly addressing Norman -- I was addressing

12        with this letter to Norman, for Norman to think

13        of a conversation we had in July 27 and July 1st.

14        It is possible that even I might not have it but

15        Kevin might have recorded something for that.  I

16        don't know.  I cannot answer straight yes or no.

17        I just don't know.

18   Q.   What I would ask, Mr. Fonte, is that you would

19        take a look through your records and also any

20        records of your employees to determine whether

21        there are any notes of phone conversations.  And

22        if there are, if you would provide them to your

23        attorney.

24   A.   Okay.

VENANZIORO FONTE                                                    September 20, 2004

Page 78

1              MR. LITTLE:  I will tell you I have

2         looked for that information and I was unable to

3         identify any notes that were not produced to you.

4              MR. JACQUES:  Fair enough.

5    Q.   You would agree if you find them, if you come

6         across them sometime in the future, you'll

7         provide them to your attorney.

8    A.   Sure.

9    Q.   The July 8 letter was signed by Mr. Crepeau on it

10        appears July 19, 2003.

11   A.   Correct.

12   Q.   And is it fair for me to assume that as of July

13        19, 2003 you had agreed that providing `the

14        specifications in your July 8 letter were met

15        that you were not cancelling the order for this

16        Johnford lathe?

17   A.   Correct.

18   Q.   The paragraph one of that letter references that

19        the machine must be shipped out of Taiwan no

20        later than August 15, 2003?

21   A.   Correct.

22   Q.   The proposal from Machine & Electrical to you,

23        which is marked as Exhibit 10, talked about a

24        shipment date of August 31.  Do you have any

 1        recollection of the conversation that shortened

 2        the time period from August 31 to August 15th?

 3    A.  No.  It says not to ship but to arrive in US by

 4        --

 5    Q.  Fair enough.  The second paragraph talks about a

 6        copy of the factory performed accuracy test

 7        report must be received and reviewed by Dynamic

 8        before approval to ship will be granted.  Do you

 9        see that?

10    A.  Yes.

11    Q.  At any time had you contemplated going to Taiwan

12        to inspect this machine prior to shipment?

13    A.  Norman had asked if anyone wanted to go.  We were

14        building a forging press also in Taiwan so one of

15        us was considering going to Taiwan to visit both

16        factories for this work that was being done for

17        us there.

18    Q.  "One of us" being you or one of your employees?

19    A.  Correct.

20    Q.  Did you in fact do that?

21    A.  No.  We did not.

22    Q.  And why didn't you?

23    A.  Didn't have time.

24    Q.  Is it customary in the industry, if you know, for

VENANZIORO FONTE                                                September 20, 2004

Page 80

1       purchases of machines like the Johnford lathe to

2       go to the manufacturer's site to inspect the

3       machine prior to shipment?

4    A.  We had never done it.

5    Q.  Never had done it in connection with the other

6       machines?

7    A.  We bought a Daewoo and we bought Mazak.  We did

8       not go and visit.  We bought the press.  Much

9       more complex piece of equipment than theirs and

10      we did not go to Taiwan.

11   Q.  Did you in fact receive an accuracy test report

12      for the Johnford lathe before it was shipped to

13      you?

14   A.  I don't know if it was before but we did receive

15      one.

16   Q.  Okay.  With respect to item three, there's a

17      reference to A, B and C.  Those are the same

18      items that were identified in your --

19   A.  Nick's.

20   Q.  Nick's E-mail to Mr. Crepeau that's been marked

21      as Exhibit 7, correct?

22   A.  Correct.

23   Q.  And July 8 was providing that Machine &

24      Electrical would be completed commissioning of

VENANZIORO FONTE                                                    September 20, 2004

Page 81

1          the machine by September 19, 2003, correct?

2     A.   Correct.

3     Q.   And then went on to provide for a penalty in the

4          event that the commissioning of the machine was

5          delayed, correct?

6     A.   Correct.

7     Q.   With respect to the penalty that's identified in

8          paragraph four, is that the only agreement that

9          you and MECI ever reached regarding any penalties

10         for delay in commissioning that you're aware of?

11    A.   That's what I can remember, yes.

12    Q.   Okay.  You don't recall any subsequent documents

13         that would have changed the terms of that

14         penalty?

15    A.   No.

16    Q.   And with respect to item five, my understanding

17         is what that did was delay the payment of the

18         second installment so that it was due upon

19         commissioning as opposed to within 30 days of

20         delivery of the machine, correct?

21    A.   Correct.

22              MR. JACQUES:  No. 12.

23              (Accuracy Inspection report marked

24         Exhibit No. 12.)

VENANZIORO FONTE                                                    September 20, 2004

Page 82

1    Q.   Before we get to 12, let me stay with Exhibit 11

2         just for a second longer.  With respect to the

3         performance specifications for this machine, the

4         specifications that you received back in January,

5         2003 and this July 8, 2003 letter, is that the

6         sum total of the written specifications that you

7         had with MECI regarding the performance of the

8         machine?

9    A.   Repeat the question again, please.

10   Q.   The January, 2003 machine specifications that are

11        marked as Exhibit 3 --

12   A.   Correct.

13   Q.   -- and this July 8, 2003 letter, are there any

14        other documents which you believe document any

15        additional performance specifications for the

16        Johnford lathe?

17   A.   No.

18   Q.   I would ask you to take a look at Exhibit 12.

19   A.   Is this marked 12?

20   Q.   Why don't you take a look at the officially

21        marked 12?  The fax Post-it note on the first

22        page for a second.  The fax Post-it note

23        indicates that on July 29 Norm from MECI faxed

24        this accuracy inspection report to Kevin at

VENANZIORO FONTE                                                September 20, 2004

Page 83

 1      Dynamic.  Do you recall reviewing the accuracy

 2      inspection report sometime around July 29?

 3  A.  No.  I wasn't even into the company at the time.

 4      I was overseas.  But we closed on Saturday,

 5      August 12.  2nd.

 6  Q.  Do you know if you had an opportunity to look at

 7      the accuracy inspection report prior to your

 8      closing on August 2nd?

 9  A.  No, I did not.

10  Q.  You did not or you don't recall?

11  A.  I wasn't here so I couldn't know that.

12  Q.  Do you know if Kevin had an opportunity to review

13      the inspection report prior to --          `

14  A.  I cannot answer that.

15  Q.  The bottom of page -- the first page indicates

16      that the model is an HT275 -- is it G?  275G,

17      correct?

18  A.  It appears to be that way.  It's not clear.

19  Q.  And this has a serial number TKA3005.  Do you see

20      that?

21  A.  Yes.

22  Q.  Have you ever matched that serial number with the

23      machine that is on your floor?

24  A.  I have not.

Page 84

1  Q.  Do you have any reason to believe that this

2      inspection report relates to a machine other than

3      the Johnford lathe that was delivered to you?

4  A.  Yes.

5  Q.  Okay.  Tell me what is the basis for your belief

6      that this inspection report relates to a machine

7      other than the Johnford lathe.

8  A.  Well, one thing is what is depicted in here.

9      It's for a parallel lathe.  For a flat bed lathe.

10     And we got a slant bed.  So --

11 Q.  Can you point to me what you're pointing to when

12     you said that?

13 A.  If we look at the straightness of bed side ways,

14     item one, this is not representative of the lathe

15     that we have on the floor.  Right off the bat.

16     So this is almost an invalid report.  Then you're

17     trying to understand what's being said and

18     disregard the pictures being shown and you try to

19     make some sense.

20 Q.  Okay.  Let me just interrupt you.  Just to make

21     it clear for the record.  What you're pointing to

22     is the three illustrations that are part of block

23     number one on the first page, correct?

24 A.  Correct.

VENANZIORO FONTE                                                September 20, 2004

Page 85

1              MR. LITTLE:  He didn't say the

2     pictures.  He referred to item one.

3  Q.  Okay.  It's your position that all of item one

4     relates to a flat bed lathe as opposed to a slant

5     bed lathe?

6  A.  The illustrations, the three pictures that we see

7     in the illustrations on item one, it's showing a

8     parallel -- a flat bed lathe and not a slant bed.

9  Q.  Any other reasons why you believe that this

10     inspection report relates to a machine other than

11     the Johnford lathe that was delivered to you?

