UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 04-10525-WGY

DYNAMIC MACHINE WORKS, INC.,      )
        Plaintiff,                )
                                  )
    VS.                           )
                                  )
MACHINE & ELECTRICAL              )
CONSULTANTS, INC.,                )
        Defendant.                )

DEPOSITION OF KEVIN McGINLEY,

a witness called on behalf of the Defendant,

taken pursuant to the provisions of the Federal

Rules of Civil Procedure, before Susan L.

Prokopik, Registered Merit Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the offices of Dynamic Machine

Works, Inc., 12 Suburban Park Drive, Billerica,

Massachusetts, on Monday, September 20, 2004,

commencing at 4:02 p.m.

MAGGIOLI REPORTING SERVICES, INC.  (781) 356-2636

```
 1    APPEARANCES:

 2

 3

 4       LAW OFFICES OF JACK BRYAN LITTLE, P.C.

 5            (By Jack Bryan Little, Esq.)

 6            401 Andover Street

 7            North Andover, Massachusetts  01845

 8            for the Plaintiff.

 9

10

11       SMITH ELLIOTT SMITH & GARMEY, P.A.

12            (By Keith R. Jacques, Esq.)

13            199 Main Street                    `

14            P.O. Box 1179

15            Saco, Maine  04072

16            for the Defendant.

17

18    ALSO PRESENT:

19

20            Norman Crepeau

21

22

23

24
```

KEVIN McGINLEY                                      September 20, 2004

Page 3

1                    I N D E X

2

3   Witness          Direct  Cross  Redirect  Recross

4

5   KEVIN McGINLEY

6

7   (By Mr. Jacques)   4

8

9   (By Mr. Little)          45

10

11

12

13                              `

14                  E X H I B I T S

15

16   Exhibit No.                        Page

17

        1    Defendant's Notice to Take Oral
18           Deposition of Kevin McGinley    4

19

20

21

22

23

24

Page 4

1                    P R O C E E D I N G S

2

3                (Defendant's Notice to Take Oral

4        Deposition of Kevin McGinley marked Exhibit No.

5        1.)

6

7                        KEVIN McGINLEY

8        having been satisfactorily identified and duly

9        sworn by the Notary Public, was examined and

10       testified as follows:

11

12       DIRECT EXAMINATION BY MR. JACQUES:

13    Q.  Mr. McGinley, could you please state your full

14       name for the record?

15    A.  Kevin McGinley.

16    Q.  Where do you reside?

17    A.  Seabrook, New Hampshire.

18    Q.  You're employed by Dynamic Machine Works?

19    A.  That's correct.

20    Q.  And the deposition today is being taken in the

21       conference room of Dynamic Machine at 12 Suburban

22       Park Drive in Billerica, Massachusetts?

23    A.  That is correct.

24    Q.  Mr. McGinley, let me hand you a document that we

KEVIN McGINLEY                                                    September 20, 2004

Page 5

1          marked as McGinley Exhibit 1 and ask you if

2          you've seen that before just now.

3    A.    No.

4    Q.    Okay.  I'm going to represent to you that that's

5          your notice to take your deposition in this case.

6          The notice requires that you bring with you

7          certain designated documents in the notice that

8          are identified in paragraphs one through four.

9          Now, I understand from conversations before

10         earlier depositions that Dynamic's attorney has

11         provided me with all of the documentation

12         contained in Dynamic's files relating to this

13         particular transaction, other than privileged

14         documents.

15               What I would like to know is whether

16         you maintain any independent or separate records

17         regarding Dynamic's purchase of the Johnford

18         lathe.

19   A.    No.

20   Q.    Any records that you would have reviewed or

21         prepared would be part of the general Dynamic

22         file with respect to this purchase?

23               MR. LITTLE:  Except for work-product.

24   Q.    Except for work-product.

Page 6

1    A.   Yes.

2    Q.   Okay.  While I'm giving speeches here, just for

3         the record, during the course of this deposition,

4         I will be referring to certain exhibits.  And by

5         agreement, since they've already been marked

6         during Ven Fonte's deposition, we'll refer to

7         them as Fonte exhibits, which will be attached to

8         Mr. Fonte's exhibit.

9              MR. LITTLE:  And not attached to Mr.

10        McGinley's.

11             MR. JACQUES:  And not attached to Mr.

12        McGinley's.

13   Q.   How long have you worked at Dynamic Machine

14        Works?

15   A.   This is my second tour of duty at Dynamic

16        Machine.  I have been employed since December of

17        2001.

18   Q.   Since December, 2001, what has been your position

19        with Dynamic?

20   A.   My title is project manager.  My position entails

21        a great variety of different tasks.

22   Q.   Can you briefly summarize the tasks that you're

23        responsible for here at Dynamic?

24   A.   Procurement of raw materials, contract review.  I

KEVIN McGINLEY                                          September 20, 2004

Page 7

```
 1      fill in for sales when those gentlemen are not

 2      available.  And different -- tasks that don't

 3      fall within the -- we'll call them ordinary

 4      course of -- course of an ordinary business day.

 5                For instance, capital acquisitions.  I

 6      do, you know, work with Ven pretty closely on

 7      those.

 8 Q.   Okay.  You mentioned it was your second tour of

 9      duty.  During what period did you serve during

10      your first tour of duty?

11 A.   I believe it was '94 to '98.

12 Q.   Was your role at Dynamic from 1994 to 1998

13      similar to your role from 2001 to the present?

14 A.   No.

15 Q.   What did you do for Dynamic during your first

16      tour of duty?

17 A.   I was the manufacturing manager.

18 Q.   And what does that involve?

19 A.   Basically overseeing the day-to-day operation of

20      the manufacturing side of the business.

21 Q.   As project manager, who do you report to?

22 A.   Mr. Fonte.  Ven.

23 Q.   Why did you leave Dynamic in 1998?

24 A.   I left for what I thought was a better
```

KEVIN McGINLEY                                              September 20, 2004

Page 8

1      opportunity.

