DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DYNAMIC MACHINE WORKS, INC.    )
            Plaintiff          )
v.                             )  Docket No. 04-10525-WGY
MACHINE & ELECTRICAL           )
CONSULTANTS, INC.,             )
            Defendant          )

DEPOSITION of NORMAN P. CREPEAU, taken

pursuant to notice, at the law offices of Smith,

Elliott, Smith & Garmey, P.A., 199 Main Street, Saco,

Maine, on June 21, 2004, commencing at 11:14 A.M.,

before Laurel A. Long, a Notary Public in and for the

State of Maine.

APPEARANCES:

For the Plaintiff:        JACK BRYAN LITTLE, ESQ.

For the Defendant:        KEITH JACQUES, ESQ.

ALSO PRESENT:             Ven Fonte
                          Kevin McGinley

THE REPORTING GROUP
Mason & Lockhart

---

**INDEX**
Deponent: NORMAN P. CREPEAU
Examination by:                        Page
    Mr. Little                           3

**EXHIBITS**

| Number | Description | Page |
|---|---|---|
| 1 | Letter from M&E dated 12/13/02 | 7 |
| 2 | Dynamic Machine Works, Inc. Purchase Order No. 13436 | 11 |
| 3 | Letter from M&E dated 12/23/02 | 14 |
| 4 | Letter from M&E dated 12/17/02 | 17 |
| 5 | Copy of check from Dynamic Machine Works, Inc. | 17 |
| 6 | Letter from M&E dated 1/3/03 | 19 |
| 7 | Dynamic Machine Works, Inc. dated 1/13/03 | 21 |
| 8 | Letter from Absolute Machine Tools, Inc. dated 12/12/02 | 26 |
| 9 | E-mail from N. Fonte dated 2/28/03 | 27 |
| 10 | Absolute Machine Tools, Inc. Sales Contract | 29 |
| 11 | E-mail from K. McGinley dated 2/27/03 | 29 |
| 12 | E-mail from K. McGinley dated 4/30/03 | 31 |
| 13 | Letter from Johnford dated 6/24/03 | 32 |
| 14 | Letter from Dynamic Machine Works, Inc. dated 7/8/03 | 34 |
| 15 | Letter from Oxford Engineering Co., Inc. dated 3/12/04 | 42 |
| 16 | Alignment document | 44 |
| 17 | Alignment document | 46 |
| 18 | Alignment document | 47 |
| 19 | DRW Consulting document | 50 |
| 20 | Johnford Accuracy Inspection | 53 |
| 21 | Johnford Accuracy Inspection Record ST Series | 55 |
| 22 | Letter from Absolute Machine Tools, Inc. dated 1/20/04 | 58 |
| 23 | Letter from Law Offices of Jack Bryan Little, P.C. dated 12/11/03 | 65 |
| 24 | Letter from Absolute Machine | 65 |

---

3

1    NORMAN P. CREPEAU, having been duly sworn by the Notary

2    Public, was examined and deposed as follows:

3                    EXAMINATION

4    BY MR. LITTLE:

5    Q.  Would you state your name, please?

6    A.  Norman Crepeau.

7    Q.  And where do you reside, sir?

8    A.  In Biddeford, Maine.

9    Q.  And your home address?

10   A.  2 Channel Cove Lane.

11   Q.  Thank you.

12       And where are you employed?

13   A.  Machine & Electrical Consultants.

14   Q.  And what is their address?

15   A.  17 Pomerleau Street, Biddeford.

16   Q.  Would you spell Pomerleau, please?

17   A.  P O M E R L E A U.

18   Q.  And what is your position there?

19   A.  Vice president.

20   Q.  Are you a shareholder?

21   A.  Yes.

22   Q.  Who else is a shareholder in the company?

23   A.  Fabian Dube.

24   Q.  Any others?

25   A.  No.

---

4

1    Q.  And your percentage of ownership is what?

2    A.  50.

3    Q.  And Mr. Dube's percentage?

4    A.  50.

5    Q.  All right.  As vice president, what are your duties?

6    A.  Sales and service of machine tools.

7    Q.  And what are Mr. Dube's responsibilities?

8    A.  Sales and service of machine tools also.

9    Q.  Are there any other employees in the company?

10   A.  Yes.

11   Q.  And how many?

12   A.  I believe 18.

13   Q.  And their functions range from what?

14   A.  Shop worker to service technician to salesperson.

15   Q.  Do you have independent salespersons?

16   A.  None.

17   Q.  Do you have employed salespersons other than you and

18       Mr. Dube?

19   A.  Yes.

20   Q.  And who are they?

21   A.  All of them by name?

22   Q.  How many of them are there?

23   A.  Oh.  Seven.

24   Q.  Have any of those people been involved in the

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL | NORMAN P. CREPEAU

**5**

1  A.  None.

2  Q.  Who were the persons involved in the transaction with

3       Dynamic?

4  A.  Myself.

5  Q.  Anyone else?

6  A.  None.

7  Q.  When I refer to Dynamic, I'm referring to Dynamic

8       Machine Works, Inc.  And for the sake of brevity, I'll

9       call it Dynamic.

10      Directing your attention to December of 2002, did

11      you have the opportunity to engage in some discussion

12      with Dynamic regarding the purchase of a specialized

13      lathe?

14  A.  Correct.

15  Q.  And the initial discussions resolved around what piece

16      of equipment?

17  A.  One CNC lathe.

18  Q.  And who was the manufacturer?

19  A.  Johnford.

20  Q.  And what was the model number?

21  A.  HT-275G.

22  Q.  Prior to the HT-275G, were there others that were under

23      discussion?

24  A.  Yes.

25  Q.  Which others?

**6**

1  A.  I don't recall the model numbers.

2  Q.  Were there discussions around an ST model?

3  A.  Possibly.

4  Q.  Do you not know?

5  A.  I don't recall.

6  Q.  Was the ST model suitable for the application at

7       Dynamic, a 60 degree slant bed machine?

8  A.  Possibly.

9  Q.  And with the length that they were looking for -- the

10      run length they were looking for?

11  A.  I believe it was.

12  Q.  At some point did your direction change to a model

13      HT-200H?

14  A.  Possibly.

15  Q.  Well, what do you mean by possibly?

16  A.  I don't recall the entire event.  It was a little while

17      ago.

18  Q.  Did you review anything prior to coming here for your

19      deposition?

20  A.  No.

21  Q.  You reviewed no documents?

22  A.  No.

23  Q.  Were you the person who prepared the documents that

24      Mr. Jacques disclosed to us?

**7**

1  Q.  Or assembled those documents?

2  A.  Yes.

3  Q.  Did you review the documents at that time?

4  A.  Yes.

5  Q.  Did you read any of the documents?

6  A.  Yes.

7  Q.  How long ago was that?

8  A.  Months and months ago.

9  Q.  Months and months ago did you say?

10  A.  I would say so.  I would defer to Keith on that.  I

11      don't recall reviewing anything.

12  Q.  So do you have any independent memory of the

13      negotiations and the transactions that followed from

14      Dynamic Machine Works?

15  A.  I recall some things.

16  Q.  December the 13th of 2002, that is a series of

17      papers --

18          MR. LITTLE:  I'll give you the count on them in a

19      moment.

20  Q.  -- dated December 13th, 2002 containing six pages.

21          MR. LITTLE:  Let's mark this as the first exhibit,

22      please.

23          (Deposition Exhibit No. 1 was marked.)

24  Q.  Now, at the time that you began discussing this new

25      piece of equipment with Dynamic, had you had prior

**8**

1       dealings with them?

2  A.  Yes.

3  Q.  On how many prior occasions?

4  A.  I don't recall.  It was more service based than

5       retrofit basis.

6  Q.  Were there any former employees who were engaged in the

7       discussions around this piece of equipment?

8  A.  None.

9  Q.  Okay.  Is it fair to say that the document we just

10      marked as Exhibit 1 initially related to a machine

11      called a GT-200H?

12  A.  Yes.

13  Q.  And there are handwritten notes on this.  Do you know

14      whose handwriting that happens to be?

15  A.  Ven's.

16  Q.  Were there discussions back and forth between you and

17      Ven about his requirements and your machine

18      capabilities?

19  A.  Yes.

20  Q.  And as a result of those discussions, did the piece of

21      equipment -- I'm sorry, let me back up.

22          On the GT-200H, do you know what price was quoted

23      for that piece of equipment?

24  A.  I don't recall.  I think it was right there, but I

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

9

1  Q.  You think it's here?
2  A.  Right.
3  Q.  Did you generate an invoice?
4  A.  No.
5  Q.  Was there a purchase order generated?
6  A.  Not for any -- not for that machine.
7  Q.  Did you receive a deposit on the GT-200H?
8  A.  No.
9  Q.  Was the price on the GT-200H quoted at $295,000?
10      MR. JACQUES:  Do you want to look at the exhibit?
11  A.  I don't -- this is not the machine he bought.
12  Q.  My question was on that machine, what was the price
13     that was quoted?
14  A.  On the GT-200H?
15  Q.  Yes.
16  A.  $310,000.
17  Q.  May I see that?
18     That includes some optional equipment?
19  A.  No.
20  Q.  What is the -- where it says 310, what is the 295
21     number that's penned in above that?
22  A.  That was a number Ven probably wanted to pay.
23  Q.  And was a purchase order issued based upon that?
24  A.  No.
25  Q.  What was the down payment that you would have required

10

1     on a $295,000 quote?
2  A.  30 percent.
3  Q.  Did you receive a deposit at some point in time?
4  A.  Yes.
5  Q.  And was that deposit 30 percent of that number?
6  A.  No.
7  Q.  Was it 30 percent of any number?
8  A.  No.
9  Q.  In fact, it was 10 percent, was it not?
10  A.  Not on this machine, no.
11  Q.  The initial deposit that was submitted was for how much
12     money?
13  A.  $29,000.
14  Q.  $29,500?
15  A.  Okay.
16  Q.  Well, not okay. If it's not your testimony, that's
17     okay. $29,500, correct?
18  A.  Correct. I see that.
19  Q.  And that was 10 percent with the purchase order, do you
20     see that?
21  A.  Correct.
22  Q.  Not 30 percent?
23  A.  Correct.
24  Q.  Okay.

11

1  Q.  Well, this order is dated when, 12/17, correct?
2  A.  Again, this is not the machine.
3  Q.  That wasn't my question. Was that purchase order dated
4     12/17?
5      MR. JACQUES:  Just so the record is clear, we're
6     talking about Purchase Order No. 13436.
7  A.  This purchase order is dated December 17th.
8  Q.  Thank you. May I see that for a moment?
9      And with that was a $29,700 deposit in December?
10  A.  Correct.
11      MR. JACQUES:  29,500.
12      MR. LITTLE:  I'm sorry, 29,500. Thank you.
13      (Deposition Exhibit No. 2 was marked.)
14  Q.  Where on this purchase order does it identify the price
15     of the lathe as opposed to the extras?
16  A.  Do you want me to checkmark them?
17      MR. JACQUES:  Just identify the line.
18  Q.  Just identify them, if you will.
19  A.  This line, this line, this line.
20  Q.  So you would describe that as the first three line item
21     entries on the first page of that document?
22  A.  No. The second, third, fourth.
23  Q.  The 29,5?
24  A.  Yes. There's a 71 above it.
25  Q.  Okay. Thank you.

