UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DYNAMIC MACHINE WORKS INC.,    )
             Plaintiff       )
                       )
vs                        )     Docket No.  04-10525-WGY
                       )
MACHINE & ELECTRICAL       )
CONSULTANTS, INC.          )
             Defendant   )

## REPLY TO OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

A review of  the summary judgment record reveals, the following undisputed facts:

1.     Dynamic sought to purchase an additional lathe that would be capable of satisfying its existing workload requirements, and, in anticipation of receiving a contract for the manufacture of a Tomahawk missile capsule, would also be  also capable of machining 23 foot long round components.  (Fonte Deposition, Page 28, Crepeau Affidavit, Paragraph 6).

2.     The specifications for Dynamic's purchase of the Johnford Lathe from MECI are as set forth in the Purchase Order dated January 13, 2003, incorporating specifications dated January 3, 2003 and the letter agreement dated July 8, 2003.  (Fonte Affidavit, Exhibits 1, 2, 3 and 4; (Crepeau Affidavit, Exhibits B, C, D and E).

3.     These specifications included, among other things, positional accuracy of $\pm$ .0005" full stroke and repeatability of  $\pm$ .0002" (Fonte Affidavit, Exhibit 1, Page 3); and a 5" diameter boring bar being able to reach at a minium a - .1875 position in the X axis (Fonte Affidavit, Exhibit 4). (Crepeau Affidavit, Paragraph 8, Exhibits B, C, D

and E).

4.  The positional accuracy requirement of ± .0005" full stroke is a standard tolerance requirement and did not relate specifically to requirements for the prospective contract for the Tomahawk missile capsule.  (Crepeau Deposition, Page 23-24).

5.  Dynamic and MECI originally agreed to a delivery date of May 15, 2003.  (Fonte Affidavit, Paragraph 6, Exhibit 2).  On June 26, 2003, M&E communicated a revised schedule of delivery for the Johnford Lathe, which contemplated delivery by September 8 and complete inspection and commissioning by September 19 (eleven days) (Crepeau Affidavit, Exhibit D). In reliance on the revised schedule of delivery, Dynamic agreed to an August 15, 2003 shipment date with a commissioning deadline of September 19, 2003.  (Fonte Affidavit, Exhibit 4, Crepeau Affidavit, Exhibit D).

6.  M&E failed to commission the Johnford Lathe by September 19, 2003, and, in fact, the machine  was not even delivered to Dynamic until October 9, 2003.   (Fonte Affidavit, Paragraph 13; Crepeau Affidavit, Paragraph 18).

7.  Initial testing on the Johnford Lathe did not begin until November.  (Crepeau Affidavit, Paragraph 20, 22; Grosberg Affidavit, Paragraph 3).  Following initial testing, M&E determined that the Lathe did not meet specifications.  ( DRW determined variance in repeatability and precision accuracy) (Crepeau Deposition, Page 50) (headstock of the machine was misaligned) (Crepeau Affidavit, Paragraph 21; Grosberg Affidavit, Paragraph 5).

8.  Following realignment of the headstock, additional testing revealed that adjustments

by M&E were not successful. (Crepeau Affidavit, Paragraph 25; Grosberg Affidavit, Paragraphs 6 and 7)

9.  From and after October 9, 2003 through December 9, 2003 MECI, was unable to get the Johnford Lathe to operate within the agreed upon specifications, specifically for positional accuracy of ±.0005 full stroke. (Fonte Affidavit, Paragraph 14 and 15; Crepeau Affidavit, Paragraph 25).

10. Because of the delays in commissioning the Johnford Lathe, Dynamic had backed off pursuing the Tomahawk contract.   (Fonte Deposition, Page 28-29).

11. By December 9, 2003, the commissioning that was represented would be completed in eleven days from date of delivery,  had still not been completed .  The parties discussed Dynamic's dissatisfaction with M&E's inability to commission the Johnford Lathe in a timely fashion.   The parties agreed to make a test cut to see how far off they were. (Crepeau Affidavit, Paragraph 26).  A letter was sent that evening which expressed an outside deadline for M&E's performance under the parties' agreement. (Crepeau Affidavit, Exhibit F).

12. The next morning, Fonte learned that the results of the test cut showed that the alignment  of the Johnford Lathe was approximately eight and one half thousandths off the specifications.   Dynamic also learned for the first time that a five inch bar would not be able to cut to center as agreed.  Dynamic immediately notified M&E on December 10, 2003 of its decision to retract its waiver. (Fonte Deposition, Page 129)  Notice of rejection/revocation was sent the next day and  Dynamic commenced to purchase a lathe from Mazak to perform its existing workload requirements.

13.    Following notice of rejection/revocation, and prior to litigation, M&E through counsel requested additional time to commission the Johnford Lathe. (Correspondence dated  January 27, 2004 attached hereto as Exhibit A). Dynamic requested adequate assurance that the Johnford Lathe would meet the specifications, specifically the ± .0005 positional accuracy. (Correspondence dated January 30, 2004 attached hereto as Exhibit B).  No such assurances were forthcoming.  Instead, M&E  represented that it would duplicate the accuracies contained in the factory performed accuracy report (Crepeau Deposition, Page 68-69; Correspondence dated February 11, 2004 attached hereto as Exhibit C and Correspondence dated February 12, 2004 attached hereto as Exhibit D), knowing that such performance would not satisfy the specifications contained in the January 3, 2003 quote.  M&E subsequently represented that it would guarantee ± .001 positional accuracy but not ± .0005 (Correspondence dated July 16, 2004 attached hereto as Exhibit E) .

