UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DYNAMIC MACHINE WORKS, INC., <br>     Plaintiff, <br><br>       v. <br><br> MACHINE & ELECTRICAL <br> CONSULTANTS, INC., <br>     Defendant. | ) <br> ) <br> ) <br> ) <br> )   CIVIL ACTION <br> )   NO. 04-10525-WGY <br> ) <br> ) <br> ) <br> ) |

MEMORANDUM AND ORDER

YOUNG, C.J.                                              January 3, 2005

## I.   INTRODUCTION

This case presents an important issue of first impression under the commercial law of Massachusetts as embodied in the Uniform Commercial Code.  It is an issue that has divided two of the nation's foremost jurists, compare the decision of Judge Posner, writing for the Seventh Circuit in Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir. 1986), with the vigorous dissent of Judge Easterbrook, id. at 1290-94, and bedeviled a generation of law students.  See, e.g., Allan E. Farnsworth & William F. Young, Contracts: Cases and Materials 568-69 (4th ed., Foundation Press 1988).

Here is the Massachusetts version:

## II.  PRIOR PROCEEDINGS

1

The plaintiff Dynamic Machine Works, Inc. ("Dynamic") filed
its original complaint in this case on February 20, 2004 in the
Massachusetts Superior Court sitting in and for the County of
Middlesex.  Pursuant to 28 U.S.C. §§ 1446(d) and 1332, the
defendant Machine & Electrical Consultants, Inc. ("Machine")
removed the action to this Court [Doc. No. 1].  Soon thereafter,
Dynamic filed a Motion for Summary Judgment [Doc. No. 14] seeking
declaratory judgment with respect to its rejection or revocation
of acceptance of a Johnford Lathe, as well as its rights and
remedies under the Uniform Commercial Code.  Dynamic also
asserted a right to summary judgment on its claims for breach of
warranty, breach of contract, and alleged violations of chapter
93A of Massachusetts General Laws.  Machine opposed summary
judgment for Dynamic, and filed a Cross-Motion for Partial
Summary Judgment in its favor [Doc. No. 20].  In its Cross-
Motion, Machine sought a ruling that Dynamic is not entitled to
recover punitive damages or penalties on its breach of contract
claim as matter of law, and further moved that the chapter 93A
claim summarily be dismissed for lack of evidence.  Id.  On
October 21, 2004, Dynamic filed a Reply to Defendant's Cross-
Motion [Doc. No. 26] ("Pl.'s Reply").

These motions were heard on October 27, 2004.  Agreeing that
there were no material facts in dispute, the parties consented to
this Court's proposal to treat the matter as a case stated.

2

Accordingly, each party received an extended period of time to put forth arguments, and the conclusions of the Court are drawn from the record in its entirety and the oral arguments of the parties without drawing inferences against either moving party. See Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972 F.2d 426, 429 n.7 (1st Cir. 1992) (observing that the submission of a matter to the court as a case stated promoted judicial efficiency); Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. and Urban Dev., 768 F.2d 5, 12 (1st Cir. 1985) (same).

## III. FACTUAL BACKGROUND

Dynamic, located in Billerica, Massachusetts, is a manufacturer of precision components for military, aerospace, nuclear, chemical, oil, and other major industries. Plaintiff's Memorandum in Support of Motion for Summary Judgment [Doc. No. 15] ("Pl.'s Mem.") at 1;[1] Defendant's Statement of Facts Pursuant to Local Rule 56.1 [Doc. No. 19] ¶ 2 ("Def.'s Facts"). Machine is a distributor of heavy machinery and turning equipment and is located in Biddeford, Maine. Def.'s Facts ¶ 1.

