_____

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT


Civil No. 04-10525-WGY
_____


DYNAMIC MACHINE WORKS, INC.

Plaintiff-Appellant

v.

MACHINE & ELECTRICAL CONSULTANTS, INC.

Defendant-Appellee
_____

RULE 1:03 Certified Question
From United States District Court
District of Massachusetts
_____

Brief of the Defendant-Appellee


_____

Jeffrey D. Clements (BBO # 632544)
Ingrid S. Martin (BBO # 653632)
Clements & Clements, LLP
50 Federal Street
Boston, MA 02110
617) 451-1800
Attorneys for Defendant-Appellee

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ....................................................... iii

I. STATEMENT OF ISSUES PRESENTED FOR REVIEW ...…............. 1

II. INTRODUCTION AND STATEMENT OF THE CASE ...…....….......1

III. SUMMARY OF ARGUMENT ….......................................…...............7

IV. STATEMENT OF THE FACTS ..............................…...…….....… 11

V. ARGUMENT ...................…....................................…................ 18

    A.    The Parties Modified the Contract to Extend the Commissioning Deadline to December 19 ...................….............................…......... 18

    B.    Under the Massachusetts Uniform Commercial Code A Buyer Does Not Have a Right to Retract a Written Extension Allowing More Time for the Seller to Cure Defects in a Delivered Product Where That Written Extension Constitutes A Modification of The Contract ...................................…................. 24

        1. Under the UCC A Modification Is Analytically Distinct From A Waiver And Serves Different Purposes ................… 24

        2. The District Court Erroneously Applied The Majority Opinion in Knife Works, Concerning Analytical Challenges in Section 2-209 That Have No Application To This Case ......................…..... 29

        3. Reliance, As With Consideration, Is Not A Measure of Whether A Party Is Bound By A Written Agreement To Extend A Performance Deadline .............. 35

4. Public Policy And the Goals of the
   UCC Are Served By Holding That A
   Buyer Who Signs An Agreement Extending
   A Contract Deadline May Not
   Unilaterally Revoke That Agreement,
   Regardless of Reliance ............................ 39

VI. CONCLUSION .................…...................................... 46

CERTIFICATE OF SERVICE ...........…............................…........47

## TABLE OF AUTHORITIES

### Cases

A. Leo Nash Steel Corp. v. Southern New England Steel
  Erection Co., Inc., 9 Mass. App. Ct. 377, (1980)...19
Besicorp Group, Inc. v. Thermo Electron Corp., 981 F.
  Supp. 86, (N.D.N.Y. 1997) .......................19
BMC Industries,Inc. v. Barth Industries, Inc., 160
  F.3d 1322, 1333 (11th Cir. 1998)................... 33
Cambridgeport Savings Bank v. Boersner, 413 Mass.
  432, 438-40 (1992) ............................... 26
Canal Electric Company v. Westinghouse Electric
  Corporation, 406 Mass. 369 (1990).............. 29
Central Illinois Public Service Co. v. Atlas
  Minerals, Inc., 965 F.Supp. 1162, 1173, n. 3 .. 24, 26
Cesco Mfg. Corp. v. Norcross, Inc., 7 Mass. App. Ct.
  837, (1979) ...................................... 20
DeBlois v. Boylson & Tremont Corp., 281 Mass. 498,
  (1933) ........................................... 20
First Pa. Mortgage Trust v. Dorchester Sav. Bank, 395
  Mass. 614, 625 (1985) ............................ 26
Gishen v. Dura Corp., 362 Mass. 177, (1972)........ 19
Green Construction Co. v. First Indemnity of Am. Ins.
  Co., 735 F.Supp. at 1261 n. 5 ................. 24, 25
Loranger Construction Corp. v. E.F. Hauserman Co.,
  376 Mass. 757 (1978) .........................27, 36
Niagara Fire Ins. Co. v. Lowell Trucking Corp., 316
  Mass. 652, 657 (1944) ............................ 27
Rhode Island Hosp. Trust Nat. Bank v. Varadian, 419
  Mass. 841, 849 (1995) ...................... 27, 36, 37
Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41,
  (1991) ........................................... 19
Uncle Henry's Inc. v. Plaut Construction Co., Inc.,
  ___ F.3d ___, 2005 WL 407394 (1st Cir. 2005) ...... 20
Wisconsin Knife Works v. National Metal Crafters, 781
  F.2d 1280 (7th Cir. 1986).......... 3, 9, 29-34, 36-37

### Statutes

28 U.S.C. §1446(d) ............................... 2

28 U.S.C. §1332 .................................. 2
Mass. Gen. Laws Ch. 93A .......................... 2
Mass. Gen. Laws Ch. 106 ...... 19-21, 27, 34, 41-42, 44

**<u>Other Authorities</u>**

E. Allan Farnsworth, <u>Farnsworth on Contracts</u> §8.5 at
  375 (1990) ........................................ 26

James J. White & Robert S. Summers, <u>Uniform</u>
  <u>Commercial Code</u>, § 1-6 ........................ 21-36

R. Anderson, <u>Uniform Commercial Code</u>, § 1-203 .... 6, 21, 41

R. Anderson, <u>Uniform Commercial Code</u>, § 2-201 ...... 20

R. Anderson, <u>Uniform Commercial Code</u>, § 2-208
  .......6, 23, 39

R. Anderson, <u>Uniform Commercial Code</u>, § 2-209 .... 3,
  5-8, 19-21, 23-25, 27, 29, 32-36, 38-39, 41

R. Anderson, <u>Uniform Commercial Code</u>, § 2-302 .... 6, 21, 41-42

## I.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

Chief Judge Young of the United States District Court for the District of Massachusetts has certified the following question to this court under Rule 1:03:

> Under the Massachusetts version of the Uniform Commercial Code, does a buyer have a right to retract a written extension allowing more time for the seller to cure defects in a delivered product absent reliance on the extension by the seller?

## II.  INTRODUCTION AND STATEMENT OF THE CASE

This matter concerns a certified question from the United States District Court for the District of Massachusetts (Young, C. J.) (the "District Court") under Supreme Judicial Court Rule 1:03, and arises from a commercial dispute involving the purchase by Plaintiff-Counterclaim Defendant Dynamic Machine Works, Inc. ("Dynamic") from Defendant-Counterclaim Plaintiff Machine & Electrical Consultants, Inc. ("Machine") of a machine lathe, a Johnford HT-275G Heavy Duty Turning Center (the "Johnford Lathe" or the "machine").

In the District Court, Dynamic alleged that although Machine delivered the Johnford Lathe, Machine "did not meet the Commissioning Deadline and was unable to get the Johnford Lathe to meet the

1

specifications and correct the problems identified."[1]
Appendix at 2.  In its Answer and Counterclaim,
Machine denied that it was in breach of the parties'
agreement, and alleged that Dynamic breached the
contract by failing to pay for the Johnford Lathe.
Appendix at 13-14.