12  A.  It's -- there is a lot of things in here.  Trying

13     to get into the technicalities, this report says

14     certain things and the accuracy we found it

15     otherwise when the machine first came.  The

16     headstock that they showed to be very perfect in

17     the alignment --

18              You have to understand what is being

19     written rather than looking at the picture and

20     trying to make some sense here.  If it is the

21     same report, it is the poorest thing I've ever

22     seen around machine tools.

23  Q.  You talked about the headstock and you -- and I

24     know you were pointing to something but I

Page 86

```
 1        couldn't pick it up.  What box or test item are

 2        you pointing to when you talk about --

 3   A.   Stupid thing.  Um --

 4             Item eight.  Parallelism,

 5        P A R A L L E L I S M, of longitudinal movement

 6        of carriage with tailstock spindle center line.

 7   Q.   And what about that particular test item number

 8        would lead you to believe that it relates to a

 9        machine other than the Johnford lathe that was

10        delivered to you?

11   A.   The accuracy reported here -- it's either false

12        or belongs to another machine because what we

13        found on the machine was so completely `out of

14        whack that it couldn't have been this report,

15        period.  It's not even close to create a doubt

16        what they talking about or what we found.  And

17        that goes for the parallelism between --

18             (Coffee was spilled.)

19             (Off the record.)

20   A.   The accuracy of various other points on the

21        machine that we can find here.  Some discrepancy

22        basically between what is being reported to what

23        we actually physically found on the machine.

24   Q.   And we'll get to what you ultimately found on
```

VENANZIORO FONTE                                    September 20, 2004

Page 87

1      this machine a little bit later on.  When was the

2      machine shipped out of Taiwan, if you know?

3  A.  I don't know.

4  Q.  With respect to this inspection report, do you

5      know whether you reviewed it prior to the machine

6      being shipped out of Taiwan?

7  A.  Again, I did not review it.  I'm sure someone did

8      here other than John.  And it may have for sure

9      been after we came back from vacation.

10 Q.  Which would have been sometime after August 11?

11 A.  Probably.

12 Q.  The issue about test item one, which you

13     indicated depicted a flat bed lathe as opposed to

14     a slant bed lathe, at any point did you or anyone

15     else from your company question Norman Crepeau

16     regarding test item one prior to the machine

17     being shipped out of Taiwan?

18 A.  No.  The intent of this thing, Keith, if I'm

19     allowed to, was that in the rush of trying to get

20     this machine out with the cancellation pending,

21     we did not want to get something half finished

22     over there that would have to be finished here so

23     that was the intent of looking that the machine

24     is actually done.  To be honest, nobody really

VENANZIORO FONTE                                        September 20, 2004

Page 88

1        actually looked and analyzed.  Okay?  Or compared

2        that 0.04 millimeters wouldn't ultimately meet

3        the specification that were part of the proposal.

4                Nobody really cared.  Those could not

5        be met here anyway and that's what we really

6        cared.  This is the case.  When you sell me a car

7        with a guarantee that that 60 miles an hour and

8        you asking me to check inside the sales room, it

9        just cannot be done.  You got to take it on the

10       street, on the highway, make sure the cops aren't

11       there and then you go 60 miles an hour.

12               So what they say, if the guy says I

13       have 500 horsepower, I have a big flat `tires and

14       I have this and you can go so fast, it didn't

15       really matter.  Because ultimately estimate 60

16       miles an hour on the highway and that's basically

17       in a nutshell what it is.

18    Q.  But my understanding is one of the things you

19        said with respect to test item number one, the

20        three illustrations depicted a flat bed lathe as

21        opposed to a slant bed lathe, correct?

22    A.  Correct.

23    Q.  That didn't relate to performance but that

24        related to what kind of machine you were buying,

1      correct?

2                MR. LITTLE:  No.  Those questions arose

3      in the context of whether the report was an

4      accurate report.

5                MR. JACQUES:  I understand.

6  A.  Right.  And you cannot really answer.  You asked

7      if I have any reason to believe that what's been

8      shown here was the lathe or not.  I cannot tell

9      you that but if I have to take what's being shown

10     here, this belongs to a flat bed lathe, not a

11     slant bed lathe.

12 Q.  That's based upon the illustrations in item one?

13 A.  Not just one.  All of it.  It's the same thing.

14 Q.  Okay.

15 A.  The left-hand side column, it's written and when

16     it says straightness of bed side ways means

17     something.  To the guy.  The technician like me.

18     It means what it says and I can understand that.

19     Now I can say disregard what's here and apply it

20     to a slant bed lathe.  But then it comes the

21     question.  There is ways -- there are two sets of

22     guideways on a slant bed machine and there is

23     only one set of ways on a flat bed.

24                So the moment you show me -- the

VENANZIORO FONTE                                     September 20, 2004

Page 90

1      illustration of flat bed and you say straightness

2      of bed side ways, it just doesn't make any sense.

3  Q.  At any point before Dynamic received the Johnford

4      lathe, did you raise that concern with Norman or

5      anyone else at MECI?

6  A.  No.  Because we had to meet 60 miles an hour plus

7      or minus five-tenths and plus or minus

8      two-tenths.  The position of accuracy was plus or

9      minus five-tenths and the repeatability was plus

10     or minus two-tenths.

11          All of this, all of this, would

12     ultimately have to meet that accuracy.  That is

13     the sum of all of this.  If there were `30 pages

14     of this, it wouldn't make any difference, any

15     more or less than two pages.  Ultimately that is

16     the test.

17  Q.  Did you at any time attempt to determine whether

18     this accuracy inspection report demonstrated the

19     machine's compliance with the specification that

20     you had agreed upon with MECI?

21  A.  It cannot.  It's impossible because the machine

22     must be set up where it's going to be.  It's

23     going to be leveled on the foundation it's going

24     to be and that's when you check that accuracy.

VENANZIORO FONTE                                                    September 20, 2004

Page 91

```
 1        You cannot check 60 miles an hour inside the

 2        sales room.

 3  Q.    So this inspection report doesn't really tell you

 4        much other than the fact --

 5  A.    Exactly.  It will tell me the accuracy of the

 6        spindle.  It will tell me certain things but

 7        that's all it's going to tell me.  The bearings

 8        and the spindle and whatever else.  Other little

 9        things.

10  Q.    Did you ever request that Johnford provide you

11        with additional documentation regarding the

12        performance of the machine, other than this

13        inspection report?

14  A.    No.  The commissioning that has to take place at

15        Dynamic has to check those accuracy, the

16        specifications that were agreed upon and it can

17        only be checked here.  If they actually

18        guaranteed that they had done it in Taiwan?  If

19        they wanted to say their story.  Ultimately that

20        document, Exhibit 11, states that whatever they

21        say must be met and duplicated here for the lathe

22        to be accepted.

23               On item --

24  Q.    Item two.  Correct?
```

VENANZIORO FONTE                                                September 20, 2004

Page 92

1   A.   Right.  So that was never addressed and needs to

2        be addressed.

3   Q.   Okay.  My understanding reviewing the records is

4        that the machine wasn't delivered to Dynamic

5        until sometime in October of 2003, correct?

6   A.   Right.

7   Q.   The agreement that you had with MECI dated July

8        8, 2003 indicated that the machine must be

9        shipped no later than August 15, 2003, correct?

10  A.   Right.

11  Q.   And that it would need to be commissioned on or

12       before September 19, 2003, correct?

13  A.   Correct.

14  Q.   At any time prior to the machine arriving at

15       Dynamic Machine Works, did you indicate to MECI

16       that since the machine had not been shipped and

17       received and commissioned in accordance with the

18       July 8, 2003 letter you were not going to accept

19       delivery of the machine at Dynamic?

20  A.   No.  There was no reason for that, Keith.  The

21       delays were caused by a number of things.  Norman

22       had told me the fellow had brought the machine to

23       a warehouse.  There was some issues with the

24       shipper.  The shipper or the people that had to

Page 93

1    rig this thing up to Boston, he had picked a

2    company that we had just used to deliver one of

3    the large flowforming machines and they done such

4    a poor job that I warned Norman.  I said, You

5    better watch these people because I don't think

6    in my opinion they're capable.