2   Q.   And where was that opportunity?

3   A.   Kittery, Maine.

4   Q.   With what company?

5   A.   It was Watts Fluid Air.

6   Q.   W A T T S.  How long did you work for Watts Fluid

7        Air?

8   A.   From '98 to 2001.

9   Q.   When you left Watts Fluid Air, was that to come

10       work directly at Dynamic?

11  A.   No.  I was laid off.

12  Q.   When were you laid off at Watts?

13  A.   End of October, 2001.

14  Q.   Was your next employment with Dynamic after that?

15  A.   There was a period that I spent -- actually

16       trying to sell machine tools for Norman between

17       those two dates.

18  Q.   For Norman at MECI?

19  A.   Yes.

20  Q.   How long did you sell machine tools on behalf of

21       MECI?

22  A.   Three or four weeks.

23  Q.   Why did you decide to stop selling machine tools

24       for MECI?

September 20, 2004

Page 9

```
 1   A.   I was -- wasn't very good at it, let's say.  I

 2        never sold a machine.

 3   Q.   Didn't give yourself a whole lot of time.

 4   A.   Well, no.  I mean, the economy at the time was

 5        pretty bad.  It was right after 9/11 and there

 6        weren't a lot of people buying equipment.

 7   Q.   Okay.

 8             (Off the record.)

 9   Q.   When did you graduate from high school?  When did

10        you leave high school?

11   A.   1979.

12   Q.   Where did you go to high school?

13   A.   Winnacunnet High School.

14   Q.   Could you spell that for the court reporter?

15   A.   No, sir.  W I N N A C U N N E T T.

16   Q.   Did you attend any further schooling when you

17        left high school in 1979?

18   A.   Not immediately.

19   Q.   What did you do upon graduation from high school?

20   A.   I went to work full-time.

21   Q.   Where did you work?

22   A.   I worked -- probably six or seven different jobs

23        between 1979 and 1984.  Bartender.  Security

24        guard.  Shipper/receiver.
```

KEVIN McGINLEY                                                                September 20, 2004

 1   Q.   Between 1979 and 1984, did you work for any

 2        companies involved in the same type of work as

 3        either MECI or Dynamic?

 4   A.   No.

 5   Q.   Is 1984 when you went back to school?

 6   A.   No.  1984 I went to work for a company called

 7        Gould Incorporated in Newburyport, Massachusetts.

 8   Q.   What did they do?

 9   A.   They're a manufacturer of circuit protection

10        devices.

11   Q.   How long did you work for them?

12   A.   Until 1993.

13   Q.   What did you do in 1993?

14   A.   I went to work for a company called Granite State

15        Manufacturing.

16   Q.   How long did you work for them?

17   A.   About a year.

18   Q.   And what sort of manufacturing do they do?

19   A.   It was a machine shop type work.

20   Q.   When you left Granite State, was that to come

21        here to Dynamic?

22   A.   Yes.

23   Q.   Have you obtained any degrees after high school?

24   A.   Yes.

KEVIN McGINLEY                                              September 20, 2004

Page 11

```
 1   Q.  What degrees have you obtained after high school?
 2   A.  I have an Associate's degree in machine tool
 3       process.
 4   Q.  What does that involve?
 5   A.  That's a two-year course in the application of
 6       machine tools in the metal cutting industries.
 7   Q.  Where did you get that degree?
 8   A.  New Hampshire Technical College.
 9   Q.  And when did you get it?
10   A.  1991, I believe.
11   Q.  Any other degrees?
12   A.  I have a Bachelor of Science in technical
13       management.
14   Q.  Where did you get that?
15   A.  New Hampshire College.
16   Q.  When did you get that?
17   A.  '94.
18   Q.  Any other degrees?
19   A.  Yeah.  I have a Master's degree in business
20       administration.
21   Q.  And where did you get that?
22   A.  New Hampshire College.
23   Q.  When did you get that?
24   A.  1999.
```

KEVIN McGINLEY                                                    September 20, 2004

Page 12

```
 1   Q.   Any other degrees?

 2   A.   No.

 3   Q.   Other than yourself, Ven Fonte, Nick Fonte and

 4        John Heymans, are there any other individuals

 5        within Dynamic who have knowledge regarding

 6        Dynamic's purchase of the Johnford lathe which

 7        gave rise to this lawsuit?

 8   A.   I'm not sure I understand the question.

 9   Q.   My understanding is that Ven Fonte, Kevin

10        McGinley, Nick Fonte and John Heymans were all

11        involved in the decision to purchase the Johnford

12        lathe from Machine & Electrical Consultants.

13   A.   That's correct.

14   Q.   Other than those four individuals, were any other

15        individuals involved in the decision-making

16        process to purchase the Johnford lathe from MECI?

17   A.   Principally it was the four of us.  Whether or

18        not -- "hey, what do you think of this" to anyone

19        else, as a kind of a passing thing, I can't say

20        for sure but it was principally the four of us.

21   Q.   At the time that the decision was made to

22        purchase the Johnford lathe from MECI, had

23        Dynamic considered other machines or compared

24        other machines to the Johnford lathe?
```

Page 13

1    A.   Yes.

2    Q.   And do you have a specific recollection of what

3         other machines were being considered by Dynamic?

4    A.   I believe that we considered a Mazak product.  I

5         believe we considered a product by a company

6         called Takang.  And perhaps a product from

7         Daewoo.

8    Q.   Do you have any knowledge as to why Dynamic

9         ultimately agreed to purchase the Johnford lathe

10        as opposed to the other three manufacturers that

11        you have identified?

12   A.   I think in general we felt it was the best value.

13   Q.   Value based upon price or value based upon

14        performance or a combination of both?

15   A.   A combination.

16   Q.   Is there anything that the Johnford lathe, was

17        there anything the Johnford lathe could do that

18        the Mazak, Takang or Daewoo machines could not

19        do?

20   A.   I don't believe either of the other three offered

21        the length that the Johnford had.