12

1      Now, is it fair to say, sir, that that adds up to
2     $295,000?
3  A.  Yes.
4  Q.  That being the same number that was circled on Exhibit
5     1 as the purchase price?
6      MR. JACQUES:  I'm just going to object to the form
7     of the question. We'll agree it's in the same amount.
8  A.  Yes.
9  Q.  Okay. Now, again, your earlier testimony was this
10     related to a different machine that was actually
11     purchased?
12  A.  Correct.
13  Q.  Who prepared the specifications that were a part of
14     Exhibit 1?
15  A.  Absolute Machine Tool and MECI.
16  Q.  What portion of it were you involved in, what portion
17     was Absolute involved in?
18  A.  Probably 99 percent them, 1 percent me.
19  Q.  What portion were you involved in?
20  A.  1 percent.
21  Q.  What did you do in that 1 percent, in terms of the
22     specifications?
23  A.  Under the terms and conditions I usually alter from
24     Absolute and put MECI in its place in the terms and

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

13

1  Q. Did you change any of the technical specifications?
2  A. No, but we probably talked about it.
3  Q. We meaning whom?
4  A. Ven and myself.
5  Q. What do you recall of those conversations regarding the
6     requirements?
7  A. I do not recall that.
8  Q. You don't recall any of the details of that
9     conversation?
10 A. No.
11 Q. Do you have any notes that would refresh your memory
12    about those conversations?
13 A. No.
14 Q. Are there any documents that would refresh your memory
15    about those conversations?
16 A. There's a later revision of this.
17 Q. That would refresh your memory about the conversations
18    you had with Ven?
19 A. No, I don't recall the -- I won't probably remember
20    that.
21 Q. So now let me ask it globally.  Is there anything that
22    you could refer to that would refresh your memory about
23    those conversations?
24 A. No.
25 Q. Okay.  Thank you.

14

1     Do you recall at some point in time the machine
2     that was being discussed changed?
3  A. Yes.
4  Q. When did that happen?
5  A. Before we received the purchase order.
6  Q. Before you received what purchase order?
7  A. This purchase order.
8  Q. Were there any written communications about it?
9  A. I don't recall.
10 Q. I would like to show you another document on Machine &
11    Electrical letterhead dated December the 23rd, 2002,
12    the subject the Johnford HT-275G containing six pages.
13    Do you recall generating that document?
14 A. Yes.
15 Q. When did you generate it?
16 A. Probably December 23rd.  I actually think I pulled it
17    in on e-mail from their facility.
18 Q. What do you mean by that?
19 A. I think I was in Kevin's office or their conference
20    room when they showed me a computer and I actually
21    finished the document there.
22 Q. But you created this document, they did not?
23 A. Correct.
24    (Deposition Exhibit No. 3 was marked.)

15

1     that was after Exhibit 1?
2  A. Yes.
3  Q. So how do you explain your earlier testimony that this
4     was done before Exhibit 1 -- that Exhibit 3 was before
5     Exhibit 1?
6     MR. JACQUES:  I'm going to object --
7  A. I didn't say that.
8     MR. JACQUES:  I'm going to object to that
9     mischaracterization of his testimony.
10 Q. Did you or did you not say that the HT-275G was quoted
11    prior to the GT-200?
12 A. No.
13 Q. Which of those two became the order for the equipment
14    that was delivered?
15 A. I don't understand the question.
16 Q. What machine did you deliver?
17 A. This one, HT-275G.
18 Q. You did not deliver the equipment that related to
19    Exhibit 1?
20 A. No.
21 Q. Okay.  At the time of the delivery of -- at the time of
22    this exhibit, Exhibit 3, did you get an additional
23    deposit; or was it the same deposit from before?
24    Before meaning the deposit tendered on Exhibit 1.
25 A. See, I don't recall MECI taking a purchase order for

16

1     this machine like you're stating.  I remember the
2     purchase order being directly for this machine.
3     MR. JACQUES:  And just so the record is clear,
4     when he was saying "this machine," he was referring to
5     Deposition Exhibit 3.
6     THE DEPONENT:  Correct.
7  A. But it could have been possible that that's how it
8     happened, but I don't recall.
9  Q. And, again, in order to clarify the record, it could be
10    possible that the deposit came with Exhibit 1 --
11 A. Correct.
12 Q. -- and not with Exhibit 3?
13 A. Correct.
14 Q. I would like to show you a photocopy of a check dated
15    December the 17th, 2002.  Do you recall receiving that?
16 A. Yes.
17 Q. Was that before or after the date on Exhibit 3?
18 A. Before.  Before.
19 Q. Were you trying to book an order prior to the end of
20    the year for business purposes?
21 A. No.  I take as many orders as I can possibly get --
22    can.
23 Q. The date on -- I'm sorry, let me do this another way.
24    I would like to show you an additional version of

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

---

**17**

1    December the 17th, 2002, also containing six pages. Do
2    you recall generating that document?
3  A.  Yes.
4  Q.  Okay. And is that the same date as the check that I
5    just put in front of you?
6  A.  Yes.
7        MR. LITTLE: I would like to offer the --
8  Q.  What would you call this document, so that we're
9    working from a common term?
10 A.  Quote. Quote.
11       MR. LITTLE: I would like to offer the quote as
12   Exhibit 4 and the check as Exhibit 5.
13       (Deposition Exhibit Nos. 4&5 were marked.)
14 Q.  Referring to Page 5 of Exhibit 4, do you see a price
15   quote of $295,000?
16 A.  Yes.
17 Q.  Okay. And do you agree with me that that was the price
18   quote for the HT-200G?
19 A.  Yes.
20 Q.  Do you recognize any of the handwriting on the
21   photocopy of the check that I just gave you, Exhibit 5?
22 A.  Yes. Matt's.
23 Q.  Who?
24 A.  Matthew's.
25 Q.  Matthew who?

---

**18**

1  A.  Ven's son, Matthew Fonte.
2  Q.  Do you recall receiving this check?
3  A.  Yes.
4  Q.  Do you recall depositing this check?
5  A.  Yes.
6  Q.  Now, following December the 17th was a third version of
7    the quote generated?
8  A.  I don't recall.
9  Q.  In January -- January 3rd of 2003 -- do you recall
10   generating another report?
11 A.  No.
12 Q.  Let me identify it for the record. Machine &
13   Electrical letterhead, January 3rd, 2003, six pages.
14   What piece of equipment does that relate to?
15 A.  Johnford HT-275.
16 Q.  Do you recall generating that document?
17 A.  Yes.
18 Q.  And what is the price that is quoted on that document
19   on Page 5?
20 A.  355,000.
21 Q.  An increase from the earlier quote of 295?
22 A.  Correct.
23 Q.  And what made the difference in the quote?
24 A.  Bigger machine.

---

**19**

1  A.  For Dynamic possibly receiving the Tomahawk contract.
2  Q.  Why did it require a bigger machine?
3  A.  For the Tomahawk contract.
4  Q.  What was the difference between the 200 and the 275?
5    Just the length of the run?
6  A.  Correct.
7  Q.  In all other respects, is it the same machine?
8  A.  I'm not sure.
9        (Deposition Exhibit No. 6 was marked.)
10 Q.  Were the technical specifications of Exhibit 6 prepared
11   following back and forth discussions with someone at
12   Dynamic?
13 A.  Yes.
14 Q.  With whom were these discussions held?
15 A.  Ven, Kevin, John.
16 Q.  Ven Fonte?
17 A.  Yes.
18 Q.  Kevin McGinley?
19 A.  Yes.
20 Q.  John?
21 A.  Haymans.
22 Q.  And following those discussions, did you arrive at the
23   technical specifications that are reflected on Exhibit
24   6?
25 A.  Steve Ortner, also of Absolute Machine Tools --

---

**20**

1  Q.  Was involved in the discussions?
2  A.  Yes. Well, not directly.
3  Q.  I guess I don't understand your answer.
4  A.  He was not at the meetings or at Dynamic with me, but
5    he was involved indirectly with the quote.
6  Q.  And Steve Ortner is?
7  A.  The president of Absolute Machine Tool.
8  Q.  Okay. So your discussions then with Dynamic were
9    communicated to Absolute?
10 A.  Correct.
11 Q.  So that, in effect, you were in the middle between the
12   two?
13 A.  Correct.
14 Q.  Do you own any part of Absolute Machine?
15 A.  No.
16 Q.  Do they own any part of Machine & Electrical?
17 A.  No.
18 Q.  What is the nature of your relationship with Absolute?
19 A.  We're their New England distributor.
20 Q.  Do you purchase equipment from them, or do you take it
21   on some consignment basis?
22 A.  We purchase and resell.
23 Q.  Now, were the technical specifications of Exhibit 6
24   those specifications that were agreed upon as a result

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

21

1   A.  Page 5?
2   Q.  The entire document.
3           MR. JACQUES:  He's talking about the exhibit
4       itself as No. 6.
5           THE DEPONENT:  Okay.
6   A.  I believe so.
7   Q.  Now, on or about the 13th of January 2003, did you
8       receive the two-page document I just handed you?
9       Across the top is Dynamic Machine Works, Inc.
10  A.  Yes.
11  Q.  And toward the top of Page 1 is there some reference to
12      the quote, Exhibit 6?
13  A.  Yes.
14  Q.  And that reference is by virtue of the date; is that
15      correct?
16  A.  Yes.
17  Q.  So that the direction to go forward that is in
18      exhibit -- I'm sorry, let me mark this next document.
19          (Deposition Exhibit No. 7 was marked.)
20  Q.  So the direction to go forward with Purchase Order No.
21      13436 refers then to the January 3rd, 2003 quote?
22  A.  Correct.
23  Q.  Okay.  While an earlier purchase order was also dated,
24      this now being Exhibit 2, 13436?
25  A.  Correct.

22

1   Q.  So is it fair to say that the equipment that was being
2       quoted and the equipment that was being purchased
3       changed from December to January?
4   A.  Possibly, yes.
5   Q.  Well, is there anything in the documents that I've just
6       shown you that would suggest otherwise?
7   A.  No.
8   Q.  So when you say possibly in that context, what do you
9       mean?
10  A.  I don't recall how it transpired, but it looks like
11      that's the way it went.  That's okay with me.
12  Q.  Is there anything inconsistent about these documents in
13      your view, in terms of your memory about how it took
14      place?
15  A.  No.
16  Q.  Are there any other documents that you believe might
17      explain any other translation of the events?
18  A.  I don't believe so.
19  Q.  When was the equipment to be delivered?
20  A.  Approximately 20 weeks.
21  Q.  And 20 weeks from what date?
22  A.  The purchase order date or end of December.
23  Q.  Not the January 13th date in Exhibit 7?
24  A.  I don't recall that.