**ARGUMENT**

From these undisputed facts, the court can find that M&E breached the agreement by failing to commission the Johnford Lathe by September 19, 2003, that M&E's failure to commission continued through December 10, 2004, and,  based on such failure, Dynamic properly rejected or revoked acceptance of the Johnford Lathe by correspondence dated December 11, 2003.

### I.  M&E Was In Substantial Breach Of The Parties' Agreement

It is undisputed that there was a five month delay in delivery of the Johnford Lathe, and that from the date of delivery, two months had passed with it not being operable within the agreed upon specifications [when M&E had previously represented it would take only eleven days].  On

December 10, 2003, M&E disclosed for the first time that a second agreed upon specification had not been met. Under all these circumstances, there can be no question that M&E had reasonable opportunity to cure defects in machine but was unable to do so in a timely fashion.

M&E breached the agreement's provision as to time and standard of performance. Timely delivery, inspection and full and complete commissioning in accordance with agreed upon specifications were essential features of the contract and M&E's failure to perform its obligations was so substantial as to justify Dynamic's refusal to go on.

M&E does not dispute its continuing breach of the agreement from September 19 through December 10, 2003. Instead, M&E argues that the December 9, 2003 correspondence which was retracted the following morning constitutes a modification of the parties agreement and that Dynamic's rejection was therefore premature.

However, any waiver by Dynamic of time of performance contained in the December 9, 2003 correspondence was retracted in a timely manner by telephone on December 10, 2003 and by writing dated December 11, 2003, and without any prejudice to M&E. *See* Uniform Commercial Code ("UCC") §2-209 (5). *See Wisconsin Knife Works v. Nation Metal Crafters*, 781 F.2d 1280 (7th Cir. 1986) [the buyer writes the seller a signed letter waiving some term in the contract and then, the next day, before the seller has relied, retracts it in writing; such a retraction would satisfy §2-209(5)]. Generally, a waiver of rights, whether express or implied, is not necessarily irrevocable.

## II. M&E Has Failed To Provide Adequate Assurance of Performance

In response to Dynamic's rejection of the Johnford Lathe, M&E requested additional time to commission the Johnford Lathe. When Dynamic requested adequate assurance that the Johnford Lathe would meet the specifications, specifically the ± .0005 positional accuracy full stroke, no such

assurances were forthcoming.  Instead, M&E  represented that it would duplicate the accuracies

contained in the factory performed accuracy report, knowing that such performance would not

satisfy the specifications contained in the January 3, 2003 quote.  M&E subsequently represented

that it would guarantee ± .001 positional accuracy but not ± .0005, again knowing that such

performance did not satisfy the agreed upon specifications

UCC  §2-609 provides a right to adequate assurance of performance.

A contract for sale imposes an obligation on each party that the other's expectation
of receiving due performance will not be impaired. When reasonable grounds for
insecurity arise with respect to the performance of either party the other may in
writing demand adequate assurance of due performance and until he receives such
assurance may if commercially reasonable suspend any performance for which he
has not already received the agreed return.

It is undisputed from and after October 9, 2003 through December 9, 2003, despite having

had ample opportunity to commission the Johnford Lathe [frequently working in excess of 12 hours

a day (Giovannani Affidavit, Paragraph 6)], M&E was unable to do so.  The test cut made on

December 9, 2003 showed that the alignment  of the Johnford Lathe was approximately eight and

one half thousandths off the specifications.   Dynamic also learned for the first time that a five inch

bar would not be able to cut to center as agreed.    These circumstances constituted reasonable

grounds for insecurity with respect to M&E's ability to perform under the contract.

Despite repeated requests for confirmation that M&E was able to fully and unconditionally

commission the Johnford Lathe in accordance with the agreed upon specifications, no such

confirmation was provided.  Even now, the summary judgment material produced by M&E fails to

provide adequate assurance of performance.

M&E's supporting  affidavits contain conclusory allegations  that the Johnford Lathe would

have been fully commissioned within specifications on or before December 19, 2003 and are unsupported by any admissible evidence. Norman Crepeau's belief that the Johnford Lathe was capable of being commissioned within all of the January 3, 2002 technical specifications, is based not on his personal knowledge, expertise or experience, but on conversations with Johnford and Absolute that they would duplicate the inspection report. (Crepeau Deposition Page 68-69).

None of the supporting affidavits indicate why the Johnford Lathe was not able to be brought into specifications, nor what can be done to bring it into specifications. They merely contain unsupported statements of confidence that the specifications can be met.