Sometime before January 2003, Dynamic solicited proposals from Machine for a CNC lathe that would be capable of machining

---

[1] Dynamic does not present a separate statement of facts as is required by Local Rule 56.1. Dynamic did, however, present lists of numbered facts in both its Memorandum and in its Reply to Opposition to Motion for Summary Judgment. The data set forth in these documents form part of the record from which the Court has derived its factual conclusions.

seven meter (approximately twenty three feet) long round
cylinders with an accuracy of ± .0005" over their entire length.
Pl.'s Mem. ¶ 1.  On or about January 3, 2003, Machine submitted a
proposal and specifications to Dynamic for the sale of the
Johnford Lathe for $355,000.  Id. at ¶ 2.  The Johnford Lathe was
designed to machine lathe tubular cylinders, such as missile
capsules, up to twenty three feet in length.  See Def.'s Facts ¶
5.  The machine uses angled "guideways" for the lathing of the
metal and thus is described as a "slant bed," in contrast to a
"flat bed."  Id.  Roundtop Machinery Industries, Co., Ltd.,
doing business as Johnford, manufactured the Johnford Lathe in
Taiwan.  Id. at ¶ 4.  Johnford sells its lathes in the United
States through Absolute Machine Tools, Inc., located in Lorain,
Ohio ("Absolute").  Id.  Absolute prepared ninety nine percent of
the specifications in the proposal of January 3, 2003.  Id. at ¶
7.

On or about January 13, 2003, Dynamic issued a purchase
order to Machine for the Johnford Lathe and other related
equipment.  Pl.'s Mem. ¶ 3.  Pursuant to the terms of this
purchase order, Dynamic agreed to pay $355,000 for the Johnford
Lathe, with a down payment of $29,500, a second payment of
$148,000 upon delivery, and a third and final payment of $177,500
after acceptance.  Def.'s Facts ¶ 9.

When Machine received confirmation of Dynamic's purchase

4

order and the down payment of $29,500, it placed an order for the Johnford Lathe with Absolute, which in turn placed the order with Johnford in Taiwan. Id. at ¶ 10. According to the terms of the purchase order, the delivery date for the Johnford Lathe was to be May 15, 2003. Pl.'s Mem. ¶ 3. Until that time, Machine provided Dynamic rental of a Johnford ST-60B lathe. Id. at ¶ 4. On or about February 28, 2003, Dynamic notified Machine that it was having problems with the rented Johnford ST-60B lathe. Id. at ¶ 5. Dynamic further advised that if these problems were not addressed in the new Johnford Lathe, it would be rejected. Id.

Meanwhile, production of the machine in Taiwan was delayed for reasons beyond the control of Machine, including the SARS epidemic. Def.'s Facts ¶ 11. In or around April 2003, Machine notified Dynamic that the anticipated May 15, 2003 delivery date would not be met and that delivery would occur some time in June. Pl.'s Mem. at ¶ 7. In June 2003, Johnford informed Absolute and Machine that:

> the SARS epidemic in Taiwan has caused many unexpected problems for our company. There has [sic] been many restrictions on work and travel and it has been difficult dealing with our subcontractors and getting this done on time. Now that the SARS is just about over, things are finally returning to normal schedule and we expect to have this machine finished and shipped out b[y] middle of Aug[ust].

Def.'s Facts ¶ 12. In letters dated June 26, 2003 and July 8, 2003, Dynamic and Machine confirmed agreements to continue with the purchase and sale of the Johnford Lathe and agreed to extend

the shipping deadline to August 15, 2003, and the commissioning

deadline to September 19, 2003.  Id. at ¶ 13.  The July letter

("July Letter Agreement") laid out further arrangements regarding

the purchase and sale of the Johnford Lathe.  Id.

The July Letter Agreement also provided as follows:

- Before shipping, Dynamic would receive a factory-performed accuracy test report, including "actual measurements for axis accuracy in positioning and repeatability as well as applicable standards in spindle error limitations."

- The Johnford Lathe would be capable of meeting certain specific tasks, including CNC system displays, a 5" diameter boring bar reaching a minimum -.1875" position in the X axis, and conveyor system for removal of chips.

- Complete commissioning would be accomplished by September 19, 2003.

- If the commissioning deadline was not met, "[Machine] will agree to pay Dynamic a fine of $500.00 per day to be deducted from the balance owed to [Machine] for the cost of the machine."