Dynamic notified Machine by letter dated December
11, 2003 that it was rejecting, or revoking acceptance
of, the Johnford Lathe because the machine had not
been commissioned and failed to meet specifications.
Appendix at 49.  The parties dispute whether the
Commissioning Deadline for the Johnford Lathe was
September 19, 2003, as set forth in a July 8, 2003
letter from Dynamic's president confirming "a verbal
understanding," or December 19, 2003, as set forth in
a second letter from Dynamic's president, dated
December 9, 2003.  Appendix at 190-91.  The District

---

[1]    Dynamic filed the Complaint in the Massachusetts
Superior Court for the County of Middlesex, and
Machine removed the action to the District Court
pursuant to 28 U.S.C.  §§1446(d) and 1332. (Appendix
at 212).  In Counts II and III of its Complaint
Dynamic alleged breach of contract and warranty, while
Count I sought Declaratory Judgment concerning the
same allegations.  In Count IV, Dynamic claimed that
Machine violated Mass. Gen. Laws ch. 93A.  (Appendix
3-6).  The District Court allowed Machine's Cross-
Motion for Summary Judgment finding "no persuasive
evidence of a chapter 93A violation. . .."  (Appendix
at 231).

Court, taking the parties' summary judgment filings as a case stated, concluded that although "[o]n December 9, 2003, Dynamic agreed [in writing] to a revised commissioning date of December 19, 2003," Dynamic "properly and timely revoked its December 9, 2003 letter extending the commissioning deadline, thus rendering Machine liable for breach of contract." Appendix at 218, 231.

In arriving at the surprising conclusion that a signed agreement could be unilaterally revoked, the District Court considered whether Dynamic's written and signed confirmation of the December 19, 2003 Commissioning Deadline was a binding modification of the contract, or whether it was a waiver under sections 2-209(4) or (5) of the Massachusetts Uniform Commercial Code ("UCC"), subject to revocation in the absence of reliance. Appendix at 222-25. In the course of its analysis, the District Court noted the sharply contrasting views expressed in Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir. 1986) by Judge Posner, for the majority, and, in dissent, Judge Easterbrook, concerning whether an unwritten "attempt at modification," where the contract required modifications to be in writing,

3

constituted a waiver in the absence of reliance.
Appendix at 226.  The District Court ultimately set
aside the question of any analytical distinction
between an irrevocable modification and a revocable
waiver, and instead concluded that Dynamic's
"revocation of the agreement, whatever name the
parties would like to assign it, was within Dynamic's
rights."  Appendix at 224.

Recognizing the unprecedented nature of this
approach in Massachusetts, the District Court
certified the following question to this Court:

> Under the Massachusetts version of the
> Uniform Commercial Code, does a buyer have a
> right to retract a written extension
> allowing more time for the seller to cure
> defects in a delivered product absent
> reliance on the extension by the seller?

For the following reasons, Machine respectfully
requests that the Court reply in the negative, and
affirm that a signed writing confirming agreement to
extend a contractual deadline for performance is a
modification rather than a waiver, and cannot be
unilaterally revoked prior to the extended deadline
for performance:

1.    An undisputed signed agreement confirming
conduct and communications of the parties about mutual

4

understanding of a contract deadline is a
modification, not a unilateral waiver of a term.
Permitting unilateral revocation of a modification – a
mutual agreement by definition – in the absence of
unconscionablity or bad faith would be without
precedent.

2.  Permitting retraction of a signed agreement
to modify a contractual term would eliminate the clear
analytical distinction between "modification" and
"waiver" under the UCC and the common law.

3.  Introduction of the concept of reliance, a
common substitute for consideration, into the question
of whether a modification can be retracted is
inconsistent with Section 2-209(1) of the UCC, which
makes modifications binding without consideration.

4.  Assuming, as the certified question does,
that a seller does not rely on an unequivocal signed
writing that extends a commissioning or other
contractual deadline is unrealistic and unfair because
such a signed writing will almost always reflect
previous and ongoing efforts of the seller to perform,
and some indicia of reliance will almost always be
present.

5

5.    Rather than permitting unilateral revocation of a signed extension based on the buyer's change of mind, or even a buyer's new perception of facts, the better way to police overreaching or unfair claims of modification of contract deadlines is through Sections 2-302 and 1-203 of the UCC which permits courts to disregard purported modifications based on unconscionablity and bad faith.

Accordingly, Machine respectfully proposes that this Court answer the certified question as follows:

Under Section 2-209 of the Massachusetts Uniform Commercial Code, the written extension of a contract deadline, signed by the party against whom it is sought to be enforced, is a binding modification of the parties' original contract. Accordingly, a buyer who signs such a written extension, absent sufficient evidence that the writing is merely a unilateral waiver, cannot retract that extension prior to the new deadline, regardless of whether the seller has materially relied on the new deadline.  The enforceability of such a valid modification is subject only to a showing of bad faith or duress.

The test of reliance outlined in Section 2-209(5) only applies if the buyer has merely waived, rather than modified, the contractual deadline. Such a waiver, in turn, only exists if sufficient evidence of modification – whether a writing or other evidence otherwise sufficient under Section 2-208 – is lacking.  In the instant case, Section 2-209(5) is inapplicable because the buyer memorialized the extension in a signed writing, thereby confirming in a valid modification under 2-209(1), which requires no consideration or reliance to be binding.

6

## III. <u>SUMMARY OF ARGUMENT</u>

Dynamic and Machine agreed to a binding modification of their contract which extended the commissioning deadline for the lathe to December 19, 2003. Under UCC Section 2-209, a modification does not need consideration to be binding. <u>Argument</u> at 18-20. Instead, the UCC and common law establish that a modification is valid and binding if: 1) it satisfies the Statute of Frauds, 2) where applicable, it satisfies the contract's requirement that all modifications be in writing, 3) the parties mutually assent, and 4) the new contract terms are sufficiently definite. <u>Argument</u> at 19-20. Here, the parties' agreement to extend the commissioning deadline met all four of these requirements. After discussion, the parties mutually agreed to extend the deadline to December 19, and this new agreement was memorialized in a signed letter sent by Machine to Dynamic. <u>Argument</u> at 21-23.

The extension of the deadline to December 19 is a modification under UCC Section 2-209(1) and the District Court erred by treating it as a retractable waiver under Sections 2-209(4) and 2-209(5). <u>Argument</u> at 24-25. Modification and waiver are distinct terms

which serve separate functions under the UCC.
Argument at 25-27.  The key difference between the two
terms is that a modification is the product of mutual
assent, while waivers are unilateral.  Id.  As a
result, one party's waiver of a contract term is not
binding under UCC Section 2-209(5) until the other
party has reasonably relied on that waiver.  Argument
at 25-26.  In contrast, because a modification
requires mutual assent, the additional requirement of
reliance is unnecessary.  Argument at 26-27.

   Although the District Court's decision rests
heavily on the discussion of Section 2-209 by Judge
Posner in Wisconsin Knife Works v. National Metal
Crafters, 781 F.3d 1280 (7th Cir. 1986), the holding
in that case is not directly applicable to this
matter.  Argument at 29-32.  In Knife Works the
dispute centered on whether an oral modification could
be valid where the parties' contract required all
modifications to be in writing.  Argument at 30-32.
Here, the parties' contract does not require
modifications to be in writing, but Dynamic's
president nevertheless memorialized the new term in a
signed writing.  Argument at 32.  Since the parties'
modification is in writing, Judge Posner's concerns

about fabrication and creating an end-run around
contract clauses requiring modifications to be in
writing do not apply.  <u>Argument</u> at 33-34.