7             Another three or four days went by.  So

8    it was kind of a creeping a few days here and few

9    days here that brought us in October.  No one

10   knew what he was going through with this machine.

11   No one had a gun on his head.  We're not going to

12   cancel the machine for a week being late.  Beside

13   the fact there was a penalty clause into this

14   agreement of July 8th.

15            Just to finish that, in my closing

16   statements on the July 8th agreement with Norman,

17   on this closing paragraph, "I trust the above

18   agreed conditions will be taken seriously by M&E

19   and the Johnford people since further failure to

20   deliver will be met with a cancellation of the

21   order."

22            So it was not an issue.  We will cancel

23   because we just had enough of this thing.  And so

24   that if and when the machine did arrive in the

Page 94

```
 1       United States, you could almost feel, you had

 2       this machine.  You needed it.  We needed this

 3       machine.  We had guns on the head with the

 4       customer that probably accounts for half a

 5       million dollars a year for us.  We were ready to

 6       cancel because we could not do the parts.  M&E

 7       knew it.

 8   Q.  Prior to the date of delivery which was October

 9       9, 2003, Dynamic didn't cancel the order,

10       correct?

11   A.  Correct.

12   Q.  You mentioned you had a customer that was anxious

13       to get their work done.  Was that work `that could

14       not be completed with the Mazak that you had on

15       the floor?

16   A.  We needed additional capacity.  Mazak was busy.

17       Couldn't get into Mazak so we had relied on this

18       machine from July to get in and then originally

19       -- these are large tubes that we do.  And we

20       needed additional capacity and there had been

21       delays.  I think we had received probably the

22       preform, what we call the starting blanks,

23       provided by the customer in June.

24              And we had told the customer that at
```

VENANZIORO FONTE                                    September 20, 2004

Page 95

```
 1        the time the machine was going to come in July

 2        when the first delay arrived.  The second delay

 3        we were told it would come in July, August.  We

 4        told the customer in September they will get the

 5        parts.  Here we come.  September has come and

 6        gone and the parts wouldn't even started, making

 7        them, turning them into what is a starting blank.

 8        We had another three or four weeks ahead of us.

 9        By the time the machine could not meet

10        specification for acceptance, the customer had

11        had it with us.

12                  Because it wasn't a case where we told

13        them, You'll get it at this date.  It was

14        continuous days in our part to provide them with

15        finished units.

16   Q.   Ultimately did you lose that contract with that

17        customer?

18   A.   No, we did not.

19   Q.   Do you continue to do work for that customer?

20   A.   Yes.

21   Q.   Did you have to pay any performance penalties or

22        reduce the contract price --

23   A.   No.

24   Q.   -- because of the delay?
```

1    A.   No.  We paid top dollar for the machine to

2         replace the Johnford within three days.  Called

3         Mazak.  We asked the price.  Bring the machine

4         in.  That was the end of the issue.

5    Q.   The Mazak you obtained, what's the model number?

6    A.   Slant 60.  I think it's CNC Slant 60.  Something

7         like that.

8              (12/9/03 letter marked Exhibit No. 13.)

9    Q.   Mr. Fonte, I'm handing you a document that's been

10        marked as Exhibit 13, which is a letter dated

11        December 9, 2003 from Dynamic to Norman Crepeau.

12        Do you recognize that letter?

13   A.   Yes.

14   Q.   And is that a letter that you wrote?

15   A.   Yes.

16   Q.   And it's signed by you on page two, correct?

17   A.   Correct.

18   Q.   On page three of that letter -- it's not really

19        page three but the third page attached to that

20        exhibit is a fax cover sheet from you to Norman

21        Crepeau purporting to attach what I assume is the

22        December 9 letter, correct?

23   A.   Right.

24   Q.   My understanding is that as of December 9 you

Page 97

1  were prepared to give Machine & Electrical

2  Consultants until Friday, December 19, 2003 for

3  them to, using your words, fully and

4  unconditionally commission the machine.  Is that

5  correct?

6  A.  Correct.

7  Q.  At the time that you wrote this letter, as of

8  December 9, 2003, what were your complaints

9  regarding the machine?  What was wrong with it?

10  A.  Machine could not meet specifications.  Machine

11  had arrived in beginning of October.  I believe

12  October 8.  Whatever the date was.  This is

13  December 9.  The machine had been here `for a

14  month.  And we still couldn't get going.

15  Q.  Who during the period of October to December,

16  2003, who if you know had worked on commissioning

17  the machine?

18  A.  Various people from Machine & Electrical.  There

19  have been a couple people probably from here

20  supervising and just making sure they were doing

21  the right thing.  There had been riggers who

22  brought the machine in.  There had been Oxford

23  Engineering trying to get the machine -- to check

24  the accuracy.  And DRW, another company that

Page 98

1      Norman had requested to come and check accuracy

2      and repeatability of the machine.

3  Q.  You mentioned a couple of people from here.

4      Would that have been the people you identified

5      earlier as employees of Dynamic?

6  A.  Physically I think the work was done along with

7      Norman's people by Nick, maybe Vannah, John but

8      they were in and out.  It was not their job to

9      set the machine.  Norman's people would set up

10     the leveling, the rough leveling.  They'll check

11     and then they'll go away and they'll keep on

12     going.

13           They had more of a supervisory

14     responsibility at that stage rather than getting

15     involved with that except just before prior to

16     that.  One of Norman's people was taking cuts,

17     which is what he and I discussed what I wanted to

18     do.  And I found that the person that Norman had

19     was not competent enough to be entrusted with

20     that.  He was using the steady rest.

21           The steady rest as the task to support

22     the part, a long piece, when it droops.  And it

23     falls by gravity.  Okay?  And that's all it's

24     supposed to do.  He described to me what he

Page 99

1    found.  He was 8/1000ths off this way.  He

2    described the condition that he used to cut this

3    piece to create a certain situation in the

4    accuracy of the piece that I said, That's not

5    possible.  You cannot do that.  It's impossible

6    for the lathe to do that.  And he said, Well, it

7    does.  So I said, The only way you can do that is

8    to have the steady rest working in reverse.

9    Instead of supporting, it's actually pulling the

10   support down.  He said, No way.

11              So we did.  I let him release the

12   steady rest and the part sprung up.

13   Q.  Who was that individual?

14   A.  I don't know.

15              Who was the last guy here?  That I told

16   him to go home.  Whoever that guy --

17   Q.  If you don't know his name, that's fine.

18   A.  Right.  But it was at that point, the day before,

19   that I put Dale LeClair, I said, Look, the guy is

20   not a machinist.  He might be a good technician

21   but he is not a machinist.  This is what we're

22   going to do so don't waste any more time here.

23              And the directives were to measure a

24   feet, pull a part out, take a cut.  A series of

VENANZIORO FONTE                                      September 20, 2004

1        things was basically set up so we would have a

2        very defined task how we could measure the

3        machine.

4                At that point the machine had failed.

5        Norman said one axis was out.  One was in.  The

6        other fellow, DRW -- we consider both axis out

7        there but then when Oxford came it was obvious

8        the machine was nowhere near where it was

9        supposed to be.  And at that point, Norman and I

10       spoke.  And I told Norman, I said, Look, the

11       situation is probably going to get a lot worse

12       once we start to cut.  But assuming that the

13       machine is made, let's take some cut. `Let's

14       forget what the laser is telling us.  Let's close

15       our eyes to it.

16               This is conversation I had with him.

17       Let's cut.  Let's see what we can get out of it.

18               And at that point he put this man there

19       and the man was not a competent machinist.

20       Certainly this condition was far beyond the man's

21       capability to understand what was going on.  If

22       he was to go and play around with the lathe, he

23       probably could do it.  But this was -- we were

24       pushing -- trying to understand what was going

VENANZIORO FONTE                                    September 20, 2004

1       on.

2                    And what I found there was not

3       heartwarming.  He was the wrong man there.  So I

4       gave him one of my supervisors on the large

5       machine, Dale.  I said, You speak with the guy

6       and that's all we going to do.

7                    One of the things was to set up the

8       tailstock for him to align it any way he wants

9       it.  Not Dale but Norman's fellow.  To take a cut

10      and then adjust the tailstock where he wanted it

11      in relation to the center.  And then from that

12      point on, I did not want him to touch the

13      tailstock.  I want him to move it every foot and

14      take another cut and see what the accuracy were.