22   Q.   And my understanding is the Johnford lathe had a

23        length of --

24   A.   I think it was 275 millimeters or 270.  275.

1    Q.   Inches?

2    A.   No.  It's millimeters.  It was 21 feet basically.

3    Q.   Okay.

4    A.   Seven meters I think it was.

5    Q.   Okay.  Why did Dynamic want to purchase -- my

6         understanding is that the other machines on the

7         floor were substantially shorter from the length

8         perspective than this Johnford lathe, correct?

9    A.   Yes.

10   Q.   Why did Dynamic decide that it needed a machine

11        that had a capability to go to 21 feet?

12   A.   As we're currently configured, you know, Dynamic

13        Machine's capability stopped at ten feet.  Our

14        flowforming machines have the capability to

15        produce pieces up to 21, 22, 23 feet long.  So

16        there's a big gap there.  So the gap between ten

17        feet and 22 feet was something that we would have

18        liked to have filled in one fell swoop.

19             In particular, there's a Tomahawk motor

20        case, a Tomahawk case that we're trying to get a

21        contract for.  And that was one of the other

22        reasons.

23   Q.   Is Dynamic still trying to get the Tomahawk case

24        contract?

KEVIN McGINLEY                                                    September 20, 2004

Page 15

 1   A.   Yes.

 2   Q.   What's the status of that at this point?

 3   A.   I don't know.

 4   Q.   Okay.  In December of 2002, was Dynamic closer to

 5        getting the Tomahawk contract than it is now, for

 6        example?

 7   A.   I don't know.

 8   Q.   Have you been involved in the discussions or the

 9        negotiations regarding obtaining the Tomahawk

10        contract?

11   A.   That's mostly a sales function.

12   Q.   And who would that be?  Ven?

13   A.   Ven and Matthew.

14   Q.   Did the Mazak, Takang and Daewoo machines have

15        the same tolerance specifications as the Johnford

16        lathe?

17   A.   Did they have the same tolerance specification?

18   Q.   Correct.  Could they all cut within plus or minus

19        five-tenths?

20   A.   I don't know.

21   Q.   Do you know if they all had positional accuracy

22        of plus or minus five-tenths?

23   A.   I don't know.

24   Q.   Were you involved in the actual discussions with

1       Norm Crepeau regarding purchasing the Johnford

2       lathe sometime in late December, 2002, early

3       January, 2003?

4   A.  Some of them, yes.

5   Q.  And then my understanding is that a purchase

6       order was issued back in December, 2002, correct?

7   A.  Yes.

8   Q.  Let me show you a document that we have already

9       marked as Fonte Exhibit 4 and ask you if that's a

10      copy of the purchase order that was issued with

11      respect to the Johnford lathe.

12  A.  I don't believe this is for the actual lathe that

13      we ended up buying.

14  Q.  That's for an earlier version?

15  A.  Yeah.  This is a previous revision I would say.

16      This purchase order.

17  Q.  Let me show you Fonte Exhibit 3.

18  A.  Mm-hmm.

19  Q.  Which is -- have you seen that before today?

20  A.  I believe I have, yes.

21  Q.  And can you tell me what that is?

22  A.  It's a description of a Johnford HT275G

23      heavy-duty turning center.

24  Q.  And is that the --

Page 17

1   A.   It's a proposal.

2   Q.   Is that the lathe that ultimately Dynamic decided

3        to purchase?

4   A.   I believe the lathe that we ultimately decided to

5        purchase was the HT275G.

6   Q.   Okay.  Let me show you a document that we

7        previously marked as Fonte Exhibit 5.

8   A.   Mm-hmm.

9   Q.   Which is a document that's signed by you on page

10       two, correct?

11  A.   Yes.

12  Q.   And is that the sort of a follow-up purchase

13       order for the Johnford lathe that ultimately

14       Dynamic purchased?

15  A.   I believe it to be, yes.

16  Q.   Okay.  Do you have any reason to believe that

17       there was any subsequent purchase order, other

18       than this January 13, 2003 letter that's dated

19       Fonte Exhibit 5?

20  A.   I don't believe there was any --

21  Q.   And that's --

22  A.   -- subsequent purchase order issued, no.

23  Q.   Apologize for interrupting.

24              That letter references the earlier

KEVIN McGINLEY                                         September 20, 2004

Page 18

1      purchase order that I showed you that was marked

2      as Exhibit 4, correct?

3   A.  Yes.

4   Q.  Okay.  Item number two -- and I'm focusing on

5      Exhibit 5 --

6   A.  Okay.

7   Q.  And I apologize for jumping around.  If I jump

8      around and you get confused, please stop me but

9      I'm sensitive to the time.  I'm just trying to

10     keep things moving.

11  A.  Mm-hmm.

12  Q.  With respect to Exhibit 5, paragraph one

13     addresses the Johnford lathe itself, correct?

14  A.  That's correct.

15  Q.  The second paragraph talks about two autoblock

16     chucks.  Do you see that?

17  A.  Yes.

18  Q.  One to be installed on a Mazak Slant 60?

19  A.  Yes.

20  Q.  And is that a Mazak that was already on the floor

21     back in January of 2003?

22  A.  Yes.

23  Q.  And was that chuck in fact installed on the

24     Mazak?

KEVIN McGINLEY                                                September 20, 2004

Page 19

 1   A.   I believe it was.

 2   Q.   Okay.  And do you know if it's still located on

 3        that Mazak?

 4   A.   I believe it to be, yes.

 5   Q.   It also addresses a second chuck to be installed

 6        on the Johnford lathe.  Do you see that?

 7   A.   Yes.

 8   Q.   Do you know if that chuck is still installed on

 9        the Johnford lathe?

10   A.   I don't know that.

11   Q.   Do you know whether there have been discussions

12        about removing it from the Johnford lathe and

13        installing it on the Mazak that subsequently was

14        purchased by Dynamic?