23

1       or about May the 15th of 2003?
2   A.  I believe I seen that in one of the exhibits that you
3       just handed out.
4   Q.  Paragraph No. 1, Item D.
5   A.  That's correct.
6   Q.  Now, on Exhibit 7 -- excuse me, Exhibit 6, Page 3,
7       there is a top category, Machine Specifications
8       Continued.  The third item refers to positioning
9       accuracy?
10  A.  Correct.
11  Q.  What does that refer to?
12          MR. JACQUES:  I'm sorry, do you want him to define
13      what position accuracy is or what the specification
14      requires?
15          MR. LITTLE:  In the context of this specification.
16          MR. JACQUES:  Okay.
17  A.  It's a factory tolerance check to see if -- the machine
18      is positioned with a laser every 1 inch and it has to
19      be within plus or minus five-tenths full stroke of the
20      laser.
21  Q.  And not over the entire length of the piece of
22      equipment -- of the piece that's being turned?
23  A.  It has nothing to do with the part being turned.
24  Q.  Does it have anything to do with the accuracy of the --
25      well, does that relate to the turret?  Does it relate

24

1       to the cutting tool?  What does that relate to?
2   A.  It relates to the X and Z axis with a laser.
3   Q.  And -- okay.  I'll leave that for the moment.
4           Did you understand that that was a requirement of
5       Dynamic?
6   A.  I believe so.
7   Q.  And was that because of the prospective order for the
8       Tomahawk missile?
9   A.  No.  That's a standard tolerance that's put on the
10      machine.
11  Q.  Was this machine required to cut 5 inches cut to
12      center?
13  A.  Not initially.
14  Q.  By not initially, when are you talking about?
15  A.  Not with the date of the PO.
16  Q.  How is it that you recall that?
17  A.  It's one of the problems that we ran into with the
18      loaner machine, that Dynamic realized that that machine
19      would not cut to center without an additional piece of
20      tooling on the turret.
21  Q.  And when you say at the time of the purchase order, do
22      you mean in December or do you mean in January?
23  A.  Both.
24  Q.  So how did it come up that the 5 inches cut to center

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

25

1  A.  After the loaner machine or rental machine was put on
2      his floor, they realized that we had a problem there.
3  Q.  And as a result of the realization of that problem, was
4      that requirement added, to your understanding, of what
5      the HT-275G would perform?
6  A.  Yes.
7  Q.  Did it ever perform that?
8  A.  Cut to center?
9  Q.  Yes. 5 inches.
10 A.  I don't believe so.
11 Q.  Is it fair to say that it would only cut to 4 inches?
12 A.  I don't recall the exact number.
13 Q.  Do you have any documents that would reflect what that
14     number is?
15 A.  No.
16 Q.  Do you recall receiving -- strike that.
17     Do you recall forwarding a communication received
18     from Absolute Machine addressed to you, December the
19     12th of 2002?
20 A.  I don't recall giving this to Dynamic.
21 Q.  Did that relate to an ST model machine?
22 A.  Correct.
23 Q.  And the problem that was -- well, is it fair to say
24     that that document relates to Absolute's unwillingness
25     to deliver an ST machine for the Dynamic purposes?

26

1  A.  Well, I also -- I'm not sure.
2  Q.  May I please --
3  A.  Sure.
4  Q.  Thank you.
5      This is a document dated December the 12th, 2002 on
6      Absolute Machine Tools, Inc. letterhead.
7      (Deposition Exhibit No. 8 was marked.)
8  Q.  I would like to show you a memo to you from Nick
9      Fonte -- F O N T E -- dated February the 28th of 2003.
10     I would like to note that there are some red pen marks
11     on this document that were not part of the original
12     document.
13     Can I offer you a clean version? It will make
14     life easier.
15     Have you had an opportunity to review that
16     document?
17 A.  Yes.
18 Q.  Do you recall receiving it?
19 A.  Yes.
20 Q.  And does that document relate to the conversation that
21     you just spoke about where the 5 inches to center was
22     the topic of discussion?
23 A.  Yes.
24 Q.  And that was up from, what, a 2 inch --

27

1  Q.  May I?
2      Item No. 2, Currently the rental lathe cannot
3      bring a 2 inch bar to center. The new machine must
4      bring a 5 inch bar to center.
5      Do you see that?
6  A.  Correct.
7  Q.  So the rental machine, was that the ST model?
8  A.  Yes.
9      MR. LITTLE: Okay. I would like to mark this as
10     my next exhibit, please.
11     (Deposition Exhibit No. 9 was marked.)
12 Q.  Do you recall when you placed the order for the HT-275G
13     with Absolute Machine?
14 A.  I don't recall.
15 Q.  Is this a copy of your order for that piece of
16     equipment?
17 A.  Part of it.
18 Q.  And does that carry your signature someplace?
19 A.  Yes.
20 Q.  And what is the date on that document?
21 A.  March 18th.
22 Q.  Of what year?
23 A.  2003.
24 Q.  Can you -- do you have an explanation for why that
25     order was not entered until some three months after the

28

1      Dynamic order to you?
2  A.  This is not the purchase order. It's just a sales
3      contract.
4  Q.  For what piece of equipment?
5  A.  For the Johnford CNC lathe. We would have to refer to
6      PO N2717.
7  Q.  Do you or do you not believe that that relates to the
8      equipment in this case?
9  A.  No, I believe it relates to it.
10 Q.  Okay. So back to my question, why is that dated three
11     months after the date that the Dynamic order was placed
12     with you?
13 A.  Because sales contracts are not required to be done at
14     the same time as purchase orders. It's not uncommon
15     for me to do sales contracts much later or before the
16     delivery of machines.
17 Q.  May I?
18     And in this case did you issue the purchase order
19     that appears to be reflected on here, N2717?
20 A.  I issued the purchase order immediately.
21 Q.  Did you maintain a copy of that purchase order in your
22     files?
23 A.  Someplace.
24 Q.  Do you know whether that document was provided to us in

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

29

1  A.  I'm sure it was in my folder.  I don't recall seeing
2      it.
3  Q.  Did you maintain a separate folder for this
4      transaction?
5  A.  Separate from what?
6  Q.  Separate from other transactions with Dynamic.
7  A.  Yes.
8  Q.  So if that document existed, it would be in the same
9      folder?
10 A.  It should be, yes.
11 Q.  Did this document come from that folder?
12 A.  Yes.
13 Q.  This document, I'm sorry, being the sales contract that
14     we're speaking of.
15     MR. LITTLE:  I would like to mark this as Exhibit
16     10, please.
17     (Deposition Exhibit No. 10 was marked.)
18 Q.  In reference to the 5 inch to center issue, did Nick
19     Fonte also send you a memo on February the 27th?
20 A.  Yes.
21 Q.  Does that also relate to the 5 inch cut to center?
22 A.  Yes.
23 Q.  That meaning the communication of February 27th, 2003.
24     MR. LITTLE:  Next exhibit, please.
25     (Deposition Exhibit No. 11 was marked.)

30

1  Q.  At some point in time did you come to understand that
2      the May 15th delivery date would not be met?
3  A.  I don't recall.
4  Q.  Well, do you recall whether the machine was delivered
5      on May the 15th of 2002?
6  A.  It was not.
7  Q.  I'm sorry, 2003?
8  A.  It was not.
9  Q.  Why?
10 A.  The factory was late.
11 Q.  Did they communicate that to you?
12 A.  I don't recall.
13 Q.  Do you recall when the delivery date was pushed back
14     to?
15 A.  I don't recall mentally, but I do remember documents.
16 Q.  Would that have been sometime in June?
17 A.  That sounds correct.
18 Q.  And when you say you remember some kind of documents,
19     what documents would you -- do you recall?
20 A.  Probably e-mails stating that the machine would ship by
21     such and such and be delivered by such and such.
22 Q.  Give me just a moment.
23 A.  No problem.
24 Q.  Again, with the exception of the highlighted areas,

31

1      to you regarding the Johnford HT-275G dated April 30th,
2      2003?
3  A.  That looks correct.
4  Q.  Do you recall receiving this document?
5  A.  Yes.
6  Q.  Minus the highlighting?
7  A.  Correct.
8      MR. LITTLE:  I would like to offer that as my next
9      exhibit.
10     (Deposition Exhibit No. 12 was marked.)
11 Q.  Is it fair to say that the delivery date was pushed
12     back from May to late June?
13 A.  Correct.
14 Q.  Based on what's in this document?
15 A.  Correct.
16 Q.  Are you in possession of any information that suggests
17     that the first delay was anything other than late June?
18 A.  No.
19 Q.  Now, at some point in time did you receive a
20     communication from China indicating that the June date
21     would also not be met?
22 A.  I do recall that.
23 Q.  Okay.  I would like to show you a document that bears
24     the Johnford letterhead dated June 24th, 2003 signed by
25     someone named Julia.

32

1  A.  Correct.
2  Q.  Do you recall that document?
3  A.  Yes.
4  Q.  What was the occasion for that to be sent to you?
5  A.  Because the machine was late.
6  Q.  And that was in June, the end of June?
7  A.  June 24th it looks like.
8  Q.  Approximately the modified delivery date that we were
9      just speaking about a moment ago?
10 A.  Correct.
11 Q.  Now, when was the delivery date pushed to?
12 A.  Shipment date was end of July, middle of August; so --
13 Q.  And was there some indication by that communication
14     about when the equipment would be on site at Dynamic?
15 A.  No.
16 Q.  Did you discuss this correspondence with Mr. Fonte?
17 A.  I believe I faxed it to Dynamic.
18 Q.  Okay.  I would like to offer that as my next exhibit.
19     (Deposition Exhibit No. 13 was marked.)
20 Q.  Did you have some discussions with Dynamic about the
21     late delivery on this occasion, meaning the August
22     delivery date?
23 A.  I don't recall verbally communicating.
24 Q.  Do you recall anyone at Dynamic expressing their

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

33

1  A. Absolutely.
2  Q. What do you recall of those expressions of concern?
3  A. That it was extremely late.
4  Q. Who were you -- who was communicating with you on that?
5  A. Ven, Kevin.
6  Q. Ven Fonte?
7  A. Correct.
8  Q. And Kevin McGinley?
9  A. Correct.
10 Q. Were these telephonic or were they written
11    communications?
12 A. Possibly both. I don't recall.
13 Q. Do you recall those conversations developing to the
14    point where there was some discussion about canceling
15    the order?
16 A. Yes.
17 Q. And was that between the July and August timeframe?
18 A. I believe so.
19 Q. And did you come to some accommodation with Dynamic as
20    a result of their stated intention to cancel the order?
21 A. I believe we did.
22 Q. And what do you understand the accommodation to have
23    been?
24 A. I don't remember entirely, but there's a written
25    documentation from Dynamic to us.