On the other hand, there is ample evidence to support Jack Grosberg's assertion [ test results over a three week period before and after adjustments made by M&E personnel] that the Johnford Lathe was not capable of meeting the agreed upon specifications. Oxford and DRW were both hired by M&E to test the Johnford Lathe's compliance with the agreed upon specifications. M&E acknowledges that the Oxford Engineering test results indicate non-compliance with the agreed upon specifications, and also acknowledges that the DRW test results similarly indicate non-compliance. Further, M&E acknowledges that the Johnford Lathe was not able to meet the specification of bringing a 5" bar to center. (Crepeau Deposition, Pages 24-25). M&E acknowledges such deficiencies but at the same time is content to rely on its unsupported assertions of "confidence" to raise a genuine issue in dispute. On these facts, there is no evidentiary foundation to support M&E's conclusory assertions regarding its ability to perform.

### III.  Dynamic Is Not Precluded From Seeking Liquidated Damages

In consideration of Dynamic's agreement not to terminate the contract for late delivery, M&E agreed to a penalty for any delay in commissioning the Johnford Lathe after September 19,

2003.

A liquidated damages clause does not preclude other remedies available at law or equity absent the clear intention of the parties to the contrary. *North Am. Consol., Inc. v. Kopka*, 644 F.Sup. 191, 193 (D.Mass. 1986). See also *De Blois v. Boylston & Tremont Corp.*, 281 Mass. 498, 518 (1933). A court will permit recovery under alternative remedies where the intention of the parties, as expressed through the terms of the contract, liquidates some, but not all, of the damages. *Id.*

It is clear that the July Letter Agreement does not contain any provision that such penalty was its sole and exclusive remedy or that a penalty for delay would not liquidate all of Dynamic's damages.

The July Letter agreement is silent as to what would happen if the equipment was rejected. Therefore, the parties agreement must be construed in accordance with the familiar principles in *Clark* v. *State Street Trust Co.*, 270 Mass. at 151--153:

> The aim of all interpretation of writings is to ascertain the meaning intended to be attached to the words by the parties who used them, and to effectuate the true purpose of the parties as thus ascertained. All rules are ancillary to that dominating aim. ... The construction of a written instrument to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end [citations omitted]. Equity looks through the form to the substance and purpose of the agreement and moulds its decree in accordance with what the parties may fairly be presumed to have intended. Every contract implies good faith and fair dealing between the parties to it. The courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable" (citation omitted).

See also *Waldo Bros.* v. *Platt Contracting Co.*, 305 Mass. 349, 355--356 (1940); *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979).

-8-

It would be unreasonable or inequitable to interpret the parties' agreement as barring Dynamic from collecting the penalty for delay upon rejection. Such an interpretation encourages breach in timely performance and in effect would reward M&E for its noncompliance with its agreement to commission the Johnford Lathe no later than September 19, 2003 and punish Dynamic for asserting its right of rejection or revocation of acceptance.

Where, as here, actual damages for delay would be difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced. *Kelly v. Marx,* 428 Mass. 877, 880 (1999) (citations omitted). See also *In re Admetric Biochem, Inc.,* 284 B.R. 1 (Bankr.D.Mass.2002).

## IV. **Dynamic's Chapter 93A Claim**

As outlined in the summary judgment record, M&E was given reasonable opportunity to correct any deficiencies with the Johnford Lathe and was unable to do so. Despite acknowledgment of its breach of the time and standards of performance of the parties agreement, M&E has failed and refused to return Dynamic's deposit and has failed and refused to accept return of the equipment or otherwise provide instructions or indemnity.

From October 9, 2003 through December 10, 2003, M&E, by its failure to fully and unconditionally commission the Johnford Lathe, was in substantial breach of the parties agreement. This notwithstanding, it has failed and refused to offer adequate assurances of its ability to perform. M&E represented that it would take eleven days to commission equipment. In reliance on this representation, Dynamic agreed to a commissioning deadline of September 19, 2003. The equipment was not even delivered until October 9. For two months M&E attempted to commission

the equipment, without success.     There is no evidentiary support for the assertion that the deficiencies could be corrected given additional time.

M&E's knowledge of the Johnford Lathe's nonconformity with the agreed upon specifications, coupled with its failure and refusal to provide adequate assurances, and/or return the downpayment are clear evidence of M&E's wilful disregard of its known contractual obligations in violation of G.L. c. 93A.   M&E deliberately withheld monies owed in order to force Dynamic to accept the nonconforming equipment.     Such actions are more than a mere breach of contract and have an extortionate quality that meets the level of unfairness contemplated by G.L. c. 93A. *See Pepsi-Cola Metropolitan Bottling Co., Inc. V. Checkers, Inc.* 754 F.2d 10, 17-19 (1st Cir. 1985); *Anthony's Pier Four, Inc. V. HBC Assocs.,* 411 Mass. 451, 475 (1991).

WHEREFORE movant requests that the court grant it summary judgment in the within proceeding, and such other and further relief as justice may require.

Respectfully submitted,
DYNAMIC MACHINE WORKS INC.
By its attorney,


Dated: _____        _____/s/_____

_____        Jack Bryan Little (#301920)
                               LAW OFFICES OF JACK BRYAN LITTLE, P.C.
                               401 Andover Street
                               North Andover, MA 01845
                               (978)682-9985

-10-