- Dynamic's second payment (40% of purchase price) of $148,000 would be due upon commissioning, with the balance 30 days from commissioning.

Id.; Pl.'s Mem. ¶ 8.  Providing all of these specifications were

met, Dynamic agreed that it would not cancel the purchase order

of the Johnford Lathe.  Pl.'s Mem. ¶ 8.

Following agreement on this revised schedule, Machine

provided Dynamic with the factory-performed accuracy report on

July 29, 2003.  Def.'s Facts ¶ 16.  Dynamic accepted this report,

and on August 15, 2003, Johnford shipped the Johnford Lathe by

sea from Taiwan to New York as agreed. Id. at ¶ 17. Machine delivered the Johnford Lathe by truck from New York to Dynamic on October 9, 2003. Id. After receipt of the Johnford Lathe, Dynamic "lagged" or bolted it to the floor and connected it to air and electrical supply lines. Id. at ¶ 18. Dynamic completed the necessary preliminary work in mid- to late-October, at which point Machine technicians began working with Dynamic employees to commission the machine. Id. at ¶ 19.

During the commissioning, Machine hired Oxford Engineering Company, Inc. ("Oxford") to conduct laser testing to determine the horizontal and vertical alignment of the ways over which the cutting tool travels. Id. at ¶ 20. Jack Grosberg ("Grosberg"), the President of Oxford, conducted testing during the month of November, and stopped testing on November 26, 2003. Id. at ¶¶ 20, 21. No one from Oxford conducted any work or inspections on the Johnford Lathe after November 26, 2003. Id. at ¶ 21. After November 26, 2003, Machine service technicians and Dynamic employees continued to make adjustments to the Johnford Lathe to improve its performance. Id. at ¶ 22.

On December 9, 2003, Dynamic agreed to a revised commissioning date of December 19, 2003. Id. at ¶ 23. Dynamic's president, Ven Fonte ("Fonte"), confirmed this agreement in a writing which read as follows: "As I stated to you early this morning on the telephone, we will grant you one last and final

7

deadline for this machine to be fully and unconditionally commissioned by the close of business day, Friday December 19, 2003." Id. at ¶ 24.

The next morning, December 10, 2003, Fonte learned for the first time that a five-inch bar was not able to be cut to the center as had been expected. Pl.'s Reply ¶ 12. Furthermore, on this morning, Fonte became aware of the results of a test revealing that alignment of the Johnford Lathe was approximately eight and one-half thousandths off the specifications required. Id. Responding to these developments, Dynamic notified Machine that it intended to retract its decision to allot Machine a time-extension to finish commissioning the Johnford Lathe, and rejected the Johnford Lathe in its entirety. Id. The following day, on December 11, 2003, Dynamic sent a written confirmation of its rejection, specifying that it "hereby rejects or revokes any acceptance of the above-referenced lathe." Def.'s Facts ¶ 26. Machine had not relied on the December 9, 2003 written extension in any way prior to the December 11, 2003 written rejection.

Dynamic requested return of its down payment of $29,500 as well as payment of a $500 per day penalty in the amount of $41,000. Pl.'s Mem. ¶ 12. Dynamic also requested instructions as to the disposition of the Johnford Lathe and indemnity sufficient to cover the expense of complying with any such instructions. Id. at ¶ 13. In response, Norman Crepeau

8

("Crepeau"), the Vice President of Machine, contacted Fonte and told him not to do anything until Crepeau spoke with Absolute. Def.'s Facts ¶ 27.  On December 15, 2003, Crepeau and personnel from Absolute arrived to continue commissioning the Johnford Lathe, but Dynamic had already dismantled and moved the machine. Id. at ¶ 29.

To date, Machine has not returned Dynamic's down payment, has not paid the $500 per day penalty, and has not provided instructions or indemnity, all as requested by Dynamic.  Pl.'s Mem. ¶ 14.  Dynamic has incurred expenses and damages relating to the inspection, receipt, transportation, care, and custody of the Johnford Lathe.  Id. at ¶ 15.  Dynamic therefore commenced this lawsuit.