A written modification under the UCC does not,
and should not, require reliance.  <u>Argument</u> at 35-39.
Reliance is a common substitute for consideration, and
the UCC expressly rejects consideration as a
prerequisite for a valid modification.  <u>Argument</u> at
35-36.  The function of reliance is largely to provide
evidence of a common understanding or agreement
between two contracting parties.  <u>Argument</u> at 37.
Here, where a writing provides evidence of the
parties' mutual assent to the extension of the
commissioning deadline, no such additional test is
needed.  <u>Argument</u> at 37.  Additionally, creating a
rule which would allow a contracting party to
unilaterally retract a valid modification so long as
the other party has not relied on the modification
would be unwise and unworkable as a matter of policy.
<u>Argument</u> at 37-38.  Reliance is difficult to measure
and requiring a showing of reliance would introduce
unnecessary complications where parties have agreed to
a modification in writing.

The goals of public policy and of the UCC are best served by a rule which does not allow unilateral revocation of a written modification.  Argument at 39-41.  The UCC, consistent with common law, makes a distinction between modifications and waivers, and this distinction must be preserved to avoid confusion and uncertainty in an array of contract principles. Argument at 40.  Introducing a reliance requirement where there is a written modification also would be unjust because a written contract modification almost always will reflect ongoing efforts by the benefiting party to perform the contractual obligation and requiring additional, express acts of reliance would be an unnecessary burden.  Argument at 40-41. Instead of adding such a new layer of complication, modifications should continue to be policed by the tests of bad faith and unconscionablity.  Argument at 41.

Holding Dynamic to its written modification is not an undue hardship on Dynamic, and it will enhance, not impede, parties' ability to achieve "optimal timing" of contract performance.  Argument at 42-43. When Dynamic memorialized the extension of the deadline, it had the bargaining power to make the

extension conditional, yet it chose to agree to the
extension of the Commissioning Deadline without
conditions or reservations.  These types of decisions
regarding extensions of performance are best left to
the parties so that they can adapt to changing
circumstances.  Argument at 43-44.  Allowing parties
the ability to enter into binding modifications allows
needed flexibility in business transactions.  Argument
at 45-46.

### IV.   STATEMENT OF FACTS[2]

Dynamic, located in Billerica, Massachusetts is a
manufacturer of precision components for military,
aerospace, nuclear, chemical, oil, and other major
industries.  Appendix at 23, 64.  Machine is a
distributor of heavy machinery and turning equipment
and is located in Biddeford, Maine.  Id. at 64.

Sometime before January 2003, Dynamic solicited
proposals from Machine for a CNC lathe that would be
capable of machining seven meter (approximately twenty
three feet) long round cylinders with an accuracy of ±

---

[2] This recitation of facts is taken from that contained
in the District Court's January 3, 2005 Memorandum and
Order.  See Appendix at 214-220.  Citations to the
record have been replaced with the appropriate
citations to the Appendix prepared by Dynamic and
submitted to this Court.

.0005" over their entire length.  Appendix at 23-24.

On or about January 3, 2003, Machine submitted a

proposal and specifications to Dynamic for the sale of

the Johnford Lathe for $355,000.  Id. at 24, 179-84.

The Johnford Lathe was designed to machine lathe

tubular cylinders, such as missile capsules, up to

twenty three feet in length.  Id. at 65.  The machine

uses angled "guideways" for the lathing of the metal

and thus is described as a "slant bed," in contrast to

a "flat bed."  Id.  Roundtop Machinery Industries,

Co., Ltd., doing business as Johnford, manufactured

the Johnford Lathe in Taiwan.  Id.  Johnford sells its

lathes in the United States through Absolute Machine

Tools, Inc., located in Lorain, Ohio ("Absolute").

Id.  Absolute prepared ninety nine percent of the

specifications in the proposal of January 3, 2003.

Id.

     On or about January 13, 2003, Dynamic issued a

purchase order to Machine for the Johnford Lathe and

other related equipment.  Appendix at 24, 185-86.

Pursuant to the terms of this purchase order, Dynamic

agreed to pay $355,000 for the Johnford Lathe, with a

down payment of $29,500, a second payment of $148,000

upon delivery, and a third and final payment of
$177,500 after acceptance.  Id. at 66, 185.

When Machine received confirmation of Dynamic's
purchase order and the down payment of $29,500, it
placed an order for the Johnford Lathe with Absolute,
which in turn placed the order with Johnford in
Taiwan.  Appendix at 66.  According to the terms of
the purchase order, the delivery date for the Johnford
Lathe was to be May 15, 2003.  Id at 24, 185.  Until
that time, Machine provided Dynamic rental of a
Johnford ST-60B lathe.  Id. at 24, 186.  On or about
February 28, 2003, Dynamic notified Machine that it
was having problems with the rented Johnford ST-60B
lathe.  Id. at 24, 45.  Dynamic further advised that
if these problems were not addressed in the new
Johnford Lathe, it would be rejected.  Id.

Meanwhile, production of the machine in Taiwan
was delayed for reasons beyond the control of Machine,
including the SARS epidemic.  Appendix at 66, 174.  In
or around April 2003, Machine notified Dynamic that
the anticipated May 15, 2003 delivery date would not
be met and that delivery would occur some time in
June.  Id. at 24.  In June 2003, Johnford informed
Absolute and Machine that:

13

the SARS epidemic in Taiwan has caused many
unexpected problems for our company.  There
has [*sic*] been many restrictions on work and
travel and it has been difficult dealing
with our subcontractors and getting this
done on time.  Now that the SARS is just
about over, things are finally returning to
normal schedule and we expect to have this
machine finished and shipped out b[y] middle
of Aug[ust].

Id. at 66-67, Defendant's Opposition to Motion to

Dismiss, Crepeau Aff., Ex. G.[3]  In letters dated June

26, 2003 and July 8, 2003, Dynamic and Machine

confirmed agreements to continue with the purchase and

sale of the Johnford Lathe and agreed to extend the

shipping deadline to August 15, 2003, and the

commissioning deadline to September 19, 2003.  Id. at

67, 187-89.  The July letter ("July Letter Agreement")

laid out further arrangements regarding the purchase

and sale of the Johnford Lathe.  Id.

     The July Letter Agreement also provided as

follows:

- Before shipping, Dynamic would receive a factory-
  performed accuracy test report, including "actual
  measurements for axis accuracy in positioning and
  repeatability as well as applicable standards in
  spindle error limitations."

- The Johnford Lathe would be capable of meeting
  certain specific tasks, including CNC system
  displays, a 5" diameter boring bar reaching a

---

[3] Dynamic appears to have inadvertently omitted Exhibit
G of the Crepeau Affidavit from the Appendix.

minimum -.1875" position in the X axis, and
conveyor system for removal of chips.

- Complete commissioning would be accomplished by
  September 19, 2003.

- If the commissioning deadline was not met,
  "[Machine] will agree to pay Dynamic a fine of
  $500.00 per day to be deducted from the balance
  owed to [Machine] for the cost of the machine."