15      I left here.  Was 11 o'clock at night.  Came back

16      the next morning at seven.  They had finished the

17      cut and the lathe was 9/1000ths out of whack.

18      Okay?

19                   And so --

20  Q.  I didn't mean to interrupt you.  When did that

21      happen?  What was the date?

22  A.  After I sent this letter.  The same night

23      actually.  This letter went probably five o'clock

24      in the afternoon and at night we were going

VENANZIORO FONTE                                      September 20, 2004

1        through this thing.  Okay?

2                So I put Dale with the fellow.  I came

3        back the next morning and they say that thing was

4        eight and a half thousandths off.  Eight and a

5        half thousandths -- eight and one half

6        thousandths off what it should be.  The

7        alignment.  And then John came out, Heymans, and

8        he said, Ven, I know you're upset.  Look.  He

9        says, That machine, the tailstock doesn't go six

10       feet to the spindle.  The five-inch bar cannot

11       cut the center.  He says, I don't know what you

12       want to do.

13               And that's when I said, Okay.` Enough

14       here.  Because if we start to play with this

15       issues, we'll be another month and I didn't have

16       a month.

17   Q.  As of --

18   A.  Parts there with customers screaming.  We

19       couldn't -- never mind get out of the tunnel, we

20       couldn't see the light at the end of the tunnel.

21   Q.  As of December 9, you were prepared to give MECI

22       until December 19 to commission the machine,

23       correct?

24   A.  Yes.

VENANZIORO FONTE                                                September 20, 2004

```
 1   Q.   As of December 9, had MECI told you that it had

 2        completed the commissioning process?

 3   A.   It couldn't have been completed.  I didn't need

 4        MECI to tell us how -- machine was specked out by

 5        M -- Machine & Electrical that it was supposed to

 6        meet the plus or minus five-tenths accuracy and a

 7        plus or minus two-tenths repeatability.  We've

 8        been there for a month.  I didn't need them to

 9        tell me that they weren't completed.

10   Q.   Yeah.

11   A.   It's my call when we call the shots here.

12   Q.   My question --

13   A.   Because I'm the buyer of that machine. `

14   Q.   At no time up until December 9 did MECI tell you,

15        We're done.  The machine works.  We're leaving.

16   A.   No.

17   Q.   Between October 9 and December 9, is it a

18        situation like you sometimes have with

19        contractors where they work a couple days and

20        then they're gone for two weeks and then they

21        come back for a couple days, or did they work

22        fairly regularly in getting this machine to work

23        between October 9 and December 9?

24   A.   The commission of a lathe is subjective who is
```

VENANZIORO FONTE                                                    September 20, 2004

Page 104

1    looking at that question.  The commission of a

2    lathe is usually no more than a week.  On a

3    machine of that size.

4    Q.  And --

5    A.  And --

6    Q.  -- what do you base that on?

7    A.  Thirty-five years with machine tools.

8    Q.  Okay.  I didn't mean to interrupt.  Go ahead.

9    A.  I answered the question.

10   Q.  So when the machine arrived on October 9, you

11   anticipated that commissioning would be complete

12   within a week or so?

13   A.  Correct.

14   Q.  Is that something that MECI represented to you?

15   Was that a conclusion that you made based upon,

16   as you testified, your years of experience?

17   A.  Let me bring you back to MECI letter to me.

18            MR. LITTLE:  Exhibit 10?

19   A.  They're giving themselves 11 days with two

20   weekends in between.  Delivered by September 8th.

21   Full commissioning by September 19.  That's

22   Norman's writing.  Eleven days with two weekends

23   in between so that's one week.  I'm giving you a

24   week and a half.  Okay?

VENANZIORO FONTE                                          September 20, 2004

1   Q.   Was this December 9 letter the first time that

2        you gave MECI a deadline to complete the

3        commissioning work?

4   A.   There might have been other conversations I'm

5        sure verbally.

6   Q.   Are you aware of any writings where you gave a

7        deadline to complete the commissioning work

8        between the time that the machine was delivered

9        and the --

10  A.   I don't think so.

11            MR. LITTLE:  You understand the July

12       8th letter did exactly that as well?

13  A.   After the machine arrived.  That's what you

14       asked, right?

15  Q.   Correct.

16  A.   No.  This is a summary of what happened and it

17       specifies the whole thing but basically since we

18       had -- since we had received the machine, this

19       was the first document in writing that said,

20       Look, the situation is bad.  Just get it together

21       or you're out of here.

22  Q.   Do you have specific recollections of having oral

23       discussions with MECI in which you gave them a

24       commission deadline between the date of delivery

VENANZIORO FONTE                                         September 20, 2004

Page 106

1    of the machine and this December 9 letter?

2  A.  Not a deadline.

3         MR. JACQUES:  Fourteen, please.

4  A.  Can I -- excuse me for one second -- call Matthew

5     and tell him something?  I'm supposed to be at

6     lunch with someone at one o'clock.

7  Q.  Sure.

8         (Recess.)

9         (12/11/03 letter marked Exhibit No.

10    14.)

11        (Lunch recess.)

12        MR. JACQUES:  For the record, we had

13    broken for lunch and we were going to resume Mr.

14    Fonte's deposition for two o'clock this

15    afternoon.  Mr. Fonte has been held up with a

16    lunch engagement and we have agreed to suspend

17    his deposition and move on to one of the other

18    scheduled depositions for this afternoon and then

19    upon conclusion of John Heymans' deposition, we

20    will then resume Ven Fonte's deposition.

21        MR. LITTLE:  Right.

22        (Off the record.)

23        MR. LITTLE:  By agreement of the

24    parties, we will reserve the right to read and

1        sign the deposition.  Thirty days to read and

2        sign.  Okay?

3                  MR. JACQUES:  That would be fine.  My

4        only concern is the --

5                  MR. LITTLE:  We'll have ours read and

6        signed by the -- within a week that we receive

7        it.

8                  MR. JACQUES:  That would be fine.  And

9        if for whatever reason it is delayed for business

10       reasons or stuff, we can just discuss the summary

11       judgment opposition date and reach some kind of

12       accommodation.

13                 MR. LITTLE:  That's fine.  `

14                 (Whereupon, the deposition was

15       suspended at 2:00 p.m.)

16

17

18

19

20

21

22

23

24

VENANZIORO FONTE                                                September 20, 2004

```
 1                    AFTERNOON SESSION

 2   Q.  Mr. Fonte, we're back from lunch break and just

 3       remind you that even though your deposition was

 4       suspended for a period of time, you're still

 5       under oath.

 6   A.  Yes.

 7   Q.  I would like to hand you a document that we

 8       marked as Deposition Exhibit 14.

 9              MR. JACQUES:  I think I gave it to you

10       before we --

11              MR. LITTLE:  You did.  Thank you.

12   Q.  Have you seen that letter prior to today?

13   A.  Yes.

14   Q.  That letter is dated December 11, correct?

15   A.  Correct.

16   Q.  And it's a letter from your attorney to Mr.

17       Crepeau?

18   A.  Correct.

19   Q.  And what is your understanding regarding why that

20       letter was sent to Mr. Crepeau?

21   A.  I think officially and formally notify Machine &

22       Electrical that we were not going to accept the

23       machine.

24   Q.  Okay.  And that letter is dated the 11th of
```

VENANZIORO FONTE                                                                 September 20, 2004

1      December?

2   A.  Correct.

3   Q.  Which is two days after your letter had been sent

4       to Mr. Crepeau giving him until December 19 to

5       fully and finally commission the machine,

6       correct?

7   A.  Correct.

8   Q.  What happened or why did you decide to rescind

9       your December 19 deadline that had been

10      communicated two days before?

11  A.  I thought I covered that before I went to lunch.

12      It was obvious after I sent the letter out that

13      we were not going to get this machine on line and

14      working soon.  The machine was out of spec.

15      Eight, eight and a half thousandths.  The machine

16      had not been able to meet both laser companies

17      that Norman had sent in.  Did not meet the

18      specification of the proposal.