15   A.   I don't know if there have been discussions.

16   Q.   Okay.  If it's been removed, you weren't involved

17        in that process?

18   A.   No, I wasn't.

19   Q.   Okay.  Paragraph three of that or item three of

20        that letter on page two talks about a steady

21        rest.  Correct?

22   A.   Yes.

23   Q.   My understanding is that steady rests are used on

24        a variety of the machines on the floor at this

Page 20

1      business; is that correct?

2  A.  Mm-hmm.

3  Q.  Yes?

4  A.  Yes.

5  Q.  With respect to this particular steady rest

6      that's referenced on Exhibit 5, do you know if

7      that steady rest is interchangeable with any of

8      the other machines on the floor?

9  A.  I don't know.

10 Q.  Once the January or Exhibit 5 was delivered to

11     MECI, can you tell me what involvement, if any,

12     you had with respect to the Dynamic's purchase of

13     the Johnford lathe, from January of 2003 through

14     -- throughout 2003?

15 A.  For the most part my responsibility was to --

16     just to keep -- keep the people at Dynamic

17     appraised of the status of the machine, when it

18     would be delivered.  I tried to keep

19     communications regarding what may have been

20     construed as problems with the rental machine.

21          Just basically to keep an eye on the

22     delivery of the machine, when it was going to be

23     here and just to communicate with Norman

24     regarding what we may have seen as problems with

KEVIN McGINLEY                                                    September 20, 2004

Page 21

1       the other machine and what -- to let Norman know

2       what we expected of the larger machine.

3    Q. I'm showing you a document which is marked as

4       Exhibit 7.  You talked about advising Mr. Crepeau

5       regarding the problems that you were having with

6       the rental machine.

7    A. Mm-hmm.

8    Q. Does Exhibit 7 address the issues that Dynamic

9       had with the rental machine?

10   A. It does address those issues.

11   Q. Other than the issues that are identified in

12      Exhibit 7, did Dynamic experience any other

13      problems with the rental machine that you brought

14      to the attention of MECI?

15   A. Can you repeat the question?

16   Q. Other than the three items identified in Exhibit

17      7, were any other problems that Dynamic had with

18      the rental machine communicated to MECI?

19   A. Not that I know of.

20   Q. At some point prior to the delivery of the

21      Johnford lathe, my understanding is that MECI

22      faxed to your attention an accuracy inspection

23      report from Johnford.  Do you recall that?

24   A. Yes.

KEVIN McGINLEY                                                    September 20, 2004

Page 22

1   Q.   Let me show you a document that we've marked as

2        Fonte Exhibit 12.

3   A.   Mm-hmm.

4   Q.   Is that the accuracy report that you received

5        from MECI?

6   A.   Looks like it.

7   Q.   Do you recall when you would have received that

8        accuracy report?

9   A.   I don't recall but there is a date on the top of

10       this document.

11  Q.   Which is what?

12  A.   July 29.

13  Q.   Do you have any reason to believe that you would

14       not have received that on or before January 29th?

15                MR. LITTLE:   July 29.

16  Q.   July 29th, yes.

17  A.   No.  I have no reason to believe that.

18  Q.   When you received the accuracy report, what, if

19       anything, did you do with it?

20  A.   I showed a copy to Ven and I showed a copy to

21       John Heymans.  Actually, I may have made them

22       copies.

23  Q.   Did you personally review the inspection report

24       to see if the report complied with the

KEVIN McGINLEY                                                    September 20, 2004

Page 23

1      specifications that previously had been provided

2      to Dynamic?

3   A.  Can you repeat that?

4   Q.  In addition to passing on the inspection report

5      to John Heymans and Ven Fonte, did you review the

6      inspection report?

7   A.  I reviewed it in the sense that I was trying to

8      get -- because it's very difficult.  It's not

9      very clear.  Basically I reviewed it and I found

10      that it wasn't legible enough to make a

11      determination one way or the other what they were

12      saying here.

13   Q.  And what led you to conclude that it wasn't

14      legible enough for you to make a determination

15      regarding what they were saying?

16   A.  Due to the fact that it was illegible.

17   Q.  Okay.  What makes it illegible?

18   A.  I mean, you can't read any of this stuff.  You

19      can't tell what they're trying to say here.  I

20      mean, there's a graphic illustration of how each

21      test is conducted and -- I can't for the life of

22      me figure out what this is a picture of.

23   Q.  And you're pointing to the third illustration --

24   A.  Second page, third illustration down.

KEVIN McGINLEY                                                    September 20, 2004

Page 24

1   Q.   Under test item number one?

2   A.   Yeah.

3   Q.   Did you communicate to MECI that Dynamic was

4        dissatisfied with the inspection report?

5   A.   We're going back a year and a half or a year now

6        and I can't remember the exact conversation I had

7        with Norman.  I believe what I said was, you

8        know, That's -- the inspection report is what it

9        is but we're going to have to meet what it calls

10       for on the purchase order when the machine

11       arrives, not when it's in Taiwan.

12  Q.   Is that something that you communicated with Mr.

13       Crepeau orally as opposed to by E-mail `or in

14       writing?

15  A.   I believe so.

16  Q.   Did Dynamic ever accept the inspection report

17       that you're aware of?

18  A.   No.

19  Q.   Do you know if anybody else at Dynamic requested

20       that Johnford provide, using your term, more

21       legible, a more legible report?