34

1  Q. Did that document require your acknowledgment?
2  A. Yes, it did.
3  Q. I would like to show you a two-page document dated July
4    the 8th, 2003 on Dynamic Machine Works, Inc.
5    letterhead. Have you seen that document before?
6  A. Yes.
7  Q. Is that the document that you're referring to in our
8    immediately prior conversation?
9  A. Yes.
10 Q. And by reference to Page 2, do you recognize any of the
11    signatures?
12 A. Ven's and mine.
13     MR. LITTLE: I would like to offer this as my next
14    exhibit.
15     (Deposition Exhibit No. 14 was marked.)
16 Q. Page 2 of this document, is it fair to say that it
17    refers to commissioning of the machine by Friday,
18    September the 19th of 2003?
19 A. Yes, that's fair to say.
20 Q. And should the machine not be fully commissioned by
21    that time, was there a financial penalty to be imposed?
22 A. Yes.
23 Q. And how much was that penalty?
24 A. $500 per day deducted from the balance owed M&E for the

35

1  Q. What is meant by commissioning?
2  A. Installation of the machine tool.
3  Q. And running at the specifications?
4  A. Yes.
5  Q. Do you know when the lathe was actually delivered?
6  A. I don't recall.
7  Q. Was it on September the 19th or earlier?
8  A. I don't believe so.
9  Q. Do you have any documents that would indicate when it
10    was, in fact, delivered?
11 A. Not with me.
12 Q. Were there documents that were in your possession that
13    reflected that information?
14 A. I don't recall.
15 Q. Does the date of October the 9th, 2003 refresh your
16    memory about that date?
17 A. That sounds correct.
18 Q. Why was the September 19th date not met?
19 A. I don't recall.
20 Q. Was it due to someone's delay?
21 A. I believe the machine was late.
22 Q. From China?
23 A. Taiwan.
24 Q. I'm sorry.
25     Did it come through the possession of Absolute

36

1     before it came to you?
2  A. No.
3  Q. It came directly from Taiwan?
4  A. Correct.
5  Q. Drop ship to Dynamic?
6  A. Through New York Harbor.
7  Q. Did you or anyone on your behalf inspect the equipment
8    prior to its arrival at Dynamic?
9  A. We looked at the machine. Not personally, but we did
10    look at it at the warehouse in New York.
11 Q. Who is "we"?
12 A. My service technician.
13 Q. And that person's name is what?
14 A. I believe it was Darren Brady.
15 Q. Did you perform any testing on the machine at that
16    time?
17 A. No.
18 Q. Did you ascertain whether the machine had been damaged
19    at that time?
20 A. You could not tell.
21 Q. Why could you not tell?
22 A. It was crated.
23 Q. So what is it that you looked at when you were at
24    the --

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

37

1  Q.  Dimensions of the crate or did you uncrate it?
2  A.  The rigger uncrated it, but dimensions of the crate,
3      the machine.
4  Q.  Now, did you or someone on your behalf supervise the
5      delivery of the equipment to Dynamic?
6  A.  I was there and a couple of other of my service techs.
7  Q.  Do you recall whether or not the machine fit into the
8      building, or did the building require some
9      modification?
10 A.  It required modifications.
11 Q.  In what way?
12 A.  Enlarging a door.
13 Q.  Following the enlarging of the door, did the machine
14     fit into the building?
15 A.  We had to remove part of the machine sheet metal to get
16     it in the door.
17 Q.  And was it placed at the location that the machine was
18     to be commissioned?
19 A.  I believe so.
20 Q.  Can the machine be commissioned without it being in an
21     operable condition?  You have to run it?
22 A.  You have to run it.
23 Q.  At some point in time did you have people verifying the
24     technical specifications of the machine against the way
25     it was running?

38

1  A.  Yes.
2  Q.  And who are those people?
3  A.  DRW and --
4  Q.  Oxford Engineering?
5  A.  Correct.
6  Q.  Now, what was the function of DRW?
7  A.  To laser the -- laser the machine positional wise.
8  Q.  Between the point of the head stock and the point of
9      the tail stock?
10 A.  No.
11 Q.  Center point?
12 A.  No.
13 Q.  In what regard then?
14 A.  X and Z axis.
15 Q.  And X axis is in which direction?
16 A.  Vertical.
17 Q.  And Z axis is in which direction?
18 A.  Horizontal.
19 Q.  And the horizontal is measured from what two points?
20 A.  From a fixed point on a head stock to the turret.
21 Q.  And the -- I'm sorry, you said that was the X axis?
22 A.  Z axis.
23 Q.  And where is the X axis measured from?
24 A.  Same two points.

39

1  A.  Vertical.
2  Q.  In the vertical direction.
3      Was the machine as tested -- were test reports
4      generated by DRW?
5  A.  Yes.
6  Q.  And based on those test reports, was the machine when
7      initially delivered in spec or out of spec?
8  A.  I don't recall.
9  Q.  Would the test data reflected by DRW accurately reflect
10     the condition of their tests?
11         MR. JACQUES:  Object to foundation.
12 Q.  The findings of their tests?
13         MR. JACQUES:  Objection to foundation.
14     You can answer.
15 Q.  Did you review the DRW report?
16 A.  Yes.
17 Q.  Did you verify any of the information in that report?
18 A.  Yes.
19 Q.  How did you verify it?
20 A.  I looked at their inspection report?
21 Q.  "Their" meaning DRW?
22 A.  Correct.
23 Q.  And you accepted their report as being an accurate
24     representation of their testing?
25 A.  Correct.

40

1  Q.  Did DRW have some relationship to Machine & Electrical?
2  A.  No.
3  Q.  Have you used them before?
4  A.  Yes.
5  Q.  Were they an independent testing contractor?
6  A.  Yes.
7  Q.  On how many prior occasions had you used them?
8  A.  10.
9  Q.  And, again, do you recall whether or not based on the
10     DRW testing the machine was in or out of
11     specifications?
12 A.  I don't recall.
13 Q.  Why was Oxford Engineering engaged?
14 A.  To check the alignments.
15 Q.  And who engaged Oxford Engineering?
16 A.  I did.
17 Q.  Had you dealt with them previously?
18 A.  No.
19 Q.  How did you come to select Oxford Engineering?
20 A.  I found them somewhere.  I don't recall.
21 Q.  What did you know of their skill level?
22 A.  None.
23 Q.  What did you know of their reputation?
24 A.  None.

**DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL**                    **NORMAN P. CREPEAU**

41

1      conduct the test?
2   A.  None.
3   Q.  So on what basis did you retain them for the alignment
4       purposes?
5   A.  My conversations with them.
6   Q.  Did you personally speak with the people there?
7   A.  Yes.
8   Q.  Do you recall who?
9   A.  Jack.
10  Q.  Would that be Jack Grosberg?
11  A.  Yes.
12  Q.  G R O S B E R G?
13  A.  Yes.
14  Q.  Did you ask him of his experience?
15  A.  Yes.
16  Q.  Did you ask him of his skill with aligning lathes?
17  A.  Yes.
18  Q.  Was there anything about his qualifications that you
19      were unsatisfied with?
20  A.  No.
21  Q.  Dissatisfied with, excuse me.
22  A.  No.
23  Q.  So at some point in time did you direct him to Dynamic?
24  A.  Correct.
25  Q.  Do you know when that was?

42

1   A.  I don't recall.
2   Q.  Do you recall being invoiced by him for the services?
3   A.  Yes.
4   Q.  Would it be fair to say that that invoice dated March
5       the 12th, 2004, does that reflect dates of service in
6       the body of the invoice?
7   A.  It looks correct.
8   Q.  But does it reflect the dates where he was on site
9       performing his services in the first paragraph?
10  A.  It looks reasonable. I'm not exactly sure.
11  Q.  I would like to offer this as my next exhibit.
12          (Deposition Exhibit No. 15 was marked.)
13  Q.  Were there a series of reports that were issued by
14      Oxford Engineering pertaining to the alignment of the
15      Johnford HT-275G?
16  A.  Yes.
17  Q.  And is it fair to say that the machine was not capable
18      of being aligned?
19  A.  I disagree.
20  Q.  And is it your testimony that the machine was
21      completely aligned and, therefore, commissioned?
22  A.  No.
23  Q.  Well, on what do you base your statement that it was
24      aligned?

43

1       aligned. I don't think the work was complete.
2   Q.  Why was the work not complete?
3   A.  We didn't complete the commissioning.
4   Q.  Did you receive any documentation from Oxford that
5       would suggest that the machine was out of
6       specification?
7   A.  It's difficult -- if you could rephrase that.
8   Q.  Sure. I'll try to.
9           I'm showing you a two-page document. The caption
10      is Alignment by Oxford Engineering, Inc. and it appears
11      to be -- there's a handwritten date in the upper right-
12      hand corner that is 11/18/03. Do you recall receiving
13      that two-page document?
14  A.  Yes.
15  Q.  And was that within the date parameters of his invoice
16      about when he was there testing?
17  A.  Yes.
18  Q.  Okay. Was that document generated by Oxford
19      Engineering, to your knowledge?
20  A.  Yes.
21  Q.  Was it delivered to you?
22  A.  It was faxed to me.
23  Q.  Are you familiar with how to read that document?
24  A.  Somewhat. I'm not an expert.
25  Q.  Does that document reflect a variance between his test

44

1       results and the technical specifications?
2   A.  No.
3   Q.  Does that document show that the equipment was within
4       spec?
5   A.  Which spec?
6   Q.  What spec is being measured on that report?
7   A.  The alignments of the machine.
8   Q.  Upon any particular axis?
9   A.  No.
10  Q.  May I?
11          (Deposition Exhibit No. 16 was marked.)
12  Q.  We're referring to this as Exhibit 16 now. Is it fair
13      to say that the handwritten notes on this document were
14      not part of the original document?
15  A.  Correct.
16  Q.  Thank you.
17          Does this document show, as it states, bore
18      straightness to bore center line?
19  A.  I believe so.
20  Q.  What does that refer to?
21  A.  The alignment of the machine.
22  Q.  In what way?
23  A.  Straightness.
24  Q.  Between what points?

**DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL**                    **NORMAN P. CREPEAU**

45

1  Q.  And is that measured at various points along the turret
2      travel?
3  A.  Correct.
4  Q.  And are those numbers, do they reflect changes at
5      various positions along the way?
6  A.  Yes.
7  Q.  And you can determine what position by reference to the
8      far left column?
9  A.  I'm not sure of that.
10  Q.  I'm sorry, the second column in, second from the left.
11  A.  Again, I'm not sure of that.
12  Q.  So is it fair to say if the equipment -- if that
13      alignment were straight, the numbers in the third and
14      fourth column in would be consistent one with the other
15      all the way along the path?
16  A.  I believe so.
17  Q.  Okay. Thank you.
18      And do you agree that those numbers are not
19      consistent one with the other, there's a range between
20      them?
21  A.  Yes.
22  Q.  And that range varies as you go down the line? It
23      widens -- the gap widens?
24  A.  Yes.
25  Q.  Now, I'll show you another document, also with some

46

1      handwritten notations that -- have you seen this
2      document?
3  A.  I believe so.
4  Q.  And what is that?
5  A.  Some sort of alignment to the tail stock ways.
6  Q.  From what?
7  A.  I would believe the head stock.
8  Q.  And does that also contain distance measurements in the
9      second column from the left?
10  A.  Yes.
11  Q.  That's distance along the travel of the equipment?
12  A.  I would believe so.
13  Q.  And can you tell by that document, column three and
14      four, whether or not there is some variance at each
15      point -- each measurement point along the line?
16  A.  It appears that way.
17      MR. LITTLE: Next exhibit, please.
18      (Deposition Exhibit No. 17 was marked.)
19      (A short recess was taken.)
20  Q.  I would like to show you another document that, again,
21      was prepared by Oxford Engineering regarding the test
22      results at Dynamic Machine. Have you seen that
23      document?
24  A.  I believe so.

47

1  A.  Turret to tail stock.
2  Q.  And what does that mean?
3  A.  The alignment of the turret to the tail stock.
4  Q.  On what -- is that on a given axis?
5  A.  I think it's both axises.
6  Q.  X and Z.
7      Do you know how to read that report?
8  A.  Yes.
9  Q.  Okay. Does that report indicate that there's a
10      variance along the -- all points of travel?
11  A.  It appears that way.
12  Q.  Now, did you have any --
13      MR. LITTLE: I would like to offer this as my next
14      exhibit.
15      (Deposition Exhibit No. 18 was marked.)
16  Q.  Did you have any discussions with Mr. Grosberg
17      regarding the results of his testing?
18  A.  Not really.
19  Q.  What did you understand to be the results of his
20      testing on the basis of these reports, 16, 17, and 18?
21  A.  Rephrase.
22  Q.  Yes.
23      Was it your opinion or do you have an opinion about
24      whether the machine was in or out of specification
25      based on these reports?

48

1  A.  Which spec?
2  Q.  Any of the specs shown in 16, 17, and 18. Would you
3      like to look at them again?
4  A.  Well, there's no specification. What am I going
5      against?
6  Q.  Against the technical specifications of the purchase
7      order for the equipment.
8  A.  No.
9  Q.  No what?
10  A.  I don't -- I don't think there's a spec in the --
11  Q.  Do those reports show that the equipment was operating
12      in the straight line that a piece of equipment of this
13      type should have operated in, horizontally and
14      vertically?
15  A.  That shouldn't be my answer. That should be Johnford.
16  Q.  But my question was do you know.
17  A.  No.
18  Q.  Why did Oxford Engineering -- well, strike that.
19      Did Oxford Engineering ever align this machine?
20  A.  That's what they were hired to do.
21  Q.  Did it align?
22  A.  I believe so.
23  Q.  So Oxford told you that it aligned correctly?
24  A.  I don't recall that.

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

49

1    the equipment aligned?
2  A.  He was all done.
3  Q.  Did he say I'm all done and the equipment is now
4    aligned?
5  A.  I don't recall how he -- how we finished.
6  Q.  Do you recall him saying that -- to you that the
7    equipment would not align?
8  A.  No.  He thought it would be able to get to alignment.
9  Q.  Do you recall receiving his invoice?
10  A.  Yes.
11  Q.  Did you pay it?
12  A.  No.
13  Q.  Why not?
14  A.  I didn't pay it because I didn't receive payment for
15    the machine.
16  Q.  Was your contract with Oxford dependent upon you
17    receiving payment?
18  A.  No.
19  Q.  Did you discuss with Mr. Grosberg that you weren't
20    going to pay his invoice?
21  A.  I didn't say I wasn't going to pay it.  I just said I
22    needed to collect funds for the machine before I paid
23    him.
24  Q.  I would like to show you another document from DRW
25    Consulting.  Have you seen that document before?

50

1  A.  Yes, I have.
2  Q.  What does that relate to?
3  A.  Repeatability and precision accuracy.
4  Q.  This is based upon the laser alignment?
5  A.  No.
6  Q.  What is it based upon?
7  A.  Laser.
8  Q.  And, again, does the laser measure the equipment
9    between two known points?
10  A.  Correct.
11  Q.  And it's also along the X and the Z axis that it makes
12    those measurements?
13  A.  Correct.
14        MR. LITTLE:  I would like to mark this as my next
15    exhibit.
16        (Deposition Exhibit No. 19 was marked.)
17  Q.  Is there a variance between the original accuracy and
18    the compensation accuracy?
19  A.  Yes.
20  Q.  Are either of those numbers consistent with the
21    technical specifications of the quote?
22  A.  X is, Z is not.
23  Q.  Thank you.
24        You indicated earlier that the machine was never

51

1  A.  Correct.
2  Q.  Who did you have on site to commission the equipment?
3  A.  Tom, Darren, probably a couple of other service guys.
4    Mark.
5  Q.  Can you provide last names for those people, please?
6  A.  Darren Brady, Mark Metayer.
7        THE DEPONENT:  What's Tom's last name again?
8        MR. JACQUES:  Giovanni.
9  A.  Giovanni.
10  Q.  Are those people still in your employ?
11  A.  Yes.
12        I take that back.  Mark Metayer is not.
13  Q.  Do you know where he is located now?
14  A.  He started his own job shop.
15  Q.  Where?
16  A.  In Biddeford.
17  Q.  And do you know the name of his shop?
18  A.  Mainely Turning.
19  Q.  And could you spell Mainely?
20  A.  M A I N E L Y.
21  Q.  By reference to Exhibit 13, in the second paragraph of
22    the Johnford communication to you, do you see where
23    they've indicated that they've never produced a machine
24    of this type prior to this one?
25  A.  They didn't produce this exact length, no.

52

1  Q.  Now, by going to the next full paragraph, starting with
2    the words, It is very difficult --
3  A.  Mm-hm.
4  Q.  -- what is being discussed at that point in time?
5  A.  The Sars epidemic.
6  Q.  Doesn't it say it's very difficult for their
7    subcontractor plus the Sars epidemic?
8  A.  Correct.
9  Q.  So what is very difficult for their subcontractor?
10        MR. JACQUES:  Object to foundation.
11        You can answer, if you can.
12  Q.  Do you know what is very difficult?
13  A.  The casting and the grinding.
14  Q.  And what is being cast and what is being ground?
15  A.  Both.  The machine.
16  Q.  Did you have any discussions with anyone at Johnford
17    about that difficulty?
18  A.  No.
19  Q.  Thank you.
20        Did you or someone on your behalf deliver this
21    accuracy inspection report to Dynamic?
22  A.  We faxed it.
23  Q.  Would you look at the -- is there a serial number
24    reflected on that?

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

53

1   Q.  What is that number?
2   A.  TKA3005.
3   Q.  Thank you.
4       MR. LITTLE: I would like to mark this as my next
5       exhibit.
6       (Deposition Exhibit No. 20 was marked.)
7   Q.  Do you know who conducted these tests?
8   A.  Johnford.
9   Q.  Do you know whether that relates to the machine that
10      was delivered?
11  A.  I would believe so.
12  Q.  So one could determine that by reference to the serial
13      number?
14  A.  I would believe so.
15  Q.  May I see that for a moment?
16      Can you tell by reference to the last page of
17      Exhibit 20 the date that this document was purported to
18      have been completed?
19  A.  July 29th, 2003.
20  Q.  So if the machine were not ready for shipment until
21      August the 15th, how could it have been tested in July?
22      MR. JACQUES: Object to foundation.
23  Q.  Do you know?
24  A.  They have to -- it's a process that they complete and
25      the -- this is just one step of the way to finish the

54

1       machine. They still have to pack it and all that. So
2       this would be not uncommon.
3   Q.  Are there some of the alignment issues that could not
4       be tested in Taiwan?
5   A.  I'm not sure of that.
6   Q.  Well, isn't it fair to say that you hired DRW and
7       Oxford to do some alignments?
8   A.  Not in behalf of them.
9   Q.  Maybe I need to ask the question a different way.
10      Were the alignments that were conducted on site at
11      Dynamic, did they relate at all to the inspection
12      report that you had before you, Exhibit 20?
13  A.  I don't think so.
14  Q.  Okay. They measured different things?
15  A.  They measured different things. According to -- they
16      did it a different way.
17  Q.  They did it a different way?
18  A.  Correct.
19  Q.  I would like to show you -- did we mark that? Yes, we
20      did.
21      I would like to show you another version of a
22      document from Johnford entitled Accuracy Inspection
23      Report.
24      Was it your earlier testimony that Exhibit 20 was

55

1   A.  Correct.
2   Q.  And it was faxed to whom?
3   A.  To Kevin at Dynamic.
4   Q.  And who faxed it to him?
5   A.  Me.
6   Q.  And where did you obtain that document?
7   A.  From Roundtop, Johnford.
8   Q.  How did you receive it from them?
9   A.  Via fax.
10  Q.  What was that document supposed to indicate to Dynamic?
11  A.  The inspection of the machine.
12  Q.  In Taiwan?
13  A.  Correct.
14  Q.  The second of those documents that I gave you --
15      MR. LITTLE: Can you mark that as the next
16      exhibit.
17      (Deposition Exhibit No. 21 was marked.)
18  Q.  How do these documents, that being Exhibit 20 and
19      Exhibit 21, how are they at variance with each other?
20  A.  The serial number.
21  Q.  Which is the serial number that was delivered?
22      Is that a question?
23  Q.  Yes. Which equipment was delivered? The equipment
24      with which serial number was delivered to Dynamic?
25  A.  I'm not sure.

56

1   Q.  Were both of these provided to Dynamic; that is,
2       Exhibit 20 and 21?
3   A.  This was with the fax and this was with the machine.
4   Q.  Are they the same?
5   A.  The numbers in the body appear to be the same.
6       MR. JACQUES: Just we would like to object to the
7       extent that you're having him compare two documents
8       that -- obviously he can testify as to whether they're
9       the same or not. Obviously the documents speak for
10      themselves.
11      MR. LITTLE: Sure. Obviously.
12  Q.  Did you review the entire Document 21 before you
13      started to answer questions about it?
14  A.  I thought I had. Is your number different?
15  Q.  On the bottom of this document do you see a date?
16  A.  Okay.
17  Q.  And what is the date?
18  A.  1997.
19  Q.  Was this equipment the subject of discussion with
20      Dynamic in 1997?
21  A.  No.
22  Q.  Thank you.
23  A.  That's not the machine though.
24  Q.  It's not?

**DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL**                    **NORMAN P. CREPEAU**

57

1  Q.  Which one is?

2  A.  That's a ball screw.

3  Q.  Does this relate to the same piece of equipment?

4  A.  It relates to a part in the machine.

5  Q.  And that was tested -- the part in this machine was

6     tested some number of years before this equipment was

7     manufactured?