A single legal issue of first impression in Massachusetts is largely dispositive of this case.  Machine asserts that, had it been given until December 19, 2003 to commission the machine, it would have been fully capable of commissioning the machine within that period.  Def.'s Facts ¶ 29.  Dynamic, on the other hand, contends that "given its breach of the promised commissioning date of September 19, 2003, the late delivery, and inability to conform the equipment to the agreed upon specifications, such equivocal assertions are insufficient."  Pl.'s Mem. 7-8.

## IV.  DISCUSSION

The principal issue to be determined in this case is whether

9

Dynamic was entitled to revoke its December 9, 2003 decision to
extend the time allotted to Machine to bring the Johnford Lathe
into full compliance with the required specifications.   The
governing law is the Uniform Commercial Code ("UCC") as enacted
in Massachusetts.   Mass. Gen. Laws ch. 106 (1999).   The parties
primarily look to the provisions of section 2-209 of the UCC to
assert their respective positions.

### A.   Uniform Commercial Code §2-209[2]

Section 2-209 of the UCC has been the cause of much

---

[2]   Section 2-209, entitled "Modification, Rescission and
Waiver," provides as follows:

> (1) An agreement modifying a contract within this
> Article needs no consideration to be binding.

> (2) A signed agreement which excludes modification or
> rescission except by a signed writing cannot be
> otherwise modified or rescinded, but except as between
> merchants such a requirement on a form supplied by the
> merchant must be separately signed by the other party.

> (3) The requirements of the Statute of Frauds section
> of this Article (section 2-201) must be satisfied if
> the contract as modified is within its provisions.

> (4) Although an attempt at modification or rescission
> does not satisfy the requirements of subsection (2) or
> (3) it can operate as a waiver.

> (5) A party who has made a waiver affecting an
> executory portion of the contract may retract the
> waiver by reasonable notification received by the other
> party that strict performance will be required of any
> term waived, unless the retraction would be unjust in
> view of a material change of position in reliance on
> the waiver.

Mass. Gen. Laws ch. 106, § 2-209 (1999).

confusion and unpredictability amongst courts and has led to a wealth of academic analysis. Specifically, judges and scholars alike have had difficulty in reconciling the five subsections of section 2-209 to avoid superfluous and inconsistent interpretations. See generally John E. Murray, Jr., The Modification Mystery: Section 2-209 of the Uniform Commercial Code, 32 Vill. L. Rev. 1 (1987) (discussing the different interpretations of section 2-209 and proposing a distinct resolution). The difficulty comes in trying to distinguish between a modification and a waiver and the legal consequences of such distinction.

Subsection (4) of section 2-209 reads that a modification "can operate as a waiver," and subsection (5) provides that a waiver (but implicitly not a modification) may be retracted absent a material change in position by the other party based on reliance. Since the UCC nowhere defines "waiver," these two subsections have generated confusion in determining the difference between the two legal concepts. See Central Illinois Public Serv. Co. v. Atlas Minerals, Inc., 965 F. Supp. 1162, 1173 n.3 (C.D. Ill. 1997) ("Waiver and modification are distinct concepts."); Green Constr Co. v. First Indemnity of Am. Ins. Co., 735 F. Supp. 1254 (D.N.J. 1990) (explaining that in contrast to waiver, "[m]odification is the changing of the terms of the agreement which may diminish or increase the duty of either party

11

as distinguished from the mere surrender of a right by one person against another." (quoting 2 R. Anderson, Uniform Commercial Code, 2-209: 7, at 319 (3d ed. 1982) (internal quotations omitted))); Nassau Trust Co. v. Montrose Concrete Prods. Corp., 436 N.E.2d 1265, 1269-71 (N.Y. 1982) (holding that the Appellate Division erred in not distinguishing between waiver and modification).