- Dynamic's second payment (40% of purchase price)
  of $148,000 would be due upon commissioning, with
  the balance 30 days from commissioning.

Appendix at 24-25, 67, 188-89.  Providing all of these
specifications were met, Dynamic agreed that it would
not cancel the purchase order of the Johnford Lathe.
Id. at 24, 188.

Following agreement on this revised schedule,
Machine provided Dynamic with the factory-performed
accuracy report on July 29, 2003.  Appendix at 68,
174.  Dynamic accepted this report, and on August 15,
2003, Johnford shipped the Johnford Lathe by sea from
Taiwan to New York as agreed.  Id. at 68.  Machine
delivered the Johnford Lathe by truck from New York to
Dynamic on October 9, 2003.  Id.  After receipt of the
Johnford Lathe, Dynamic "lagged" or bolted it to the
floor and connected it to air and electrical supply
lines.  Id.  Dynamic completed the necessary
preliminary work in mid- to late-October, at which

15

point Machine technicians began working with Dynamic employees to commission the machine.  Id.

During the commissioning, Machine hired Oxford Engineering Company, Inc. ("Oxford") to conduct laser testing to determine the horizontal and vertical alignment of the ways over which the cutting tool travels.  Appendix  at 68.  Jack Grosberg ("Grosberg"), the President of Oxford, conducted testing during the month of November, and stopped testing on November 26, 2003.  Id. at 68-69.  No one from Oxford conducted any work or inspections on the Johnford Lathe after November 26, 2003. Id. at 69. After November 26, 2003, Machine service technicians and Dynamic employees continued to make adjustments to the Johnford Lathe to improve its performance.  Id. at 69.

On December 9, 2003, Dynamic agreed to a revised commissioning date of December 19, 2003.  Appendix at 69, 190-191.  Dynamic's president, Ven Fonte ("Fonte"), confirmed this agreement in a writing which read as follows: "As I stated to you early this morning on the telephone, we will grant you one last and final deadline for this machine to be fully and

16

unconditionally commissioned by the close of business day, Friday December 19, 2003." Id. at 191.

The next morning, December 10, 2003, Fonte learned for the first time that a five-inch bar was not able to be cut to the center as had been expected. Appendix at 194. Furthermore, on this morning, Fonte became aware of the results of a test revealing that alignment of the Johnford Lathe was approximately eight and one-half thousandths off the specifications required. Id. Responding to these developments, Dynamic notified Machine that it intended to retract its decision to allot Machine a time-extension to finish commissioning the Johnford Lathe, and rejected the Johnford Lathe in its entirety. Id. The following day, on December 11, 2003, Dynamic sent a written confirmation of its rejection, specifying that it "hereby rejects or revokes any acceptance of the above-referenced lathe." Id. at 25, 49, 69. Machine had not relied on the December 9, 2003 written extension in any way prior to the December 11, 2003 written rejection.[4]

---

[4] Machine respectfully disagrees with the District Court's conclusion that Machine did not rely on Dynamic's agreement to extend the Commissioning Deadline. Machine relied on both the parties' oral

17

Dynamic requested return of its down payment of $29,000 as well as payment of a $500 per day penalty in the amount of $41,000. Appendix at 25, 49. Dynamic also requested instructions as to the disposition of the Johnford Lathe and indemnity sufficient to cover the expense of complying with any such instructions. Id. at 25, 49. In response, Norman Crepeau ("Crepeau"), the Vice President of Machine, contacted Fonte and told him not to do anything until Crepeau spoke with Absolute. Id. at 69. On December 15, 2003, Crepeau and personnel from Absolute arrived to continue commissioning the Johnford Lathe, but Dynamic had already dismantled and moved the machine. Id. at 70.

## V.    ARGUMENT

### A.    The Parties Modified the Contract to Extend the Commissioning Deadline to December 19.

Dynamic and Machine extended the commissioning deadline through a valid, binding modification. The

---

understanding prior to December 9, 2003 that it should continue with costly commissioning efforts, and upon the December 9, 2003 written confirmation of the December 19, 2003 Commissioning Deadline. Machine does not ask this Court to resolve these factual issues, but discusses below the hazards of judging the permissibility of revoking a written agreement on the basis of whether sufficient reliance has occurred. See infra. at 35-39.

UCC does not specifically define the term
"modification," but the UCC and ample case law in
Massachusetts demonstrate that four factors determine
whether the parties have mutually agreed to a binding
modification of executory (or unperformed) contract
terms.  First, under Section 2-209(3) the new term
must satisfy the Statute of Frauds as set forth in
Section 2-201.  Second, Section 2-209(2) permits – but
does not require – parties to agree that any
modifications must be made in writing in order to be
binding.  Third, a party seeking to enforce the new
contract term must be able to establish that the
parties mutually assented to the modification.  See
Gishen v. Dura Corp., 362 Mass. 177, 121 (1972) (under
common law, valid modification requires mutual
assent); Schinkel v. Maxi-Holding, Inc., 30 Mass. App.
Ct. 41, 47 (1991) (valid modification exists where
parties' conduct indicated agreement to new term); A.
Leo Nash Steel Corp. v. Southern New England Steel
Erection Co., Inc., 9 Mass. App. Ct. 377, 383 (1980)
(modification valid where parties' conduct indicated
agreement); Besicorp Group, Inc. v. Thermo Electron
Corp., 981 F.Supp. 86, 98 (N.D.N.Y. 1997)
(Massachusetts law would not find a valid modification

under section 2-209 where one party had not assented
to the new term).[5]   Fourth, and related to the need
for mutual assent, a new term only functions as a
modification if its terms are sufficiently definite so
that both parties understand how the contract has been
altered.  See Cesco Mfg. Corp. v. Norcross, Inc., 7
Mass. App. Ct. 837, 840 (1979) (no valid modification
where parties had inconsistent understanding of
proposed new term).

In a departure from common law, the UCC
eliminated the requirement of consideration in order
to make a modification binding: "An agreement
modifying a contract within this Article needs no
consideration to be binding."  Mass. Gen. Laws c. 106,
§ 2-209.  Modified terms of a contract are binding on
the parties, and a party who attempts to revoke an
agreement to modify the contract and fails to perform
its obligations is in breach of the contract.  See
Uncle Henry's Inc. v. Plaut Construction Co., Inc.,
___ F.3d ___, 2005 WL 407394 (1st Cir. 2005) (valid
modification became binding contract term); DeBlois v.

---

[5] See Mass. Gen. Laws ch. 106, § 1-103 (common law
supplements UCC provisions).  See also Mass. Gen. Laws
ch. 106, § 1-201(3), defining "Agreement" under the
UCC.

Boylson & Tremont Corp., 281 Mass. 498, 508 (1933)
(after valid modification, new terms become the
parties' binding contract).