19              And as much as I wanted, with the

20      machine on the floor, as much as I wanted to go

21      forward with that, the fact that the machine

22      which I had not heard up to that point could not

23      cut with a five-inch bar to center, could not

24      meet the specification.  It was the proverbial

VENANZIORO FONTE                                             September 20, 2004

1         drop that tipped the bucket.  I said, That's it.

2         I did not have another month to play with this

3         thing.  We needed a machine and that was the end

4         of it.

5    Q.   The first item listed in the December 11 letter

6         is that the equipment was incapable of holding

7         positional accuracy as specified.  Specifically

8         what was the positional accuracy that you

9         understood the machine was unable to meet?

10   A.   Plus or minus five-tenths of a thousand.  And the

11        repeatability, which is supposed to be a plus or

12        minus two-tenths of a thousand.

13   Q.   With respect to your determination that the

14        machine was incapable of holding the positional

15        and repeatability accuracy, what did you base

16        your conclusion upon?

17   A.   Repeat the question, please.

18   Q.   What did you base your conclusion upon that the

19        machine could not hold the positional accuracy

20        and repeatability accuracy within specs?

21   A.   The two engineering firms that Norman hired to

22        come and inspect the machine both produced

23        records, written records of the machining

24        capability to meet plus or minus what we needed.

VENANZIORO FONTE                                      September 20, 2004

Page 111

1   Q.   And the two firms were Oxford Engineering and

2        DRW?

3   A.   Correct.

4   Q.   With respect to DRW, did you speak to any

5        individuals at DRW regarding the results of their

6        testing?

7   A.   No, but the result, what I spoke, I came in on a

8        Sunday trying to expedite it, as Norman knows.

9        He arranged when he said he couldn't get this

10       person for two weeks -- I went ballistics.  Okay.

11       So he arranged for the fellow to come in with one

12       of his people on a Sunday.  And I came in, opened

13       the door, let him in and I worked while they were

14       playing with that.

15            And at the end of the day in the

16       afternoon, fellow was complete.  He had completed

17       the job, and he basically told me that one axis

18       seemed to be within specs and one axis was out.

19       There was as far as the positional accuracy

20       showing about one-thousandth when it should be

21       five-tenths or half thousandths.

22            There is another issue there which is a

23       repeatability of the machine which is supposed to

24       be within plus or minus two-tenths of a thousand

VENANZIORO FONTE                                                September 20, 2004

Page 112

```
 1      and the machine is out.  At that point, I wasn't

 2      that much concerned.  That was the first time we

 3      went around this thing.  I wasn't that much

 4      concerned with that kind of reading.  I was more

 5      concerned our ability to maintain a plus or minus

 6      half thousand throughout the stroke of this

 7      machine.  That was the primary concern that I

 8      had.

 9                    If something does not on a machine tool

10      -- if you give a command to the machine and the

11      machine misses that command by one-thousandth,

12      you can always change the program to make the

13      machine go where you want it to so yes, it is not

14      right but you can deal with.  It's when the

15      machine is wavy.  Nothing you can do about it.

16  Q.  What test results did you rely upon in concluding

17      that the machine was wavy when it performed?

18  A.  The Oxford Engineering.  The other person did not

19      check that.

20  Q.  Okay.  And Oxford Engineering is Jack Grosberg?

21  A.  That's his last name?  Yeah.

22  Q.  And I understand that you reviewed the test

23      results by Oxford Engineering?

24  A.  Yes.
```

1  Q.  Did you and Mr. Grosberg speak at any point

2      regarding the testing results that he had

3      observed?

4  A.  Sure.

5  Q.  How many occasions did you and Mr. Grosberg speak

6      regarding what he had found regarding the

7      capability of this machine?

8  A.  We probably spoke through the course of a week,

9      ten days, whatever he was here.  Three times,

10     four times.  I went outside.  How things are

11     going, to check how things are going.  Sometime

12     at the later part of his working here, we had a

13     conversation and basically said, This is the best

14     this machine is going to do.  He said -- this

15     person was for a long time -- I don't know what

16     he was.  Large company.  In charge of

17     maintenance.

18          He says, I usually do things in one

19     day.  He says, Maybe 12, 14 hours.  I have to

20     come back the next morning and so on.  He said,

21     I've been here for a week.  He said, This lathe

22     is not going to go within the plus or minus

23     five-tenths.  It's not going to meet

24     specifications.

VENANZIORO FONTE                                             September 20, 2004

Page 114

1   Q.   Other than you and Mr. Grosberg, who else was

2        present when he told you that, if anybody?

3   A.   I don't recall.

4   Q.   Is Mr. Grosberg the only individual that has told

5        you that the machine could not meet the

6        specifications?

7   A.   Yes.

8   Q.   Has anyone ever told you that the machine could

9        meet specifications with additional work?

10  A.   We have asked you guys three times in writing to

11       answer that question.  It's funny that you ask

12       that.  We asked three times with a letter.  Can

13       your machine meet the plus or minus five-tenths?

14       You never gave us the courtesy to answer and now

15       you come back and ask me if anyone has told you.

16       We asked the same question three times.

17             No.  I did not hear that from anyone.

18  Q.   Okay.  Has anyone other than Mr. Grosberg and DRW

19       performed testing on the machine?

20  A.   No.

21  Q.   With respect to your oral conversations with Mr.

22       Grosberg, did you keep any notes regarding those

23       conversations?

24  A.   No.

VENANZIORO FONTE                                                    September 20, 2004

```
 1                    MR. JACQUES:  Mark that whatever is

 2        next.

 3                    (Document marked Exhibit No. 15.)

 4   Q.   Mr. Fonte, I'm handing you a document that we

 5        have marked as Exhibit 15.  And I understand that

 6        at least the first three pages of that exhibit is

 7        a document that you have prepared --

 8   A.   "You" being Dynamic.

 9   Q.   "You" being Dynamic.  That Dynamic has prepared

10        which in effect extrapolates or graphs the

11        results that Mr. Grosberg reported on his

12        November 25, 2003 report, correct?

13   A.   That is correct.

14   Q.   With respect to the portion that Dynamic

15        prepared, who prepared that documentation?

16   A.   John Heymans.

17                    MR. LITTLE:  I would like to interrupt

18        for the moment.  The version you gave as Exhibit

19        15 varies from the version that I gave you.  It

20        has handwriting on it.

21   A.   Looks like my handwriting when we were in Maine.

22        Tool turret.  I don't know what it says there.

23        Tool carriage.  It's written here.  Tool turret.

24        And then there is showing the tool or probably
```

VENANZIORO FONTE                                                  September 20, 2004

Page 116

1       something.  I don't know if you want to rip it

2       and make a new clean one or leave it.

3    Q.  We can leave that and let me ask you some

4       questions just to clarify it.

5    A.  Sure.

6    Q.  The light printing that appears to be in pencil

7       is your markings on that document?

8    A.  It seems to be, yes.

9    Q.  Okay.  The rest of the document being the first

10       three pages were prepared by John Heymans.  And

11       if I recall correctly, you made the handwritten

12       changes at the deposition of Norman Crepeau,

13       correct?

14   A.  Possibly.

15           MR. LITTLE:  Actually, I believe it was

16       not during the deposition.

17           MR. JACQUES:  After.

18           MR. LITTLE:  Discussions following

19       that.

20   A.  Might have been a copy that I had in my briefcase

21       or something.

22   Q.  Okay.  With respect to the last two pages of

23       Exhibit 15, which is the Oxford Engineering

24       November 25, 2003 results, who did you receive

VENANZIORO FONTE                                                    September 20, 2004

1         that documentation from?

2    A.   Probably from my engineering department.  This

3         was from Oxford to John and Nick.  People that

4         were involved with him.  And ultimately I got to

5         see it through them.  He did not give it to me

6         directly.

7    Q.   Okay.  And with respect to the handwritten

8         portions on the last two documents, the last two

9         pages on the document, specifically on the first

10        page where it says "tailstock ways" and then

11        "final tailstock ways at 45 degrees," do you know

12        whose handwriting that is?

13   A.   No.  I wonder if it was John -- Jack's `assistant.

14        He had an engineer that operated the computer and

15        Jack did the measurement at that time.

16   Q.   Do you happen to know the name of the assistant

17        that was operating the computer?