22  A.   I don't know.

23  Q.   When Dynamic originally decided to purchase the

24       Johnford lathe, do you know whether Dynamic

KEVIN McGINLEY                                              September 20, 2004

Page 25

```
 1        contemplated going to Taiwan to inspect this

 2        machine prior to being shipped to the United

 3        States?

 4   A.   I know there were discussions.

 5   Q.   And who were those discussions with?

 6   A.   With Norman.

 7   Q.   Do you know why ultimately that inspection didn't

 8        take place?

 9   A.   I believe that there was -- there wasn't really

10        time to do that.  I believe there was also some

11        concern that at the time the SARS epidemic was

12        going on and unnecessary travel to Taiwan was not

13        something that anyone took lightly.        `

14   Q.   Did MECI or Johnford attempt to dissuade Dynamic

15        from inspecting the machine in Taiwan?

16   A.   No.

17   Q.   My understanding is that the Johnford lathe was

18        delivered to Dynamic on October 9, 2003; is that

19        correct?

20   A.   That sounds about right.  I don't know exactly

21        what the date was but that sounds about right.

22   Q.   Do you have a recollection as to how long after

23        delivery of the machine that MECI began

24        commissioning the machine?
```

Page 26

```
 1   A.   I'm not sure.

 2   Q.   Were there certain steps that Dynamic was

 3        required to perform before the commissioning of

 4        the machine could occur?

 5   A.   I believe it had to be lagged to the floor.

 6   Q.   Was that something that Dynamic was required to

 7        do?

 8   A.   I think so.

 9   Q.   Do you know how long that process took?

10   A.   I don't know for sure.

11   Q.   Other than lagging the machine to the floor, did

12        Dynamic have to undertake any other steps in

13        order to accept delivery of the Johnford lathe?

14             MR. LITTLE:  I'm sorry.  I don't mean

15        to keep interrupting.  Do you mean something

16        different between accepting delivery and

17        commissioning?

18             MR. JACQUES:  Yes.

19   Q.   Prior to commissioning, prior to MECI beginning

20        the commissioning process for the machine, what,

21        if any, responsibilities did Dynamic have to

22        prepare this machine for commissioning?

23   A.   Power had to be brought to it.  I believe air had

24        to be brought to it.  And it had to be lagged to
```

KEVIN McGINLEY                                                    September 20, 2004

Page 27

```
 1       the floor.

 2   Q.  With respect to power being brought to the

 3       machine, my understanding is that Dynamic hired

 4       an outside electrician to perform the work?

 5   A.  Yes.

 6   Q.  Do you know if that electrician provided you with

 7       an invoice for the work that he did in providing

 8       electrical power to the machine?

 9   A.  I don't know.  I don't know.

10   Q.  Do you know what the cost was of providing

11       electricity to the machine?

12   A.  No.  I don't know.

13   Q.  Do you know who within Dynamic would know what

14       the cost was of providing electricity to the

15       machine?

16   A.  I would think Christine would.

17   Q.  Christine is --

18   A.  Donovan.

19   Q.  Who is she?

20   A.  She's our controller.

21            MR. JACQUES:  Would you agree to just

22       provide me with a -- whatever the invoice or

23       whatever is that was paid to a gentleman that I

24       won't try to pronounce his name at this point?
```

Page 28

1      The electrical work.

2              MR. LITTLE:   Invoice for electrical.

3      Yes, I'll provide that.

4  Q.  Sort of getting ahead of myself.  While we're

5      talking about the electrical component, sometime

6      in December of 2003, I understand that the

7      machine was moved by Dynamic from one location to

8      the other within the shop, correct?

9  A.  I'm not sure when that occurred but I know it has

10     been moved.

11 Q.  Around that same time, Dynamic purchased a Mazak

12     to perform -- I won't say the same work because

13     it was a shorter work but to perform a `lot of the

14     work that the Johnford lathe could have done,

15     albeit on a much smaller scale?

16 A.  Yes.

17 Q.  The electrical work that was done, was that used

18     in connection with the Mazak that was brought

19     onto the shop?

20 A.  I don't know.  I'm not sure that they have the

21     same power requirements or location of the power,

22     whether they were the same spot or -- I'm not

23     sure they could be used.

24 Q.  You don't know one way or the other?

KEVIN McGINLEY                                                    September 20, 2004

Page 29

1   A.   Don't know one way or the other.

2   Q.   Mr. Fonte's affidavit in this case has a

3        reference to installation labor of $21,029.  Is

4        that a figure that you provided to him regarding

5        the cost of installing the lathe?

6   A.   Probably, yes.

7   Q.   Do you know what labor was performed that made up

8        the $21,029 cost to Dynamic?

9   A.   There's the electrical.  There's air.  There's

10       preparation of the floor where the machine is

11       going.  We also had to open up an entryway to

12       make it wide enough to fit the Johnford.

13  Q.   Let me show you Exhibit 16, which is Mr. Fonte's

14       affidavit and specifically paragraph 17 of that

15       affidavit.  With respect to the installation

16       labor, there's the number of $21,029.

17  A.   Mm-hmm.

18  Q.   Do you know if a breakdown of that labor expense

19       was ever maintained by anybody at Dynamic?

20  A.   I don't know.

21  Q.   With respect to the rigger expense of $5,800, do

22       you know if there is an invoice that reflects the

23       expense associated with the rigger and what I

24       understand is moving the machine from one

Page 30

1      location to another?

2    A.  I believe there is, yes.

3            MR. JACQUES:  And Jack, if that has not

4      been provided to me, would you agree to provide

5      it to me?

6            MR. LITTLE:  Sure.

7    Q.  With respect to the materials expense of $1,644,

8      do you know what materials were purchased that

9      cost Dynamic $1,644?

10   A.  I don't know entirely what makes up that amount,

11     no.  I know that some portion of that is a piece

12     of material that was bought for test cuts.  I

13     don't know what the rest of it is.        `

14   Q.  Okay.

15           MR. LITTLE:  Can we go off the record a

16     second?

17           (Off the record.)

18   Q.  The electrical we've already talked about and

19     Dynamic's attorney has agreed to provide that to

20     me.  The next entry is a building modifications

21     of $7,000.  Do you know if that was an actual

22     invoice that Dynamic received in connection with

23     modifications to the building?

24   A.  I don't know that, no.

1  Q.  Do you know if there is an invoice out there that

2      addresses any modifications that were done to the

3      building?