8     MR. JACQUES:  Object to foundation.

9  A.  I don't know.

10  Q.  What conclusion would you draw by reference to the

11     dates if that's a part in the machine?

12  A.  I would draw that conclusion, but I would have to ask.

13     MR. JACQUES:  There is some handwriting, some

14     numbers that have been entered onto this document that

15     are marked in pencil.  Presumably those didn't come

16     from Machine & Electrical.

17     MR. FONTE:  That's just the translation from

18     millimeters to inches.  That's an internal thing at

19     Dynamic.

20     MR. JACQUES:  Okay.  Thank you.

21  Q.  I would like to show you correspondence from Absolute

22     Machine addressed to you January 20th, 2004.

23  A.  Okay.

24  Q.  Who is that from?

25  A.  Hayden Wellman.

58

1  Q.  And do you know Mr. Wellman?

2  A.  Yes.

3  Q.  What's his position with Absolute Machine?

4  A.  Vice president.

5  Q.  Does that correspondence relate to the machine that's

6     delivered at Dynamic?

7  A.  Yes.

8  Q.  Thank you.

9     MR. LITTLE:  I would like to mark this as my next

10     exhibit.

11     (Deposition Exhibit No. 22 was marked.)

12  Q.  By reference to Exhibit 22, did Mr. Wellman speak of

13     the serial number of the machine delivered at Dynamic?

14  A.  He did.

15  Q.  And what is the number?

16  A.  TD3007.

17  Q.  And Exhibit 20, which is the technical inspection

18     report, which machine does that relate to?

19  A.  It says TKA3005.

20  Q.  Not the same piece of equipment?

21  A.  They only built one.

22  Q.  Where would the serial number on this machine be

23     located?

24  A.  I believe there's a name plate on the base of the

59

1  Q.  And would that reflect one of those numbers?

2  A.  I sure would hope so.

3  Q.  You were referring to Exhibit No. 21 as relating to the

4     ball screw, a subassembly on this machine; is that

5     correct?

6     MR. JACQUES:  Objection.  Mischaracterization of

7     his testimony.

8  Q.  Did you discuss a few moments ago in your testimony a

9     part inside the machine called a ball screw?

10  A.  Yes.

11  Q.  And did you make some statement regarding the ball

12     screw in connection with one of those accuracy reports?

13  A.  I just said it relates to the ball screw.

14  Q.  So Exhibit 21 relates to the testing of the ball screw?

15  A.  It appears that way.

16  Q.  Now, drawing your attention to Exhibit 21, I'm on the

17     third from the last page.

18  A.  Mm-hm.

19  Q.  That is the page with the test data of 1997; is that

20     fair to say?

21  A.  Yes.

22  Q.  Okay.  And that refers to the ball screw?

23  A.  Correct.

24  Q.  That being the page that we're talking about?

25  A.  Correct.

60

1  Q.  Now, by -- would you take a look at the next page; that

2     is, the second from the last page?

3  A.  Okay.

4  Q.  Is there now a more current date on the back?

5  A.  There's two separate parts.  This is the X axis.  This

6     is the Z axis.  There's two parts of the machine.

7  Q.  Okay.

8  A.  And this is a very common one.  This is the X axis,

9     which is very common, so they could have had tons of

10     inventory.  This is the long one, which could have been

11     around a long time.  This was the one that was built

12     for the machine.  But this is a 40 inch screw.  That

13     inventory wouldn't surprise me on that.

14  Q.  So the third page from the end, the one with the 1997

15     date is the short axis?

16  A.  Correct.

17  Q.  And the second from the end with the 2003 date is the

18     long axis?

19  A.  Correct.

20  Q.  Can you determine whether these were tested by the same

21     person or not?

22  A.  I can't tell.  There's a stamp there, but it's Chinese.

23  Q.  Is there a difference in the font that was used, right-

24     hand side, on the numbers?  Could you --

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

61

1    document speaks for itself.
2  Q. Can you determine whether there's a difference in the
3    font, by your observation?
4  A. It appears that way. But, again, it's not the same
5    document or relating to the same part. It's two
6    separate issues, two separate things.
7  Q. You mean each page relates to a different part?
8  A. In the machine.
9  Q. Okay.
10    Was Exhibit 20 sent for the purpose of being the
11    quality -- the inspection report that was part of the
12    agreement with Dynamic?
13  A. Yes.
14  Q. And not a version on a piece of equipment numbered
15    3007?
16  A. Repeat that.
17  Q. Yes.
18    Was Serial No. TKA3005 sent as being the serial
19    number -- that inspection report for the serial number
20    of the machine delivered to Dynamic?
21    MR. JACQUES: Object on foundation grounds.
22  A. I don't know. That's Johnford's saying. But the
23    serial number definitely could be a screw up because we
24    had to supply Dynamic a serial number very early in the
25    stages, and I don't recall -- so that this might have

62

1    been the factory and this might have been the office.
2    And we supplied Dynamic a serial number very early in
3    the game.
4  Q. How did you supply it?
5  A. I either e-mailed or talked to Absolute and they got me
6    a serial number for the State of Massachusetts so Ven
7    could use it for the State of Massachusetts. And I
8    don't know which machine -- what the actual serial
9    number off the top of my head is.
10  Q. Is that reflected in the --
11  A. But it appears that the TD3007 is the correct one. I
12    would have to look at my service reports.
13  Q. And the date on Exhibit 22, which reflects the 3007, is
14    what date?
15  A. August 2003.
16  Q. Is the letter dated January 20th, 2004?
17  A. Oh, this one?
18  Q. Yes.
19  A. Okay. 22. So repeat the question.
20  Q. Yes.
21    Exhibit 22 is dated when?
22  A. January 20th, 2004.
23  Q. And that's from Absolute?
24  A. Absolute.

63

1  A. Correct. But I may have given him that.
2  Q. You may have given whom that?
3  A. Hayden Wellman, the serial number.
4  Q. At some point in time did Dynamic cancel the order for
5    this machine or reject the machine?
6  A. I think they told us not to work on it anymore.
7  Q. Did you leave the premises?
8  A. Yes, as soon as Ven told us.
9  Q. And did you ever return?
10  A. Yes.
11  Q. On what date and for what purpose?
12  A. I believe the following Monday I brought Hayden Wellman
13    in to review the situation.
14  Q. And do you recall who -- did you meet with anybody?
15  A. Ven, Kevin, John, Nick.
16  Q. So it was Ven Fonte, Nick Fonte, Kevin McGinley, and
17    John -- I'm sorry, I forgot his last name.
18  A. John Haymens. And I think Matt was even there too.
19  Q. Matt Fonte?
20  A. But I don't remember.
21  Q. And from Absolute, anyone other than Mr. Wellman?
22  A. Just Hayden.
23  Q. And from Machine & Electrical anyone but you --
24  A. Just myself.
25    MR. JACQUES: Let him finish.

64

1  A. Sorry.
2  Q. She's good, but she can only take one of us at a time.
3    Do you recall what was discussed at this meeting?
4  A. The problem with the machine.
5  Q. What problem was that?
6  A. The delivery, the 5 inch to center, and the feeling
7    that we couldn't make the inspection report.
8  Q. Meaning that he questioned the validity of the
9    inspection report, Exhibit 20?
10  A. I don't recall if he did that or not.
11  Q. Well, then by what were you referring to when you said
12    he questioned the inspection report?
13  A. I mean the Oxford and DRW's inspection reports.
14  Q. Meaning he was saying that they were inconsistent with
15    the Taiwan inspection report?
16  A. Correct.
17  Q. And did you review those reports one against the other?
18  A. No. Because they're not -- unfortunately they're not
19    plain and Jane apples for apples.
20  Q. Was the issue of positional accuracy half a thousandth
21    full stroke discussed in that meeting?
22  A. I don't recall.
23  Q. Did you make notes of that meeting?
24  A. I believe so. It might have been in the discovery that

65

1  Q.  You don't recall whether you gave it to me or you don't
2      recall whether you made them?
3  A.  I don't recall if I made them or had them.
4  Q.  And you believe that you produced those documents in
5      discovery?
6  A.  If I would have wrote something down, it would have
7      been there.
8  Q.  Is it your custom to make notes of meetings you have
9      with customers who are complaining about equipment?
10 A.  Rephrase.
11 Q.  Do you normally make notes of these kinds of meetings?
12 A.  It's difficult to say.  Some are mental notes.  Some
13     are written notes.  I don't recall.
14 Q.  Do you recall receiving correspondence from me dated
15     December the 11th, 2003?
16 A.  Yes.
17 Q.  Is the document I just put before you that
18     correspondence?
19 A.  I would believe so.
20     MR. LITTLE:  Next exhibit, please.
21     (Deposition Exhibit No. 23 was marked.)
22 Q.  I would like to show you a piece of correspondence from
23     Absolute Machine addressed to you regarding the Dynamic
24     HT-275.
25     (Deposition Exhibit No. 24 was marked.)

66

1  Q.  Again, does this refer to Serial No. TD3007?
2  A.  Correct.
3  Q.  This meaning Exhibit 24.
4      In the third paragraph of this letter is there some
5      discussion about the positional accuracy of half a
6      thousandth?
7  A.  Correct.
8  Q.  That being expressed as .0005?
9  A.  Plus or minus.
10 Q.  Okay.  What was that discussion about?  What does that
11     relate to?
12 A.  Repeat the question.
13 Q.  Yes.
14     What does Mr. Wellman -- what is he referring to in
15     that letter to you in the third paragraph -- first line
16     of the third paragraph?
17     MR. JACQUES:  Objection on foundation grounds, but
18     he can answer if he can.
19 A.  He's asking for the actual specification that -- I
20     don't know what he means.
21 Q.  Okay.  Following my correspondence to you, Exhibit 23,
22     did you receive several more requests from my office to
23     verify that the machine could meet the half thousandth
24     full stroke positional accuracy?

67

1  Q.  And what was your response on any of those -- on each
2      of those occasions?
3  A.  I don't recall.  Did I respond?
4  Q.  Do you know if you responded?
5  A.  I'm not sure.
6  Q.  Okay.  Now, at some point did Dynamic demand the return
7      of its money?
8  A.  I believe so.
9  Q.  And at some point did you discuss with them returning
10     their money?
11 A.  I believe so.
12 Q.  Do you recall when that discussion took place?
13 A.  No.
14 Q.  Do you recall the substance of that conversation?
15 A.  No.
16 Q.  Do you recall who the conversation was had with?
17 A.  Probably Ven.
18 Q.  Did you make any notes of that conversation?
19 A.  No.
20 Q.  Do you recall that conversation, including a request
21     that the $500 a day penalty not be assessed?
22 A.  No.
23 Q.  Did you return their money?
24 A.  No.
25 Q.  Why?