In essence, Machine argues that Dynamic's agreement to extend the commissioning deadline until December 19, 2003 was a binding modification that was irrevocable, and that Dynamic's subsequent rejection of the Johnford Lathe was a breach of contract. Def.'s Mem. at 10-11. Dynamic counters that its December 9, 2003, decision to extend the deadline for commissioning was a waiver that was revocable absent reasonable reliance by Machine, and that its rejection of the Johnford Lathe was proper given the pattern of untimeliness created by Machine. Pl.'s Reply at 4-5.

This Court now holds that Dynamic was entitled to and did properly revoke the December 9, 2003 letter extending the commissioning deadline, regardless whether that letter is termed a "modification" or a "waiver" under section 2-209. Such a proper revocation effectively confirmed that Machine was in breach of contract for failing to bring the machine into compliance with required specifications by the previously agreed

12

upon deadlines.

This Court does not disagree that the concepts of modification and waiver are distinct from one another. Often, however, as is the case here, drawing such a distinction is an implausible and unnecessary attempt to impart a sense of certainty to what is, in fact, case specific reasoning to a just result. See Wisconsin Knife Works, 781 F.2d at 1286 (noting that "a conceivable but unsatisfactory way around [interpreting the provisions of section 2-209 as superfluous] is to distinguish between a modification that substitutes a new term for an old, and a waiver, which merely removes an old term" (emphasis added)); see also Triton Commercial Props., Ltd. v. Norwest Bank Texas, N.A., 1 S.W.3d 814, 817 n.1 (Tex. App. 1999) (commenting that it would not be practical for the court in that case to differentiate between the concepts of modification and waiver because the statute of frauds is applicable regardless of any attempted distinction).

In the case at hand, Dynamic extended the commissioning deadline and the next day, after learning of further problems with the machine and before Machine made any material changes in reliance on the extension, Dynamic revoked it and rejected the Johnford Lathe. This revocation of the agreement, whatever the name the parties would like to assign it, was within Dynamic's rights.

"The fundamental function of contract law (and recognized at such at least since Hobbes's day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and (the same point) obviate costly self-protective measures." Richard A. Posner, Economic Analysis of Law 103 (5th ed. 1998). Allowing Machine to sue Dynamic for breach of this revoked agreement under the argument that it is an irrevocable modification contravenes the general principles of contract law described above.  One of the functions of contract law is "to encourage the optimal timing of economic activity."  Id.  In the instant case, "optimal timing" was laid out in the original purchase order, which stated that the delivery date for the Johnford Lathe was to be on or about May 15, 2003.  Pl.'s Mem. ¶ 3.  Upon initial delay of delivery, Dynamic agreed to extend the deadline and in the July Letter Agreement agreed to a ship date of August 15, 2003, with a final commissioning date of September 19, 2003.  Id. at ¶ 9.  At the time of the alleged modification or waiver of the commissioning deadline, Machine had already been in breach of the contract for almost three months.  Permitting Machine to sue Dynamic under these circumstances not only would discourage timely performance, it would also unjustifiably punish Dynamic for trying to alleviate the situation through means other than litigation.

14

The law in all instances encourages negotiations and settlements between parties in the interest of avoiding litigation wherever possible.[3]  Although Machine had already breached the contract several times through untimely deliveries and failure timely to commission the machine, Dynamic nevertheless continued to extend the deadlines for Machine. Although the law encourages performance of economic activity in a timely fashion, it is undoubtedly preferable that the parties reach an agreement as to another course of action short of litigation in the event that timely performance is not possible. Here, Dynamic attempted to do just that.  After multiple delays and several attempts at negotiating a reasonable timeline for performance, Dynamic was entitled to reject the Johnford Lathe. This entitlement does not change as a result of an extension (not relied upon) which was subsequently revoked, with proper notice, in light of new information regarding the machine failing its specifications.  See Wisconsin Knife Works, 781 F.2d at 1280 (the majority opinion written by Judge Posner, in opposition to a sharp dissent by Judge Easterbrook, asserts that in order for a waiver to be effective, there must be reasonable reliance on the waiver).  Such a result would discourage parties from agreeing to