In departing from the common law requirement of
consideration to make a modification binding, the
drafters of the UCC did not neglect the need to guard
against abusive or unreasonable claims by a non-
performing seller that a term had been modified.  The
drafters recognized, as Messrs. White and Summers
colorfully put it, that "not all contract modifiers
are honest.  Extortionists, chiselers, and whiners
also come to feed at 2-209." See James J. White &
Robert S. Summers, Uniform Commercial Code, § 1-6 at
37 (4th ed. 1995).  The UCC polices modifications by
imposing measurements of bad faith and
unconscionablity under sections 1-203 and 2-302.  Id.
at 43 ("And judges can use Code sections 1-203 and 2-
302 on bad faith and unconscionablity to police those
who unjustly demand modifications or waivers.")

Here, Dynamic's signed writing and the undisputed
evidence of the parties' conduct, communications, and
the utter absence of bad faith or duress demonstrate
that Dynamic and Machine agreed to modify the contract
to change the Commissioning Deadline to December 19,

2003.  As the District Court found, "[o]n December 9,
2003, Dynamic agreed to a revised commissioning date
of December 19, 2003."  <u>Appendix</u> at 218.  The District
Court's conclusion rested on the undisputed evidence
that the president of Dynamic executed and delivered a
letter to Machine confirming a new, and final,
Commissioning Deadline: "As I stated to you early this
morning on the telephone, we will grant you one last
and final deadline for this machine to be fully and
unconditionally commissioned by the close of business
day, Friday December 19, 2003."  <u>Appendix</u> at 191.

    Dynamic's letter of December 9 was consistent
with a course of conduct and verbal understandings of
the parties showing mutual assent to extend the
Commissioning Deadline under the contract.  For
example, even after the July 2003 letter agreement
confirmed modified terms of the agreement, including a
September 19, 2003 Commissioning Deadline, Dynamic
accepted delivery of the Johnford Lathe on October 9,
2003, after both the original expected delivery date
and Commissioning Deadline.  <u>Appendix</u> at 218.  Machine
and Dynamic then took various actions to commission
the Johnford Lathe over the following weeks.  When
Dynamic confirmed in writing that the final

22

Commissioning Deadline was agreed to be December 19, 2003, Machine continued its efforts, and arranged to have a representative of Absolute join the commissioning effort.  This pattern of cooperative conduct was unbroken until Machine and Absolute representatives traveled to Dynamic on December 15, 2003, only to find that Dynamic had dismantled and moved the machine.  <u>Appendix.</u> at 70.

The new agreed-upon commissioning deadline memorialized in Dynamic's December 9, 2003 letter moved the matter out of section 2-208 course of conduct analysis, and into section 2-209 which provides that the letter was a valid modification which is binding without consideration.  The December 9 letter meets all four of the requirements for a valid modification outlined above.  First, it complies with the Statute of Frauds.  Second, even though the parties' contract did not require a writing for modifications to be valid, this modification was memorialized in a letter written and signed by Dynamic's president.  Third, the letter clearly demonstrates that both parties had discussed and agreed to the new commissioning deadline.  Fourth, there is no ambiguity about the meaning of this new

term – the parties have agreed to change the
commissioning deadline from September 19, 2003 to
December 19, 2003.[6]  The remaining questions concern
whether such a modification can be unilaterally
revoked, and whether the issue of reliance is relevant
to that determination.

      **B.   Under the Massachusetts Uniform Commercial
Code A Buyer Does Not Have a Right to
Retract a Written Extension Allowing More
Time for the Seller to Cure Defects in a
Delivered Product Where That Written
Extension Constitutes A Modification of The
Contract**

      **1.   Under the UCC, A Modification Is
Analytically Distinct From A Waiver And
Serves Different Purposes.**

As the District Court noted, the terms
"modification" and "waiver," are not synonymous.
Appendix at 224, citing Central Illinois Public
Service Co. v. Atlas Minerals, Inc., 965 F.Supp. 1162,
1173, n. 3 ("Waiver and modification are distinct
concepts."); Green Construction Co. v. First Indemnity
of Am. Ins. Co., 735 F.Supp. 1254, 1261 n. 5
("Modification and waiver are different legal

---

[6]  Judge Young's findings of fact are consistent with
this conclusion.  He writes, "On December 9, 2003,
Dynamic agreed to a revised commissioning date of
December 19, 2003. … Dynamic's president, Ven Fonte
('Fonte'), confirmed this agreement in [the December
9, 2003 letter]."  Appendix at 218.

concepts").  The District Court also correctly

described that under section 2-209(5) "a waiver (but

implicitly <u>not</u> a modification) may be retracted,

absent a material change in position by the other

party based on reliance."  <u>Appendix</u> at 222.

The District Court, however, erred by stating

that "Subsection (4) of section 2-209 reads that <u>a</u>

<u>modification</u> 'can operate as a waiver.'"   <u>Appendix</u> at

222 (emphasis added).  This is incorrect.  Section 2-

209(4) reads that "an <u>attempt</u> at modification . . .

can operate as a waiver."  The difference between "an

<u>attempt</u> at modification" and "a modification" is

significant because while an attempt may operate as a

waiver, and thus may be revocable in some instances,

an actual modification is a binding agreement and does

not "operate as a waiver" so as to permit retraction.

The fundamental distinction between modification

and waiver – a distinction that lies at the heart of

why modifications are binding, but waivers may be

revocable in some circumstances – is that

modifications are the product of mutual assent, while

waivers are unilateral. <u>Green Construction</u>, 735

F.Supp. at 1261 n. 5, <u>quoting</u> R. Anderson, <u>Uniform</u>

<u>Commercial Code</u>, § 2-209:39, at 333 (3d ed. 1982)

25

(Modification and waiver "differ from each other. . .
in that waiver is the result of the intention of the
one party who would otherwise have a right to insist
on adherence to contract terms or claim damage for
departure therefrom, whereas modification is the
result of the bilateral action of both parties to a
sales transaction."); Central Illinois, 965 F.Supp.
at 1173, n. 3, quoting 2 E. Allan Farnsworth,
Farnsworth on Contracts §8.5 at 375 (1990) ("If the
court asks whether the conduct of the parties amounted
to a 'modification,' it will determine whether there
was assent by applying the usual rules for the
formation of contracts; if the court asks whether the
conduct amounted to a 'waiver,' it may give effect to
more dubious manifestations of intent."). See also
Cambridgeport Savings Bank v. Boersner, 413 Mass. 432,
438-40 (1992) (affirming judgment notwithstanding
verdict in favor of lender because insufficient
evidence that parties reached an agreement to modify
interest payment terms), citing First Pa. Mortgage
Trust v. Sav. Bank, 395 Mass. 614, 625 (1985) (party
denying existence of modification had unequivocally
expressed approval of the new terms, thus evidencing
mutual agreement to modification).

In other words, while a waiver is usually a
unilateral act – "the intentional relinquishment of a
known right," Niagara Fire Ins. Co. v. Lowell
Trucking Corp., 316 Mass. 652, 657 (1944) –
modification is mutual.  The UCC reflects this
distinction.  Under Section 2-209(1) a valid
modification is binding without either consideration
or reliance.   In contrast, waivers can be
unilaterally retracted, unless the other party has
reasonable relied upon the waiver. See Mass. Gen. Laws
ch. 106, § 2-209(5).  The fact that reliance may
render a waiver irrevocable merely reflects
longstanding contract principles that reasonable and
foreseeable reliance may add sufficient mutuality to a
unilateral act (such as a waiver or a promise) so as
to bind a party.  See Rhode Island Hosp. Trust Bank v.
Varadian, 419 Mass. 841, 849 (1995) (when one party's
promise induces other party to act in reasonable
reliance, the promise is a binding commitment);
Loranger Constr. Corp. v. E.F. Hauserman Co., 376
Mass. 757, 760 (1978) (where reliance was reasonable
and foreseeable, parties are bound).