18   A.   No, sir.

19   Q.   And likewise, I'm assuming that since it appears

20        to be the same handwriting, the handwriting on

21        what's identified as B with a circle on the last

22        page of the exhibit, you don't know whose

23        handwriting that is?

24   A.   Correct.

VENANZIORO FONTE                                                    September 20, 2004

1   Q.   And with respect to your conclusions that the

2        Johnford lathe was not capable of meeting the

3        repeatability and precision accuracy

4        specifications, is it fair for me to assume that

5        that is based upon Mr. Grosberg's November 25,

6        2003 test results and his conversations with you?

7   A.   And DRW both.

8   Q.   Okay.

9   A.   But this was the more serious.

10  Q.   Okay.  Is there anything else other than the

11       Exhibit 15 and the DRW stuff that you found of

12       less significance that you relied upon in

13       concluding that the lathe was not capable of

14       meeting the repeatability and precision accuracy

15       specifications?

16  A.   For one thing, the five-inch bar on the machine.

17  Q.   Okay.

18  A.   And basically the accuracy.  That's the primary

19       concerns.

20  Q.   When you say "the five-inch bar," my

21       understanding based upon 14 is that the machine

22       was unable to --

23  A.   Based on what?

24  Q.   Exhibit 14.

VENANZIORO FONTE                                                    September 20, 2004

1   A.   Oh, 14.

2   Q.   I'm sorry.  Is that the machine was unable to

3        reach the center line of the X axis when using a

4        five-inch boring bar.

5   A.   Correct.

6   Q.   And how did you reach that conclusion?

7   A.   They told us.

8   Q.   "They" being MECI?

9   A.   Right.  And actually, they say they could correct

10       one of -- one of his men told me.  Mark.  I don't

11       know what his name was.  It was a counterbalance

12       cylinder for the turret that impaired, physically

13       impaired the turret that traveled the center but

14       they could change that and maybe they could get

15       four inches but definitely they were not going to

16       get five inches so the case was final.

17  Q.   And do you recall when you --

18  A.   And I learned that that morning, by the way, when

19       I came in the next morning, December 9, December

20       10.  After I wrote that letter.  I did not know

21       about that issue in the morning.  Until that

22       morning.  It was John that told me.  I went to

23       the machine.  And the guy confirmed it, yes.

24  Q.   John Heymans told you?

VENANZIORO FONTE                                September 20, 2004

Page 120

```
 1   A.   Right.  That the issue with the tailstock would

 2        not go against the -- within six feet or so of

 3        the spindle and this issue of the five-inch

 4        diameter bar going to center or not what it

 5        supposed to be.

 6   Q.   With respect to item three where the headstock

 7        chuck and the tailstock body couldn't come within

 8        six feet of each other, was that because of the

 9        installation of guards, if you know, on the

10        machine?

11   A.   Yes.  And that is why we dropped -- personally,

12        anyone that does that, and that manufacturing

13        machine like that, doesn't belong in that

14        business but I'm willing to tolerate it and say

15        it's fine.  We'll take the guards off.  All

16        right?

17             We have the same situation on other

18        machines and that has nothing to do with --

19        that's irrelevant to the length of the machine.

20        That's just a tailstock getting to the spindle.

21        And everyone has got a solution to it.  Obviously

22        in Johnford they haven't figured out how to do it

23        yet.

24   Q.   The fact that it could not come within six feet
```

VENANZIORO FONTE                                                    September 20, 2004

Page 121

1       of each other was because the guards prevented

2       that from happening?

3    A.  I learned that, yes.

4    Q.  Okay.  Would you agree that removing the guards

5       was a relatively simple solution to the

6       difficulty of --

7    A.  Yeah.  We dropped it.  Something I didn't like.

8       And I could name, by the way, another two dozen

9       things that I think are just junk around that

10      machine.  Okay?  We dropped that.  That's not an

11      issue anymore.  We said, Fine.  We don't like it

12      but we will take it.

13           But the five-inch bar and the accuracy

14      of the machine are pretty serious thing.  The

15      machine was purposely bought with something in

16      mind and we do go to center with the machine.  If

17      the machine cannot perform that, then we don't

18      need that machine in here.

19   Q.  My understanding is your position in this case is

20      that the specifications substantially impairs the

21      value of the Johnford lathe to you?

22   A.  Not substantially.  It negates any value if I

23      can't work with it.

24   Q.  You mentioned that there were a dozen or so other

VENANZIORO FONTE                                          September 20, 2004

Page 122

1    concerns you had with the machine.  Is it fair

2    for me to assume that what substantially impairs

3    the value of the machine to you in your mind is

4    item one and item two on Exhibit 14?

5  A.  Correct.

6  Q.  And the other items are perhaps a nuisance but

7    they're insignificant?

8  A.  Dropped it long time ago.

9  Q.  Can you identify for me what expenses you believe

10   Dynamic has incurred in connection with your

11   purchase of the Johnford lathe?

12             THE  WITNESS:  Do you have that list?

13  A.  We made a list.

14             Well, if I have to answer that question

15   right off the memory, there's been a number of

16   things associated with that.  Of course the fact

17   we had to tear down a door and the installation

18   of the machine, the removing of the machine, the

19   storing of the machine.  All of those are

20   expenses that we have to deal with.

21  Q.  My understanding is that since the delivery of

22   the Johnford lathe, in addition to the Mazak and

23   the Daewoo machine that you have purchased, you

24   also purchased a planing machine, I believe?  Is

VENANZIORO FONTE                                    September 20, 2004

Page 123

1      that right?

2              MR. CREPEAU:  A press.

3   Q.  A press?  Forging press?

4   A.  Yes.

5   Q.  Would the delivery of the forging press have

6       required alterations of your building in order to

7       get it into your building?

8   A.  No, sir.

9   Q.  You confident of that?

10  A.  Perfectly confident.

11  Q.  One of the items you have identified in your

12      affidavit --

13  A.  Machine came in three pieces and then put

14      together.  Don't look at it as it stands there.

15      So it was put on the side.  It came in.  There

16      was no problem.

17  Q.  Okay.  One of the items -- actually, to be fair,

18      let's go ahead and mark this as Exhibit 16.

19              (Affidavit of Venanzioro Fonte marked

20      Exhibit No. 16.)

21              MR. LITTLE:  This is your affidavit.

22              (Off the record.)

23  Q.  Let me hand you a document that we marked as

24      Exhibit 16.  Turning to the -- do you recognize

VENANZIORO FONTE                                                    September 20, 2004

1    that document?

2  A.  Yes, I do.

3  Q.  And can you tell me what it is?

4  A.  It's my affidavit on the facts surrounding this

5      case.

6  Q.  I would like you to turn to page three of that

7      affidavit.  And specifically item -- paragraph

8      17.  I believe we've talked about the purchase of

9      the steady rest but could you describe for me,

10     you have an installation labor total of $21,029.

11     Can you describe for me what that number is

12     comprised of?

13  A.  No, I can't.

14  Q.  Is there somebody in your company that would be

15      able to tell me how you came up with that number?

16  A.  Yes.

17  Q.  And who is that?

18  A.  Kevin McGinley.

19  Q.  Do you have any independent knowledge of what

20      installation labor was required in connection

21      with this machine being delivered to the

22      property?

23          MR. LITTLE:  Again, I'll object to the

24      form of the question.  There is a difference

1      between knowledge of the labor that was involved

2      and knowledge of what the price was that related

3      to it.

4              MR. JACQUES:  Yeah.

5              MR. LITTLE:  So I'm not sure which one

6      you're asking about.

7   Q.  I'm actually looking for the specific nature of

8      the labor that was done in connection with the

9      installation labor entry on your affidavit.

10  A.  I trust Kevin to give me that figure and it was

11     fine with me.  The details, what made up that

12     figure in total, I couldn't tell you.  I mean,

13     there were just a lot of charges.  I don't know

14     what account they go to and so on.

15  Q.  And is that pretty much the same for the rigger

16     expenses, the materials, the electrical and the

17     building modifications?

18  A.  Well, the rigging I knew because John came over

19     and he said that the guy -- they wanted 5,800 to

20     move the machine.  We had to move the machine

21     fast because Mazak was coming in.  And John came

22     over and said it's $5,800 just to shift it.  To

23     move it from where it is.  I said, Fine.  What

24     are you going to do?