4  A.  I do not know that, no.

5              MR. JACQUES:  Same request?

6              MR. LITTLE:  Yes.  That will be John

7      Sorbello.

8              MR. JACQUES:  Is the contractor?

9              MR. LITTLE:  Right.  S O R B E L L O.

10 Q.  Can you tell me what building modifications Mr.

11     Sorbello did for delivery of the lathe?

12 A.  There is one doorway that the lathe had to go

13     through that was not wide enough.  Consequently,

14     he had to widen that doorway.

15 Q.  And I understand that that doorway has remained

16     in the widened state as opposed to being brought

17     down to its original state; is that correct?

18 A.  Yes, it has.

19 Q.  Has Dynamic benefited from having a wider

20     entrance to its building?

21             MR. LITTLE:  Objection.  Vagueness.

22             You can answer it.

23 A.  I don't know.

24 Q.  Do you know how much the door was widened?

KEVIN McGINLEY                                                            September 20, 2004

Page 32

1  A.  No, I don't.

2  Q.  Were you involved in the commissioning process

3      between the date of delivery in October of 2003

4      up until December of 2003?

5  A.  Not -- not intricately involved.  I would say my

6      interest in the process, in the commissioning

7      process brought me over there to look at what was

8      going on and things but I was not really involved

9      in the technical aspect of commissioning the

10     machine.

11 Q.  During -- your interest bringing you there, did

12     that also include your having conversations with

13     individuals that were involved in the `

14     commissioning process?

15 A.  Yes.

16 Q.  Who did you speak to regarding the commissioning

17     of the machine?

18 A.  I can't remember who the technician's name that

19     was working for Norm.  I spoke with him on

20     occasion and I spoke with Jack Grosberg on

21     occasion and I spoke with John and Nick on

22     occasion.  More in passing.  How is it going?

23     Are we making progress?

24          Not a lot of specifics involved there.

KEVIN McGINLEY                                                      September 20, 2004

Page 33

```
 1   Q.   Were you provided with the test results being

 2        performed by either DRW or Oxford Engineering as

 3        part of the commissioning process?

 4   A.   Not while the commissioning was going on.

 5   Q.   At any time during the commissioning process, did

 6        anyone ever tell you that the machine could not

 7        meet specifications?

 8   A.   I don't believe anybody ever told me that during

 9        the commissioning process.

10   Q.   Did anyone at any time -- actually, step back.

11        When you refer to the commissioning process, what

12        time period are you talking about?

13   A.   Between the time the machine was delivered and

14        the time that the work stopped on it.

15   Q.   And my understanding is the work stopped on the

16        machine sometime around December 9 or 10 of 2003?

17   A.   That sounds about right.

18   Q.   Who did you speak with after December 10, 2003

19        who told you that this machine could not meet the

20        specifications?

21   A.   I don't recall one particular individual telling

22        me that.

23   Q.   Do you recall the names of any of the individuals

24        telling you that?
```

KEVIN McGINLEY                                                    September 20, 2004

Page 34

 1   A.   I mean, it was a general topic of conversation.

 2   Q.   Within Dynamic?

 3   A.   Yes.

 4   Q.   Did anybody not associated with Dynamic ever tell

 5        you that the machine could not meet

 6        specifications?

 7   A.   During the commissioning or afterwards?

 8   Q.   At any time.

 9   A.   I believe that afterwards Jack Grosberg said that

10        he was convinced that the machine would not be

11        able to meet specifications.

12   Q.   When did he tell you that?

13   A.   I would have to say it was early 2004. ` I can't

14        nail it down any closer than that.

15   Q.   And by early 2004, Jack Grosberg was no longer

16        working on this machine, correct?

17   A.   Correct.

18   Q.   What was the occasion by which -- how was it that

19        you spoke to Jack Grosberg in 2004 after he was

20        done testing the machine?

21   A.   I think we were trying to get an idea from him

22        whether he -- whether or not he thought that the

23        machine could be brought into specification.

24   Q.   "We" being you and who else?

KEVIN McGINLEY                                                    September 20, 2004

Page 35

```
 1   A.   I think Ven was there and maybe Nick or John.

 2   Q.   At that point, your attorney had or Dynamic's

 3        attorney had already sent a letter to MECI

 4        indicating that Dynamic didn't want MECI to

 5        continue to work on commissioning this machine,

 6        correct?

 7   A.   I believe that's correct.

 8   Q.   And the machine already had been moved from the

 9        location where it had been worked on to another

10        location within the shop, correct?

11   A.   I don't know that.

12   Q.   Other than Jack Grosberg indicating to you that

13        he was convinced that the machine could not meet

14        specifications sometime in 2004, has anyone else

15        ever told you that this machine could not meet

16        specifications?

17   A.   Not that I recall.

18   Q.   And when Jack Grosberg communicated to you that

19        he was convinced that the machine could not meet

20        specifications, did he tell you what

21        specifications he didn't feel the machine could

22        meet?

23   A.   He didn't feel that the machine could meet the

24        positional accuracy of .0005.
```

KEVIN McGINLEY                                                September 20, 2004

Page 36

1  Q.  What is your understanding regarding what

2      positional accuracy is?

3  A.  My understanding is that if you program a point

4      from A to B, that within that line, the machine

5      doesn't vary more than a half a thousandth.

6  Q.  Is it your position that positional accuracy is

7      different than cutting accuracy?

8  A.  I consider them one in the same.

9  Q.  As you sit here, do you have a specific

10     recollection of Jack differentiating whether he

11     was talking about positional accuracy versus

12     cutting accuracy when he was telling you that the

13     machine could not meet specifications? `

14 A.  No.

15 Q.  Did Mr. Grosberg indicate to you what he was

16     relying upon in making the assertion that the

17     machine could not meet specifications?

18 A.  Did he communicate that to me?

19 Q.  Correct.

20 A.  I believe he communicated that on the basis of

21     what he had seen while he was here with his

22     equipment and his experience.  I believe that's

23     what he used to draw that conclusion.