68

1  A.  I don't know.
2  Q.  Do you recall being requested to remove the machine and
3      have instructions given on where you wanted it to be
4      delivered?
5  A.  I believe so.
6  Q.  Did you give such an instruction?
7  A.  No.
8  Q.  Why not?
9  A.  I don't want the machine back.
10 Q.  Why not?
11 A.  I want him to buy it.
12 Q.  Do you believe that that machine is commissionable?
13 A.  Yes.
14 Q.  Within all of the technical specifications of the
15     January technical specifications?
16 A.  Yes.
17 Q.  And on what do you base that belief?
18 A.  My conversations with Johnford and Absolute.
19 Q.  And what did they say to you about the ability to
20     commission that machine?
21 A.  Rephrase that question.
22 Q.  Yes.
23     You said you had conversations with Johnford and
24     Absolute that would lead you to believe that the

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

69

1      specs.  What did they say to you that led you to that
2      belief?
3   A.  That they would send factory personnel.
4   Q.  And in the context of that conversation, was the
5      request made to you to verify that they could meet
6      positional accuracy of a half a thousandth full stroke?
7   A.  Yes.
8   Q.  And do you know whether they responded to you in that
9      regard?
10  A.  No.  They said the inspection report -- they would
11      duplicate the inspection report.
12  Q.  And not the technical specifications?
13  A.  They didn't say that, but they said they would
14      duplicate the inspection report.
15  Q.  And do you believe that that satisfies the terms of the
16      technical specifications?
17  A.  Yes, I do.
18  Q.  And in what way does it satisfy that?
19  A.  That's the factory specifications.  That's how they
20      test the machine.
21  Q.  Were those the specifications of the quote?
22  A.  Yes.
23  Q.  In their entirety?
24  A.  No.
25  Q.  Okay.  So what was not in the inspection report that

70

1      was in the quote?
2   A.  Well, they didn't go over every dimension in the quote
3      and check all the dimensions of the kick capacities and
4      all that.
5   Q.  Did they go over all of the tolerances?
6   A.  I'm not sure.  I would have to double check that.  But
7      I believe, yes, they did.
8   Q.  In order to do that, would they have had to have
9      commissioned the machine in Taiwan and then
10      decommissioned it for shipment?
11  A.  I'm not sure how the factory does it.  That's a
12      question for Johnford.
13  Q.  Do you recall filing an answer and a counterclaim to
14      the lawsuit that was filed by Dynamic Machine Works?
15  A.  Yes, I believe so.
16  Q.  Did you have the assistance of someone in drafting that
17      answer?
18  A.  I don't recall.  I would have to review it.
19      MR. JACQUES:  Other than his attorney or --
20      MR. LITTLE:  I'm not going to ask questions about
21      what you --
22      MR. JACQUES:  No, I know that; but I guess I'm
23      just -- go ahead.  I'm sorry.
24  Q.  By reference to the last page, can you tell me whether

71

1   A.  I would believe I had been assisted by Keith.
2   Q.  Did you discuss these facts with him before this answer
3      was completed?
4      MR. JACQUES:  I'm going to object on the grounds
5      that that's attorney/client privilege.
6      MR. LITTLE:  Well, the fact that you discussed it
7      is not privileged.  What the context of the
8      conversation was may very well be.
9      MR. JACQUES:  Did we discuss the case or did we
10      discuss the representation of the counterclaim?
11  Q.  Did you discuss the answer that is reflected in this
12      document, the entitled answer and counterclaim?
13  A.  I don't recall.  If you want me to read through it, I
14      could -- I'm not sure.
15  Q.  Did you discuss the facts that became the part of the
16      admissions and the denials in that document?
17      MR. JACQUES:  I'm going to let him answer that
18      question generically, but I won't let him answer
19      specifically as to any of the facts.
20      MR. LITTLE:  Okay.
21  A.  I believe so.  I'm not sure.
22  Q.  Well, what was your participation in the process of
23      answering the complaint?
24  A.  I don't understand the question.
25  Q.  Did you offer information regarding the underlying

72

1      facts?
2      MR. JACQUES:  I'm just going to have a continuing
3      objection to these questions.
4   A.  I'm not sure.
5   Q.  Well, let's go through them one at a time.
6   A.  Okay.
7      MR. JACQUES:  I'm going to object to any questions
8      about specific facts on the basis of attorney/client
9      privilege.
10      MR. LITTLE:  I'm not asking about the
11      conversations with the attorneys.  I'm asking about the
12      facts that are set forth in the answer.
13      MR. JACQUES:  But you're asking him whether he
14      conveyed those facts to me.  If he conveyed them to me,
15      that would be protected by the attorney/client
16      privilege.
17      MR. LITTLE:  We can argue about that in front of a
18      judge, but --
19      MR. JACQUES:  That's fine, but I'm not going to
20      allow him to answer the question.
21      MR. LITTLE:  Well, as to each one, you can
22      instruct him not to answer the question as we get to
23      it.
24      MR. JACQUES:  That's fine.

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

73

1    Machine & Electrical Consultants, Inc. is a Maine
2    corporation with a principal place of business at 17
3    Pomerleau Street in Biddeford.
4        Your answer to that was that you admit.  Did you
5    tell your attorney that that was correct or not?
6        MR. JACQUES:  I'm going to object to that question
7    and instruct him not to answer.
8  A. I'm not sure.
9  Q. Paragraph 3 of the complaint says, On or about January
10   3rd, 2003 M&E submitted a proposal and specifications
11   to Dynamic for the sale of a Johnford HT-275 heavy duty
12   turning center, the Johnford lathe, for $355,000.
13       Your answer says that you admit that you submitted
14   the proposal to Dynamic for the sale of the Johnford
15   HT-275G lathe and other equipment for $413,000 but
16   denies the remaining allegations contained in Paragraph
17   3.  What remaining allegations are you denying?
18       MR. JACQUES:  If you know, you know.  If you
19   don't, you don't.
20 A. I don't know.
21 Q. On Paragraph 4, On or about January 13th, 2003 Dynamic
22   issued a purchase order to M&E for the Johnford lathe
23   and other equipment.  Delivery date for the lathe was
24   to be on or about May 15th, 2003.
25       Your answer was MECI admits that on or about

74

1    December the 17th, 2002 Dynamic issued a purchase order
2    to MECI for the Johnford lathe and other equipment
3    totaling $413,000 but denies the remaining allegations.
4    On what do you base your denial?
5  A. I don't know.
6  Q. Paragraph 6 of the complaint, On or about February
7    28th, 2003 Dynamic notified M&E of problems it was
8    experiencing with the rented Johnford ST-60B lathe.
9    Dynamic further advised that if these problems were not
10   addressed, the new Johnford lathe would be rejected.
11       Your answer to Paragraph 6 was that you admit that
12   you received an e-mail from Dynamic on February 28th of
13   2003 and aver that the e-mail speaks for itself, but
14   you deny the remaining allegations in Paragraph 6 of
15   the complaint.
16       What other allegations in Paragraph 6 are you
17   denying?
18 A. I don't know.
19 Q. Do you know what the basis of that denial is?
20 A. I have no idea what you're even talking about, what you
21   mean.
22 Q. Paragraph 14 of the complaint says Dynamic requested
23   the return of its down payment of 29,500 as well as the
24   payment of $500 a day penalty in the amount of $41,000.

75

1    dated December 11th, 2003 speaks for itself and denies
2    the remaining allegations contained in Paragraph 14 of
3    the complaint.
4        What allegations of Paragraph 14 are you denying?
5  A. I don't know.
6  Q. Do you recall that either you or someone on your behalf
7    filed a counterclaim against Dynamic in this matter?
8  A. I believe so.
9  Q. Do you know what the basis of that counterclaim was?
10 A. I don't recall.
11 Q. Was it for the payment of money?
12 A. Probably.
13 Q. I would like to show you Page 6, Paragraphs 2 through
14   7, of your counterclaim.
15       What is the amount of $413,000?  What does that
16   relate to, Paragraph 3?
17 A. The purchase order.
18 Q. And are you alleging that there are two additional
19   payments that are to be made?
20 A. I believe so.  I don't know if the amounts are right
21   or --
22 Q. Did you understand that those payments would only come
23   after the commissioning of the equipment?
24 A. Yes.
25 Q. And was the equipment commissioned?

76

1  A. I was not allowed to finish.
2  Q. So between mid November and early December you were
3    unable to commission the machine?
4  A. It's not finished, correct.
5  Q. How long does commissioning normally take?
6  A. It's difficult to say.  It's a special piece of
7    equipment.
8  Q. This machine had a number of problems, didn't it?
9  A. I think it had a couple.
10       MR. LITTLE:  Okay.  If I can have a couple of
11   minutes with my client, I may be close to being
12   finished.
13       (A short recess was taken.)
14 Q. I would like to go back over a couple of items with
15   you.  Between Exhibit 20 and Exhibit 21 I'm directing
16   your attention to Item 12 toward the bottom of each of
17   those pages.  Do you see that on one there is -- I'm
18   sorry, I can't read this one upside down.
19       MR. JACQUES:  The .034?
20 Q. O34 and that one is 036?
21 A. That is definitely 34.
22       MR. JACQUES:  That's 34?
23 A. That's definitely 34.  That the time when he -- I know
24   the handwriting.  That's 4.

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                              NORMAN P. CREPEAU

77

1   significantly at variance with that?
2  A.  No.
3       MR. JACQUES:  No, you don't know or, no, they
4   didn't?
5  A.  I don't know.
6  Q.  Do you know which of your men would have -- if that was
7   out, which of your men would have been adjusting?
8  A.  I think Tom and Mark would have looked at that.
9  Q.  And if Tom and Mark determined that that was
10  significantly off from those numbers, would that imply
11  to you that these numbers are wrong?
12  A.  No.
13  Q.  How would you explain the difference?
14  A.  Again, inspection of equipment is all different.  We
15  inspect it differently than they inspect it.  There
16  could be a million reasons.
17  Q.  On the basis of different test equipment, how much of a
18  variance might you expect reasonably?
19  A.  I don't know.  I would have to check to see how
20  Johnford actually inspected it.  You know, we inspected
21  it with a chuck, did they inspect it with a chuck.
22  It's difficult.
23  Q.  Wouldn't it have arrived at the same conclusion
24  regardless of the test equipment?
25  A.  The equipment was probably the same.  The method was

78

1   probably different.  They probably have a better jig to
2   set that up.
3  Q.  When we're referring to positional accuracy along the A
4   axis and the B axis, is it your testimony that it's
5   plus or minus a half a thousandth at the A and at the B
6   point?
7  A.  I don't follow the question.
8  Q.  If the machine is positionally accurate to plus or
9   minus five-tenths between A and B, is it your position
10  that it must remain between the plus or minus five-
11  tenths for the entire stroke of the machine?
12  A.  On position accuracy, yes.
13  Q.  So that at any point along the way if you plotted it,
14  it would be inside the five-tenths allowance?
15  A.  No, it would be within one-thousandths, plus or minus
16  five-tenths.
17  Q.  Plus or minus five-tenths.
18       So if, for example -- I'm showing you a document
19  that was prepared by us.  It's a graph, which is based
20  upon the tail stock ways at 45 degrees.  This is bore
21  straightness --
22  A.  Again, I disagree with that.  That's alignment and
23  we're still talking position accuracy, so I still say
24  that's different.