---

[3] One of the underlying principles of the UCC is to confirm longstanding principles of law and equity unless doing so would directly contradict a provision of the Code.  See Mass. Gen. Laws ch. 106, § 1-103 (1999).

extend deadlines at all and would cause parties to employ "costly self-protective measures," a result which is best avoidable in the interests of justice.[4]

In the interests of upholding the fundamental principles of contract law and protecting innocent parties who patiently try to resolve issues before resorting to litigation, this Court rules that Dynamic was entitled to revoke its gratuitous extension giving Machine more time to commission the Johnford Lathe. Furthermore, this revocation effectively renders Machine liable to Dynamic for breach of contract.

**B.    Chapter 93A Claim**

Section 2 of chapter 93A of Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts of practices in the conduct of any trade or commerce." Dynamic asks this Court to find that Machine willfully evaded its known contractual obligations to Dynamic in violation of this provision.[5] Pl.'s Mem. at 8. As evidence,

---

[4] For a general discussion of the maxim that cooperation between parties is desirable providing that no injustice is done to those who rely on the cooperation, see Jack M. Graves, Course of Performance as Evidence of Intent or Waiver: A Meaningful Preference for the Latter and Implications for Newly Broadened Use Under Revised U.C.C. Section 1-303, 52 Drake Law Rev. 235 (2004) (proposing generally that giving effect to a waiver is a better way to give proper effect to parties' past conduct than is relying on course of performance).

[5] Dynamic also asserts a claim for breach of warranty against Machine, Pl.'s Mem. at 1, and a claim for chapter 93A liability (and attorneys fees) as a result of such breach, id.

16

Dynamic notes that Machine has knowledge of the non-conformity of the Johnford Lathe and has given no adequate justification for not returning Dynamic's down payment. Id. at 9. Furthermore, Dynamic asserts that Machine has provided no instructions on returning the machine. Id.

Machine's actions do not give rise to a chapter 93A violation. See Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 226 (1992) (asserting that breach of contract, without showing a pattern of continual breach intended to benefit the breaching party, does not support a chapter 93A claim). Dynamic cites KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1 (1st Cir. 2003), for the proposition that breach of contract and refusal to pay money due is a violation of Chapter 93A. In that case, however, the First Circuit ruled that there was evidence sufficient to state a chapter 93A claim where the vendor refused to pay commissions owed to the representative, unjustifiably demanded that the representative terminate its relationship with other vendors, and threatened unilaterally to terminate the

---

See Maillet v. ATF-Davidson Co., 407 Mass. 185, 193 (1990) ("Generally, a breach of warranty constitutes a violation of Mass. Gen. Laws ch. 93A, § 2."); see also Canal Elec. Co. v. Westinghouse Elec. Corp., 756 F. Supp. 620, 628-29 (D. Mass. 1990). There is a paragraph warranting the machine in the purchase order of January 3, 2003. See Crepeau Aff. [Doc. No. 22], Ex. B, at 6. This paragraph, however, states that "[Machine] warrants products it sells to be free from defects in parts and workmanship for 12 months, from date of commissioning." Id. (emphasis added). Because the Johnford Lathe was never commissioned, as both parties agree, these claims fail.

contract if the representative did not do so.  Id. at 24.  That
conduct is far more willful, unfair, and overreaching than
Machine's breach here.  It is true that Machine delivered a
faulty machine to Dynamic, but there is nothing to suggest that
Machine did so intentionally or knowingly.  Furthermore, Machine
continued to work to bring the machine into compliance with
agreed upon specifications following delivery.  Def.'s Facts ¶
22.