To say that waiver and modification are distinct
terms and concepts, of course, does not mean that the

two are easily distinguished in various factual scenarios.  For example, in this case, where the parties did not require modifications to be in writing, the parties' course of conduct and their communications before December 9, 2003 could have raised issues of fact about whether they intended to modify their agreement as to the commissioning deadline, or whether Dynamic had merely waived its right to insist on strict compliance with the previous September 19, 2003 commissioning deadline.  Dynamic's signed letter of December 9, 2003, however, ends these factual disputes, as all of the conditions necessary to constitute a modification now have been satisfied.

Dynamic appears to agree that overlooking the distinction between modification and waiver is not a sound approach.  Brief for Appellant ("Dynamic's Brief") at 10-14.  Dynamic, however, then argues that the signed letter is "an express waiver," based on disputed facts and undue inferences that disregard the District Court's finding that "Dynamic agreed to a revised commissioning date of December 19, 2003." Appendix at 218; Compare Dynamic's Brief at 15-20 and Memorandum and Order, Appendix at 218 ("Dynamic's president, Ven Fonte ('Fonte') confirmed this

28

agreement in a writing [the December 9, 2003 letter] .
. . .").

Under Rule 1:03 this Court confines its answers
to the undisputed facts, or at least to the facts
found by the District Court.  See Canal Electric
Company v. Westinghouse Electric Corporation, 406
Mass. 369, 371-72 (1990).  Certainly there are no
grounds to follow Dynamic's suggestion that the Court
set aside the District Court's factual premise to the
Certified Question that "Dynamic agreed to a revised
commissioning date of December 19, 2003,"  in order to
make a factual finding that the December 9 letter was
a waiver rather than a modification.

    2.    The District Court Erroneously Applied The
          Majority Opinion in Knife Works, Concerning
          Analytical Challenges of Section 2-209 That
          Have No Application To This Case.

The District Court observed that the strong
debate between Judges Posner and Easterbrook in
Wisconsin Knife Works v. National Metal Crafters, 781
F.2d 1280 (7th Cir. 1986), raised many questions about
the interrelationship of each of the five subsections
of section 2-209, and about modification and waiver of
contractual terms.  Appendix at 212, 222
("Specifically, judges and scholars alike have had

difficulty in reconciling the five subsections of section 2-209 to avoid superfluous and inconsistent interpretations . . . The difficulty comes in trying to distinguish between a modification and a waiver and the legal consequences of such a distinction.") Indeed, the District Court adopted language similar to Judge Posner's reasoning when it determined that it was unnecessary to distinguish between modification and waiver.  The District Court relied on Knife Works when it concluded that the "revocation of the agreement, whatever name the parties would like to assign it, was within Dynamic's rights."  Id. at 224. Compare 781 F.2d at 1286 ("Whether called modification or waiver, what National Metal Crafters is seeking to do is to nullify a key term other than by a signed writing.")

The Seventh Circuit Court of Appeals' decision in Knife Works, however, involved markedly different issues and facts than those of this case, where a signed, written agreement extended the period of performance.  In Knife Works, the buyer, Wisconsin Knife Works, agreed to purchase raw metal from the seller, National Metal Crafters, so that Wisconsin Knife Works could manufacture spade bits.  The parties

30

agreed in writing to a series of delivery dates for
the metal.  Further, the parties agreed in writing
that "No modification of this contract shall be
binding upon Buyer [Wisconsin Knife Works] unless made
in writing and signed by a Buyer's authorized
representative."  781 F.2d at 1283.  The seller,
National Metal Crafters, missed two deadlines for
delivery.  The buyer, Wisconsin Knife Works, did not
declare a breach or cancel the contract, and even
placed additional purchase orders.  Later, however,
Wisconsin Knife Works cancelled the contract, and
initiated a breach of contract action based on the
missed deadlines.  In response, National Metal
Crafters argued that the contract had been modified as
to the delivery dates by oral understandings or by
conduct.  Id. at 1283-84.

At trial, the jury decided that the contract had
been modified, and that National Metal Crafters was
not in breach.  Id. at 1283.  The issue in Knife
Works, therefore, was whether the trial court erred by
permitting the jury to consider whether "the contract
could be modified orally or by conduct," where the
parties had explicitly required that the contract
could not be modified except by a writing "signed by a

31

Buyer's authorized representative." _Id._ at 1283-84.
The majority opinion, written by Judge Posner,
concluded "that the clause forbidding modifications
other than in writing was valid and applicable and
that the jury should not have been allowed to consider
whether the contract had been modified in some other
way." _Id._ at 1285.

The contrast with this case could not be more
stark. Here, a writing signed by the Buyer's
authorized representative was _not_ required to modify
the delivery date or Commissioning Deadline, but
Dynamic's president _did_ sign exactly that kind of
writing. Dynamic and Machine never excluded unwritten
modifications of the Commissioning Deadline, or any
other term, and in fact appeared to have modified the
deadline term even without the signed writing of
December 9. Dynamic's signed letter of that date left
no doubt as to the modification issue.

As Judge Posner saw the matter in Knife Works,
"whether called modification or waiver, what National
Metal Crafters is seeking to do is to nullify a key
term other than by a signed writing. If it can get
away with this merely by testimony about an oral
modification, section 2-209(2) [permitting parties to

exclude unwritten modifications] becomes very nearly a
dead letter." Knife Works, 781 F.2d at 1286. His
first task, then, was to reconcile section 2-209(2)
(which clearly made the parties' exclusion of
unwritten and unsigned modifications valid) with
section 2-209(4), which provides that an "attempt at
modification" can operate as a waiver even if such an
attempt failed to satisfy the writing requirement of
section 2-209(2). 781 F.2d at 1286-1287.

Judge Posner's point that fine distinctions
between modification and waiver were less significant
than permitting a non-performing seller to end-run a
signed exclusion of unwritten modifications valid
under section 2-209(2) is understandable given the
facts of Knife Works. But see 781 F.2d at 1290-91
Easterbrook, J., dissenting (the suggestion that a
signed "waiver" can be retracted "gets things
backwards. A signed writing is binding as a
modification under section 2-209(2) [or 209(1)]
without the need for a "waiver.") See also BMC
Industries, Inc. v. Barth Industries, Inc., 160 F.3d
1322, 1333 (11th Cir. 1998) ("Judge Posner ignores a
fundamental difference between modifications and
waivers:  while a party that has agreed to a contract

modification cannot cancel the modification without giving consideration for the cancellation, a party may unilaterally retract its waiver of a contract term provided it gives reasonable notice." )[7]

The Knife Works decision and the difficulties with which Judge Posner was concerned have no application to this case. Here, a writing was not required by any of the documents reflecting the parties agreement in order to evidence a modification, and a writing nevertheless confirmed the extended Commissioning Deadline.  Indeed, Judge Posner distinguished a failed "attempt at modification," under section 2-209(4) from a "completed (not attempted) modification, which does not require reliance to be enforceable."  781 F.2d at 1288 (emphasis added).