VENANZIORO FONTE                                                September 20, 2004

1              That's it.  So that was 58.  So that I

2       have a firsthand knowledge of because I remember

3       that figure.  Building modifications.  I knew we

4       were somewhere above 5,000 and less than 15,000

5       so 7,000 does not surprise me.

6   Q.  And again, would Kevin be the person that would

7       have more specifics with respect to that number?

8   A.  Probably.  And a combination of Kevin, Nick,

9       John, I think one of them would probably

10      substantiate each one of them.

11  Q.  With respect to the electrical component, did

12      additional electrical work have to be performed

13      to accommodate this machine?

14  A.  We had to run the pipes, substantial amount of

15      wiring to the machine, install it to be able to

16      move it, trying to commission it and then tear

17      that stuff down.

18  Q.  Do you know who performed the electrical work?

19  A.  Yeah.

20  Q.  Who is that?

21  A.  Gino DiPietroantonio.  He is electrician we use

22      all the time.  Do you want to know the spelling?

23  Q.  I don't but I'm sure she does.

24  A.  Okay.  The last name is D I.  Capital D I.

VENANZIORO FONTE                                                September 20, 2004

Page 127

1      Separate word.  Capital P I E T R O A N T O N I

2      O.  I'm not joking.  That's what it is.  And the

3      first name is Gino.  G I N O.

4  Q.  The electrical work that Dynamic did, did that

5      benefit Dynamic with respect to the Mazak or the

6      Daewoo machine that was purchased at some later

7      time?

8  A.  No, because they were in both -- two different

9      locations so he redid the wiring there.

10  Q.  And with respect to the materials, the $1,644,

11      was that materials in connection with the

12      electrical work or was that a separate entry?

13  A.  It was probably installation of the machine,

14      bolts.  I don't know.  Kevin can probably answer

15      those questions.

16  Q.  When the machine was moved from one location to

17      the other, do you know when the machine was

18      moved?

19  A.  Probably a day or two before the Mazak arrived,

20      which was few days after.  Within three days we

21      bought a machine.  The machine was supposed to

22      have been shipped the same day I bought it.  I

23      gave a purchase order.  I said, This is a

24      purchase order number.  This is the money.  Just

VENANZIORO FONTE                                                    September 20, 2004

1      ship.

2                    And it turned out that the machine was

3      in a bonded warehouse.  Because of customs, we

4      lost three or four days.  Eventually -- bonded

5      warehouse.  So the machine left three or four

6      days later.  It literally was a case of timing

7      where this machine had to move out of the place

8      and rearrange things.  We had to shift smaller

9      machine to where the Johnford was, which is the

10     Multiplex.  Norman is familiar with.  And we

11     moved Multiplex into that spot and we

12     repositioned the first of the two Mazak that we

13     owned and then reposition the new machine.

14                    Now, all of that cost is not part here.

15     Jack said, You cannot -- what do you call those

16     costs?  Ancillary cost or whatever.  You cannot

17     charge for those things.  But it's a substantial

18     amount of money.  Beside the fact we paid

19     literally top dollar for the Mazak.  Almost the

20     list price.

21  Q.  Okay.  You mentioned that this all happened

22     within two or three days.  We're talking two or

23     three days of your December 9 letter or Attorney

24     Little's December 11 letter?

VENANZIORO FONTE                                         September 20, 2004

Page 129

 1   A.   What happened on the 10th, which was a morning

 2        after, I called Norm and I said, We're done.

 3        This thing is out of here.  And he said, Don't do

 4        anything.  Let me talk to Absolute.  Absolute is

 5        the name of a company.  Importer.  This was on

 6        the 10th and I told him, I need a machine.  We

 7        cannot -- I don't have three weeks.  Period.

 8             So I went outside.  Told his men, Just

 9        pack and leave.  Okay?  And at that point, I got

10        on the horn.  I told Kevin, Just call Mazak.

11        Call everyone.  See where is the machine.  Let's

12        move with this.

13             In the afternoon, I called Jack.  I

14        said, Send Machine & Electrical a note.  We are

15        not taking the machine.  Period.

16             That's the result.  The next day is

17        that one.

18   Q.   So by December 11 or 12th, had the Johnford lathe

19        been moved from its original location --

20   A.   No, no.  I think it took another two or three

21        days.  If you -- don't remember the calendar but

22        what day that might have been.  I believe it was

23        later in the week like a Thursday or so.  We

24        bought the machine.  Those are a matter of

VENANZIORO FONTE                                        September 20, 2004

Page 130

1      records to see when the Mazak was bought.

2              It was literally within a day or two of

3      that and with a promise that it will come the

4      following Monday or Tuesday or whatever.  But

5      then there were three or four days.  So I imagine

6      this machine, the Johnford, got moved --

7              THE WITNESS:  When did you come here?

8      With Absolute people.

9              MR. CREPEAU:  Monday.

10  A.  Was Monday.

11              THE WITNESS:  Was the machine already

12      moved at that point?

13              MR. CREPEAU:  Yes.            `

14  A.  Okay.  So we moved on Friday or Saturday then.

15      Because Mazak had to arrive right then and there.

16      And then there was some delays.

17  Q.  At any time did you request or demand that MECI

18      bring in Absolute or Johnford to take a look at

19      this machine?

20  A.  No.

21  Q.  And at any time have you spoken to anybody from

22      Absolute or Johnford regarding this machine?

23  A.  There was -- when we were negotiating the machine

24      with Norman back in December, 2002, another

VENANZIORO FONTE                                          September 20, 2004

```
 1        gentleman come in.  I don't know his name.  From

 2        Absolute.

 3                THE WITNESS:  One of the two partners,

 4        is it?  Was not the same fellow that came --

 5    Q.  Let me narrow my question.

 6    A.  Okay.

 7    Q.  At any time after October 9, 2003, did you speak

 8        with anyone from Johnford or Absolute regarding

 9        the Johnford lathe?

10    A.  After we made a decision not to accept the

11        machine, Norman came with another fellow from

12        Absolute and we had a meeting here at Dynamic.

13    Q.  What was discussed at that meeting?

14    A.  The same issues we discussing today.  The machine

15        could not meet specifications.  Machine could not

16        go to center.  Okay.  That's basically.

17    Q.  The Mazak that you purchased in December of 2003,

18        is that machine able to reach the center line of

19        the X axis when using the five-inch boring bar?

20    A.  Of course.

21    Q.  And is that machine capable of holding positional

22        accuracy of plus or minus five-tenths?

23    A.  No.

24    Q.  What is the differential that it is able to
```

VENANZIORO FONTE                                               September 20, 2004

Page 132

```
 1        maintain regarding positional accuracy?
 2   A.   I don't know what it is but it's not bought for
 3        that type, for that purpose.  We don't need long
 4        things on that.  So we can deal with things.  I
 5        don't know what -- we don't even check in Mazak.
 6        It might be plus or minus six-tenths.  Plus or
 7        minus eight-tenths or one-thousandth.  I don't
 8        care what it is.  But it was never an issue from
 9        the very beginning with them.
10   Q.   Does the precision of plus or minus five-tenths,
11        is that because of the requirements of the
12        Federal Government in connection with the
13        Tomahawk contract?
14   A.   No.  Because it's a machine that is supposed to
15        be doing very long parts.  And very long parts
16        you cannot afford a machine that wanders so you
17        have to put a specification.  And that's what was
18        done at the very beginning.  The same
19        specification probably have been imposed on a
20        flat bed lathe.
21   Q.   Does any of the machinery that you have in your
22        shop, is it able to maintain positional accuracy
23        of plus or minus five-tenths?
24   A.   I can't answer that firsthand but I will say
```

VENANZIORO FONTE                                                    September 20, 2004

 1      probably yes.  For the type of work that we do.

 2      Within a certain confines.  The going gets roughs

 3      and it changes considerably the moment you have a

 4      long part.

 5  Q.  With respect to the two machines that you had

 6      looked at in Ohio that I think you said had

 7      30-foot length beds, what is the positional

 8      accuracy that those machines are able to

 9      maintain?