24 Q.  Do you know if Mr. Grosberg made his or performed

KEVIN McGINLEY                                                September 20, 2004

Page 37

```
 1        his test before or after any parts had been cut

 2        on the machine?

 3   A.   I believe he made his measurement prior to any

 4        parts being cut on the machine.

 5   Q.   Do you have a recollection as to when Dynamic cut

 6        any parts on this machine?

 7   A.   The only part ever cut on the machine was the

 8        test cut piece that we bought.  And I believe

 9        that was done after Jack had worked for a while

10        on the machine.

11   Q.   The test part cut being the part that resulted in

12        the material charge of $1,600?

13   A.   I believe so, yes.

14   Q.   I'm going to show you a document that's marked as

15        Exhibit 15.

16   A.   Mm-hmm.

17   Q.   Have you seen that before today?

18   A.   Yes.

19   Q.   Okay.  And Exhibit 15 -- I just ask you to flip

20        through it -- is actually five pages.  Three of

21        which I understand were prepared by Dynamic and

22        two of which are some test results from Oxford

23        dated I believe it's November 25, 2003.

24   A.   Okay.
```

KEVIN McGINLEY                                                    September 20, 2004

Page 38

1    Q.   With respect to the first three pages, did you

2         participate in the preparation of those first

3         three pages?

4    A.   No.

5    Q.   Have you seen those pages prior to today?

6    A.   Yes.

7    Q.   And have you discussed those pages with anyone,

8         either inside or outside of Dynamic?

9    A.   Yes.

10   Q.   With respect to individuals not associated with

11        Dynamic, who, if anyone, have you discussed those

12        documents with?

13   A.   I don't believe I've discussed them with anyone

14        not associated with Dynamic.

15   Q.   Do you know if the test cut occurred before

16        November 25, 2003?

17   A.   I don't know that for a fact.

18   Q.   Are there any records where you could determine

19        when the test cut was performed?

20   A.   I think the only thing that I could do is look at

21        the purchase order for the test cut piece and see

22        if it was placed after 11/25.  If so, that would

23        tell us that this was done before the test cut.

24   Q.   Do you have any knowledge of one of Dynamic's

Page 39

1        employees damaging the tailstock of the Johnford

2        lathe during the performance of the test cut?

3    A.  No.

4    Q.  Has anyone from Dynamic ever told you that while

5        the test cut was being performed the tailstock

6        was knocked out of alignment?

7    A.  I think I remember hearing that it had been hit.

8    Q.  Who told you that?

9    A.  I don't remember.

10   Q.  Would it have been one of Dynamic's employees?

11   A.  Probably.

12   Q.  Did that individual explain to you what, if any,

13       damage had happened to the tailstock as a result

14       of it being hit?

15   A.  No.

16   Q.  Did you attempt to determine what, if anything,

17       had happened to the tailstock as a result of it

18       being hit?

19   A.  No.

20   Q.  Can you describe for me what you understand to be

21       the problems in Dynamic's mind with respect to

22       the Johnford lathe?

23   A.  I believe that the number one problem is that the

24       machine is incapable of moving in a straight line

KEVIN McGINLEY                                                    September 20, 2004

Page 40

1       plus or minus five-tenths over the stroke of the

2       machine.  I believe that the X axis is not

3       capable of moving past center line with a

4       five-inch diameter boring bar.  I think the

5       tailstock doesn't move close enough to the

6       headstock.

7   Q.  Anything else?

8   A.  That's all that comes to mind.

9   Q.  With respect to the last item, the tailstock not

10      being able to be brought close enough to the

11      headstock, my understanding is that prevents

12      Dynamic from machining parts less than six feet;

13      is that correct?

14  A.  Yes.

15  Q.  I also understand from Mr. Fonte that that -- he

16      recognizes it is a repairable condition and he's

17      not particularly concerned about it?

18  A.  Yes.

19              MR. LITTLE:  Objection to the

20      characterization of his testimony.

21  Q.  Do you believe that the -- do you have an

22      understanding regarding whether the machine could

23      be modified so that the tailstock could be

24      brought within six feet of the headstock?

KEVIN McGINLEY                                                    September 20, 2004

Page 41

1   A.   I believe it can be.

2   Q.   And do you have an understanding that that would

3        be a relatively minor modification of the

4        machine?

5   A.   I suppose it could be called minor.

6   Q.   With respect to the inability of the machine to

7        move in a straight line at plus or minus

8        five-tenths --

9   A.   We should correct that and it should be .0005.

10       That's a terminology that's used in machine

11       shops.  Five-tenths.  It's .0005.

12  Q.   With respect to that perceived deficiency on the

13       part of Dynamic, other than the information

14       provided to you by Jack Grosberg that you

15       previously testified to, do you have any other

16       basis for reaching that conclusion?

17  A.   That it's unable to do that?

18  Q.   Yes.

19  A.   I don't know of anything except for Jack's report

20       that's told us that.

21  Q.   With respect to your second item that the X axis

22       is -- actually is unable to reach a center line

23       of the X axis when using a five-inch boring

24       bar --

KEVIN McGINLEY                                                    September 20, 2004

Page 42

1    A.    Right.

2    Q.    -- who has told you that the machine is unable to

3          do that?

4    A.    I believe Nick told me that.

5    Q.    Nick Fonte?

6    A.    Yes.

7    Q.    Okay.  Other than what Nick has told you with

8          respect to the difficulty with the X axis, do you

9          have any other information that supports your

10         statement that the machine is incapable to reach

11         a center line of the X axis when using a

12         five-inch boring line?

13   A.    Can you repeat that?

14   Q.    Has anybody other than Nick Fonte told you that

15         the machine is unable to reach a center line of

16         the X axis when using a five-inch boring line?