79

1   three times on this thing and we don't get an answer
2   from you?  Just -- this pisses me off.  Okay?  This is
3   plus or minus five-tenths from the two lines.  Is the
4   lathe allowed to do this, or is it supposed to stay
5   there?  If I cut a diameter, what happens?  You're
6   becoming like Absolute, which annoys me a great deal.
7   Okay?  We have an agreement.  We have to cut a straight
8   diameter.  And you guys are buzzing around this thing.
9       MR. LITTLE:  Ven --
10  Q.  Do you understand the point that he was making?
11       MR. FONTE:  Of course he understands the point.
12  Q.  Do you?
13  A.  I agree with the point, but I never agreed to cut a
14  part to those tolerances.
15       MR. FONTE:  Okay.  Next question --
16       MR. LITTLE:  Your -- this is his.
17       MR. FONTE:  I'm not allowed.  Okay.
18       MR. LITTLE:  We want to know what he says.
19  Q.  If this drawing accurately reflects the point between
20  the head stock and the tail stock and if from that
21  center line you plot plus or minus a half a thousandth,
22  would you agree that those dotted lines would represent
23  that plotting?
24  A.  If you say so.  I don't know.  I didn't plot it out and
25  I don't know the -- I don't know if I entirely --

80

1  Q.  Whether you agree with the accuracy is a different
2   question than the one I'm asking.
3  A.  Correct.
4  Q.  I'll just give you -- I'm not expecting you to have an
5   opinion about that.
6       If at any point along the line the equipment is not
7   capable of staying within that plus or minus half a
8   thousandth, is that within spec or not within spec?
9  A.  Again, how are you checking it?
10  Q.  At any point along the line.  In fact, in this case at
11  18 points along the line.
12       MR. JACQUES:  Just before he answers the question,
13  you're not asking him to verify whether this drawing is
14  accurate or anything else.
15       MR. LITTLE:  Not at all.
16       MR. JACQUES:  You're saying assuming that this
17  would be the .0005 and that's where it shows up, and
18  assuming that this is where it graphs out, is that or
19  is that not --
20       MR. LITTLE:  In compliance.
21  Q.  This is looking down from the top.  This is the side.
22  A.  Again, is it cutting; or is it with the alignment?  How
23  are we checking it?  That's the question.
24       MR. FONTE:  Anyway you want.

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

81

1    was supposed to cut a straight line the full stroke of
2    the equipment?
3  A.  To within reason.
4  Q.  To plus or minus five thousandths?
5  A.  No.
6  Q.  Five-tenths?
7  A.  No. Because there's steady risk issues. There's
8    drooping of the part. I never agreed to put parts
9    between centers and cut that. My statement was always
10   position accuracy plus or minus five-tenths.
11 Q.  Full stroke?
12 A.  Full stroke. But that's not --
13 Q.  What does full stroke mean?
14 A.  275 inches.
15 Q.  So at any point along the line, it would be
16   positionally accurate to plus or minus five-tenths at
17   any point along the 275 inches?
18 A.  I agree with that, if it's done correctly. I'm not
19   saying cutting a part.
20       MR. FONTE: How would you do it?
21       MR. LITTLE: Again, we can have that discussion --
22       MR. FONTE: Explain to us.
23 Q.  How would you measure -- in this example, how would you
24   measure whether you're in that range at the position 4
25   on this diagram?

82

1  A.  I don't know that answer. That I would have to get
2    with Johnford and have them do that.
3  Q.  If the machine is allowed to vary between Point A and
4    Point B, how far is it allowed to vary? Could it go up
5    or down 6 inches?
6  A.  I don't understand the question.
7  Q.  Could the variance from center line be plus or minus 6
8    inches on this machine?
9  A.  I wouldn't think so.
10 Q.  Would that be acceptable for it to be that way?
11 A.  I wouldn't think so.
12 Q.  So if it is plus or minus some other variant, less than
13   6 inches, would it then be acceptable or not
14   acceptable?
15 A.  It depends on how it's checked.
16 Q.  Well, you didn't have any trouble with it at 6 inches?
17 A.  6 inches is a big number. That's huge. You know, you
18   can see it with the eyeball. We're talking less than a
19   thousandth. And are we cutting or are we doing laser,
20   or how are we checking it? I have to go by how the
21   factory checked it. I didn't make the tolerance. All
22   I'm doing is representing the tolerance, and all I want
23   to do is make the inspection report match the machine.
24 Q.  On this very issue that we're speaking of, I believe

83

1    requests for you to verify that this would happen. Do
2    you recall whether or not you responded to those
3    requests?
4  A.  I don't recall.
5  Q.  Meaning that you have no memory one way or the other or
6    meaning --
7  A.  I remember the request. I don't remember if we gave
8    you a verbal or a written response.
9  Q.  Would you expect the tolerances plus or minus the
10   straight line, would you expect the equipment to hold
11   those tolerances over the full stroke?
12 A.  Cutting or accuracy?
13 Q.  Either one.
14 A.  I would believe the position accuracy to hold those
15   tolerances, yes, I would. Cutting those tolerances, I
16   don't know. In my opinion, you would need steady rests
17   and a whole bunch of other tooling things. That's not
18   what I was hired to do.
19 Q.  Well, does the weight and location of the turret affect
20   positional accuracy along the whole line of A to B?
21 A.  Probably. That would be a Johnford question.
22 Q.  Does the possibility that the machine torques itself in
23   the operation have something to do with that?
24 A.  Again, a Johnford question.
25 Q.  Could have it?

84

1  A.  I would think so.
2  Q.  And the same thing with the weight of the turret?
3  A.  I would think so.
4  Q.  And what's the function of the steady rest?
5  A.  To support the weight of the part.
6  Q.  So if the part itself was too heavy, it would sag?
7  A.  Correct.
8  Q.  Now, when this machine was delivered, was there some
9    device to keep the part from sagging?
10 A.  One.
11 Q.  What is that?
12 A.  One steady rest.
13 Q.  Who selected the number of steady rests for the
14   machine?
15 A.  Dynamic Machine.
16 Q.  Was there some recommendation about the requirement for
17   it?
18 A.  No.
19   I would like to confirm an earlier statement regarding
20   the conversation with Ven where he requested the return
21   of his money and the payment of the $41,000. Do you
22   recall that conversation?
23 A.  Verbally, yes.
24 Q.  Was that a face to face meeting or on the phone?

85

1  Q.  And did you agree to pay him back the 29,5?
2  A.  No, not without the approval of Absolute and Johnford.
3  Q.  Why did you require their approval?
4  A.  Because they're on the hook for this machine just as
5     much as I am.
6  Q.  Did you receive the deposit of 29,500 or did someone
7     else?
8  A.  I received it and passed it along.
9  Q.  The entire deposit?
10 A.  The entire deposit. And you can see that in the
11    contract that you gave me.
12 Q.  To whom did you pass it?
13 A.  Absolute Machine Tool, which in turn passed it along to
14    Johnford.
15 Q.  Would you describe the nature of your current
16    relationship with Absolute?
17 A.  Extremely well.
18 Q.  Is Machine & Equipment engaged in any other litigation
19    at this time?
20 A.  Yes.
21 Q.  With whom?
22 A.  That would be more of a Keith question.
23        MR. JACQUES: I would be happy to provide you a
24    list of any litigation that's pending.
25        MR. LITTLE: Okay.

86

1  Q.  Without regard to any sagging in the piece that is
2     being turned, would you expect the equipment to track
3     straight, plus or minus five-tenths, over the entire
4     stroke?
5  A.  Position accuracy?
6  Q.  Yes.
7  A.  Plus or minus five-tenths.
8  Q.  Over the full stroke?
9  A.  Over the full stroke.
10 Q.  Yes or no?
11 A.  It depends on how it's checked, again; but position
12    accuracy is plus or minus five-tenths.
13 Q.  Over the full stroke?
14 A.  Over the full stroke.
15 Q.  And if it does not do that and the failure is not as a
16    result of the stock that's being turned, would the
17    machine be in compliance or out of compliance?
18 A.  Again, you're asking me to say if it's doing it during
19    cutting; and I'm saying it's not the proper check.
20 Q.  I removed cutting from the equation.
21 A.  Okay. If you -- it's supposed to -- it's supposed to
22    hold plus or minus five-tenths position accuracy and Z
23    axis. The method of checking it, I don't know. That
24    is going to have to be Johnford.

87

1  A.  There's a laser. Apparently they have a different way.
2     They're going to have to say which way they're going to
3     check it. I don't know.
4  Q.  Well, did you reasonably expect that you would have to
5     perform that requirement once the machine was
6     commissioned?
7        MR. JACQUES: Once the commission was finished?
8     I'm sorry, just the form of the question -- once the
9     commissioning was finished or the construction was
10    finished?
11       MR. LITTLE: Commissioning finished at Dynamic.
12 Q.  Was it your expectation that you would have to verify
13    the accuracy of the machine once it's commissioned?
14 A.  Correct.
15 Q.  And by what method would you test it?
16 A.  The DRW method.
17 Q.  And did the Oxford Engineering method have anything to
18    do with the alignment of the machine?
19 A.  Position accuracy and alignment is different.
20 Q.  Okay. Oxford had to do with positional issues?
21 A.  No. Alignment issues.
22 Q.  Position accuracy I mean?
23 A.  No.
24 Q.  Only the laser?
25 A.  The laser for the alignment.

88

1  Q.  All right. We've exceeded my technical understanding
2     of what you're talking about, so I have asked enough
3     questions to get to that point. I think I'm through.
4        MR. JACQUES: I have no questions. Thank you.
5     (The deposition was concluded at 2:03 p.m.)
6                      * * * * * *
7
8
9
10
                        _____
                    NORMAN P. CREPEAU
11
12    Subscribed and sworn to before me
13    this __ day of _____ 2004.
14
                     _____
15     Notary Public
16
17
18
19
20
21
22
23
24

DYNAMIC MACHINE TOOLS v. MACHINE & ELECTRICAL                    NORMAN P. CREPEAU

89

```
 1              CERTIFICATE
 2        I, Laurel A. Long, a Notary Public in and for
 3   the State of Maine, hereby certify that the
 4   within-named deponent was sworn to testify the truth,
 5   the whole truth and nothing but the truth, in the
 6   aforementioned cause of action.
 7        I further certify that this deposition was
 8   stenographically reported by me and later reduced to
 9   print through Computer-Aided Transcription, and the
10   foregoing is a full and true record of the testimony
11   given by the deponent.
12        I further certify that I am a disinterested
13   person in the event or outcome of the above-named cause
14   of action.
15        IN WITNESS WHEREOF I subscribe my hand this ___
16   day of _____ , 2004.
17   Dated at Sanford, Maine.
18
19
20        _____
21              Notary Public
22   My Commission Expires
     April 1, 2010.
23
24
25
```