Machine has not returned the down payment to Dynamic because
it believes that Dynamic has breached its contract, and Dynamic
may not therefore be entitled to such compensation.  Failure to
make a payment given a justifiable legal claim for withholding
does not rise to the level of conduct in violation of chapter
93A.  See Framingham Auto Sales, Inc. v. Workers' Credit Union,
41 Mass. App. Ct. 416, 418 (1996) ("Mere resistance to a just
claim is not the stuff of c. 93A . . . ."); Quaker State Oil Ref.
Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989)
(merely withholding funds and countersuing does not give rise to
liability under chapter 93A).  Although the Court here rules that
Machine breached the contract, this Court nevertheless finds
nothing in the evidence sufficient to persuade it of a violation
of Chapter 93A, sections 2 and 11.  The Court expects, of course,
that once judgment enters, Machine will promptly return the down
payment.

**C.    Dynamic is Not Entitled to Recover Punitive Damages or Penalties on Its Breach of Contract Claim as Matter of Law**

The July Letter Agreement between Dynamic and Machine stated that:

> [b]eginning with September 20, 2003 and continuing for every calendar day thereafter until complete commissioning of the machine is achieved, [Machine] will agree to pay Dynamic a fine of $500.00 per day to be deducted from the balance owed to [Machine] for the cost of the machine.

Crepeau Aff. [Doc. No. 22], Ex. E, at 2.  Machine contends that as matter of law this Court should find that Dynamic is not entitled to recover the $500 per day penalty because Dynamic prevented Machine from completing commissioning of the machine and because the provision of the July Letter Agreement was not meant to be a punitive damages provision.  Def.'s Mem. at 16-18. Dynamic asserts that it should be able to recover the $500 per day for every day after and including September 20, 2003 because complete commissioning of the machine has not yet been achieved. Pl.'s Reply at 7-9.

"The interpretation of a contract is generally a question of law." Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999).  Unambiguous words in a contract must be construed in their ordinary and usual sense.  Fried v. Fried, 5 Mass. App. Ct. 660, 663 (1977).  The contract provision in question states that the penalty will accrue "until complete commissioning of the machine is achieved . . . ."  Crepeau Aff.,

19

Ex. E, at 2.  Revocation seems to be a situation not contemplated by the parties in formulating this agreement.  Were this provision interpreted to mean that punitive damages would accrue even in the case of revocation, two inequitable results would follow.  First, Dynamic would be encouraged to revoke its offer at the latest possible date in order to incur the largest possible amount of punitive damages.  Second, here the penalties cannot be "deducted from the balance owed to [Machine] for the cost of the machine" as explicitly stated therein for the simple reason that this Court has found that Dynamic has properly rejected the Johnford Lathe.  Dynamic's interpretation of the provision is thus unreasonable in the context of this case.  Dynamic has no doubt lost time and money pursuing performance of this purchase order.  Even so, for all the reasons that contract law does not penalize Dynamic for granting extensions, so too it does not penalize Machine for seeking in good faith (albeit ultimately failing) to perform over time.

## V.    CONCLUSION

In conclusion, this Court declares that Dynamic properly and timely revoked its December 9, 2003 letter extending the commissioning deadline, thus rendering Machine liable for breach of contract.  There is no persuasive evidence of a chapter 93A violation and Dynamic is not entitled to recover punitive damages based on the cited provision in the July Letter Agreement.

20

## IV.  ORDER FOR CERTIFICATION

Since the resolution of the determinative issue in this case depends on a question of Massachusetts law as to which there are no clearly controlling precedents in the decisions of the Supreme Judicial Court of Massachusetts, this Court respectfully certifies the following question to the Supreme Judicial Court of Massachusetts pursuant to its Rule 1:03:

> Under the Massachusetts version of the Uniform Commercial Code, does a buyer have a right to retract a written extension allowing more time for the seller to cure defects in a delivered product absent reliance on the extension by the seller?

This Court of course welcomes the advice of the Supreme Judicial Court of Massachusetts on any other questions of Massachusetts law deemed material to this case.

The Clerk will transmit this question and copies of the record, briefs, and appendices in this case to the Supreme Judicial Court of Massachusetts.

Further proceedings in this case will be stayed and the case administratively closed pending a response by the Supreme Judicial Court to the certified question.

SO ORDERED.


WILLIAM G. YOUNG
CHIEF JUDGE

21