The District Court erred by importing the Knife Works analysis, which focused on waiver and reliance

---

[7]   Judge Easterbrook's comments dismissing the notion of a "signed waiver" were in response to the following *dicta* of Judge Posner:  "Suppose that while the contract is still executory the buyer writes the seller a signed letter waiving some term in the contract and then, the next day, before the seller has relied, retracts it in writing; we have no reason to think that such a retraction would not satisfy section 2-209(5), though this is not an issue we need definitively resolve today."  781 F.2d at 2-209(5).

issues in order to reconcile section 2-209(4) and (5)
with section 2-209(2), where a late-delivering seller
claimed an attempted unwritten modification
notwithstanding the parties agreement that a writing
was required for modification.  As discussed further
below, importation of concepts of reliance and
revocability into a case where a written modification
exists even though none is required threatens to make
section 2-209(1) a dead letter, ensuring that even the
most explicit, signed modification may be challenged
with disputed, and until now irrelevant, testimony
about revocation and reliance.

   3.    **Reliance, As With Consideration, Is Not A
         Measure of Whether A Party Is Bound By A
         Written Agreement To Extend A Performance
         <u>Deadline</u>**.

     The question posed by the District Court in
effect asks whether under Massachusetts law a signed,
written agreement extending the date of performance
can be converted into a revocable waiver if the other
party has not relied on the written extension.  An
affirmative answer is inconsistent with the UCC, the
common law, and sound policy.

     First, reliance is a substitute for
consideration, a common law requirement for

modification that the UCC explicitly rejects.  M.G.L.
c. 106, § 2-209(1) (Modification needs no
consideration to be binding).  See Rhode Island Hosp.
Trust Nat. Bank v. Varadian, 419 Mass. 841, 849 (1995)
(discussing contract formation through reliance
instead of consideration); Loranger Construction Corp.
v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978)
(plaintiff's reasonable reliance on defendant's
promise created a binding contract).  The elimination
of the consideration requirement recognizes the
business reality that "Occasions commonly arise in
which it is neither unreasonable nor unjust to allow a
party to benefit from a modification without paying
anything further."  See James J. White & Robert S.
Summers, Uniform Commercial Code, § 1-6 at 37 (4th ed.
1995). The application of a reliance test to an
undisputed written extension of a contract term cannot
be reconciled with section 2-209(1), which makes
contractual modifications binding without
consideration. As Judge Easterbrook observed in
dissent in Knife Works, "§ 2-209(1) of the UCC
provides that consideration in unnecessary to make a
modification effective.  The introduction of a
reliance requirement into a body of law from which the

36

doctrine of consideration has been excised is novel."
781 F.2d at 1290.

Second, the common law acceptance of reliance as
a substitute for consideration (and the consideration
requirement itself) in large measure rests on the
evidentiary need to ensure that a modification is the
product of mutual assent, rather than a unilateral
assertion excusing late performance or a concession
coercively obtained from a desperate buyer. See Rhode
Island Hosp. Trust Nat. Bank, 419 Mass. at 849
(reliance provides evidence that parties have made
binding commitment to one another); Knife Works, 781
F.2d at 1287 (reliance "is a common substitute for
consideration in making a promise legally enforceable,
in part because it adds something in the way of
credibility to the mere say-so of one party."). Here
an undisputed writing is signed by the party against
whom it is sought to be enforced, and there is no
evidence of bad faith, coercion or opportunistic
conduct by Machine.

Finally, adopting a rule permitting a party who
has signed an agreement modifying a contract term to
revoke that agreement if no reliance has occurred is
unwise and unworkable as a matter of policy. As in

37

this case, written modifications almost always
reflect, rather than anticipate, changed circumstances
and good faith efforts of sellers and buyers to adopt
agreed terms to changing commercial conditions.  As
such, reliance is almost always present.

While the District Court's question assumes no
reliance, substantial evidence of Machine's reliance
on the extension is reflected in the record.  For
example, the December 9 letter agreeing to extend the
Commissioning Deadline did not exist in isolation, but
reflected the parties' course of conduct and
conversations over many weeks in which Machine
invested time and money seeking to commission the
Johnford Lathe, justifiably relying on Dynamic's
expressed intention not to hold Dynamic strictly to
the original Commissioning Deadline.  Additionally,
after receiving the signed extension of the
Commissioning Deadline, Machine arranged to travel to
Massachusetts with an Absolute representative to
continue commissioning efforts.

Whether a party sufficiently relied on the
extension of a contract deadline is an unproductive
and unnecessary inquiry where the fact of the signed
extension is not in dispute.  Once the conditions of

modification under section 2-209 and common law are
satisfied, the court's inquiry should be complete,
especially where the UCC has eliminated the need for
consideration to bind a party to a modification.

    **4.    Public Policy And the Goals of the UCC Are
Served By Holding That A Buyer Who Signs An
Agreement Extending A Contract Deadline May
Not Unilaterally Revoke That Agreement,
<u>Regardless of Reliance.</u>**

Machine respectfully requests that the Court
answer the certified question from the District Court
as follows:

> Under Section 2-209 of the Massachusetts Uniform
> Commercial Code, a written extension of a
> contract deadline, signed by the party against
> whom it is sought to be enforced, is a binding
> modification of the parties' original contract.
> Accordingly, a buyer who signs such a written
> extension, absent sufficient evidence that the
> writing is merely a unilateral waiver, cannot
> retract that extension prior to the new deadline,
> regardless of whether the seller has materially
> relied on the new deadline.  The enforceability
> of such a valid modification is subject only to a
> showing of bad faith or duress.

> The test of reliance outlined in Section 2-209(5)
> only applies if the buyer has merely waived,
> rather than modified, the contractual deadline.
> Such a waiver, in turn, only exists if sufficient
> evidence of modification – whether a writing or
> other sufficient evidence under Section 2-208 –
> is  lacking.  In the instant case, Section 2-
> 209(5) is inapplicable because the buyer
> memorialized the extension in a signed writing,
> thereby confirming a valid modification under 2-
> 209(1), which requires no consideration or
> reliance to be binding.

This approach has many advantages as compared to an approach that inevitably would require a *post hoc* labeling of something as a modification or waiver, depending on whether consideration of reliance and other disputed facts lead one or another factfinder to decide whether a party confirming an extension agreement can change its mind the next day.

First, an undisputed signed agreement confirming conduct and communications of the parties about the mutual understanding of an extended contract deadline is, as the District Court found, an agreement. By definition, such a writing is a modification under the UCC and case law. Permitting unilateral revocation of a modification in the absence of unconscionablity or bad faith would be without precedent, and would introduce confusion and uncertainty in an array of contract principles, from the basic concepts of offer and acceptance to the statute of frauds.

Second, as discussed above, permitting retraction of a signed agreement to a modified term would eliminate the significant and clarifying analytical distinction between "modification" and "waiver" under the UCC and the common law. Furthermore, introduction of the question of reliance, a common substitute for

consideration, into the question of whether a
modification can be retracted is inconsistent with
Section 2-209(1) of the UCC, which makes modifications
binding without consideration.