10  A.  Guaranteed plus or minus five-tenths by Phoenix.

11      They will take -- we will buy the machine for

12      like $30,000.  These are used machinery.  They

13      will regrind the ways.  Put new controls, new

14      whatever on it.  Sell the machine to us for about

15      half a million bucks.  And the machine will meet

16      plus or minus five-tenths.  It will not be

17      accepted.  The machine will not be accepted.

18  Q.  Do you have an opinion regarding what is causing

19      or what caused the Johnford lathe to be unable to

20      hold the positional accuracy in this case?

21  A.  I wouldn't dare answer that.

22  Q.  Okay.  Do you have an opinion regarding what

23      caused the Johnford lathe not to be able to reach

24      the center line of the axis when using a

VENANZIORO FONTE                                              September 20, 2004

1          five-inch boring bar?

2     A.   Poor design.

3     Q.   And specifically, what about the design is poor?

4     A.   The fact it can't go to center.

5     Q.   What is causing it not to be able to go to

6          center, if you know?

7     A.   They claim that there was this counterbalance for

8          the cutting tool turret that they needed on the

9          back.  And the stroke of the piece -- I don't

10         know.  I don't know the details but supposedly

11         there is something that impairs, physically

12         impairs this turret to travel to where it's

13         supposed to.

14                   MR. JACQUES:  Can we take just a

15         two-minute break?  I think we're all done.

16                   MR. LITTLE:  Sure.

17              (Recess.)

18    Q.   Mr. Fonte, my understanding is that when you were

19         first speaking with Mr. Crepeau about purchasing

20         the Johnford lathe that you also were looking at

21         some other machines to -- for the same purpose as

22         the Johnford lathe, correct?

23    A.   Probably.  I don't recall everything.

24    Q.   Okay.  And specifically my understanding is --

VENANZIORO FONTE                                              September 20, 2004

Page 135

```
 1        and I believe that Mr. Heymans testified to this

 2        -- that you were looking at Takang machines also?

 3   A.   I cannot remember.  Maybe.

 4   Q.   Do you have any recollection of what the

 5        tolerances were of the Takang machines?

 6   A.   No.

 7   Q.   Looking at a calendar which suggests that if your

 8        attorney on December 11, which was a Thursday,

 9        sent the letter and if Mr. Crepeau arrived here

10        the following Monday, that would have been

11        December 15.  Does that sound accurate?

12   A.   Don't know.

13   Q.   During that meeting on December 15 -- `

14             MR. LITTLE:  Objection.  Characterizing

15        a meeting.  He said he didn't know.

16   Q.   Well, I believe you weren't -- you didn't know

17        about the date but you did --

18   A.   Correct.  It did take place on the Monday or

19        whatever.  Yeah.

20   Q.   With respect to that, during that meeting, did

21        MECI and Absolute request an opportunity to have

22        the manufacturer take a look at the machine and

23        attempt to correct the problems?

24   A.   I can't remember.
```

VENANZIORO FONTE                                                    September 20, 2004

 1    Q.   Was there any discussion of MECI, Absolute or

 2         Johnford having some additional time to

 3         commission the machine?

 4    A.   No.  The gentleman that came up, he flat out said

 5         that we don't take machines back.  You're going

 6         to a negotiating table.  You got a machine that

 7         is a year late.  The machine is five times out of

 8         spec than what it should be.  And the guy says,

 9         We don't take machines back.

10    Q.   That was not somebody from MECI but somebody from

11         Absolute?

12    A.   Correct.

13    Q.   Was --

14    A.   And the guy was so incompetent.  Whoever he was.

15         Did not know what a five-inch bar going to center

16         meant and he's trying to convince me that I

17         should accept this machine.

18    Q.   Did they specifically request a final opportunity

19         to complete the commissioning of the machine at

20         that meeting?

21    A.   No.

22    Q.   Did they specifically request an opportunity to

23         continue to work on the machine?

24    A.   No.

VENANZIORO FONTE                                                                September 20, 2004

Page 137

1   Q.   Did they tell you that with additional work that

2        they believed that the machine could meet the

3        specifications that you were requiring?

4   A.   No.

5   Q.   What, if anything, did they express to you

6        regarding the performance of the machine within

7        specifications?

8   A.   I told them that I had bought the machine and the

9        case was closed as far as I was concerned.  They

10       asked Norman, the gentleman, if they could go see

11       the machine and I said, Fine.

12              They went there.  Norman came back.  He

13       and I sat down in the conference room. `And

14       Norman at that point, he said it was not all his

15       fault.  It was the other people.  I said, What

16       about the plus or minus five-tenths?  He said,

17       That was not my doing.

18              He said, You are going to put me out of

19       business with this.  I said, How is that?  And he

20       said, Well, you know, I cannot afford this.  I

21       lost a lot of money already on this machine.  I

22       have a lot of work done here.

23              And I said, Well, who put the plus or

24       minus five-tenths there if you cannot meet that

Page 138

1       in specifications?  And he said, It's on the

2       letterhead and came to me and I just put it on my

3       letterhead, he said.  I did not invent that.  I

4       said, Good.  You go ask them for money now, to

5       take care of the problem.

6               We discussed the return of the money

7       and he was willing to give me the $29,000 back

8       but he wouldn't want to give me the 41,000 on

9       that.  And I said no.  That's a penalty that you

10      pay for waiting another three months from July to

11      November here.  And that's how the situation

12      ended.

13  Q.  Okay.  How long did that meeting take? `

14  A.  Half an hour, 45 minutes.  My meeting with Norman

15      or the total thing?

16  Q.  Meeting with you, Norm and --

17  A.  That's probably --

18  Q.  -- Absolute.  The total thing.

19  A.  -- 20 minutes.  All of us.  Kevin was there.  And

20      John was there.  Nick was there.  And then when

21      Norman and I sat down, maybe five, ten minutes.

22  Q.  Okay.  I don't have any other questions.  Thank

23      you.

24  A.  Okay.

VENANZIORO FONTE                                                September 20, 2004

Page 139

1              MR. JACQUES:  All set?

2              MR. LITTLE:  All set.

3              (Whereupon, the deposition was

4      concluded at 3:56 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

VENANZIORO FONTE                                                          September 20, 2004

                                                                              Page 140
1       Excerpt from Rule 30(e):
        Submission to Witness; Changes; Signing.
2
                When the testimony is fully transcribed,
3       the deposition shall be submitted to the witness
        for examination and shall be read to or by
4       him/her, unless such examination and reading are
        waived by the witness and by the parties.  Any
5       changes in form or substance which the witness
        desires to make shall be entered upon the
6       deposition by the officer with a statement of the
        reasons given by the witness for making them.
7
                ************************************
8
9           I, Venanzioro Fonte, have examined the above
        transcript of my testimony and it is true and
10      correct to the best of my knowledge, information
        and belief.  Any corrections are noted on the
11      errata sheet.
12
            Signed under the pains and penalties of
13      perjury this     day of              , 2004.
14
15
                        ---------------------------
16                          Deponent's Signature
17          On this    day of            , 2004, before
        me, the undersigned notary public, personally
18      appeared               , proved to me through
        satisfactory evidence of identification, which
19      were           , to be the person whose name is
        signed on the preceding or attached document, and
20      who swore or affirmed to me that the contents of
        the document are truthful and accurate to the
21      best of his/her knowledge and belief.
22
23                      ---------------------------
                            Notary Public
24      My commission expires:

VENANZIORO FONTE                                                        September 20, 2004

Page 141

1    COMMONWEALTH OF MASSACHUSETTS
     ESSEX, SS.
2

3          I, Susan L. Prokopik, Registered Merit

4    Reporter and Notary Public duly commissioned and

5    qualified in and for the Commonwealth of

6    Massachusetts do hereby certify that there came

7    before me on the 20th day of September, 2004 the

8    person hereinbefore named, who was satisfactorily

9    identified by me and duly sworn to testify to the

10   truth of his knowledge concerning the matters in

11   controversy in this cause; that he was thereupon

12   carefully examined upon his oath and his

13   examination reduced to typewriting under my

14   direction; and that the deposition is a true and

15   accurate record of the testimony given by the

16   witness.

17         I further certify that I am not

18   interested in the cause of this action.

19

20
                 SUSAN L. PROKOPIK, RMR, CRR
21                      (CSR #124893)

22

     My commission expires:
23      April 15, 2005

24