17   A.    That may be the fact.  I mean, that may be the

18         case but I'm not sure who else would have told me

19         that or who else told me that.  Usually when Nick

20         tells me something like that, I --

21   Q.    I mean, you have no reason to --

22   A.    Exactly.

23   Q.    -- dispute it?

24   A.    I have no reason to dispute it, yeah.

KEVIN McGINLEY                                          September 20, 2004

Page 43

```
 1   Q.   My only question is whether anybody else has told

 2        you that.

 3   A.   Not that I know of.

 4   Q.   Have you seen any test results which document

 5        that the machine is unable to reach the center

 6        line of the X axis?

 7   A.   No.

 8   Q.   During the course of the depositions taken so

 9        far, there has been testimony of a Mazak that's

10        been acquired since this machine was -- since the

11        Johnford lathe was delivered to Dynamic.  Do you

12        know whether the Mazak is capable of holding a

13        positional accuracy within plus or minus .005?

14   A.   I don't know that.

15             MR. LITTLE:  It's not .005.

16   A.   .0005.

17   Q.   .0005.  With respect to the Daewoo that's been

18        acquired since the Johnford lathe was delivered,

19        do you know whether that machine is capable of

20        holding positional accuracy within .0005?

21   A.   I do not.

22   Q.   There has also been testimony earlier about a

23        flowform machine that Jack Grosberg of Oxford

24        Engineering has worked on recently.
```

KEVIN McGINLEY                                                September 20, 2004

Page 44

```
 1   A.  Mm-hmm.

 2   Q.  Are you familiar with that machine?

 3   A.  Yes.

 4   Q.  Do you know what the tolerance of that machine

 5       is?

 6   A.  I do not.

 7   Q.  Do you know when that machine was delivered to

 8       Dynamic?

 9   A.  No, I don't.  I don't know exactly when it was,

10       no.

11   Q.  Do you know whether Dynamic has experienced

12       problems with that machine meeting the tolerance

13       specifications?

14   A.  I don't know that.

15   Q.  Other than Jack Grosberg and DRW, do you know any

16       other individuals or businesses that have

17       inspected the Johnford lathe or performed any

18       tests on the Johnford lathe?

19   A.  No.

20   Q.  Not aware?

21   A.  Not that I'm aware of, no.

22   Q.  All set.  Thank you very much.

23   A.  Thank you.

24
```

 1         CROSS-EXAMINATION BY MR. LITTLE:

 2    Q.   I have a question.  Purchase order number on this

 3         December purchase order was 13436.

 4    A.   Right.

 5    Q.   There was reference to that number in January on

 6         a subsequent document?

 7    A.   Mm-hmm.

 8    Q.   Can you explain to us how that number gets

 9         assigned and how it carries forward?

10    A.   Basically the number is assigned -- I have a

11         stack of purchase orders on my desk.  They're

12         just triplicate copies.  I pick up the next one

13         that's on my desk.  That's the next one I use.

14         The reason for assigning a purchase order is

15         basically so that you can track the costs as they

16         go through the system.

17              When we make -- when we want to cut a

18         check to Norm or to anybody, we write a purchase

19         order.  That way that check can reference that

20         purchase order.  At the time when we're talking

21         about buying this machine, we wanted to get

22         things moving.  We wanted to show good faith.  We

23         wanted -- I think Norm wanted to get this sale in

24         the year.  I can't speak for him but we wanted to

KEVIN McGINLEY                                                    September 20, 2004

Page 46

1      get things moving so we cut a purchase order.  I

2      think we made a down payment of $30,000.  And

3      that purchase order number stays attached to that

4      purchase throughout its life.

5              You know, it may undergo no revisions.

6      It may undergo one revision, two revisions, three

7      revisions but -- it maintains its identity

8      through the whole procurement phase.

9              MR. LITTLE:  Thank you.

10             MR. JACQUES:  No further questions.

11             (Whereupon, the deposition was

12     concluded at 5:02 p.m.)

13                              `

14

15

16

17

18

19

20

21

22

23

24

KEVIN McGINLEY                                                    September 20, 2004

Page 47

```
 1      Excerpt from Rule 30(e):
        Submission to Witness; Changes; Signing.
 2
              When the testimony is fully transcribed,
 3      the deposition shall be submitted to the witness
        for examination and shall be read to or by
 4      him/her, unless such examination and reading are
        waived by the witness and by the parties.  Any
 5      changes in form or substance which the witness
        desires to make shall be entered upon the
 6      deposition by the officer with a statement of the
        reasons given by the witness for making them.
 7
              *************************************
 8
 9          I, Kevin McGinley, have examined the above
        transcript of my testimony and it is true and
10      correct to the best of my knowledge, information
        and belief.  Any corrections are noted on the
11      errata sheet.
12
            Signed under the pains and penalties of
13      perjury this     day of              , 2004.
14
15
                        ---------------------------
16                          Deponent's Signature
17          On this    day of              , 2004, before
        me, the undersigned notary public, personally
18      appeared                , proved to me through
        satisfactory evidence of identification, which
19      were            , to be the person whose name is
        signed on the preceding or attached document, and
20      who swore or affirmed to me that the contents of
        the document are truthful and accurate to the
21      best of his/her knowledge and belief.
22
23                      ---------------------------
                            Notary Public
24      My commission expires:
```

Page 48

```
 1     COMMONWEALTH OF MASSACHUSETTS
       ESSEX, SS.
 2

 3          I, Susan L. Prokopik, Registered Merit

 4     Reporter and Notary Public duly commissioned and

 5     qualified in and for the Commonwealth of

 6     Massachusetts do hereby certify that there came

 7     before me on the 20th day of September, 2004 the

 8     person hereinbefore named, who was satisfactorily

 9     identified by me and duly sworn to testify to the

10     truth of his knowledge concerning the matters in

11     controversy in this cause; that he was thereupon

12     carefully examined upon his oath and his

13     examination reduced to typewriting under my

14     direction; and that the deposition is a true and

15     accurate record of the testimony given by the

16     witness.

17          I further certify that I am not

18     interested in the cause of this action.

19

20                    SUSAN L. PROKOPIK, RMR, CRR
21                         (CSR #124893)

22

       My commission expires:
23        April 15, 2005

24
```