Third, assuming that a seller does not rely on an
unequivocal writing signed by the buyer extending a
commissioning or other contractual deadline is
unrealistic and unfair because such a signed writing
almost always reflects ongoing efforts of the seller
to perform the contractual obligation, or other
evidence of reliance.

Fourth, rather than permitting unilateral
revocation of a signed extension based on the buyer's
change of mind or new perception of facts, the better
way to police overreaching or unfair modifications of
contract deadlines is through Sections 2-302 and 1-203
of the UCC, permitting courts to disregard purported
modifications based on unconscionablity and bad faith.[8]

---

[8] As to Mass. Gen. Law ch. 106, §§ 1-203 and 2-103(1)(b)
(good faith), see Zapatha v. Dairy Mart, Inc., 381
Mass. 284, 289, n. 7 (1980)  ( "Generally, throughout
the Uniform Commercial Code, 'good faith' is defined
to mean 'honesty in fact in the conduct or transaction
concerned.' The definition of 'good faith' in the
sales article includes a higher standard of conduct by
adding a requirement that 'merchants' observe
'reasonable commercial standards of fair dealing in
the trade.") (citations omitted).  As to Mass. Gen.

These points are illustrated by the facts of this
case.  The parties had consistently engaged in
negotiations and revisions of their contract to adapt
to the ongoing difficulties that Machine and Dynamic
were having in commissioning the lathe.  On December
9, Dynamic and Machine again discussed these problems
and agreed to extend the commissioning deadline to
December 19.  Dynamic then memorialized this new
deadline in a letter.  If Dynamic was bound to this
new deadline, Machine either would or would not have
succeeded in commissioning the lathe by December 19.
To require Dynamic to wait ten days before dismantling
the lathe that the parties had worked to commission
would hardly be draconian, and might have avoided much
costly litigation about whether Machine could have
commissioned the lathe by the new deadline.

Holding Dynamic to its written modification is
not an undue hardship to Dynamic, nor does it raise
grave future implications.  When Dynamic negotiated

---

Laws Ch. 106, § 2-302 (unconscionable contract or
clause), see id. at 292-93 (". . .unconscionability
must be determined on a case by case basis, giving
particular attention to whether, at the time of the
execution of the agreement, the contract provision
could result in unfair surprise and was oppressive to
the allegedly disadvantaged party." (citations
omitted)).

the extended commissioning deadline with Machine, it
could have conditioned the extension on action by
Machine.  For example, it could have written that "on
the condition that Machine arrives with technical
personnel from Absolute by December 15, Dynamic agrees
to extend the commissioning deadline to December 19."
There is no evidence that Dynamic did not have the
bargaining power to insist on such terms.  To the
contrary, Dynamic had ordered a unique good which
Machine could not readily resell to another customer,
so when Dynamic rejects the lathe, Machine has no
readily available way to mitigate its losses.

Finally, as discussed above, while the District
Court found no reliance by Machine on the December 9
letter, this issue is not so readily resolved.  Once
Dynamic confirmed its agreement of the December 19th
Commissioning Deadline, Machine continued its
commissioning efforts and, in addition, began the
process of bringing personnel from Absolute to Dynamic
on December 15 to assist with the process.  <u>See
Appendix</u> at 219-20.

Although the District Court identifies several
policy reasons to support its reasoning, those
policies actually support a finding in Machine's

43

favor. While the District Court properly raised
concerns relating to the "optimal timing" of contract
performance, this concern is not undermined by giving
proper effect to the parties' modification of the
commissioning deadline. Appendix at 225.  In its
opinion, the District Court writes that one of the
fundamental functions of contract law "is to deter
people from behaving opportunistically toward their
contracting parties, in order to encourage the optimal
timing of economic activity ... ."  Id.  However, this
leaves open the question of what is the "optimal
timing" of contract performance.  Clearly, it is the
parties themselves who are in the best position to
determine what qualifies as "optimal timing" for
performance.  The buyer knows by when he must have a
certain good, and the seller knows by when he can
obtain and deliver that good.  At times, however,
unforeseen circumstances will arise, and will render
the original timing unreasonable or even impossible.
The parties then should reopen discussions and
determine whether, in light of the new circumstances,
a new agreement on "optimal timing" can be reached.
See also Mass. Gen. Laws ch. 106, § 2-615 (allowing
seller to delay delivery where delivery has been made

44

"impracticable" by failure of a contingency).  It is only by allowing parties to modify their contract to adapt to changing circumstances that the goal of optimal timing can be maintained.

The District Court also expressed a related concern that precluding revocation of a buyer's written extension of a contract deadline could unduly burden an innocent party. The District Court writes that making the December 19 deadline a binding contract term would "unjustifiably punish Dynamic for trying to alleviate the situation through means other than litigation." Appendix at 225.  The District Court adds that its holding serves, in part, to protect "innocent parties who patiently try to resolve issues before resorting to litigation . . . ." Appendix at 227.

These concerns, however, are misplaced here where Dynamic voluntarily wrote and signed a letter memorializing its agreement to a new commissioning deadline, and agreement that was consistent with the parties' conduct and communications up until that point.  A party who does not wish to relinquish its right to insist on the earlier deadline should not set down an agreement to the contrary.  If Dynamic had not

45

written the December 9 letter, then the District
Court's concern that Dynamic was an innocent party who
had merely waived its right to the earlier deadline
could have some support in the record, although
Machine have a different view.  However, where Dynamic
expressly and without conditions or reservations
agreed in writing to a new deadline, it is hardly
"punishing" Dynamic to insist that it wait the
additional days to which it agreed.

Finally, the District Court's concern that
allowing the extension to become binding encourages
litigation is incorrect. First, Dynamic, not Machine,
initiated this litigation.  Second, allowing parties
to enter into binding modifications, and holding each
party to these modifications, allows needed
flexibility in business transactions.  Litigation is
not reduced by injecting uncertainty into valid
modifications.  Indeed, litigation would have been far
less likely had Dynamic simply complied with its own
promise to wait ten more days until December 19 before
unilaterally dismantling the Johnford Lathe.

## VI.  <u>CONCLUSION</u>

For the reasons set forth herein, Machine
respectfully requests that the Court respond to the

certified question from the District Court in the
negative.

                        Respectfully submitted,

                        MACHINE & ELECTRICAL
                        CONSULTANTS, INC.

                        by its attorneys,


                        _____
                        Jeffrey D. Clements, BBO #632544
                        Ingrid S. Martin, BBO #653632
                        Clements & Clements LLP
                        50 Federal Street
                        Boston, MA 02110
                        (617)  451-1802


COUNSEL:

Keith R. Jacques
Smith Elliot Smith & Garmey, P.A.
199 Main Street
P.O. Box 1179
Saco, ME  04072

DATED:  March 15, 2005


                    **CERTIFICATE OF SERVICE**

I, Jeffrey D. Clements, hereby certify that a copy of the
foregoing document was served by hand to counsel of record for
the plaintiff on March 15, 2005.


                    _____
                    Jeffrey D. Clements